UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ROBERT THOUSAND,

                                        Plaintiff,
                                                                9:17-cv-1003
v.                                                              (BKS/TWD)

GREGORY KING; MICHAEL KIRKPATRICK;
JOHN MILLER,

                                        Defendants.
_____

APPEARANCES:                                    OF COUNSEL:

ROBERT THOUSAND
11-B-0026
Plaintiff, *pro se*
Eastern NY Correctional Facility
Box 338
Napanoch, NY 12458

HON. LETITIA JAMES                              JOHN MOORE, ESQ.
New York State Attorney General                 Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

## I.      INTRODUCTION

        This *pro se* civil rights action, brought under 42 U.S.C. § 1983, has been referred to the

Court for a report and recommendation by the Honorable Brenda K. Sannes, United States

District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule

("L.R.") 72.3(c).  Plaintiff Robert Thousand, an inmate in custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this action on September 8, 2017, alleging violations of his First, Eighth, and Fourteenth Amendment rights. (Dkt. No. 1.)  Following an initial review pursuant to 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A, only Plaintiff's First Amendment retaliation claims against Defendants King, Kirkpatrick, and Miller survived.  (Dkt. No. 9.)  Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (Dkt. No. 51) on the grounds that: (1) Plaintiff failed to exhaust his administrative remedies before commencing this action; (2) Plaintiff's First Amendment retaliation claim fails on the merits; and (3) Defendants are entitled to qualified immunity.  (Dkt. Nos. 51-9, 63-1.)  Plaintiff has filed responsive papers.  (Dkt. No. 59.)  For the reasons that follow, the Court recommends that Defendants' motion be granted, in part, and denied, in part.

## II.    FACTUAL BACKGROUND

At all times relevant to this action, Plaintiff was incarcerated at the Clinton Correctional Facility ("Clinton") in Dannemora, New York.  (Dkt. No. 1 at ¶ 4.[1])  Plaintiff claims Defendants King and Miller violated his First Amendment rights under the United States Constitution by retaliating against Plaintiff for engaging in constitutionally protected speech.  *Id.* at ¶ 198. Plaintiff also alleges supervisory liability on the part of Defendant Kirkpatrick.  (Dkt. No. 51-2 at 335.[2])

---

[1]  Paragraph references are used where the referenced document contains consecutively numbered paragraphs throughout.

[2]  Page references to documents identified by docket number are to the page numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

Plaintiff contends that his constitutionally protected speech began on May 1, 2016, with an informal complaint sent to Clinton's administration.  (Dkt. No. 1 at ¶ 47-48.)  He further claims Defendant King retaliated against him by filing a false Inmate Misbehavior Report ("MBR") on May 4, 2016, charging Plaintiff with fighting.  (Dkt. No. 59 at ¶¶ 36, 38.)  Plaintiff also claims Defendant Miller retaliated against him by rendering a guilty verdict at a disciplinary hearing held on the MBR.  (Dkt. No. 1 at ¶ 201.)  Defendants deny any retaliatory motive.  (Dkt. Nos. 51-3 at ¶ 17; 51-5 at ¶ 11; 51-6 at ¶ 27.)

### A.    Informal Complaint

On May 1, 2016, Plaintiff wrote a letter to "the entire Administration team" at Clinton expressing his concern that facility staff members were retaliating against him.  (Dkt. No. 1 at ¶ 18.)  In this letter, Plaintiff explained he was pursuing a civil action arising out of an incident he experienced "in another facility."  (Dkt. No. 51-2 at 46-49.)  Plaintiff further claimed that, as retaliation for his pursuit of legal remedies, Clinton staff members had interfered with his legal mail and subjected him to poor living conditions.  *Id.*  Finally, Plaintiff acknowledged he was "required to exhaust [his] administrative remedies" and would therefore file a grievance on the matter.  *Id.*

### B.    Misbehavior Report and Tier II Disciplinary Hearing

On May 4, 2016, Plaintiff was at work at his regularly assigned job with Clinton's Industrial Tailor Shop No. 5 when a fight broke out among inmates.  (Dkt. No. 1 at ¶ 59.)  Plaintiff maintains that he "had absolutely nothing to do with" the fight.  *Id.* at ¶ 61.  However, Defendant King, a Sergeant, thereafter wrote an MBR, stating Plaintiff "punched and kicked" another inmate "several times" and charging Plaintiff with a rule violation.  (Dkt. No. 51-7 at ¶¶

36-38.)  Defendant Miller, a Lieutenant, later conducted the Tier II disciplinary hearing on the

MBR.  *Id.* at ¶ 53.

At the hearing, Plaintiff argued Defendant King falsified the MBR as a form of retaliation

against Plaintiff.  *Id.* at ¶ 66.  Defendant Miller allowed Plaintiff to call and question witnesses to

support his contentions.  (Dkt. No. 51-6 at 27-35).  In particular, Plaintiff called another inmate,

who testified Plaintiff was not involved in the fight giving rise to the MBR.  *Id.* at 30-31.

Defendant Miller also questioned Defendant King about the MBR.  *Id.* at 31-32.  At the

conclusion of the hearing, Defendant Miller found Plaintiff guilty of the rule violation and

sentenced Plaintiff to thirty days of keeplock.  (Dkt. No. 51-7 at ¶¶ 69, 71.)

Plaintiff appealed this disposition to Defendant Kirkpatrick, the superintendent.  *Id.* at ¶

78.  The appeal was forwarded to the Captain's Office, and the disposition was affirmed.  *Id.* at ¶

79.  Plaintiff then commenced an Article 78 proceeding in state court.  *See Thousand v.

Kirkpatrick*, 153 A.D.3d 1506 (N.Y. App. Div. 2017).  On September 21, 2017, the New York

Supreme Court, Appellate Division, Third Department, dismissed Plaintiff's petition because the

administrative decision had been internally reversed.  *Id.* at 1507.

### C.    Grievance No. CL-69548-16

Following the MBR, Plaintiff filed a grievance with Clinton's Inmate Grievance Program

("IGP") office alleging retaliation and disputing the charge of fighting.  (Dkt. No. 51-7 at ¶¶ 94-

95.)  The grievance stated, in part:

> I am being falsely accused in this alleged altercation that transpired
> in tailor #5.  I honestly believe that this is a set up in some way or
> another.

(Dkt. No. 51-2 at 51-52.)  The grievance, eventually assigned Grievance No. CL-69548-16, was

received by the IGP office on May 23, 2016.  *Id.* at 51.  The Inmate Grievance Resolution

Committee ("IGRC") issued a response, stating:

> The investigation has revealed that; the grievant received a MBR
> on 5/4/16.  A disciplinary hearing may be appealed in accordance
> with Title 7 NYCRR, Chapter V, and the appeal mechanism
> affords the Inmate the Opportunity to remedy any factual or
> procedural errors in a disciplinary report.  The grievance program
> cannot be used as an additional or substitute appeal mechanism.

*Id.* at 53.  Plaintiff appealed this disposition to Defendant Kirkpatrick.  *Id.* at 54-55.  On July 21,

2016, Defendant Kirkpatrick issued the following decision:

> The grievant is advised that per directive #4040, disciplinary has
> its own appeal process which you have utilized, which disqualifies
> this as a grievable issue.  A security supervisor did interview you.
> The grievant is further advised to follow the appeal process set in
> place for the disciplinary process.

*Id.* at 56.  Plaintiff did not appeal the superintendent's decision to the Central Office Review

Committee ("CORC").  (Dkt. No. 51-7 at ¶ 103.)

## III.    APPLICABLE LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together

"show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of

showing, through the production of admissible evidence, that no genuine issue of material fact

exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is

"genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted); *Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006).[3] "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

---

[3] The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV.    PLAINTIFF'S FAILURE TO COMPLY WITH L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). While Plaintiff has responded to Defendants' motion for summary judgment, he has failed to do so in the manner required under L.R. 7.1(a)(3).[4]  (Dkt. No. 59.)

Where a party has failed to respond to the movant's statement of material facts as required by L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[5] and (2) the nonmovant if proceeding *pro se*,

---

[4]  L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's statement of material facts. Under the rule, the response "shall mirror the movant's statement of material facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

[5]  Under L.R. 7.1(a)(3), "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *But see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004)

has been specifically advised of the possible consequences of failing to respond to the motion.[6]

*Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Although this Circuit adheres to the view that nothing in Rule 56 imposes an obligation

on a court to conduct a search and independent review of the record to find proof of a factual

dispute where a non-movant willfully fails to respond to a properly filed summary judgment

motion, *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002), the Second

Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a

party's failure to comply with local court rules," including local rules relating to requirements

regarding the submission of and response to statements of material facts on summary judgment

motions, and to "conduct an assiduous review of the record."  *Holtz v. Rockefeller & Co., Inc.*,

258 F.3d 62, 73 (2d Cir. 2001) (citation and quotation marks omitted).

In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary

judgment record.

## V.   ANALYSIS

### A.   Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought

with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail,

prison, or other correctional facility until such administrative remedies as are available are

exhausted."  42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016).

---

("[I]n determining whether the moving party has met his burden of showing the absence of a
genuine issue for trial, the district court may not rely solely on the statement of undisputed facts
in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to
evidence in the record supports the assertion.") (citations omitted).

[6]  Plaintiff was provided with the requisite notification.  (Dkt. No. 51.)

"[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Id.* at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "'using all steps that the [government] agency holds out, and doing so properly'" (quoting *Woodford*, 548 U.S. at 90)). In New York State prisons, DOCCS has a well-established three-step IGP. 7 N.Y.C.R.R. § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence. *Id.* § 701.5(a)(1). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id.* § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are

forwarded directly to CORC for a decision under the process applicable to the third step.  *Id*. § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision.  *Id*. § 701.5(d)(1)(i).  CORC is to render a written decision within thirty calendar days of receipt of the appeal.  *Id*. § 701.5(d)(3)(ii).

Additionally, DOCCS maintains a separate and distinct review process for inmate appeals of disciplinary hearings.  In fact, the applicable regulations specifically state that the results of disciplinary hearings are "non-grievable."  N.Y. Comp. Codes R. & Regs. tit. 7, § 701.3(e)(1)-(2) (2010).  Ordinarily, an inmate's appeal of a disciplinary hearing decision "constitutes exhaustion under the PLRA[.]"  *Davis v. Barrett*, 576 F.3d 129, 132 (2d. Cir. 2009).  However, where an inmate claims some form of official misconduct in the underlying events leading to the disciplinary hearing, this Court and others have found that the inmate must separately grieve the alleged misconduct, and the inmate does not exhaust his administrative remedies merely by pursuing the disciplinary appeals process.  *Kimbrough v. Fischer*, No. 9:13-CV-0100 (FJS/TWD), 2014 WL 12684106, at *6 (N.D.N.Y. Sept. 29, 2014) (citing *Rosales v. Bennett*, 297 F. Supp. 2d 637, 640 (W.D.N.Y. 2004) (finding the plaintiff failed to exhaust claims that did not arise directly out of the conduct of his disciplinary hearing)).

In *Kimbrough*, the plaintiff brought a due process claim arising out of the defendant's conduct of his disciplinary hearing and other claims related to the underlying events giving rise to the disciplinary hearing.  *Id.* at *4.  This Court distinguished between the claims, finding that the plaintiff fully exhausted his administrative remedies with respect to his due process claim by appealing through the disciplinary process.  *Id.* at *6. On the other hand, this Court also found

that the plaintiff did not fully exhaust his administrative remedies with respect to his other

claims, which he did not appeal to CORC as required by the IGP.  *Id.*

Generally, if a plaintiff fails to follow each of the required steps of the IGP, including

receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his

administrative remedies as required under the PLRA.  *See Ruggiero v. Cty. of Orange*, 467 F.3d

170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps

that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the

merits).") (quotations marks and citations omitted)).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its

own, textual exception to mandatory exhaustion."  *Ross*, 136 S. Ct. at 1858.  More specifically,

section 1997e(a) provides that only those administrative remedies that "are available" must first

be exhausted.  42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion

requirement hinges on the availability of administrative remedies[.]") (quotation marks and

citations omitted).  In the PLRA context, the Supreme Court has determined that "availability"

means that "an inmate is required to exhaust those, but only those, grievance procedures that are

capable of use to obtain some relief for the action complained of."  *Ross*, 136 S. Ct. at 1859

(quotation marks and citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal

administrative remedies are not available to prisoners under the PLRA.  *Id*. at 1859-60.  First,

"an administrative procedure is unavailable when (despite what regulations or guidance materials

may promise) it operates as a simple dead end—with officers unable or consistently unwilling to

provide any relief to aggrieved inmates."  *Id*. at 1859.  "Next, an administrative scheme might be

so opaque that it becomes, practically speaking, incapable of use."  *Id*.  Finally, an administrative

remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id*. at 1860.  In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]"  The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry.  *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements.  *See Jones*, 549 U.S. at 216.  Plaintiff must then establish the IGP grievance procedure was unavailable to him under *Ross*.  *Id*.

Applying the legal standard set forth above, the issue of exhaustion involves a two-step analysis: First, the Court must determine whether Plaintiff properly exhausted his administrative remedies by following all the steps required by the administrative review process.  If Plaintiff did not exhaust his administrative remedies, the Court must then determine whether the administrative remedy was available to Plaintiff.  Both steps of the analysis are relevant here.

It is undisputed that Plaintiff did not appeal Grievance No. CL-69548-16 to CORC.  (Dkt. No. 51-7 at ¶ 103; 59-2 at ¶ 103.)  Thus, Defendants argue they are entitled to summary judgment on exhaustion grounds.  (Dkt. No. 51-8 at 10.)  In opposition, Plaintiff contends that an appeal to CORC was not necessary because prison officials directed him to use the disciplinary appeal process.  (Dkt. No. 59-1 at 7-8.)

Here, the Court finds that Plaintiff did not exhaust his administrative remedies against Defendant King but did exhaust his administrative remedies against Defendant Miller.  The Court considers the claims against each defendant in turn.

     1.    <u>Defendant Miller</u>

Plaintiff's retaliation claim against Defendant Miller arises out of Defendant Miller's disposition of Plaintiff's disciplinary hearing.  (Dkt. No. 1 at ¶ 201.)  In particular, Plaintiff contends Defendant Miller "alleged that [another inmate] refused to testify" at Plaintiff's hearing, "outright refused to" clarify the inmate's refusal to testify, and ultimately "render[ed] an unsupported guilty disposition with the intention of punishing the Plaintiff for his constitutionally protected speech."  (*Id.*; Dkt. No. 59-1 at 3.)  Thus, the totality of alleged facts giving rise to Plaintiff's retaliation claim against Defendant Miller relates directly to Defendant Miller's alleged conduct at Plaintiff's disciplinary hearing, over which Defendant Miller presided.  Furthermore, the parties do not dispute that Plaintiff appealed his disciplinary hearing to Defendant Kirkpatrick.  (Dkt. Nos. 51-7 at ¶ 78; 59 at ¶ 78.)  As a result, the Court finds Plaintiff exhausted his administrative remedies against Defendant Miller by following the disciplinary appeals process.  Therefore, the Court recommends denying Defendant Miller summary judgment on exhaustion grounds.

     2.    <u>Defendant King</u>

Plaintiff's retaliation claim against Defendant King arises out of the MBR filed by Defendant King following the May 4, 2016, altercation.  (Dkt. No. 1 at ¶ 200.)  Specifically, Plaintiff alleges Defendant King "falsely accused Plaintiff" of participating in the altercation. (Dkt. No. 59-1 at 2.)  Plaintiff further alleges Defendant King took this action "with the intention of punishing the Plaintiff for his constitutionally protected speech."  (Dkt. No. 1 at ¶ 200.)  Thus, Plaintiff's retaliation claim against Defendant King arises out of conduct separate from the disciplinary hearing.  Therefore, the Court finds Plaintiff was required to separately grieve this issue and appeal it fully in order to sufficiently exhaust his administrative remedies.  Because

Plaintiff did not appeal his grievance regarding retaliation to CORC, the Court finds that he failed to properly exhaust his administrative remedies with respect to his retaliation claim against Defendant King prior to commencing this action.

Based on this determination, the Court must proceed to step two of the exhaustion analysis to consider whether the administrative remedies were available to Plaintiff on this claim. At this step, the Court finds that Plaintiff's administrative remedies were unavailable to him because prison officials misled Plaintiff into believing that his administrative remedies were exhausted.

To use the Supreme Court's language from *Ross*, prison officials in this case effectively "thwart[ed Plaintiff] from taking advantage of a grievance process through . . . misrepresentation[.]" *Ross*, at 1860.  Here, it is undisputed that Plaintiff received two responses from prison officials with regard to Grievance No. CL-69548-16.  (Dkt. Nos. 51-7 at ¶¶ 96, 102; 59 at ¶¶ 96, 102.)  The first response came from IGRC, and the second response came from Defendant Kirkpatrick, per the normal grievance process.  *Id.*  Both responses told Plaintiff that he needed to use the disciplinary appeals process to address his grievance.  *Id.*  Specifically, the Superintendent's decision advised Plaintiff that he had already utilized the appropriate process and his matter was "disqualifie[d]" as a non-grievable issue.  (Dkt. No. 51-7 at ¶¶ 102.)  Thus, Plaintiff claims his administrative remedy was unavailable to him because prison officials misled him "to pursue his grievance appeals elsewhere," which he indeed did by appealing his disciplinary hearing.  (Dkt. No. 59-1 at 8.)

In support of their exhaustion argument, Defendants analogize to *Fox v. Lee*, a recent case from this District, where the Court rejected a similar argument.  No. 9:15-CV-0390

(TJM/CFH), 2018 U.S. Dist. LEXIS 213705, at *22-24 (N.D.N.Y. Dec. 18, 2018).[7]  However, that case is readily distinguishable from the present matter.  In *Fox*, the plaintiff alleged that "an unspecified person" misled him about the proper grievance process.  *Id.* at *22.  The Court then corrected the "plaintiff's interpretation of DOCCS' regulations and procedures" by citing *Kimbrough* and other cases where courts in this District have held that certain matters must be separately grieved.  *Id.* at *22-24.  Here, Plaintiff's own interpretation of the regulations is not at issue.  Rather than relying on "an unspecified person," Plaintiff claims, and the undisputed facts show, that prison officials, namely the IGRC and Defendant Kirkpatrick, twice misled him about the appropriate administrative exhaustion process for his First Amendment retaliation claim against Defendant King.

Defendants seemingly want to have it both ways, telling Plaintiff internally that he had already appealed his complaint appropriately and now, before this Court, asserting Plaintiff did not appeal his complaint fully.  The Court finds this inconsistency problematic.  Therefore, on this summary judgment record, although Plaintiff did not exhaust his administrative remedies by appealing to CORC, the Court finds those remedies were unavailable to him because of misrepresentation on the part of prison officials.  As such, the Court recommends denying Defendant King summary judgment on exhaustion grounds.

## B.     First Amendment Retaliation Claim

Defendants also seek summary judgment on the grounds that Plaintiff's First Amendment retaliation claims fail as a matter of law.  (Dkt. No. 51-8 at 11.)  Claims of retaliation find their roots in the First Amendment.  *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004). Central to such claims is the notion that in a prison setting prison officials may not take actions

---

[7]  LEXIS citations are provided where documents are not available on Westlaw.

that would have a chilling effect upon an inmate's exercise of First Amendment rights. *Id*. at 381-83. Thus, when prison officials take adverse action against an inmate, motivated by the inmate's exercise of constitutional rights, including the free speech provision of the First Amendment, a cognizable claim of liability under section 1983 lies. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and prone to abuse, and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

To state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations showing that (1) he engaged in protected speech; (2) the defendants took adverse action against him; and (3) there was a causal connection between the protected activity and the adverse action. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007). In the prison context, "adverse action" is objectively defined as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Pidlypchak*, 389 F.3d at 381. "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis*, 320 F.3d at 353 (quotation marks and citation omitted).

An inmate bears the burden of showing "the protected conduct was a substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). Those factors include (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon*, 58 F.3d at 872-73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

If a plaintiff makes the appropriate showing of retaliation, a defendant may avoid liability if he demonstrates that he would have taken the adverse action even in the absence of the protected conduct. *See Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show . . . that even without the improper motivation the alleged retaliatory action would have occurred.") (citation omitted).

It is well-settled in this Circuit that the filing of lawsuits and administrative grievances constitutes a constitutionally protected activity for retaliation purposes. *See Colon*, 58 F.3d at 872 ("Prisoners . . . have a constitutional right of access to the courts and to petition the government for redress of grievances, and prison officials may not retaliate against prisoners for exercise of that right."); *Davis*, 320 F.3d at 352-53 (finding the right of prisoners to file administrative grievances "is a constitutionally protected activity" for retaliation purposes).

Courts in this Circuit have further found that First Amendment protections extend to inmates' informal complaints. *See Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *10 (N.D.N.Y. Apr. 24, 2006), *aff'd*, 219 F. App'x 110 (2d Cir. 2007) (acknowledging "the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints[.]"); *McKethan v. N.Y. State Dep't of Corr. Servs.*, No. 10 Civ. 3826 (NRB), 2011 WL 4357375, at *6 (S.D.N.Y. Sept. 16, 2011) ("There can be little doubt that plaintiff's informal complaints . . . constitute protected activity under the First Amendment."). Furthermore, Defendants do not argue that Plaintiff's retaliation claim stemming from an informal letter sent to prison administration involves conduct not protected by the First Amendment. (Dkt. Nos. 51-8; 63-1.) Accordingly, the Court finds Plaintiff engaged in protected speech for the purposes of stating a retaliation claim under the First Amendment. At this point, the Court once again considers the specific claims against each Defendant in turn.

     1.   <u>Defendant Miller</u>

        *a.*    *Adverse Action*

Plaintiff alleges Defendant Miller took adverse action against him "by rendering an unsupported guilty disposition" in the Tier II disciplinary hearing over which Defendant Miller presided. (Dkt. No. 1 at ¶ 201.) It is undisputed that Defendant Miller sentenced Plaintiff to thirty days of keeplock. (Dkt. Nos. 51-7 at ¶ 71; 59 at ¶ 71.)

In this Circuit, keeplock confinement may, but does not always, rise to the level of severity necessary for demonstrating adverse action at the summary judgment stage. *Compare Burns v. Martuscello*, 890 F.3d 77, 93-94 (2d Cir. 2018) (concluding that six months of restricted confinement supported a finding of adverse action at the summary judgment stage), *and Keesh v. Goord*, No. 04-CV-271A, 2007 WL 2903682, at *10 (W.D.N.Y. Oct. 1, 2007) (finding a

sufficient allegation of adverse action where the plaintiff was confined to keeplock for no more

than 24 hours but may have been deprived meals during that time), *with Gill v. Tuttle*, 93 F.

App'x 301, 303 (2d Cir. 2004) (reversing district court's decision that nine days of keeplock

confinement did not constitute adverse action because evidence showed that plaintiff's conduct

"could have resulted in significantly more time in keeplock"), *and Hayes v. Dahkle*, No. 9:16-

CV-1368 (TJM/CFH), 2018 WL 7356343, at *15 (N.D.N.Y. Dec. 11, 2018) (finding keeplock

confinement insufficient to demonstrate adverse action where the plaintiff was confined for one

day, and no evidence indicated additional "adverse conditions such as lack of food or denial of

religious services").  Nonetheless, these cases and others strongly support a finding of adverse

action where the period of keeplock, as here, lasted three weeks or more.  *See id.*; *see also*

*Pidlypchak*, 389 F.3d at 384 (finding that a "sentence of three weeks in keeplock" demonstrated

adverse action sufficient to "deter a prisoner of ordinary firmness from vindicating his or her

constitutional rights").  As a result, the Court finds Plaintiff's thirty-day keeplock sentence

constitutes adverse action.

> b.      *Causal Connection*

Nevertheless, what remains in dispute is the causal connection element of Plaintiff's

claim.  Plaintiff alleges a causal connection between his protected speech and the guilty

disposition, claiming his conduct was a "substantially motivating factor" in Defendant Miller's

decision to punish Plaintiff.  (Dkt. No. 1 at ¶ 146.)  More specifically, Plaintiff alleges Defendant

Miller was aware of Plaintiff's ongoing litigation concerning an incident at another facility and

of Plaintiff's informal complaint to Clinton's administration regarding retaliation.  (Dkt. No. 59

at ¶¶ 64-65.)  According to Plaintiff, "common sense and reason" support his allegation of a

causal connection because "Plaintiff and [Defendant] Miller had no prior bad history" yet

"[Defendant] Miller completely disregarded" Plaintiff's exculpatory evidence at the Tier II disciplinary hearing and instead relied solely on Defendant King's "bare and self-serving" evidence and testimony.  (Dkt. No. 59-1 at 11.)

Defendant Miller asserts that Plaintiff merely "made a vague reference" to his civil case but did not mention his informal complaint during the Tier II hearing.  (Dkt. No. 51-6 at ¶ 26.) Defendant Miller states he was not aware of Plaintiff's May 1, 2016, letter sent to prison administration when he conducted the Tier II hearing beginning on May 10, 2016.  *Id.* at ¶ 25. Plaintiff disputes this assertion, maintaining that he made Defendant Miller aware of his complaint and outside litigation during the hearing.  (Dkt. No. 59 at ¶¶ 64-65.)  To support their conflicting contentions, both parties point to the transcript of the hearing.  (*Id.*; Dkt. No. 51-7 at ¶¶ 64-65.)  It shows, in pertinent part, Plaintiff testified, "I sort of find it more than a coincidence that (inaudible) member of the administration team, um, last Monday as to some incidents that were going on as far, regarding a lot of retaliation for a civil proceeding that I had two days later."  (Dkt. Nos. 51-6 at 28; 59-2 at 34.)  The portion of Plaintiff's statement deemed "inaudible," if recorded properly in the transcript, could resolve the question whether Defendant Miller was aware of Plaintiff's complaint and therefore may have had motivation to retaliate against Plaintiff.

Where a defendant is unaware of the plaintiff's protected speech, there is, generally speaking, no causal connection.  *See Gordon v. New York City Bd. of Educ*, 232 F.3d 111, 117 (2d Cir. 2000) ("A jury, . . . can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, . . . so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit upon the orders of a superior who has the requisite knowledge."); *see also Ehrbar v.*

*Forest Hills Hosp.*, 131 F. Supp. 3d 5, 34 (E.D.N.Y. 2015) ("[W]here it is undisputed that the decision maker was unaware of the [plaintiff's] protected activity, that fact may be evidence that there is no causal connection."). If the defendant did not know about the plaintiff's protected speech, it seems largely impossible for the protected speech to have motivated the defendant's actions.

Even assuming, in the light most favorable to Plaintiff, Defendant Miller was aware of Plaintiff's complaint and pending lawsuit, Defendant Miller can still avoid liability by showing that he would have taken the same action regardless of Plaintiff's protected speech. *Graham*, 89 F.3d at 79; *Davis v. Rhoomes*, No. 07 Civ. 6592 (JGK) (THK), 2010 U.S. Dist. LEXIS 103562, at *48-49 (S.D.N.Y. July 8, 2010). In finding Plaintiff guilty of fighting, Defendant Miller relied on the written report prepared by Defendant King and on Defendant King's testimony at the hearing. (Dkt. No. 51-7 at ¶ 70.) The transcript of the hearing further shows that Defendant Miller allowed Plaintiff to testify at the hearing, called witnesses as requested by Plaintiff, and questioned those witnesses as requested by Plaintiff. (Dkt. Nos. 51-6 at 28-35; 59-2 at 33-40.) Plaintiff concedes that this transcript, and the administrative record compiled relative to it, is the only evidence he can offer to show retaliation. (Dkt. No. 59 at ¶ 75.) Beyond the administrative record, Plaintiff relies on "only an assumption" that "in [his] mind, there would be no way . . . for [Defendant Miller] to find [Plaintiff] guilty, unless [Defendant Miller] had it out for [Plaintiff]." (Dkt. No. 51-2 at 323.) Furthermore, Plaintiff's due process claim against Defendant Miller was already dismissed by this Court. (Dkt. No. 9 at 12.)

These circumstances can be easily compared to those in *Rhoomes*, where the Court granted the defendant's motion for summary judgment on the grounds that the defendant hearing officer would have rendered the same decision in the absence of the plaintiff's protected conduct.

*Rhoomes*, 2010 U.S. Dist. LEXIS 103562, at *49-50.  In that case, the Court reasoned that "allow[ing] an inmate to proceed on a retaliation claim against a hearing officer simply because the officer ruled against him at a disciplinary proceeding, would clearly run afoul" of the skepticism with which retaliation claims must be viewed in this Circuit.  *Id.*

At most, Plaintiff made a single, brief mention of his previous complaint during the hearing with Defendant Miller.  Audible or not, this isolated statement, coupled with the lack of any evidence beyond Plaintiff's "assumption" that Defendant Miller conducted the hearing in a manner that violated Plaintiff's due process rights, is insufficient to suggest that Defendant Miller acted in retaliation.  Indeed, Defendant Miller heard testimony both incriminating and exculpating Plaintiff, allowed Plaintiff to give his own testimony, then rendered a decision. Given the skepticism with which the Court must view Plaintiff's retaliation claim, the Court finds Defendant Miller is entitled to summary judgment.

Accordingly, the Court recommends granting Defendant Miller summary judgment on Plaintiff's First Amendment retaliation claim.

 2. <u>Defendant King</u>

  *a.* *Adverse Action*

Plaintiff alleges Defendant King took adverse action against him "by issuing a false misbehavior report" that eventually resulted in Plaintiff's thirty-day keeplock sentence.  (Dkt. No. 1 at ¶ 200.)  The filing of a false MBR constitutes adverse action sufficient to establish a claim for retaliation.  *Pidlypchak*, 389 F.3d at 384.  Here, the parties do not dispute that Defendant King issued an MBR against Plaintiff on May 4, 2016.  (Dkt. Nos. 51-7 at ¶ 36; 59 at ¶ 36.)  The parties merely dispute the validity of the MBR.  *Id.*  Viewing these facts in the light

most favorable to the non-movant, the Court finds that Plaintiff has sufficiently alleged adverse action for the purpose of stating a retaliation claim against Defendant King.

### b.   Causal Connection

Plaintiff alleges a causal connection between his protected conduct and Defendant King's actions by claiming that Plaintiff's protected conduct was a "substantially motivating factor" in Defendant King's decision to issue the MBR.  *Id.* at ¶ 145.  To that end, Plaintiff alleges that there was temporal proximity between his protected conduct and Defendant King's actions, and Plaintiff had previously maintained a good disciplinary record.  *Id.* at ¶ 151.

Defendant King asserts he was not aware "of any complaint letters" or "lawsuits filed" by Plaintiff before he issued the MBR following the altercation that occurred on May 4, 2016.  (Dkt. No. 51-5 at ¶ 10.)  Collectively, Defendants further assert that "it would have been impossible" for Defendant King to have become aware of Plaintiff's complaint to prison administration before writing the MBR because Plaintiff's complaint, although written on May 1, 2016, was not received by the superintendent until May 9, 2016.  (Dkt. No. 51-7 at ¶ 18.)  Plaintiff has produced no direct evidence to dispute this impossibility, but he nonetheless claims that Defendant King's awareness of the complaint, which expressed Plaintiff's intent to file a formal grievance, is circumstantially evidenced by statements Defendant King allegedly made to Plaintiff.  (Dkt. No. 59 at ¶ 51.)  In particular, Plaintiff alleges that Defendant King told him, "Well, I'm gonna [sic] give you one more thing to grieve," and, "Fine, let's see you grieve your way out of this one," while interviewing Plaintiff after the altercation and prior to preparing the MBR.  (Dkt. No. 1 at 11.)  Defendant King denies making these statements.  (Dkt. No. 51-5 at ¶ 7.)

The Court finds that a question of material fact remains concerning the causal connection element of Plaintiff's retaliation claim against Defendant King. Namely, it remains unclear from the summary judgment record whether Plaintiff's May 1, 2016, complaint letter substantially motivated Defendant King's decision to issue the May 4, 2016, MBR. This question remains because it is further unclear whether Defendant King was actually aware of the informal complaint letter. As explained above, the parties dispute Defendant King's awareness of the complaint. (Dkt. Nos. 51-7 at ¶ 51; 59 at ¶ 51.)

This dispute goes to the heart of Plaintiff's retaliation claim against Defendant King. If Defendant King was aware of Plaintiff's complaint, dated May 1, 2016, then the temporal proximity between Plaintiff's protected speech and Defendant King's decision to file an MBR just days later on May 4, 2016, supports an inference of a causal connection. *See Bennett v. Goord*, 343 F.3d 133, 138 (2d Cir. 2003) (holding that the plaintiff successfully raised a question of material fact regarding causation where disciplinary charge arose "just days after" the prisoner filed a grievance); *see also Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002) (finding temporal proximity relevant where MBR was issued less than a week after grievance). On the other hand, if Defendant King was not aware of Plaintiff's complaint, then the case for a causal connection seems tenuous at best.

On a summary judgment motion, a court may not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). "The weighing of the evidence and the determination as to which version of the events to accept are matters for the jury." *Id.* at 856; *see also Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (on a

summary judgment motion "the court should not weigh evidence or assess the credibility of witnesses. . . . These determinations are within the sole province of the jury.").

The Court finds, viewing the evidence in the light most favorable to Plaintiff, Defendant King's alleged statements to Plaintiff following the May 4, 2016, altercation raise a credibility issue with regard to Defendant King's awareness of the May 1, 2016, complaint.  More than speculative or bald allegations, Plaintiff's contentions identify specific statements that Defendant King allegedly made during a specific conversation on a precise date.  (Dkt. No. 59 at ¶ 50.) Although Defendant King denies making these statements, he acknowledges that a conversation between him and Plaintiff did occur on May 4, 2016, in which they discussed the altercation giving rise to the MBR.  (Dkt. No. 51-5 at ¶ 7.)  Accordingly, the Court finds the relevant credibility determination is not one for this Court, and the weighing of the evidence is for the jury.

In their memorandum of law, Defendants also argue Defendant King would have acted the same way even in the absence of Plaintiff's protected speech.  (Dkt. No. 51-8 at 18.) Defendant King claims that he filed the MBR charging Plaintiff with fighting based on the statement of another inmate involved in the fight.  (Dkt. No. 51-7 at ¶ 39.)  That inmate, according to Defendant King, "identified [Plaintiff] by name and description as someone who punched and kicked him."  *Id.*  Plaintiff disputes these facts and denies that the inmate actually identified him.  (Dkt. No. 59 at ¶ 37.)  Moreover, Plaintiff maintains that he "was not involved in the fight" giving rise to the MBR.  (Dkt. No. 59-1 at 2.)

Generally speaking, a genuine issue of material fact exists and summary judgment is inappropriate where the plaintiff denies the underlying conduct giving rise to a disciplinary charge.  *See Gayle*, 313 F.3d at 684 (denying summary judgment where the parties "disputed

whether [the plaintiff] committed all of the prohibited conduct[.]"); *see also Waters v. Melendez*, No. 15-CV-0805 (TJM/CFH), 2018 WL 3079764, at *12 (N.D.N.Y. May 18, 2018) (finding a genuine issue of material fact remaining where the plaintiff "did not concede to the charges[.]"). As explained above, the parties here dispute whether Plaintiff actually participated in the fight giving rise to Defendant King's MBR.  As a result, a genuine issue of material fact exists regarding whether Defendant King would have acted the same in the absence of Plaintiff's protected speech.

Based on the foregoing, the Court recommends denying Defendant King summary judgment on Plaintiff's First Amendment retaliation claim.

### 3.   Defendant Kirkpatrick

On initial review, Plaintiff's complaint was liberally construed as alleging a retaliation claim against Defendant Kirkpatrick.  (Dkt. No. 9 at 14.)  Since initial review, Plaintiff has conceded and it is no longer disputed that he does not claim Defendant Kirkpatrick retaliated against him.  (Dkt. Nos. 51-2 at 335; 51-7 at ¶ 108; 51-9 at ¶ 108.)  In his deposition, Plaintiff clarified that he intended instead to assert a supervisory liability claim against Defendant Kirkpatrick.  (Dkt. No. 51-2 at 335.)

As superintendent, Defendant Kirkpatrick directed the Captain's Office to review the disciplinary disposition rendered by Defendant Miller, which was affirmed upon that review. (Dkt. No. 51-7 at ¶ 79.)  Defendant Kirkpatrick also affirmed the IGRC's denial of Grievance No. CL-69548-16 alleging retaliation.  *Id.* at ¶ 101.

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977).  "Because vicarious liability is inapplicable to . . . § 1983 suits,

a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (noting that a defendant may not be held liable in a § 1983 action merely because he or she held a high position of authority). Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[8]

---

[8] The Second Circuit has thus far expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

Here, Plaintiff's supervisory liability claim against Defendant Kirkpatrick implicates the second *Colon* factor.  By receiving Plaintiff's May 1, 2016 letter, his appeal from the Tier II disciplinary hearing, and his appeal from Grievance No. CL-69548-16, Defendant Kirkpatrick appears to have been informed of the constitutional violations Plaintiff alleges.

Nevertheless, Plaintiff's supervisory liability claim fails for at least two reasons.  First, the foregoing analysis in Part V.B.1. makes clear that no deprivation of Plaintiff's First Amendment rights occurred at his Tier II disciplinary hearing.  Because the Court finds Plaintiff's underlying First Amendment claims are without merit, "none of the above bases for supervisory liability are applicable."  *Thompson v. Carlsen*, No. 9:08-CV-487 (TJM/RFT), 2010 WL 843872, at *7 (N.D.N.Y. Mar. 10, 2010) (citing *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999) ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation.")).  Therefore, the Court recommends granting summary judgment on Plaintiff's supervisory liability claim insofar as it relates to Defendant Kirkpatrick's role in the disciplinary appeals process.

Second, Defendant Kirkpatrick's involvement in the grievance appeals process is insufficient to sustain Plaintiff's supervisory liability claim.  There is a dispute in this Circuit whether the denial of a grievance, on its own, may give rise to supervisory liability.  *Compare Collins v. Goord*, 438 F. Supp. 2d 399, 420 (S.D.N.Y. 2006) ("Such denials, standing alone, do not suffice to support Section 1983 liability."), *and Burroughs v. Petrone*, 138 F. Supp. 3d 182, 221 (N.D.N.Y. 2015) ("'[A]n official's denial of a grievance alleging constitutional deprivation, without more, does not amount to personal involvement.'" (quoting *Ramrattan v. Fischer*, No. 13 Civ. 6890, 2015 WL 3604242, at *10 (S.D.N.Y. June 9, 2015)), *with Williams v. Fisher*, No. 02 Civ. 4558 (LMM), 2003 WL 22170610, at *10 (S.D.N.Y. Sept. 18, 2003) (finding denial of

grievance sufficient to survive motion to dismiss for lack of personal involvement where underlying claim also survived), *and Rodriguez v. Selsky*, No. 9:07-CV-0432 (LEK/DEP), 2011 WL 1086001, at *6 (N.D.N.Y. Jan. 25, 2011) ("[A]ffirmance . . . of a constitutionally defective disciplinary determination at a time when the inmate is still serving his or her disciplinary sentence . . . falls within the *Colon* factors[.]").  I have previously taken the position that affirming an appeal may suffice to demonstrate personal involvement.  *See Kimbrough v. Fischer*, No. 9:13-CV-0100, 2014 WL 12836864, at *6 (N.D.N.Y. Oct. 21, 2014).

To the extent that Defendant Kirkpatrick's denial of Plaintiff's grievance suggests personal involvement, however, Plaintiff's supervisory liability claim still fails because any underlying constitutional deprivation would not have been ongoing at the time of Defendant Kirkpatrick's decision.  Despite the dispute in this Circuit, the foregoing cases and others make clear that any alleged constitutional deprivation must be ongoing at the time of the supervisor's decision to affirm or deny the appeal.  *See Harnett v. Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008) ("It appears that the distinction is whether the supervisory official is confronted with an alleged violation that has ended or whether he is confronted with a 'continuing violation.'").  With regard to the grievance here, Plaintiff appealed the IGRC's response on June 12, 2016. (Dkt. No. 51-2 at 54-55.)  On June 15, 2016, Defendant Kirkpatrick ordered an investigation into the grievance.  (Dkt. No. 51-3 at ¶ 14.)  The investigating officer submitted a memorandum, which was dated July 15, 2016.  *Id.*  In the meantime, Plaintiff was released from keeplock on June 17, 2016.  (Dkt. No. 51-7 at ¶ 71.)  Defendant Kirkpatrick then issued his decision, effectively denying Plaintiff's grievance, on July 21, 2016.  (Dkt. No. 51-3 at ¶ 15.)

Significantly, Plaintiff was released from keeplock weeks before Defendant Kirkpatrick received the investigation memorandum and issued his decision regarding Plaintiff's grievance.

As a result, any alleged constitutional deprivation suffered by Plaintiff as a result of the MBR and indicated in the grievance was not ongoing at the time of Defendant Kirkpatrick's relevant involvement in the appeals process. Because there was no ongoing constitutional deprivation, the Court recommends granting summary judgment on Plaintiff's supervisory liability claim insofar as it relates to Defendant Kirkpatrick's role in the grievance appeals process.

### C.    Qualified Immunity

Finally, Defendant King moves for summary judgment on the grounds that he is entitled to qualified immunity.[9]  (Dkt. No. 51-8 at 19.)  "Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. City of Syracuse*, No. 5:16-CV-00622 (BKS/DEP), 2018 U.S. Dist. LEXIS 73764, at *13 (N.D.N.Y. Apr. 11, 2018) (quoting *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (internal quotation omitted).

Here, Defendants argue, without pointing to any factual basis in the record, that their actions were "objectively reasonable."  (Dkt. No. 51-8 at 20.)  However, because of the existing issues of material fact surrounding Plaintiff's retaliation claim against Defendant King, the Court finds that consideration of Defendants' motion for summary judgment on qualified immunity grounds is premature. *See Johnson*, 2018 U.S. Dist. LEXIS 737634, at *14-15 (denying summary judgment on qualified immunity grounds where issues of material fact remained regarding excessive force claim).  Therefore, the Court recommends denying Defendants'

---

[9]  Defendants assert the defense of qualified immunity collectively.  (Dkt. No. 51-8 at 19-20.) However, inasmuch as the Court is recommending that summary judgment be granted to Defendants Miller and Kirkpatrick on other grounds, the Court need not address the question of qualified immunity with respect to these Defendants.

motion for summary judgment on qualified immunity grounds without prejudice to Defendant King's right to renew the defense at trial.  *See Johnson v. Smith*, No. 9:03-CV-1050, 2006 WL 1843292, at *5 (N.D.N.Y. June 29, 2006) (adopting recommendation that defendant's motion for summary judgment on qualified immunity grounds be denied without prejudice to renew at trial where a jury could find defendant's action objectively unreasonable).

## VI.    CONCLUSION

Based on the foregoing, the Court recommends that Defendants' motion for summary judgment be granted in part and denied in part.  In sum, if the above recommendations are accepted and adopted by the District Court, only Plaintiff's First Amendment retaliation claim against Defendant King will remain for trial.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 51) be **GRANTED in part and DENIED in part**; and it is further

**RECOMMENDED** that Defendants Miller and Kirkpatrick be **GRANTED** summary judgment on Plaintiff's First Amendment retaliation claim; and it is further

**RECOMMENDED** that Defendant King be **DENIED** summary judgment on Plaintiff's First Amendment retaliation claim; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies or the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[10]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: June 21, 2019
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[10]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

KeyCite Yellow Flag - Negative Treatment
Distinguished by Smith v. Collins, S.D.N.Y., October 1, 2015

2006 WL 1133247
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeff SMITH, Plaintiff,
v.
Robert K. WOODS, Deputy Superintendent;
Joseph R. Belarge, Captain; G.J. O'Donnell,
Sergeant; F.S.A. Antonelli; and Wayne
Holt, Correction Officer, Defendants.

No. 9:03-CV-480.
|
April 24, 2006.

**Attorneys and Law Firms**

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of
New York, Kelly L. Munkwitz, Esq., Asst. Attorney
General, of Counsel, Department of Law, Albany, NY,
for Defendants.

## DECISION and ORDER

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Jeff Smith, brought this civil rights
action pursuant to 42 U.S.C. § 1983. By Report-
Recommendation dated March 17, 2006, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted, and that plaintiff's motion for
partial summary judgment be denied. (Docket No.
51). The plaintiff has filed objections to the Report-
Recommendation. (Docket No. 53).

Based upon a de novo determination of the portions of
the report and recommendations to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted in whole. See 28 U .S.C. 636(b)(1). Accordingly,
it is ORDERED that
1. Defendants' motion for summary judgment is
GRANTED;

Plaintiff's motion for partial summary judgment is
DENIED. and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and
Recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(c) of the Rules of Practice
for this Court. In this *pro se* civil rights action brought
under 42 U.S.C. § 1983, Jeff Smith ("Plaintiff") alleges
that five employees of Upstate Correctional Facility-
Deputy Superintendent Robert K. Woods, Captain
Joseph R. Belarge, Sergeant G.J. O'Donnel, Food Service
Administrator Richard Antonelli, and Correction Officer
Wayne Holt ("Defendants")-violated his rights under the
First, Fourth, Eighth, and Fourteenth Amendments by
(1) retaliating against him for having previously filed a
complaint, (2) subjecting him to an unreasonable search
and seizure, (3) subjecting him to a damaged bunk bed
while he was housed in the Upstate Correctional Facility
Special Housing Unit, and (4) taking away his "good
time" credits without affording him due process. (Dkt.
No. 5 [Plf.'s Am. Compl.].) [1]

[1]     Given my duty to liberally construe a *pro se*
        plaintiff's civil rights complaint, I construe Plaintiff's
        Amended Complaint as including a claim that
        various Defendants violated Plaintiff's rights under
        the Fourth Amendment to be free from unreasonable
        searches and seizures. See *Phillips v. Girdich,* 408
        F.3d 124, 130 (2d Cir.2005) ("We leave it for the
        district court to determine what other claims, if any,
        [the plaintiff] has raised. In so doing, the court's
        imagination should be limited only by [the plaintiff's]
        factual allegations, not by the legal claims set out
        in his pleadings.") [citations omitted]. *(See also*
        Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that
        Defendants Woods and Holt "violat[ed] plaintiff's

4th ... Amendment[ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 37), and Plaintiff's motion for partial summary judgment (Dkt. No. 38), both brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Because both motions were filed on the same day (February 11, 2005), and neither was filed in response to the other, I construe each motion as a "motion" and neither motion as a "cross-motion." Both Plaintiff and Defendants have responded to each other's motion (Dkt.Nos.42, 45), and replied to the other's response (Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1) whether Plaintiff has failed to establish (or even state) a First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff has failed to establish (or even state) an Eighth Amendment claim; (4) whether Plaintiff has failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6) whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

**\*2** Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. See Fed.R.Civ.P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

## I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

[2]    A fact is "material" only if it would have some effect on the outcome of the suit. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 477 U.S. 574, 585-86 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Ross v. McGinnis, 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a pro se plaintiff's pleadings. "[I]n actions in which one of the parties appears pro se, this Court is faced with the ... responsibility of granting significant liberality in

how *pro se* pleadings are construed." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) *(per curiam)* *(pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

## II. STATEMENT OF MATERIAL FACTS
The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [3] and are not specifically controverted by the plaintiff. [4]

[3]     *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

[4]     *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*).

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." [5]

[5]     Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a) (3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a) (3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at *4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at *2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment). [6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based "on personal knowledge." [7] An affidavit

Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 36 of 237

or verified complaint is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay.[8]

[6]   *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

[7]   Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

[8]   *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made

on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

Similarly, such an affidavit or verified complaint must not be conclusory.[9] Of course, an affidavit may be conclusory because its assertions are too general.[10] However, even where an affidavit's assertions are specific (e.g., with respect to time, place, persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[11] Indeed, it has long been the rule in the Second Circuit that "issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds." *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978), *aff'd without opinion,* 603 F.2d 214 (2d Cir.1979).

[9]   *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

[10]  *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985);

*Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

[11]   *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), aff'd, 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

**\*4**   Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No.

42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and verified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a][2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when he and Inmates Lipman and Robles approached Defendant Holt with such materials]." [12]   However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials. [13]

[12]   (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

[13]   *(See, e.g.,* Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff ***"stuck with them*** as well as the other two inmates"], 31-32 [admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 [admitting that he took the documents to "honor" Inmate Alcivar's "wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate

was deceased"]; Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself.... Peter told me that you have copies of all his papers, those of which are the same as the papers *I have here"];* Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to **hold a copy of the complaint"** in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents **being in my possession ...** you and the administration cannot take any action against the inmate's family nor myself"] [emphasis added].)

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail." [14] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters. [15] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail. [16]

[14]     (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

[15]     (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube"].)

[16]     (Dkt. No. 5, ¶ 12 [Am. Compl.].)

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and are not specifically controverted by Plaintiff:

Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F."). [17]

[17]     (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl.].)

**\*5** At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F. [18]

[18]     (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4-8 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

Plaintiff's Legal Assistance to Inmate Peter Alcivar and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198). [19]

[19]     (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37, Part 18, Ex. B at 18-37 [Antonelli Aff., attaching pleading and motion from lawsuit].)

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit. [20] At the time, Plaintiff was not an inmate law clerk. [21]

[20]     (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

[21]     (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].)

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer.[22]

[22]     (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit and its contents"].)

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's pending federal civil rights action.[23] In pertinent part, the letter stated,

[23]     (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter 6/24/02]; Dkt. No. 37, Part 23, Ex. A at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't already tied both of you that I am helping him with the filing of his motions, etc....
Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court* ... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research that I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him.[24]

[24]     (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center.[25]

[25]     (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶ 3 [Am. Compl.].)

**\*6** 8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters.[26] In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on."[27] In addition, the last page of the letter states:

[26]     (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

[27]

    (Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public. Make a copy for your files and send me the *original.*

It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession.[28]

[28]

    (Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters.[29] In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

[29]

    (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

    Plaintiff's Communications with Defendant Woods and the Search of Plaintiff's Prison Cell (or "Cube")

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods.[30] The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in person at your earliest convenience. Thank you for your professional attention to this request."[31]

[30]

    (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

[31]

    (Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods.[32] The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak to you before July 23, 2002. This matter is very important. Thank you for your attention."[33]

[32]

    (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

[33]

    (Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic."[34]

[34]

    (Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until after July 23, 2003, or that Defendant Woods believed the notes to be "cryptic"]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods.[35] The note stated, in pertinent part:

[35]

    (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter concerning a *<DEAD>* man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration

cannot take any action against the inmate's family nor myself. [36]

[36]   (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

**\*7** 14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff. [37] That memorandum stated, in pertinent part:

[37]   (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the memorandum].)

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately. [38]

[38]   (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum. [39]

[39]   (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents. [40] Plaintiff denied having such documents. [41]

[40]   (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

[41]   (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule 7.1 Response, which is not material to the asserted fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.].)

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note. [42]

[42]   (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers). [43] At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters). [44]

[43]   (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before those Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating that Defendant Belarge had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

[44]   (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell was the one who

found the documents]; Dkt. No. 38, Part 4 at 90 [exhibit to Plaintiff's motion for summary judgment, attaching Contraband Receipt issued by Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31-33 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that, after Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents being in my possession ... you and the administration cannot take any action against the inmate's family nor myself"]; *see also* Dkt. No. 37, Part 19, ¶ 3 [Holden Aff., testifying that at some point in the summer of 2002 Plaintiff told Holden that he was helping an inmate who had been taken to the hospital due to an illness]; Dkt. No. 45, Part 6, ¶¶ 4-5 [Belarge Reply Aff., swearing that evidence in question did not come from any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

19. At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant Woods. [45] At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters) in an evidence locker at Greene C.F. [46]

[45]    (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1 Statement, asserting that interview took place]; Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response, admitting that interview took place despite his blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5 [Belarge Aff.]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-15 [Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that the interview took place at 11:00 a.m. on 8/31/02].)

[46]    (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell stored the documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A at 2 [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that Defendant O'Donnell stored the documents in an evidence locker on 8/31/02].)

### Plaintiff's Misbehavior Report, Disciplinary Hearing, and Appeal

20. Relying on the documents discovered and the subsequent interview conducted, Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002. [47] The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and (3) soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20. [48]

[47]    (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report].)

[48]    (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee; [49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization; [50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate

family member without the consent or approval of the Superintendent or his designee. [51]

[49]      (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt].) *See also* 7 N.Y.C.R.R. § 270.02[B][26][vii].

[50]      (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].) *See also* 7 N.Y.C.R.R. § 270.02[B][14] [v].

[51]      (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or services" from Inmate Alcivar's daughters].) *See also* 7 N.Y.C.R.R. § 270.02[B][4][ii].

**\*8** 22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli. [52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits . [53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made certain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube"). [54]

[52]      (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

[53]      (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

[54]      (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4-6, 11

[Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 [Am. Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002. [55] Plaintiff's appeal did not complain about any lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint. [56]

[55]      (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses the appeal]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

[56]      (Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses his one-page appeal and acknowledges that it did not complain about any lack or denial of witnesses]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

24. On October 24, 2002, Greene C.F. officials conducted a discretionary review of Plaintiff's SHU sentence. [57] Based upon this review, Plaintiff's SHU time was reduced from 90 days to 75 days. [58] However, Plaintiff's good time loss was unaffected by the discretionary review. [59]

[57]      (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 1 [Plf.'s Response, admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any

denial of this fact]; Dkt. No. 37, Part 8, ¶ 8 [Belarge Aff.].)

58    (*Id.*)

59    (*Id.*)

### Meetings Between Defendants Woods, Belarge and O'Donnell

25. At some point between August 5, 2002, and August 31, 2002, Defendant Woods met with Defendant Belarge to discuss Plaintiff. [60] Defendant Belarge then met with Defendant O'Donnell to discuss Plaintiff. [61]

60    (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 37 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Woods and Belarge at some point].)

61    (Dkt. No. 37, Part 2, ¶ 3 8 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 8 [Plf.'s Response, admitting this fact]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 42, Part 22 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Belarge and O'Donnell at some point].)

26. Both meetings (which were held *prior* to the issuance of Plaintiff's misbehavior report on August 31, 2002) were held according to standard procedure at Greene C.F. [62] Specifically, the purpose of the meetings was to discuss how to investigate whether Plaintiff had violated prison rules. [63]

62    (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 39 [Plf.'s Response, not specifically controverting that the pre-misbehavior report meeting between Defendants Woods and Belarge, and the pre-misbehavior report meeting between Defendants Belarge and O'Donnell, were held according to standard procedure at Greene C.F., and, in any event not citing any admissible

evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

63    (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 37-39 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

### Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002. [64]

64    (Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002...."].)

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU. [65]

65    (Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned. [66] Those photographs are made part of the

record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood. [67] Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of the bunk beds that Plaintiff was assigned while in SHU; between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff suggests he may have been assigned while in SHU. [68]

[66]    (Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[67]    (Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[68]    (Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No. 37, Parts 13-15, Ex. B [Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit and exhibits, attaching work orders].)

## III. ANALYSIS

### A. Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim

**\*9** In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty right to make an oral and written complaint about Defendant Antonelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits (which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. See *Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. See *Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d. Cir.1995); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), overruled on other grounds, *Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

   **\*10** Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers. [69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

[69]   *See Malik'El v. N.Y. State DOCS,* 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at \*7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J .) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("In the context of the confrontation described in [the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin.") (emphasis added); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation" with corrections officer was not protected speech or conduct under the First Amendment).

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy Superintendent Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks before the disciplinary hearing. [70] Plaintiff's letter did not mention Defendant Antonelli. [71] In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of Plaintiff's disciplinary hearing. [72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing. [73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision). [74]

[70]   (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

[71]   (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

[72]   (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week

prior to holding said hearing," without providing any specifics about the alleged "encounter," without providing any assertion that it was Antonelli who was motivated by the alleged "encounter," and without providing reason to believe Plaintiff had personal knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

73    (Dkt. No. 42, Part 1 ¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter" with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess hall].)

74    (*See, supra,* Statement of Fact Nos. 22-23 [stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

**B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim**

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as *suggesting* that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction. [75]

75    (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific

paragraph that you are referring to," i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though that cause of action cites the Fourth Amendment], 26 [in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].) *See Clissuras v. CUNY*, 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a "suggestion" to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3] ).

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint. [76] Specifically, the allegations contained in Paragraph 15 of his Amended Complaint are the sole *factual* basis for Plaintiff's Fourth Amendment claim. [77] In pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge ... had plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt...." [78]

76    (*See* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 14-22, 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

77    (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to" Plaintiff's first cause of action], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due

process claim, and Plaintiff answered, "Not at this point, ma'am" even though the cause of action cites the Fourth Amendment], 28 [in which defense counsel asked, "Are you alleging that the facts in paragraph 15 give rise to a constitutional claim for search and seizure?" and Plaintiff answered, "Yes, ma'am"].)

78    (Dkt. No. 5, ¶ 14 [Am. Compl.].)

**\*11** The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred as Plaintiff alleged, that search was of a prisoner's cell (or "cube"). "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984). [79] Nor does the Fourth Amendment proscription apply within the confines of a prison "cube." [80] Indeed, Plaintiff appears to recognize this point of law. [81]

79    *See also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at \*7 (N.D.N.Y. March 31, 1997) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights."); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd,* 122 F.3d 1055 (2d Cir.1995).

80    *See Freeman v. Goord,* 02-CV-9033, 2005 U.S. Dist. LEXIS 32019, at \*5 & n. 4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell, which plaintiff referred to as his "cube"); *Rodriguez v. Coughlin,* 795 F.Supp. 609, 611, 613 (W.D.N.Y.1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell" as his "cubicle").

81    (Dkt. No. 37, Part 22, Ex. A at 26 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].)

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth Amendment claim against Defendant Woods for (allegedly) unreasonably searching and seizing various pieces of Plaintiff's outgoing and incoming mail in August of 2002. However, even if I did so construe that Amended Complaint, I would conclude that this Court would not have subject matter jurisdiction over that claim. The only portion of Plaintiff's Amended Complaint that regards such a search and seizure by Defendant Woods of Plaintiff's mail is vague and conclusory. [82] Even taking as true Plaintiff's allegations, the mail in question consisted of clearly identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from, persons bearing the last name of Alcivar). [83] I fail to see how any search and confiscation of such contraband would have violated the Fourth Amendment. Indeed, such a search and confiscation would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the Inmate Correspondence Program). [84]

82    (Dkt. No. 5, ¶ 12 [Am. Compl.].)

83    I note that the alleged "interception" by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents [belonging to Inmate Alcivar] being in [Plaintiff's] possession" and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

84    *See, e.g.,* DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit ... services, or goods."), § III.G.1. ("All incoming general correspondence will be opened and inspected for ... photocopied materials, or contraband.") (5/18/02).

As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

### C. Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) an Eighth Amendment claim because (1) Plaintiff has not established (or even alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and (2) he has not established that Defendants were *deliberately* indifferent to Plaintiff's health or safety. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he has established

a deprivation that is "sufficiently serious" through his evidence that he experienced a back injury while in SHU as a result of his "twisted bunk," and (2) he has established such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

**\*12** With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference" exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

1. Sufficiently Serious Deprivation

Plaintiff alleges that he was diagnosed with "spondylolisthesis"[85] in September of 2002 as a result of sleeping on a defective bed.[86] As far as I can tell from

available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a prisoner civil rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a serious medical need.[87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint,[88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need.[89]

| [85] | "Spondylolisthesis" is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth,* 92-CV-6140, 1993 U.S. Dist. LEXIS 10233, at \*35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman's Medical Dictionary* at 1456[25th ed.1990] ). |

| [86] | (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No. 37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff describes his injury generally].) |

| [87] | *See Villante v. N.Y. State DOCS,* 96-CV-1484, 2002 U.S. Dist. LEXIS 26279, at \*4, 8-9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report-recommendation,* 2002 U.S. Dist. LEXIS, at \*11-12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.); *Rowland,* 1993 U.S. Dist. LEXIS 10233, at \*13-16, 30; *Smith v. Umar,* 89-CV-6988, 1989 U.S. Dist. LEXIS 14170, at \*4-6, 8-10 (E.D.Pa. Nov. 28, 1989). |

| [88] | (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am. Compl., alleging that Defendants-who are non-medical personnel-violated Plaintiff's Eighth Amendment rights by placing him in, and keeping him in, SHU, despite knowing of the allegedly substandard conditions there, which included his allegedly defective bunk].) |

| [89] | (Dkt. No. 37, Part 23 at 42-43, 53, 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff was deliberately indifferent to a serious medical need].) |

Smith v. Woods, Not Reported in F.Supp.2d (2006)
Case 9:17-cv-01003-BKS-TWD    Document 65    Filed 06/21/19    Page 50 of 237
2006 WL 1133247

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he suffered from "spondylolisthesis," but do challenge his allegation that he was assigned a bunk bed that was in any way defective. [90] In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after the time in question. [91]

[90]   (Dkt. No. 37, Part 25 at 14 [Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged' in any manner," citing record evidence in an attempt to support that argument].)

[91]   (*See, supra,* Statement of Fact No. 29.)

**\*13** More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question. Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed, [92] there is evidence indicating that Plaintiff's back injury existed *before* he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002. [93] There is even evidence indicating that Plaintiff's back injury existed before he was admitted to SHU on September 6, 2002. [94]

[92]   (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].)

[93]   (*Compare* Dkt. No. 42, Part 1, ¶¶ 10(a), 11 [Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated" bunk in question-Bunk Number "OS-A1-20(b)"-on **9/23/02,** after having been assigned to two different SHU cells, i.e., first in Cell "SH-0013" and then in Cell "B1-18"] *with* Dkt. No. 5, ¶¶ 26-27 [Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before **9/13/02,** and that the date of diagnosis was **9/20/02**] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on **9/18/02**] *and* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first

requested sick call on **9/9/02,** or three days after his admission to SHU].)

[94]   (Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on **9/9/02** containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT **in the past.** I request a **repeat treatment** series for 6 weeks" and noting that Plaintiff was 51 years old at the time] [emphasis added].)

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was *exacerbated* by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds. [95] For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

[95]   *See Faunce v. Gomez,* No. 97-16943, 1998 U.S.App. LEXIS. 22703, at *3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); *Page v. Kirby,* 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); *Levi v. District of Columbia,* 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at *5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable).

### 2. Deliberate Indifference

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any

evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 3 5, 37, 39, 43 [Am. Compl.].)

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it. [96] More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times. [97] Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antonelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

[96]     (Dkt. No. 5, ¶ 38 [Am. Compl.].)

[97]     (*See, e.g.,* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints. [98] Any assertion by Plaintiff that Defendants Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk. [99]

[98]     (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the

allegedly "dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with* Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].)

[99]     (*Compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

**\*14**  In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October 24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace. [100]

[100]     (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days). [101] Under the circumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

101    *(See, supra,* Statement of Fact No. 24.)

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

### D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed is not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution,

then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

**\*15** *White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at \*6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

#### 1. Availability of Administrative Remedies

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed. [102] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions, testimony containing (at best) inadmissible hearsay, and documents that are completely immaterial to the fact in question. [103] Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds] are proper subjects of grievances." (Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

[102]  (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[103]  (*See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which Plaintiff appears to argue-without any citation to evidence-that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]." *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,* "the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the PLRA]." *See Brown v. Croak,* 312 F.3d 109, 112-113 (3d

Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*16**  Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question. [104] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that he told him that the matter was not grievable. [105]

[104]  (*See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

[105]  (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

### 2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

### 3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities

in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year of law school. [106] He admits that, at the time of the incident, he was familiar with the grievance process at Greene C.F. [107] Indeed, he had filed grievances immediately before and during this very time period. [108] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

[106]    (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

[107]    (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[108]    (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that his Eighth Amendment claim be dismissed.

E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim

**\*17** In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-

time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia, Heck v. Humphrey,* 512 U .S. 477 (1994) and *Edwards v. Balisok,* 520 U.S. 641 (1997) ].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their modest threshold burden with regard to this issue. [109] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to (1) whether or not his disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated. [110] He has not done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated. [111]

[109]    *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986); *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely ... upon the lack of evidentiary support for plaintiff's retaliation claims ... is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims.") [citations omitted].

[110]    *See Griffin v. Selsky,* 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); *McNair v. Jones,* 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at \*7-8 (S.D.N.Y.2003); *Dawes v. Dibiase,* 91-CV-0479, 1997 WL 376043, at \*7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

111    (*See, e.g.,* Dkt. No. 5, ¶ 18 [Am. Compl., containing sworn allegation that Plaintiff was sentenced to three months loss of good-time credits]; Dkt. No. 42, Part 1 [Plf.'s Response to Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's disciplinary sentence did not affect Plaintiff's loss of good-time credits]; Dkt. No. 38, Part 4 at 32 [Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s Response, arguing that "even though plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not make plaintiff's claims 'not cognizable'...."].)

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be dismissed.

F. Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a claim for conspiracy because (1) such a claim falls not under 42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3) Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative and conclusory allegations of conspiracy, *see, e.g.,* Dkt. No. 5, ¶¶ 21-22 (Am.Compl.). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues that the evidence does establish such a meeting of the minds because (1) in their affidavits, Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary charge be filed and decided by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

**\*18** I agree with Defendants largely for the reasons stated, and based upon the cases cited, in their memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be asserted under 42 U.S.C. § 1985. *See Webb v. Goord,*

340 F.3d 105, 110 (2d. Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights" as Section 1985 claim). To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb,* 340 F.3d at 110 [internal quotation marks and citations omitted]. Where a plaintiff does not provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy claim fails. *Id.* (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants"); *Boddie v. Schneider,* 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general. It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff. *(See, supra,* Statement of Fact Nos. 25-26.) The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered no *evidence* to the contrary. Plaintiff merely argues that DOCS' policies and procedures would *never* involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff. Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have personal knowledge of such a fact. Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result, I recommend that the Court dismiss Plaintiff's conspiracy claim.

G. Whether Defendants Are Protected by Qualified Immunity

*19 In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known their conduct was violating Plaintiff's clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), cert. denied, 503 U.S. 962 (1992). [112]

Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness" [113] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court explained,

112   *See also Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

113   *See Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's motion papers and response papers, I will assume, for the sake of argument, that Plaintiff is claiming he had, among others, the following rights: (1) a right to have Defendant Holt take control of Inmate Alcivar's legal materials when Plaintiff offered those materials to Defendant Holt, and to later acknowledge his failure to take control of those materials; (2) a right to have Defendant Woods personally visit Plaintiff in his "cube," and not launch a disciplinary investigation against him, following Plaintiff's notes to

Defendant Woods; (3) a right to have Defendants Belarge and O'Donnell not open or read Plaintiff's correspondence to and from Inmate Alcivar's two daughters, following Plaintiff's notes to Defendant Woods; (4) a right to have Defendant Antonelli recuse himself based on the (alleged) fact that Plaintiff and Defendant Antonelli, one week before the disciplinary hearing, had had an "encounter" regarding the conditions of the equipment in the prison mess hall; and (5) a right to be either transferred to a new cell in SHU, or provided with a new bunk bed in SHU, *immediately* upon making an oral complaint about his bunk bed to Defendants Woods, Belarge, O'Donnell, Antonelli and/or Holt (or upon the observations of that bunk bed by those Defendants).

**\*20** As an initial matter, it is unclear to me that any of these rights were "clearly established" in the summer and fall of 2002 (or are clearly established now). In any event, even if these rights were clearly established, it appears entirely reasonable to me for Defendants to have concluded that their treatment of Plaintiff did not violate these rights (or any rights). Simply stated, I can find no *evidence* in the record that Defendants Holt, Woods, Belarge, O'Donnell or Antonelli did anything wrong. At the very least, officers of reasonable competence could have disagreed as to the lawfulness of Defendants' actions..

As a result, even if the Court does not dismiss all of Plaintiff's claims for the reasons stated earlier in this Report-Recommendation, I recommend that the Court dismiss all of Plaintiff's claims based on qualified immunity.

H. Plaintiff's Motion for Partial Summary Judgment
Based on the above reasons, I find that Plaintiff's motion for partial summary judgment-which (at best) contains

arguments regarding the issues discussed above-is without merit. I reach this conclusion for the independent reason that Plaintiff's Rule 7.1 Statement of Material Facts (Dkt. No. 38, Part 2) generally does not contain any citations to the record; and, to the extent that Rule 7.1 Statement does contain citations to the record, the record generally does not actually support the facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) ( *"Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."*) [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial summary judgment (Dkt. No. 38) be *DENIED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1133247

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

 **\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*' s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*
It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

[1]  In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*
For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall

have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Kimbrough v. Fischer, Not Reported in Fed. Supp. (2014)

2014 WL 12684106

2014 WL 12684106
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Melvin KIMBROUGH, Plaintiff,

v.

Brian FISCHER, Albert Prack, T. Fauss,
Abate, H. Hai, McCarthy, Defendants.

9:13-CV-0100 (FJS/TWD)
|
Signed 09/29/2014

**Attorneys and Law Firms**

MELVIN KIMBROUGH, 00-A-2134, Attica
Correctional Facility, Box 149, Attica, NY 14011, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General
for the State of New York, OF COUNSEL: TIFFINAY
M. RUTNIK, ESQ., The Capitol, Albany, NY 12224,
Counsel for Defendants.

## REPORT-RECOMMENDATION and ORDER

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**\*1** This pro se prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to
me for Report and Recommendation by the Honorable
Frederick J. Scullin, Jr., Senior United States District
Judge, pursuant to 28 U.S.C. § 636(b) and Local
Rule 72.3(c). Plaintiff Melvin Kimbrough claims that
Defendants violated his constitutional rights when they
punished him for passing Black Nationalist literature to
another inmate. (Dkt. No. 1.) Currently pending before
the Court is Defendants' motion for summary judgment
pursuant to Federal Rule of Civil Procedure 56.[1] (Dkt.
Nos. 47.) For the reasons discussed below, I recommend
that Defendants' motion be granted in part and denied in
part.

[1] Plaintiff has also filed a motion for summary
judgment. (Dkt. No. 49.) That motion will be
discussed in a separate Report-Recommendation.

## I. FACTUAL AND PROCEDURAL SUMMARY

Plaintiff alleges that in July 2003, when he was housed at
Upstate Correctional Facility ("Upstate"), he ordered and
received a pamphlet titled "Black Nationalism." (Dkt. No.
1 at 5.[2]) Officials at Upstate allowed him to possess the
pamphlet. *Id.* at 5-6.

[2] Citations to page numbers in the complaint refer to
the page numbers assigned by the Court's electronic
filing system.

In August 2003, Plaintiff was transferred to Auburn
Correctional Facility ("Auburn"). (Dkt. No. 1 at 6.)
Plaintiff remained there until June 2010. *Id.* On June 6,
2010, Plaintiff was informed that he would be transferring
to a medium security facility. *Id.* On June 7, 2010,
Plaintiff passed "an abundance of papers" to another
inmate to throw away. *Id.* These papers included Black
Nationalist literature. *Id.* Defendant Correction Officer J.
Hai intervened and confiscated the papers from the other
inmate. *Id.*

Plaintiff arrived at Mohawk Correctional Facility
("Mohawk") on June 8, 2010, and was immediately placed
in solitary confinement without any explanation. (Dkt.
No. 1 at 6.) On June 9, 2010, Plaintiff was issued a
misbehavior report that charged him with violating 105.13
(Unauthorized Organizations), 105.14 (Unauthorized
Organizational Activities), 113.22 (Possessing Prohibited
Articles), and 114.10 (Smuggling). *Id.*

On June 11, 2010, Defendant T. Fauss began the Tier
III disciplinary hearing regarding the June 9, 2010,
misbehavior report. (Dkt. No. 1 at 7.) He adjourned the
hearing to allow Plaintiff to receive assistance, a rule book,
and his personal property from Auburn. *Id.* This personal
property included Plaintiff's receipts for the allegedly
unauthorized materials. *Id.* at 6. Plaintiff was provided
with an outdated rule book. *Id.* at 7. His "efforts to retrieve
his receipts for Black Nationalist literature were thwarted
by prison officials." *Id.*

Plaintiff asked his assigned assistant to obtain copies of his
disbursement receipts from prison business office records.
(Dkt. No. 1 at 7.) The assistant was unsuccessful because
facility records only went back three years. *Id.* He advised
Plaintiff to obtain a monthly statement from DOCCS'
central office. *Id.*

**\*2** Defendant Fauss restarted the disciplinary hearing
on June 14, 2010. (Dkt. No. 1 at 7.) Plaintiff pleaded

Kimbrough v. Fischer, Not Reported in Fed. Supp. (2014)
2014 WL 12684106

Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 63 of 237

not guilty to all of the charged violations. *Id.* Plaintiff
also moved to dismiss the charges for violating Rules
105.13 and 105.14 because those rules were not listed
in the copy of the rule book that had been given to
him. *Id.* Plaintiff also argued that he should not be
charged with violating Rule 105.13 because it pertained
to gangs rather than unauthorized organizations. *Id.*
Plaintiff argued that Defendant Hai had "attempted to
enhance the magnitude of [the] alleged violation" by
charging Plaintiff with violating both Rule 105.13 and
105.14. *Id.* Plaintiff testified that the Black Nationalist
literature had been "reviewed, permitted and delivered to
him" at Upstate and that it posed no threat to the safety
and security of the institution. *Id.*

The hearing continued on June 15, 2010, with testimony
from the inmate to whom Plaintiff handed the materials
and from Defendant Hai. (Dkt. No. 1 at 8.)

Defendant Fauss found Plaintiff guilty of all four rule
violations. (Dkt. No. 1 at 8.) He imposed sanctions of
120 days' solitary confinement, 120 days' loss of good
time credits, and loss of phone, commissary, and package
privileges. *Id.*

Plaintiff alleges that after finding him guilty, Defendant
Fauss turned off the tape recorder and said "You know
what this is about, Mr. Hai told me about you. That Black
Nationalist bullshit is not tolerated!" (Dkt. No. 1 at 8.)

Plaintiff appealed Defendant Fauss' determination to
Defendant Brian Fischer, the Commissioner of DOCCS.
(Dkt. No. 1 at 8.) On July 20, 2010, Defendant
Albert Prack, Acting Director of Special Housing/
Inmate Disciplinary Program, modified Defendant Fauss'
decision by dismissing the Rule 105.13 charge. *Id.* at 8, 25.
Defendant Prack affirmed the other sanctions. *Id.*

On August 16, 2010, Plaintiff submitted a four-page
grievance. (Dkt. No. 51-6 at 17-20.) The third paragraph
of the grievance stated that Plaintiff's "complaint is 1st,
5th, 8th, and 14th amendment violations in regards to
a ticket written on me ... on 6/7/10." *Id.* at 17. Plaintiff
described the circumstances leading to Defendant Hai's
issuance of the misbehavior report. *Id.* at 17-18. He
stated that Defendant Hai "failed to substantiate how me
possessing the said material constitutes a violation under
the ... rules." *Id.* at 18. Plaintiff complained, in particular,
that both Rule 105.13 and Rule 105.14 stated that the rules

"exclude[ ] published materials," and the materials that he
passed to the other inmate were published. *Id.* Plaintiff
alleged that the misbehavior report "was malicious and
he intended to cause me an (sic) deprived indifference
by writing an insufficient ticket based on nonlegitimate
(sic) charges." *Id.* Plaintiff stated that the fact that neither
his rule book nor Defendant Fauss' rule book contained
Rules 105.13 and 105.14 violated his "1 st , 5 th , 8 th &
14 th amendment rights." *Id.* at 19. He complained that
his punishment had not been modified when Defendant
Prack dismissed the Rule 105.13 charge. *Id.* at 19-20.

Plaintiff declares that the Inmate Grievance Program
immediately answered his August 16, 2010, grievance by
stating that the issue was non-grievable and that he should
pursue the matter in the courts. (Dkt. No. 51-3 at 33.)

On August 17, 2010, Plaintiff filed another grievance.
(Dkt. No. 47-7 at 12.) Plaintiff stated that:

> I received a response on my Appeal
> that it was reviewed and modified
> by Albert Prack, Acting Director
> for Special Housing. Charge 105.13
> was dismissed. On 7/25/10, I wrote
> a letter to the Superintendent
> in pursuit of NYCRR Title 7,
> Section 254.9 (2004), which gives
> the superintendent the authority
> to reduce a penalty even if the
> Commissioner decides not to. On
> 7/27/10, Captain Rockwood, acting
> on behalf of the Superintendent,
> refused to modify my penalty which
> was imposed by a charge that was
> dismissed!

**\*3** *Id.* Plaintiff requested that "all penalties upon me
for being guilty of 105.13 be lifted." *Id.* The Inmate
Grievance Resolution Committee ("IGRC") responded
on August 24, 2010. *Id.* The IGRC stated that it
did "not have the authority to grant [the] requested
action. The Grievant has exhausted his Administrative
Remedies relative to his disciplinary issues and may
proceed to the Courts to address the issues contained
in this complaint." *Id.* The Superintendent responded on

September 9, 2010, affirming the findings of the IGRC. *Id.* Plaintiff appealed to the Central Office Review Committee ("CORC"). *Id.* Plaintiff stated that the Superintendent's decision was "evasive" because "[h]e failed to specifically address why he [can't] modify my penalties." *Id.* CORC responded on December 1, 2010. *Id.* at 10. CORC upheld the Superintendent's decision. *Id.* CORC noted that because Plaintiff challenged a disposition resulting from a disciplinary proceeding, the issue was non-grievable. *Id.*

On September 23, 2010, Plaintiff was transferred back to Auburn. (Dkt. No. 1 at 9.) He was met by a sergeant, who "with the intent to har[ ]ass" him, stated "Mr. Hai told me to tell you welcome back, and he hope you enjoyed your summer!" *Id.* From September 24 through September 28, 2010, Defendant Hai continued to send similar messages to Plaintiff through other correction officers. *Id.*

Sometime between September 24 and September 28, 2010, Plaintiff spoke with the inmate to whom he had passed his papers. (Dkt. No. 1 at 9.) The inmate informed Plaintiff that he had been allowed to serve his sentence for the June 7, 2010, incident on keeplock status in his general population cell. *Id.*

On September 30, 2010, Plaintiff was informed that he had been placed on "immediate draft status." (Dkt. No. 1 at 9.) The escort officers informed Plaintiff that Defendant McCarthy, the Acting Deputy Superintendent of Security, did not want Plaintiff in his facility. *Id.*

Plaintiff arrived at Five Points Correctional Facility ("Five Points") on September 30, 2010. (Dkt. No. 1 at 9.) There, he was "made aware" that Defendant Hai had trained and worked under Defendant McCarthy. *Id.*

Plaintiff alleges that he was constantly harassed at Five Points. (Dkt. No. 1 at 9-10.) He alleges that as he was being initially processed at the facility he saw five escort officers whispering with Five Points officers while pointing at Plaintiff. *Id.* at 9. He alleges that he was "treated with overt hostility" and told that "you won't be here long asshole." *Id.* Plaintiff alleges that his cell was searched weekly, he was required to submit to weekly urinalysis testing, and his girlfriend was verbally and sexually harassed. *Id.* Two weeks after arriving at Five Points, Plaintiff was placed on mail watch. *Id.*

Plaintiff alleges that on October 28, 2010, he was falsely accused of violating Rule 105.13 (gang affiliation). (Dkt. No. 1 at 9.) On November 8, 2010, Plaintiff was found guilty and sentenced to five months of solitary confinement, two months' lost good time credits, and five months of lost privileges. *Id.* at 10. Plaintiff challenged the finding both administratively and through a state court Article 78 proceeding. *Id.* The initial determination was affirmed. *Id.*

Plaintiff alleges that on November 18, 2010, he was again falsely charged with violating Rule 105.13. (Dkt. No. 1 at 10.) He was found guilty and sentenced to twelve months of solitary confinement, six months' lost good time credits, and twelve months of lost privileges. *Id.* Plaintiff challenged the finding both administratively and through a state court Article 78 proceeding. *Id.* The initial determination was affirmed. *Id.*

Plaintiff alleges that while he was housed in solitary confinement, he was locked down for twenty-four hours a day in a sixty-foot double bunk cell. (Dkt. No. 1 at 10.) The light was kept on all night. *Id.* He had no privacy, was not allowed to participate in sports or social gatherings, was unable to attend religious services, was not allowed to have contact visits, received the "bare minimum personal property and food rations." *Id.* Plaintiff was released from solitary confinement on April 21, 2012. *Id.* He alleges that the time he served in solitary confinement was all "a compound result of prejudice and harassment, set in motion by [D]efendant J. Hai's initial misbehavior report." *Id.*

**\*4** Plaintiff filed an Article 78 proceeding in state court challenging his disciplinary conviction. (Dkt. No. 1 at 8.) On June 21, 2012, the appellate division ruled in Plaintiff's favor and ordered DOCCS to expunge the disciplinary conviction, restore all of Plaintiff's privileges, and restore Plaintiff's good time credits. *Id.*; *Kimbrough v. Fischer,* 946 N.Y.S.2d 714 (N.Y. App. Div. 3d Dep't 2012). The court stated that:

> On the record before us, we cannot conclude that substantial evidence supports the determination finding petitioner guilty of possessing unauthorized organizational material. The disciplinary rule at issue provides, in pertinent part, that '[a]n inmate shall not ... possess printed or handwritten material relating to an unauthorized organization where such material advocates either expressly or by clear implication,

2014 WL 12684106

violence based upon race, religion, sex, sexual orientation, creed, law enforcement status or violence or acts of disobedience against department employees or that could facilitate organizational activity within the institution by an unauthorized organization.' Significantly, the documents that petitioner possessed did not refer to any particular organization nor did they advocate violence or acts of disobedience. Further, as no evidence was presented in the misbehavior report, the hearing testimony, or elsewhere to sustain the remaining charges on a basis independent of a finding that the materials petitioner possessed were unauthorized, those charges must also be annulled.

*Id.* at 714-15.

Plaintiff filed this action on January 28, 2013. (Dkt. No. 1.) The complaint asserts the following causes of action: (1) a First Amendment claim against Defendant Hai for confiscating Plaintiff's papers and issuing the misbehavior report and against Defendant Abate [3] for failing to dismiss the misbehavior report (*id.* at 10-11); (2) a due process claim against Defendant Fauss for his conduct during the disciplinary hearing, against Defendant Prack for affirming the majority of the hearing results, and against Defendant Fischer for failing to reverse the disciplinary decision (*id.* at 11, 13); (3) an equal protection claim against Defendants Hai, McCarthy, and Fauss (*id.* at 12-13); and (4) an Eighth Amendment claim against Defendants Hai, Abate, Fauss, Prack, and Fischer (*id.* at 14-15).

[3]     The complaint does not make any reference to Defendant Abate other than asserting that he had the authority to dismiss the misbehavior report.

Defendants now move for summary judgment. (Dkt. No. 47.) Plaintiff has opposed the motion and filed a cross-motion for summary judgment. (Dkt. Nos. 49, 51.) Defendants have opposed the cross-motion and replied to Plaintiff's opposition. (Dkt. Nos. 51-52.) Plaintiff has replied to Defendants' opposition. (Dkt. No. 53.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* at 273. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [4] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

[4]     A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*, 477 U.S. at 248.

### B. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

*5 To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968); *accord Katz v. Molic*, 128 F.R.D. 35, 37-38 (S.D.N.Y. 1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint on the ground that the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In

order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but it has not shown that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## III. ANALYSIS

### A. Exhaustion of Administrative Remedies

Defendants argue that all of Plaintiff's claims except his due process claim must be dismissed because Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). (Dkt. No. 47-1 at 2-5.[5]) For the reasons discussed below, I recommend that the Court deny the motion for summary judgment on this ground.

[5]    Citations to page numbers in Defendants' memorandum of law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). In New York state prisons, the Department of Corrections and Community Supervision ("DOCCS") has a well-established three-step inmate grievance program. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2013).

**\*6** Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*Id.* at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id.* at § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to CORC for a decision under the process applicable to the third step. *Id.* at 701.5(c)(3)(I).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* at 701.5(d)(1)(I). CORC is to render a written

Kimbrough v. Fischer, Not Reported in Fed. Supp. (2014)

2014 WL 12684106

decision within thirty calendar days of receipt of the appeal. *Id.* at 701.5(d)(3)(ii).

DOCCS has a separate and distinct administrative process for inmates to appeal the result of disciplinary hearings, which is not referred to as a "grievance" process. In fact, the regulations specifically state that the results of disciplinary hearings are "non-grievable." N.Y. Comp. Codes R. & Regs. tit. 7, § 701.3(e)(1)-(2) (2010). For Tier III disciplinary hearings, the appeal is to the Commissioner of DOCCS. N.Y. Comp. Codes R. & Regs. tit. 7, § 254.8 (2010). An inmate's appeal of a disciplinary hearing decision "constitutes exhaustion under the PLRA for purposes of rendering his due process claim ripe for adjudication in federal court." *Davis v. Barrett*, 576 F.3d 129, 132 (2d Cir. 2009).

Where an inmate claims both that there was official misconduct in the events leading to the disciplinary hearing and that the hearing itself was constitutionally flowed, he must follow both DOCCS procedures. *See Rosales v. Bennett*, 297 F. Supp. 2d 637, 639 (W.D.N.Y. 2004). The inmate:

> cannot satisfy the PLRA's exhaustion requirement as to grievable matters that do not directly relate to the *conduct* of a hearing simply by alluding to them in his administrative appeal of the hearing decision. For example, if at the hearing the inmate asserts, or attempts to assert, allegations of misconduct by the correction officers involved in the underlying events, the inmate cannot adequately exhaust his remedies for PLRA purposes through his administrative appeal of the hearing decision; he must separately grieve the alleged misconduct of the officers.

*Id.* (collecting cases) (emphasis in original).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford*, 548 U.S. at 93.

Here, Plaintiff properly exhausted his due process claim regarding Defendant Fauss' conduct of the disciplinary hearing by pursuing an appeal of the disciplinary conviction and receiving a final decision from Defendant Prack, the Commissioner's designee. (Dkt. No. 1 at 8.) However, Plaintiff did not exhaust any of his other claims because the only decision he received from CORC involved solely the issue of whether his punishment should have been reduced when the Rule 105.13 charge was dismissed. (Dkt. No. 47-7 at 10.) Therefore, Plaintiff failed to exhaust his administrative remedies as to his First Amendment, equal protection, and Eighth Amendment claims.

**\*7** Plaintiff's failure to exhaust, however, does not end the review. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004). [6]

[6]     The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford*, 548 U.S. 81. *Amador v. Andrews*, 655 F.3d 89, 102 (2d Cir. 2011).

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill*, 380 F.3d at 686 (citation omitted). Here, as discussed above, the grievance process was available to Plaintiff.

Second, if those remedies were available:

> the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the

plaintiff's failure to exhaust as a defense.

*Hemphill*, 380 F.3d at 686 (citations omitted). Here, Defendants preserved the exhaustion defense by asserting it in their answer. (Dkt. No. 26 ¶ 15; *Jones*, 549 U.S. at 216; *Alster v. Goord*, 745 F. Supp. 2d 317, 332 (S.D.N.Y. 2010).) Defendants are not estopped from asserting the exhaustion defense because Plaintiff has not alleged that any of the individual Defendants inhibited him from filing grievances.

Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Hemphill*, 380 F.3d at 686 (citations and internal quotations omitted). Justification "must be determined by looking at the circumstances which might understandably lead ... uncounselled prisoners to fail to grieve in the normally required way." *Giano v. Goord*, 380 F.3d 670, 678 (2d Cir. 2004). Here, prison officials rejected the grievance that Plaintiff filed complaining about some of the issues underlying his disciplinary convictions as "non-grievable" and instructed him to pursue his issues in the courts. (Dkt. No. 51-3 at 33.) Under these circumstances, Plaintiff has raised a triable issue of fact that his failure to properly exhaust his administrative remedies was justified. Therefore, I recommend that the Court deny Defendants' motion for summary judgment on this ground.

Generally, where a plaintiff has raised a triable issue of fact as to an excuse under *Hemphill* for failing to exhaust, I would recommend that the Court set the matter for an evidentiary hearing on the issue of exhaustion. Here, however, as discussed below, Defendants are entitled to summary judgment on the merits as to each of Plaintiff's unexhausted claims. Thus, even if Plaintiff demonstrated at a hearing that his failure to exhaust was justified, Defendants would still be entitled to judgment in their favor on the unexhausted claims. As discussed further below, Defendants are not entitled to summary judgment in their favor on the due process claims. If there were an issue as to the exhaustion of those claims, I would recommend that the Court conduct an evidentiary hearing regarding exhaustion. However, Defendants concede that

Plaintiff properly exhausted his administrative remedies as to his due process claims against Defendants Fauss and Prack. Therefore, no evidentiary hearing is necessary.

**B. Personal Involvement by Defendant Fischer**

*8 Defendants argue that Defendant Fischer is entitled to summary judgment because there is no evidence that he was personally involved in any of the alleged constitutional violations. (Dkt. No. 47-1 at 19-22.) Defendants are correct.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some "tangible connection" between the unlawful conduct and the defendant. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). If the defendant is a supervisory official, a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (per curiam); *Wright*, 21 F.3d at 501; *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) (per curiam). In other words, supervisory officials may not be held liable merely because they held positions of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996) (citations omitted). Rather, supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citations omitted). [7]

[7]   In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the

Kimbrough v. Fischer, Not Reported in Fed. Supp. (2014)

2014 WL 12684106

official's purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. *See Sash v. United States*, 674 F. Supp. 2d 531, 543-44 (S.D.N.Y. 2009) (collecting cases). The Second Circuit itself has noted that "*Iqbal* has ... engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon*." *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012). The Second Circuit declined to address the issue in *Reynolds*, however, and has not addressed it since that time. I will assume for the purposes of this motion that *Colon* remains good law.

Here, there is no evidence that Defendant Fischer was personally involved in any of the incidents of which Plaintiff complaints. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendant Fischer.

### C. Due Process

**\*9** Plaintiff asserts due process claims against Defendants Fauss and Prack. (Dkt. No. 1 at 11.) Defendants, who concede that Plaintiff exhausted his administrative remedies regarding these claims, move for summary judgment of these claims. (Dkt. No. 47-1 at 10-13.) For the reasons discussed below, I recommend that the Court deny the motion for summary judgment of these claims.

### 1. Defendant Fauss

In order to prove that procedural due process rights were violated, a plaintiff must show that he was deprived of a cognizable liberty or property interest without due process of law. *McKithen v. Brown*, 626 F.3d 143, 151 (2d Cir. 2010). An inmate has a liberty interest in remaining free from a confinement or restraint where the confinement or restraint imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Tellier v. Fields*, 280 F.3d 69, 80 (2d Cir. 2000); *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996).

Defendants concede for the purposes of this motion "that the penalty imposed here, four months in special

housing, implicated a liberty interest." (Dkt. No. 47-1 at 10.) Defendants, however, "dispute whether plaintiff was deprived of that interest as a result of insufficient process." *Id.*

Due process is satisfied if an inmate facing disciplinary charges receives (1) advanced written notice of the charges against him; (2) a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; (3) a fair and impartial hearing officer; and (4) a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken. *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974); *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). In some circumstances, such as where the inmate is illiterate or where the complexity of an issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, an inmate may also be entitled to assistance from another inmate or from prison staff in preparing his defense. *Wolff*, 418 U.S. at 570.

Here, Plaintiff does not challenge the sufficiency of the written notice he received, allege that he was not given a reasonable opportunity to call witnesses and present evidence, or challenge the sufficiency of the written statement of the disposition. (Dkt. No. 51-5 at 11-15. [8]) Rather, he argues that Defendant Fauss was not a fair and impartial hearing officer and that Defendant Prack should not have affirmed the hearing decision. *Id.*

[8]   Citations to page numbers in Plaintiff's opposition refer to the page numbers in original document rather than to the page numbers assigned by the Court's electronic filing system.

It is well settled "that the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally." *Espinal v. Goord*, 180 F. Supp. 2d 532, 539 (S.D.N.Y. 2002) (citing *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989)). Due process in this context requires only that the hearing officer's decision not be "arbitrary." *Wolff*, 418 U.S. at 571. A decision is not "arbitrary" if it is supported by "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985). "This standard is extremely tolerant and is satisfied 'if there is *any* evidence in the record that supports' the disciplinary ruling." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (emphasis in original) (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). In contrast

to this "extremely tolerant" federal standard, "New York law requires prison disciplinary rulings to be supported by sufficiently relevant and probative information to constitute *substantial* evidence. This requirement is sterner than the 'some evidence' standard necessary to afford due process." *Sira*, 380 F.3d at 76 n.9 (emphasis added) (internal citations omitted).

**\*10** Here, there was not "some evidence" that Plaintiff violated Rule 105.13. That rule states that an inmate:

> shall not engage in or encourage others to engage in gang activities or meetings, or display, wear, possess, distribute or use gang insignia or materials including, but not limited to, printed or handwritten gang or gang related material. Note: For purposes of this rule, a gang is a group of individuals, having a common identifying name, sign, symbol or colors, who have individually or collectively engaged in a pattern of lawlessness (e.g., violence, property destruction, threats of harm, intimidation, extortion, or drug smuggling) in one or more correctional facilities or that are generally recognized as having engaged in a pattern of lawlessness in the community as a whole. For purposes of this rule, printed or handwritten gang or gang related material is written material that, if observed in the inmate's possession, could result in an inference being drawn about the inmate's gang affiliation, but excludes published material that the inmate has obtained through the facility library or that has been approved for the inmate to possess through the media review process.

N.Y. Comp. Codes R. & Regs. tit. 7, § 270.2 (2013). There was no evidence presented at the disciplinary hearing that Plaintiff distributed gang materials. Defendant

Fauss' guilty finding on this charge was subsequently reversed. (Dkt. No. 1 at 8, 25.) This reversal does not protect Defendant Fauss from liability because it is well established in the Second Circuit that subsequent administrative reversals do not cure procedural defects in disciplinary hearings. *Walker v. Bates*, 23 F.3d 652, 657 (2d Cir. 1994).

There was also not "some evidence" that Plaintiff violated Rule 105.14. That rule states that an inmate:

> shall not engage in or encourage others to engage in unauthorized organizational activities or meetings, or possess printed or handwritten material relating to an unauthorized organization where such material advocates either expressly or by clear implication, violence based upon race, religion, sex, sexual orientation, creed, law enforcement status or violence or acts of disobedience against department employees or that could facilitate organizational activity within the institution by an unauthorized organization.... This rule excludes possession of published material that the inmate has obtained through the facility library or that has been approved for the inmate to posses through the media review process.

N.Y. Comp. Codes R. & Regs. tit. 7, § 270.2 (2013).

The rule clearly states that inmates who possess published material that has been approved through the media review process cannot be found guilty of violating the rule. Plaintiff raised this issue at his disciplinary hearing, noting that the publications were from an approved vendor and that "I shouldn't be penalized or punished just by having this." (Dkt. No. 47-11 at 50.) Defendant Fauss stated that:

> I have had numerous hearings where
> guys have been ... charged with
> having possession of things that
> they shouldn't have whether it be
> gang related or things that they
> purchased ... and ... the staff at
> the facilities do their best to review
> things and if it is stuff that is not
> allowed in they stop it. They don't
> allow it to come in, but the reality
> is that they can't review every little
> thing that comes into the facility,
> so the responsibility is placed on
> the person receiving it, the inmate
> receiving the material. If you are in
> possession of something that you are
> not supposed to have that is on you
> because that is in your possession
> and that is the way it is looked at....
> Just to let you know.

**\*11** *Id.* at 51.

Defendants argue that Defendant "Fauss correctly explained to [Plaintiff] that it is the responsibility of the inmate to ensure that his possessions ultimately conform with DOCCS rules, not the officials who screen materials coming into the prison." (Dkt. No. 47-1 at 11-12.) Defendants, however, cite no authority for the proposition that this was a "correct" statement of the rules. On the record before the Court, in fact, Defendant Fauss' statement appears to directly contradict the plain language of Rule 105.14.

Defendants have not shown that they are entitled to judgment as a matter of law that Defendant Fauss' decision was supported by "some evidence." Therefore, I recommend that the Court deny Defendants' motion for summary judgment on this ground.

### 2. Defendant Prack

Plaintiff's due process claim against Defendant Prack is premised on the fact that he affirmed the majority of Defendant Fauss' decision. (Dkt. No. 1 at 8, 11.)

Defendants appear to argue that this allegation is insufficient to implicate Defendant Prack's personal involvement. (Dkt. No. 47-1 at 13.) For the reasons discussed below, I recommend that the Court deny Defendants' motion for summary judgment on this ground.

Defendants correctly note that "[d]istrict courts are split in the Second Circuit on the issue of whether simply affirming an allegedly unconstitutional disciplinary decision will implicate the requisite personal involvement for § 1983 liability." (Dkt. No. 47-1 at 13 n.3.) Courts declining to find personal involvement conclude that there is no "ongoing" violation for the supervisory official to "remedy" in such a situation. *See Jamison v. Fischer, No. 11 Civ. 4697 RJS, 2012 U.S. Dist. LEXIS 144307, at \*14-15, 2012 WL 4767173, at \*5 (S.D.N.Y. Sept. 27, 2012)* ("Despite the fact that Plaintiff continued to be housed in the SHU, Bezio's involvement and review of the matter was distinct from whatever took place at the hearing, and he cannot be held liable ... for violations that occurred at the hearing and were not ongoing.").[9] *See also Abdur-Raheem v. Selsky, 598 F. Supp. 2d 367, 370 (W.D.N.Y. 2009); Chavis v. vonHagn, No. 02-CV-0119, 2009 U.S. Dist. LEXIS 6871, at \*198-99, 2009 WL 236060, at \*68 (W.D.N.Y. Jan. 30, 2009); Odom v. Calero, No. 06 Civ. 15527, 2008 U.S. Dist. LEXIS 52408, at \*16-20, 2008 WL 2735868, at \*6-7 (S.D.N.Y. July 10, 2008); Ramsey v. Goord, No. 05-CV-47A, 2005 U.S. Dist. LEXIS 42953, at \*18-20, 2005 WL 2000144, at \*6 (W.D.N.Y. Aug. 13, 2005).*

9    The Court will provide Plaintiff with a copy of all of
     unpublished decisions cited herein in accordance with
     the Second Circuit's decision in *Lebron v. Sanders, 557
     F.3d 76 (2d Cir. 2009)* (per curiam).

Other district courts in this circuit have found personal involvement where a supervisory official affirms an allegedly constitutionally infirm hearing decision. *See Thomas v. Calero, 824 F. Supp. 2d 488, 509-10 (S.D.N.Y. 2011); Holmes v. Fischer, 764 F. Supp. 2d 523, 539-40 (W.D.N.Y. 2011); Rodriguez v. Selsky, No. 9:07-CV-0432, 2010 U.S. Dist. LEXIS 23811, at \*14-20, 2010 WL 980273, at \*6 (N.D.N.Y. Mar. 15, 2010)[10]; Baez v. Harris, No. 9:01-CV-807, 2007 U.S. Dist. LEXIS 8728, at \*6, 2007 WL 446015, at \*2 (N.D.N.Y. Feb. 7, 2007); Johnson v. Coombe, 156 F. Supp. 2d 273, 278 (S.D.N.Y. 2001)* These courts find that there is an "ongoing" violation because

having the power to vacate an allegedly unconstitutional decision, refusing to do so, and allowing an inmate to remain in the SHU "knowingly continu[es] a deprivation of liberty without due process of law." *Delgado v. Bezio*, No. 09 Civ. 6899 (LTS), 2011 U.S. Dist. LEXIS 51917, at *27, 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011).

10    Lexis and Westlaw list different dates for this decision. The Court has used the date listed by Westlaw, which represents the date on which the district court judge adopted the magistrate judge's report-recommendation.

**\*12** I agree with Magistrate Judge David E. Peebles that the cases finding personal involvement in such situations "appear to be both better reasoned and more consistent with the Second Circuit's position regarding personal involvement." *Bennett v. Fischer*, No. 9:09-CV-1236, 2010 U.S. Dist. LEXIS 139587, at *38-39, 2010 WL 5525368, at *12 (N.D.N.Y. Aug. 17, 2010). Therefore, I recommend that the Court find that Defendant Prack was personally involved in the alleged constitutional violation and deny Defendants' motion for summary judgment on this ground.

**D. First Amendment**

Plaintiff alleges that Defendants Hai and Abate violated his First Amendment rights by confiscating his materials and by retaliating against him. (Dkt. No. 1 at 10-11.) In addition to arguing that these claims are barred because Plaintiff failed to exhaust his administrative remedies, Defendants move for summary judgment on the merits of these claims. (Dkt. No. 47-1 at 6-10.) For the reasons discussed below, I recommend that the Court grant Defendants' motion for summary judgment as to these claims.

1. Confiscation

Defendants argue that they are entitled to summary judgment of Plaintiff's First Amendment claim regarding the confiscation of his materials. (Dkt. No. 47-1 at 6-10.)

Prison restrictions on inmates' receipt and possession of publications are governed by the test set out in *Turner v. Safley*, 482 U.S. 78 (1987). *Thornburgh v. Abbott*, 490 U.S. 401, 404 (1989). In *Turner*, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. The Court articulated the following factors to consider when determining whether a prison regulation is reasonable: (1) whether the action[11] has a "valid, rational connection" to a legitimate governmental objective[12]; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Id.* at 89-91.

11    Although *Turner* involved prison regulations, the Second Circuit has applied the same analysis to individual decisions that allegedly impinge an inmate's constitutional rights. *See, e.g.*, *Young v. Coughlin*, 866 F.2d 567 (2d Cir. 1989).

12    Courts applying *Turner*, including the Second Circuit, have noted that the first factor "is more properly labeled an 'element' because it is not simply a consideration to be weighed but rather an essential requirement." *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006); *Boles v. Neet*, 486 F.3d 1177, 1181 (10th Cir. 2007).

Regarding the first factor, Defendants argue that Defendant Hai's confiscation of the materials was validly and rationally connected to the legitimate governmental objective of maintaining order in the facility. (Dkt. No. 47-1 at 7.) Preservation of security and discipline do, indeed, constitute legitimate penological interests. *Giano v. Senkowski*, 54 F.3d 1050, 1055 (2d Cir. 1995). Plaintiff argues that Defendant Hai's confiscation of his materials, however, was not validly and rationally related to that legitimate governmental objective because the materials themselves did not violate Rule 105.14. (Dkt. No. 51-5 at 8-9.) Defendant Hai declares that to, his eye, the materials "appear[ed] to advocate civil disobedience inside prisons." (Dkt. No. 47-6 ¶ 11.) Because Defendant Hai confiscated the materials as Plaintiff was being transferred, Plaintiff could not inform him that he had been given permission to possess the materials before Defendant Hai wrote the misbehavior report. Defendant Hai's conclusion was rational and connected to the legitimate objective of maintaining order in the facility. Plaintiff has not introduced any evidence raising a triable issue of fact otherwise.

**\*13** Defendants argue that the remainder of the *Turner* factors weigh in their favor. (Dkt. No. 47-1 at 8-10.) Defendants are correct. Plaintiff does not dispute any of these factors in his opposition, in which he argues entirely about the first factor. (Dkt. No. 51-5 at 8-9.) Therefore, I recommend that the Court grant Defendants' motion for summary judgment of the First Amendment claim against Defendants Hai and Agate.

## 2. Retaliation

Plaintiff claims that Defendant Hai "wrote plaintiff a misbehavior report out of a personal prejudice against the political material of 'Black Nationalism,' thus retaliated for engaging in constitutionally protected conduct, with the intent to cause plaintiff an actual injury (confinement)." (Dkt. No. 1 at 10.) Defendants argue that Plaintiff has not raised a triable issue that he was engaged in protected conduct or that there was a causal connection between any protected conduct and Defendant Hai's actions. (Dkt. No. 47-1 at 9-10.) Defendants are correct.

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill*, 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official even those otherwise not rising to the level of a constitutional violation can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citations omitted), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly suggesting that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Gill*, 389 F.3d at 380 (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d. Cir. 2001)).

As Defendants note, Plaintiff testified at his deposition that his intent in passing the materials to the other inmate was for the other inmate to either throw the materials away or keep them for himself. (Dkt. No. 47-1 at 8.) Plaintiff has not cited, and the Court cannot find, any authority suggesting that this type of conduct is protected.

**\*14** Even if the conduct was protected, Plaintiff has not raised a triable issue of fact that there was a causal connection between his conduct and Defendant Hai's adverse action. Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon*, 58 F.3d at 872-73). "The causal connection must be sufficient to support an

Kimbrough v. Fischer, Not Reported in Fed. Supp. (2014)

Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 74 of 237

2014 WL 12684106

inference that the protected conduct played a substantial part in the adverse action." *Id.* Here, there is no evidence that Defendant Hai was motivated by anything other than his job duty to enforce disciplinary rules. Therefore, I recommend that the Court grant Defendants' motion for summary judgment of the retaliation claim.

### E. Equal Protection

Plaintiff alleges that Defendants Hai, McCarthy, and Fauss violated his right to equal protection. (Dkt. No. 1 at 12-13.) In addition to arguing that this claim is barred because Plaintiff failed to exhaust his administrative remedies, Defendants move for summary judgment on the merits of this claim, arguing that Plaintiff has not raised a triable issue of fact that he was treated differently from any similarly situated individual. (Dkt. No. 47-1 at 14-17.) Defendants are correct.

The Equal Protection Clause provides that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)) (emphasis omitted). Governmental action may also violate the Equal Protection Clause where the defendants intentionally treat the plaintiff "differently from others similarly situated with no rational basis for the difference in treatment." *Id.* (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Thus, a plaintiff asserting an equal protection claim must allege facts plausibly suggesting that (1) he was treated differently from similarly situated individuals; and (2) the defendants treated him differently due to his membership in a suspect class, inhibited his exercise of a fundamental right, acted out of malice, or acted irrationally and arbitrarily.

Here, Plaintiff has not raised a triable issue of fact that he was treated differently from any similarly situated individual. Plaintiff alleges that the inmate to whom he

passed the materials served a less onerous disciplinary sentence than Plaintiff did. (Dkt. No. 1 at 9.) However, that inmate was not similarly situated to Plaintiff because his conduct was different: he merely received the materials that Plaintiff handed to him, whereas Plaintiff was charged with distributing the materials. Therefore, I recommend that the Court grant Defendants' motion for summary judgment of the equal protection claim.

### F. Eighth Amendment

Plaintiff alleges that Defendants Hai, Abate, Fauss, Prack, and Fischer violated his Eighth Amendment rights. (Dkt. No. 1 at 14-15.) In addition to arguing that this claim is barred because Plaintiff failed to exhaust his administrative remedies, Defendants move for summary judgment on the merits of this claim. (Dkt. No. 47-1 at 17-19.) For the reasons discussed below, I recommend that the Court grant Defendants' motion for summary judgment of this claim.

**\*15** The Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials "must 'take reasonable measures to guarantee the safety of the inmates.' " *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

To establish an Eighth Amendment conditions of confinement claim, a plaintiff must prove both an objective and a subjective component. *Farmer*, 511 U.S. at 834. To satisfy the objective component, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the 'minimal civilized measure of life's necessities.' " *Id.* (citations omitted). Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

To satisfy the subjective component, the plaintiff must show that the defendant acted with "deliberate indifference." *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). A prison official demonstrates deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Kimbrough v. Fischer, Not Reported in Fed. Supp. (2014)

2014 WL 12684106

Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 75 of 237

Here, Plaintiff has not alleged or raised a triable issue of fact that he was denied the minimal civilized measure of life's necessities. Therefore, I recommend that the Court grant Defendants' motion for summary judgment of this claim.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 47) be **GRANTED IN PART AND DENIED IN PART**. Specifically, it is recommended that the Court dismiss (1) the First Amendment claims against Defendants Hai and Abate; (2) the equal protection claims against Hai, McCarthy, and Fauss; and (3) the Eighth Amendment claims against Defendants Hai, Abate, Fauss, Prack, and Fischer and that the Clerk terminate Defendants Hai, Abate, McCarthy, and Fischer from the docket. It is recommended that the due process claims against Defendants Fauss and Prack survive the motion for summary judgment; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Jamison v. Fischer*, No. 11 Civ. 4697 RJS, 2012 U.S. Dist. LEXIS 144307, 2012 WL 4767173 (S.D.N.Y. Sept. 27, 2012); *Chavis v. vonHagn*, No. 02-CV-0119, 2009 U.S. Dist. LEXIS 6871, 2009 WL 236060 (W.D.N.Y. Jan. 30, 2009); *Odom v. Calero*, No. 06 Civ. 15527, 2008 U.S. Dist. LEXIS 52408, 2008 WL 2735868 (S.D.N.Y. July 10, 2008); *Ramsey v. Goord*, No. 05-CV-47A, 2005 U.S. Dist. LEXIS 42953, 2005 WL 2000144 (W.D.N.Y. Aug. 13, 2005); *Rodriguez v. Selsky*, No. 9:07-CV-0432, 2010 U.S. Dist. LEXIS 23811, 2010 WL 980273 (N.D.N.Y. Mar. 15, 2010); *Baez v. Harris*, No. 9:01-CV-807, 2007 U.S. Dist. LEXIS 8728, 2007 WL 446015 (N.D.N.Y. Feb. 7, 2007); *Delgado v. Bezio*, No. 09 Civ. 6899 (LTS), 2011 U.S. Dist. LEXIS 51917, 2011 WL 1842294 (S.D.N.Y. May 9, 2011); and *Bennett v. Fischer*, No. 9:09-CV-1236, 2010 U.S. Dist. LEXIS 139587, 2010 WL 5525368 (N.D.N.Y. Aug. 17, 2010).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

**All Citations**

Not Reported in Fed. Supp., 2014 WL 12684106

---

**End of Document**                © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 76 of 237

2016 WL 3948100
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jonathan MENA, Plaintiff,

v.

CITY OF NEW YORK, et al., Defendants.

No. 13-cv-2430 (RJS)
|
Signed 07/19/2016

**Attorneys and Law Firms**

Jonathan Mena, Stormville, NY, pro se.

Omar Javed Siddiqi, Ryan Glenn Shaffer, New York City Law Department, New York, NY, for Defendants.

<u>OPINION AND ORDER</u>

RICHARD J. SULLIVAN, District Judge

**\*1** Plaintiff Jonathan Mena, who is currently incarcerated and proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983") against Correction Officer Benjamin Eason ("Defendant"), alleging violations of the Eighth Amendment. Now before the Court is Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

## I. BACKGROUND

### A. Facts [1]

[1]     The following facts are drawn from Defendant's unopposed Local Civil Rule 56.1 Statement. (Doc. No. 55 ("56.1 Statement" or "56.1 Stmt.").) In deciding Defendant's motion for summary judgment, the Court has also considered Plaintiff's submission in opposition to summary judgment (Doc. No. 58 ("Opp'n")), and has conducted an independent review of the record, notwithstanding Plaintiff's failure to submit a statement compliant with Local Civil Rule 56.1. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (noting that district court "may in its discretion opt to conduct an assiduous review of the record even when" a party has failed to comply with Local Civil Rule 56.1 (citations and quotation marks omitted)).

On September 9, 2012, while incarcerated at the Otis Bantum Correctional Center ("OBCC") on Rikers Island, Plaintiff was placed in an intake cell in the OBCC's receiving area, which he shared with two other individuals. (56.1 Stmt. ¶¶ 2–3.) Plaintiff alleges that the cell was extremely cold, vermin-infested, and too small to accommodate three men. (*See* Doc. No. 54-1 ("Compl.") 4, 8.) Plaintiff further alleges that these conditions, coupled with the constant noise made by the two other inmates, prevented him from sleeping for the entire 60-hour period that he was held in the cell. (*See id.* at 4.) Consequently, he asked Defendant, who was on duty, to transfer him to a different cell. (56.1 Stmt. ¶¶ 7–8.) According to Plaintiff, Defendant responded that there was "nothing he could do" about the situation. (*Id.* ¶ 9; *see also* Doc. No. 54-2 ("Mena Dep.") 59:5-8.)

Plaintiff avers that he filed a grievance with the OBCC to complain about his experience in the cell. (*See* Compl. at 7.) The New York City Department of Correction ("DOC") has an administrative grievance procedure, known as the Inmate Grievance and Request Program ("IGRP"), for inmates housed at facilities such as the OBCC. The IGRP, which was available and in effect at all times relevant to this lawsuit, requires that inmates first file a complaint with the Inmate Grievance Resolution Committee ("IGRC") within ten days of the complained-of act. (56.1 Stmt. ¶¶ 11–12; *see also* Doc. No. 54-3 ("IGRP Directive") § IV(D)(1).) The IGRC then attempts to resolve the grievance informally within five days, and if the grievance is not informally resolved, then the inmate may request a formal hearing before the IGRC. (56.1 Stmt. ¶ 12; *see also* IGRP Directive §§ IV(G)-(H).) An inmate may appeal the IGRC's decision to the commanding officer, or her designee, and subsequent appeals may be taken to the Central Office Review Committee ("CORC"). (56.1 Stmt. ¶ 13; *see also* IGRP Directive §§ IV(I)-(J).) The CORC's decision is the final and binding decision of the DOC; if an inmate disputes the decision of the CORC, he may independently appeal to the Board of Correction. (IGRP Directive at 47.) Finally, if an inmate does not receive a timely disposition at any point throughout the grievance process, he has the option of either granting an extension of time to the relevant decisionmaker (i.e., the IGRC, the commanding officer, or the CORC) or appealing and

proceeding to the next level of review. (56.1 Stmt. ¶ 14; *see also* IGRP Directive §§ IV(D)(9)(b), (10).)

**\*2** As Plaintiff himself acknowledges, after submitting the grievance and receiving no response, he neither granted the DOC an extension of time nor appealed. (*See* Compl. 7–8; Opp'n 6.) In his Complaint, Plaintiff admits that he is "still waiting" for a disposition of his grievance, but does not indicate any steps he has taken to appeal any decision before the IGRC. (*See* Compl. 7.) In response to a question on the Southern District of New York Prison Complaint form asking a plaintiff to "set forth any additional information that is relevant to the exhaustion of your administrative remedies," Plaintiff repeated a number of his substantive allegations against the OBCC staff, but did not state any information relevant to the grievance process. (*Id.* at 5.) And in his opposition brief in connection with this motion, Plaintiff again notes that he filed "several grievances about the issues in question," but he does not indicate any specific steps he took to appeal to the IGRC or to pursue any other avenue of appellate review within the IGRP. (Opp'n 6.)

### B. Procedural History

On April 11, 2013, Plaintiff commenced this action by filing a complaint against the City of New York, Correction Officer Jaquon Pickwood ("Pickwood"), Correction Officer Sauda Abdul-Malik ("Abdul-Malik"), and Defendant (collectively, "Defendants"), pursuant to Section 1983, asserting violations of his constitutional rights under the Eighth and Fourteenth Amendments. (*See* Doc. No. 1.) On December 9, 2013, Defendants moved to dismiss the Complaint. (Doc. No. 18.) On September 17, 2014, the Court granted Defendants' motion to dismiss with respect to Plaintiff's claims against the City of New York, Pickwood, and Abdul-Malik, and Plaintiff's Fourteenth Amendment claims against Defendant for failure to state a claim upon which relief can be granted, but denied Defendants' motion to dismiss with respect to Plaintiff's Eighth Amendment claim against Officer Eason. (Doc. No. 29.) On September 11, 2015, following the completion of discovery, Defendant filed the instant motion for summary judgment, along with his brief and his 56.1 Statement, arguing that Plaintiff failed to exhaust administrative remedies, that his Eighth Amendment conditions of confinement claim failed on the merits, and that in any event, Defendant was entitled

to qualified immunity. (Doc. Nos. 53–55, 57.) Defendant also filed a notice pursuant to Local Civil Rule 56.2 alerting Plaintiff of his obligation to submit a responsive statement and informing him of the consequences of not doing so. (Doc. No. 56.) In accordance with Local Rule 56.2, this notice included copies of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (*Id.*) On October 14, 2015, Plaintiff filed a brief opposing summary judgment and submitted several exhibits (*see* Doc. No. 58), but he failed to submit a responsive 56.1 Statement. Defendant submitted his reply on October 22, 2015. (Doc. No. 59 ("Reply").)

### II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 78 of 237

2016 WL 3948100

the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**\*3** Typically, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (citing *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). "This general rule applies equally" to cases involving a *pro se* nonmoving party who has been provided adequate notice of the consequences of failing to properly respond to a summary judgment motion. *Pierre-Antoine v. City of N.Y.*, No. 04-cv-6987 (GEL), 2006 WL 1292076, at \*3 (S.D.N.Y. May 9, 2006); *see also Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund,* No. 03-cv-7421 (KMK), 2005 WL 1026330, at \*1 n.2 (S.D.N.Y. May 3, 2005). Even so, the Court "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement," *Holtz*, 258 F.3d at 73, and the Court is obligated to construe *pro se* litigants' submissions liberally, *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

Here, Plaintiff failed to submit a responsive Rule 56.1 statement, even though Defendant, pursuant to Local Civil Rule 56.2, sent Plaintiff notice of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 and sent copies of both rules. (Doc. No. 56). In light of Plaintiff's *pro se* status, the Court has exercised its discretion to independently review the record, which reveals no controverted facts. *See Holtz*, 258 F.3d at 73. In fact, as discussed below, Plaintiff's own submissions confirm the material facts contained in Defendant's Rule 56.1 Statement.

## III. DISCUSSION

Defendant argues that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's effort to reduce the quantity of prisoner suits" (citations and quotation marks omitted)). Accordingly, "the law is well-settled that the failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-cv-7054 (RJS), 2015 WL 3999180, at \*3 (S.D.N.Y. June 29, 2015); *accord Johnson v. N.Y.C. Dep't of Corr.*, No. 13-cv-6799 (CM), 2014 WL 2800753, at \*6 (S.D.N.Y. June 16, 2014) ("Assuming that [p]laintiff filed a timely grievance ... and received no response within five business days[,] ... [p]laintiff ... could have taken the next step and requested a hearing."); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-cv-5440 (RMB) (GWG), 2005 WL 483363, at \*7 (S.D.N.Y. Mar. 1, 2005) ("[T]hat [plaintiff] allegedly did not receive a response to her grievance does not excuse her from failing to exhaust the appellate remedies available to her."); *Burns v. Moore*, No. 99-cv-966 (LMM) (THK), 2002 WL 91607, at \*8 (S.D.N.Y. Jan. 24, 2002) ("Thus, even if [p]laintiff received no response to his initial grievance, [p]laintiff could have sought the next level of review, in this case, to the prison superintendent.").

**\*4** At the OBCC, where Plaintiff was incarcerated, an inmate must exhaust several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (56.1 Stmt. ¶ 12–14.) Here, as Plaintiff reveals in his own complaint and brief in opposition to the motion for summary judgment, he did not exhaust the OBCC administrative procedure. (Compl. 7–8; Opp'n 6.) Rather, he indicates that he filed a grievance but otherwise did not appeal or seek further review through the IGRP process. (Compl. 7–8 (noting that he is "still waiting" for disposition of his grievances and did not seek review at the next levels within IGRP); Opp'n 6 (noting that he filed "several grievances about the issues in question,"

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

but by omitting reference to any specific steps taken to appeal)). Accordingly, Plaintiff failed to satisfy the PLRA exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust administrative remedies at the IGRP. Last month, the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *See Ross*, 136 S. Ct. at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.") In doing so, the Supreme Court expressly rejected the Second Circuit's prior framework under *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), and, by extension, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), which recognized a "special circumstances" exception to the PLRA's exhaustion requirement. *See Williams v. Priatno*, No. 14-4777, ___ F.3d. ___, ___, 2016 WL 3729383, at *4 (2d Cir. July 12, 2016) ("[T]o the extent that our special circumstances exception ... permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.").

Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are "available" to him. *Ross*, 136 S. Ct. at 1862; *see also* 43 U.S.C. § 1997e(a). An inmate's failure to exhaust may therefore be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross*, 136 S. Ct. at 1858–59. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief," and therefore unavailable. *Id.* While not exhaustive, these illustrations nonetheless guide the Court's inquiry. *See Williams*, 2016 WL 3729383, at *4 n.2. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross*, 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner*, 523 U.S. 731, 736, 738 (2001) ("[T]he modifier

'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1860.

Here, Plaintiff has not alleged – let alone shown – that the administrative procedures at the OBCC were unavailable to him. Although Plaintiff's initial grievance received no response, this alone is insufficient to show that the IGRP acted as a mere dead end. As stated earlier, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin*, 2015 WL 3999180, at *3 (collecting authorities). In short, the DOC's untimeliness in this case is not enough to demonstrate the unavailability of an administrative remedy. This is especially true in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance. (*See* IGRP Directive § IV(D) (9)(b), (10).) Furthermore, Plaintiff has not introduced any facts to indicate that prison officials at OBCC are "consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859.

**\*5** Nor has Plaintiff pointed to any evidence that the IGRP was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially unknowable." *Ross*, 136 S. Ct. at 1859. While the Second Circuit recently found that certain administrative grievance procedures at a different New York State facility met this standard, the Second Circuit's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams*, 2016 WL 3729383, at *1, *5. Specifically, the plaintiff in *Williams* was housed in a special housing unit and segregated from the regular prison population; therefore, he gave his grievance complaint to a correction officer to file on his behalf. *Williams*, 2016 WL 3729383, at *2. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.*, and because the Second Circuit concluded that

**Mena v. City of New York, Not Reported in Fed. Supp. (2016)**
Case 9:17-cv-01003-BKS-TWD Document 65 Filed 06/21/19 Page 80 of 237

2016 WL 3948100

the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the District Court's dismissal for failure to exhaust. Here, by contrast the IGRP expressly guides inmates in Plaintiff's position who have filed a grievance but have not received a timely response and directs them to either grant an extension of time to the relevant decisionmaker or to appeal to the next level of review. (*See* IGRP Directive §§ IV(D)(9)(b), (10).) In light of the IGRP's unambiguous directive, Plaintiff has clearly failed to show that the IGRP was "essentially unknowable." *See Ross*, 136 S. Ct. at 1859.

Finally, the Court turns to the third scenario contemplated by the Supreme Court, in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859. Plaintiff has not demonstrated, or even suggested, that prison administrators obstructed or interfered with his access to administrative remedies. *See, e.g.*, *Winston v. Woodward*, No. 05-cv-3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (concluding that plaintiff's failure to exhaust administrative remedies was not excused in light of his "failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering"). Thus, this exception to the exhaustion requirement is also clearly inapplicable.

Therefore, the Court concludes, as a matter of law, that Plaintiff has failed to exhaust administrative remedies available to him through the IGRP and has failed to offer any facts to prove that administrative remedies were not available to him. Because Plaintiff's claims are barred

for failure to comply with the administrative exhaustion requirement of the PLRA, Defendant's motion for summary judgment is granted. [2]

[2]    Although Defendant has raised other grounds for summary judgment, including that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim, and that Defendant is entitled to qualified immunity, the Court finds it unnecessary to address these other arguments because of Plaintiff's failure to exhaust remedies.

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Although Plaintiff has paid the filing fee in this action and has not applied to proceed *in forma pauperis*, the Court nevertheless certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis*, any appeal would not be taken in good faith.

The Clerk is respectfully directed to terminate the motion pending at docket number 53, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3948100

---

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

McKethan v. New York State Department of Correctional..., Not Reported in...

2011 WL 4357375

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Panayoty v. Annucci, N.D.N.Y., August 16, 2012

2011 WL 4357375

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

William McKETHAN, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES; Lesley Malin,
Deputy Superintendent of Program Services
at Sing Sing C.F., and T. Riddick, Correction
Counselor at Sing Sing C.F., Officially, Unofficially,
Jointly, Individually and Severally, Defendants.

No. 10 Civ. 3826(NRB).

|

Sept. 16, 2011.

**Attorneys and Law Firms**

William McKethan, Woodbourne, NY, pro se.

Rebecca Ann Durden, New York State Department of
Law, Environmental Protection Bureau, Albany, NY, for
Defendants.

**MEMORANDUM AND ORDER**

NAOMI REICE BUCHWALD, District Judge.

**\*1** Plaintiff William McKethan, appearing pro se,
brought this action pursuant to 42 U.S.C. § 1983
against the New York State Department of Correctional
Services ("DOCS") and two individual defendants
(collectively, "the State" or "defendants"). On November
15, 2010, defendants moved to dismiss plaintiff's amended
complaint. While plaintiff eventually opposed this motion
on February 1, 2011, he also moved on December
15, 2010, for leave to amend the complaint. Plaintiff
submitted a proposed Second Amended Complaint to the
Court in connection with this motion.[1] The proposed
amendments substituted a new individual defendant for
DOCS, eliminated the amended complaint's claim of
conspiracy, and requested punitive damages instead of
compensatory damages. The State opposed the motion

for leave to amend. In this opinion we resolve both (1)
the State's motion to dismiss and (2) plaintiff's motion
for leave to amend. For the foregoing reasons, the State's
motion is denied and the plaintiff's motion is granted
in part and denied in part.[2] The parties are directed to
complete all discovery within ninety (90) days. At the
conclusion of the discovery period, the parties should
submit letters describing any proposed dispositive motion.

[1] Plaintiff referred to his proposed pleading as an
"amended complaint," but it would be his second
amendment.

[2] Since we grant plaintiff's motion for leave to amend,
the proposed Second Amended Complaint will
become the operative pleading in this matter. As a
result, we will only address the substantive arguments
put forward in defendants' motion to dismiss the
amended complaint inasmuch as they would also
apply to plaintiff's Second Amended Complaint.

**FACTS**[3]

[3] These facts are taken from plaintiff's proposed
Second Amended Complaint, which, as noted above,
will be the operative pleading going forward.

In November 2007, plaintiff was an inmate in the
Eastern New York Correctional Facility ("Eastern").
During that month, he was placed in the Special Housing
Unit ("SHU") following an incident of misbehavior.
Proposed Amended Compl. ¶ 1. When taking inventory
of his personal property, a SHU supervisor authorized
the possession of his "universal crown," which is the
"headwear for sincere male adherents to the teachings"
of the Nation of Gods and Earths ("Nation" or "NGE").
Id. ¶ 2. The universal crown is a "hemispheric head cap
that has a tassel and is made of cloth, knitted, crocheted,
multicolored or single colored" and "must fit close to the
head (hair)." Id. ¶ 2 n. 1. Despite the initial approval
of the headgear, the crown was subsequently confiscated
by a corrections officer who claimed that plaintiff was
not allowed to possess it while in the SHU. Id. ¶ 3. The
plaintiff immediately filed a grievance complaining of
this confiscation. Id. Approximately one month later, a
lieutenant gave the plaintiff his crown back, along with
a copy of a memorandum from Eastern's Coordinating
Chaplain which stated that the headgear in question "can
be worn by ... the Nation of God's and earths [sic] under

the name 'Crown.' " *Id.* ¶ 4; Ex. A to Proposed Amended Compl.

Plaintiff was then transferred to Upstate Correctional Facility ("Upstate"), another SHU facility. *Id.* ¶ 5. However, in February 2008, the disciplinary violation which caused plaintiff to be transferred to Upstate, and presumably to be placed in the SHU in the first instance, was reversed. *Id.* ¶ 6. Plaintiff was then classified as a "general confinement inmate" and transferred to Sing Sing Correctional Facility ("Sing Sing"). *Id.*

**\*2** Plaintiff claims that when he arrived at Sing Sing, he noticed ongoing violations of this Court's order in *Marria v. Broaddus, et al.,* No. 97 Civ. 8297(NRB), 2004 U.S. Dist. LEXIS 14829, 2004 WL 1724984 (S.D.N.Y. July 30, 2004) (hereinafter "Marria Order"). [4] For example, a copy of the Marria Order and other information pertaining to the NGE were not posted in the facility's law and general libraries. *Id.* ¶ 7. Plaintiff asserts that Lesley Malin, defendant in this action, was then the "Acting Deputy Superintendent of Programs at Sing Sing" and was responsible for ensuring that the facility complied with the requirements of the Marria Order. *Id.* According to plaintiff, in response to Sing Sing's deficient compliance, he recruited inmates who were sincere adherents of the NGE to send letters to Malin asserting their beliefs. Such written notification is a necessary prerequisite in order to obtain the benefits granted to members of the NGE under the Marria Order. *Id .* ¶¶ 8–9; *see also Marria,* 2004 U.S. Dist. LEXIS 14829 at \*8–11, 2004 WL 1724984.

[4]    In 1997, a member of the NGE brought a lawsuit against several DOCS officials complaining about DOCS' treatment of the NGE as an "unauthorized" or "security threat" group and the "consequent prohibition on his receipt of Nation materials and literature, including the group's central texts and its newspaper, and ban on formal gatherings with other members of the group." *Marria,* 2003 U.S. Dist. LEXIS 13329 at \*2, 2003 WL 21782633 (S.D.N.Y. July 31, 2003). Following a five-day bench trial, we held that the members of the NGE were entitled to First Amendment and RLUIPA protection for their sincerely-held beliefs and remanded to DOCS to take action not inconsistent with our opinion. *Id.* at \*3. In 2004, we approved DOCS' proposed protocols for sincere adherents of the NGE. *Marria,* 2004 U.S. Dist. LEXIS 14829, 2004 WL 1724984. The protocols grant certain rights to members of the NGE who

formally register as sincere adherents, but do not allow them to congregate in groups, among other things. *Id.* at \*8–11. It is this final order, from 2004, that we refer to as the "Marria Order."

Plaintiff also claims that upon arriving at Sing Sing, he had an interview with his counselor, defendant Riddick. *Id.* ¶ 10. According to plaintiff, Riddick informed him that he was now a "general confinement inmate" and would remain at Sing Sing so long as he "adjusted to facility living." *Id.* Riddick further informed the plaintiff that his educational background likely qualified him for enrollment in a bachelor's degree program offered by Mercy College in Sing Sing. Plaintiff contacted the supervisor of this program and made plans to interview for enrollment. *Id.* ¶ 10. Plaintiff eventually interviewed, where he was informed that his previous educational credits from Bard College were fully transferrable to the Mercy College program and that he would be enrolled in the program's next semester "pending confirmation of his credits from Bard College." *Id.* ¶ 28. Presumably plaintiff cites these facts in order to demonstrate that he adjusted well to Sing Sing and had behaved himself.

Plaintiff claims that on April 3, 2008, he received a ruling on his grievance complaining of the confiscation of his headgear while at Eastern. According to plaintiff, the ruling denied his grievance and directed DOCS' staff to once again confiscate his crown. *Id.* ¶ 11. Plaintiff states that the decision was signed by C. Lindquist, Assistant Director of DOCS' Central Officer Review Committee ("CORC"), and the official whom plaintiff seeks to add as a defendant in this action. In compliance with this order, plaintiff's headgear was confiscated, and plaintiff once again filed a grievance. *Id.* On June 4, 2008, CORC denied this grievance, in a ruling also signed by Lindquist. *Id.* ¶ 19; Ex. G to Proposed Amended Compl. [5]

[5]    Plaintiff submits the June 4 ruling signed by Lindquist as an exhibit to the proposed amended complaint. Ex. G to Proposed Amended Compl. However, he does not submit the supposed April 2008 ruling. Furthermore, a review of the June ruling reflects that it was deciding a grievance filed on April 7, 2008 and "upholds the determination of the Superintendent." *Id.* Notably, April 7 was just four days after plaintiff claims he had his crown confiscated following a ruling on his initial grievance. In short, despite plaintiff's allegations that Lindquist signed the early April ruling ordering the confiscation of his headgear, the record suggests that the "Superintendent" made this

McKethan v. New York State Department of Correctional..., Not Reported in...

Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 83 of 237

2011 WL 4357375

determination and that Lindquist merely upheld it in his role as the Assistant Director of CORC in June.

On April 14, 2008, plaintiff wrote a letter to Malin requesting compliance with the Marria Order and certain accommodations for the NGE. Over the course of the next few months, plaintiff and Malin corresponded several times regarding accommodations of the NGE at Sing Sing. [6] While this correspondence was ongoing, plaintiff also filed a grievance complaining that his right to practice his religion was not appropriately protected by the DOCS protocols that were approved by the Marria Order. *See Id.* ¶¶ 12–27.

[6]   At this stage in the litigation, it is unnecessary to concern ourselves with the specifics of this correspondence. It suffices to note that plaintiff continuously objected to what he perceived as a failure to comply with the Marria Order and otherwise respect the First Amendment rights of the NGE. Malin consistently responded that she was working to ensure that members of the NGE received all the rights granted to them by law.

**\*3** Plaintiff claims that at some point during the months he corresponded with Malin, a corrections officer named Hill approached him in the Law Library and asked him what it was that he "wanted pertaining to the NGE." *Id.* ¶ 14. According to plaintiff, Hill said that Malin was his boss and had asked Hill to find out what the plaintiff wanted since he was plaintiff's area supervisor. *Id.* Despite this seemingly conciliatory gesture, plaintiff claims that Hill warned him to " 'slow down' " since he " 'just got to Sing Sing' and shouldn't 'move too fast,' [and] to 'take it slow' because [plaintiff] 'didn't know [Malin].' " *Id.* ¶ 15. Plaintiff states that Hill then warned him that Malin " 'would have [plaintiff] on the next thing smoking out of Sing Sing.' " *Id.* A few days later, Hill again approached the plaintiff in the Law Library. After plaintiff detailed "everything he wrote to [Malin] in his 4/14/08 letter," Hill warned him to " 'slow down before [Malin] got tired of his demands.' " *Id.* ¶ 16.

On August 20, 2008, plaintiff was transferred to Auburn Correctional Facility ("Auburn"). *Id.* ¶ 29. While at Auburn, he made a Freedom of Information Law request to obtain Riddick's written explanation for his transfer from Sing Sing. According to the form obtained by plaintiff and attached to his complaint, the stated explanation was that "inmate served more than 60 days SHU/[Keeplock] within last 12 months and he is no longer

suitable for downstate placement." Ex. L to Proposed Amend Compl. The form recommended "any suitable 02 facility." *Id.*

Plaintiff believes that the decision to transfer him out of Sing Sing was in error, and that the actual reason for his transfer was his multiple informal complaints to Malin and administrative grievances. He brought this lawsuit on May 10, 2010, alleging violations of his rights of freedom of religion, First Amendment retaliation, and conspiracy. As noted above, plaintiff has since abandoned his conspiracy claim.

## DISCUSSION

A. *Legal Standards*

1. *Motion for Leave to Amend*
Leave to amend shall be freely granted "when justice so requires ." Fed.R.Civ.P. 15(a)(2); *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). However, it is within the discretion of a district court to deny leave when amendment would be futile. *Foman v. Davis,* 371 U.S. at 182; *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir.2007); *Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 258 (2d Cir.2002). The Second Circuit has found "[a]n amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to [Federal] Rule [of Civil Procedure] 12(b)(6)." *Dougherty v. Town of North Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 88 (2d Cir.2002). Consequently, in order to decide whether amendment would be futile, we will assess whether plaintiff's proposed amended complaint would survive a motion to dismiss.

2. *Motion to Dismiss*
**\*4** When deciding a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in plaintiff's favor. *Kassner v. 2nd Ave. Delicatessen, Inc.,* 496 F.3d 229, 237 (2d Cir.2007). A complaint must include "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929, 949 (2007). Where a plaintiff has not "nudged [his] claims across the line from conceivable to

McKethan v. New York State Department of Correctional..., Not Reported in...

2011 WL 4357375

plausible, [his] complaint must be dismissed." *Id.* This pleading standard applies in "all civil actions." *Aschroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868, 887 (2009).

Where, as here, a complaint is filed by a *pro se* plaintiff, the complaint should be reviewed under a more lenient standard than that applied to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652, 654 (1972) (per curiam). In other words, courts may interpret such pleadings "to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Nevertheless, *pro se* plaintiffs remain subject to the general standard applicable to all civil complaints under the Supreme Court's decisions in *Twombly* and *Iqbal. See Schwamborn v. County of Nassau,* 348 F. App'x 634, 635 (2d Cir.2009).

B. *Violation of Right to Free Exercise*

Plaintiff's first proposed cause of action alleges that Lindquist and Malin infringed his right to freely exercise his religion, in violation of the First and Fourteenth Amendment of the Constitution and several applicable statutes, most notably the Religious Land Use and Institutionalized Persons Act 42 U.S.C. § 2000cc–1 *et seq.* ("RLUIPA"). Plaintiff seeks injunctive relief ordering Lindquist and Malin to take several actions to remedy the perceived constitutional deficiencies.

Construing the proposed amended complaint broadly, plaintiff's allegations and proposed remedies appear to fall into three categories. First, plaintiff seeks to alter the Court's Marria Order to afford the NGE "the same rights and privileges ... [as prisoners] who practice mainstream belief systems." Proposed Amended Compl. ¶ 36; *see Marria,* 97 Civ. 8297(NRB), 2004 U.S. Dist. LEXIS 14829, 2004 WL 1724984. Specifically, he requests that the Court order DOCS to allow members of the NGE to congregate on Honor Days, engage in fundraising projects, conduct study groups in prison, and meet with non-prisoner members of the NGE through volunteer or group activities. [7] Plaintiff recognizes that the relief sought revises the protocols approved in the Marria Order, and asks us to order that "DOCS' Protocols be rescinded or, in the alternative revised in accordance with the declaratory relief sought herein." Proposed Amended Compl. ¶ 36.

[7]
We note that under the current protocols, plaintiffs are allowed to meet one-one-one with outside volunteers, a fact that we found significant in approving the prohibition on congregation. *Marria,* 2004 U.S. Dist. LEXIS 14829 at *7, 2004 WL 1724984.

**\*5** Essentially, plaintiff claims that the DOCS protocols approved in the Marria Order are unconstitutional. However, the constitutionality of the protocols was decided in the Marria Order, and even assuming that a single, *pro se* plaintiff, would have standing in a separate lawsuit, this plaintiff alleges no facts which would require us to review our previous determination. The only "facts" pled by plaintiff which could possibly assert changed circumstances are his contentions that DOCS is "no longer operating at a 'hiring freeze' or under strict orders to 'minimize overtime expenditures' " and that the NGE is not any more disruptive to prison life than other religious groups. Proposed Amended Compl. ¶ 26. These are conclusory allegations insufficient to sustain his claim. Since plaintiff's proposed second amended complaint seeks to challenge DOCS activity which has already been found to be constitutional, this proposed claim is futile.

Second, plaintiff's proposed amended pleading appears to complain that DOCS did not properly comply with the Marria Order and its protocols. [8] For example, plaintiff alleges that the Marria Order was not made available in the law and general libraries as required. [9] In addressing this issue, we note that we are not aware, despite receipt of many letters from NGE adherents over the years, of a single complaint regarding DOCS' compliance with the protocols in the seven years since the Marria Order. Given this fact, and that plaintiff himself does not seek an injunction forcing DOCS to comply with the Marria Order, we see no reason to issue an injunction. Moreover, inasmuch as plaintiff's motion to amend seeks to complain about DOCS' compliance with *Marria,* it is denied. Of course, we trust that if DOCS should ever run afoul of the protocols, the Attorney General will take appropriate action to ensure the situation is rectified.

[8]
We note that plaintiff does not explicitly ask the Court to remedy these violations. In fact, not only does plaintiff's requested injunction not order DOCS to enforce the current protocols, but rather it orders that the current protocols be revised and replaced. However, since many of the pled allegations suggest that the Marria Order has not been followed, we

McKethan v. New York State Department of Correctional..., Not Reported in...

2011 WL 4357375

Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 85 of 237

address these concerns pursuant to our obligation to interpret plaintiff's *pro se* pleading "to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

9    Inasmuch as the failure to comply with the Marria Order was unique to Sing Sing, plaintiff's claim also faces a mootness issue since he is no longer an inmate at that facility. *See, e.g., Amador v. Andrews,* ––– F.3d –––– (2d Cir.2011), 2011 U.S.App. LEXIS 17440, 2011 WL 3629717 (2d Cir. Aug. 19, 2011) (noting that injunctive claims of prisoners become moot once they have been released from prison).

Lastly, plaintiff complains that his universal crown was confiscated, and requests an order requiring DOCS to permit use of such headgear. Plaintiff faces a couple of potentially fatal issues with regard to this claim. First, it is far from clear that he will be able to demonstrate the necessary "personal involvement" by either of the named defendants. *See Joseph v. Fischer,* 08 Civ. 2824(PKC), 2009 U.S. Dist. LEXIS 96952 at *50–51, 2009 WL 3321011 (S.D.N.Y. Oct. 8, 2009)* (reviewing pertinent case law and holding that personal involvement is a prerequisite to stating a claim under RLUIPA and that, post-*Iqbal,* "an official's denial of a grievance alleging a constitutional deprivation, without more, does not amount to personal involvement in the deprivation of that right"); *see also Montero v. Travis,* 171 F.3d 757, 761–62 (2d Cir.1999) (affirming dismissal of § 1983 claim seeking injunctive relief as frivolous because plaintiff did not allege defendants' personal involvement in the constitutional violation). Second, plaintiff's own exhibit appears to demonstrate that DOCS typically allows members of the NGE to wear headgear. Specifically, a memorandum from the Coordinating Chaplain of Eastern stated that the "head apparel you wanted me to review can be worn by two district religious groups as approved head wear," including the NGE "under the name 'Crown.' " Ex. A to Proposed Amended Compl. It is our suspicion that DOCS generally allows members of the NGE to wear the crown, but plaintiff had his crown confiscated for a specific reason. [10] When more facts come to light, it is certainly possible that defendants will demonstrate an entirely reasonable justification for their decisions with regard to plaintiff's crown.

10    Indeed, one of the alleged confiscations happened while plaintiff resided in the SHU, which is allowed to have stricter rules for inmates. *See, e.g. Ford v.*

*McGinnis,* 352 F.3d 582, 585 (2d Cir.2003) (referring to SHU as "more restricted confinement").

**\*6** Nevertheless, the circumstances surrounding the confiscation of plaintiff's crown are presently unknown, and we decline to dismiss this claim on the current record. In alleging that his crown was confiscated with no justification, plaintiff has plausibly alleged a violation of his rights under the First Amendment and RLUIPA. Particularly given that other claims in plaintiff's proposed Second Amended Complaint survive this motion to dismiss, it is appropriate to seek a further submission from the State on its policy regarding the crown and the circumstances surrounding its confiscation from this particular plaintiff. It is certainly possible that, upon receipt of a supplemental submission, this issue will be resolvable on summary judgment.

## C. *Retaliation*

In order to survive a motion to dismiss, a plaintiff alleging a claim of retaliation under the First Amendment must "advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001). The Second Circuit has instructed that courts "must approach prisoner claims of retaliation with skepticism and particular care." *Id.* This is so because "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Id.* Furthermore, "prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Id.*

Plaintiff alleges that Malin and Riddick transferred him from Sing Sing in retaliation for his complaints regarding DOCS' treatment of members of the NGE and perceived failure to comply with the Marria Order. There can be little doubt that plaintiff's informal complaints and formal grievances constitute protected activity under the First Amendment. *See, e.g., Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Furthermore, while a prisoner "has no liberty interest in remaining at a particular correctional facility ... prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights." *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998)

(internal citations omitted). Thus, the remaining question is whether plaintiff has adequately alleged causation.

Plaintiff appears to rely on three facts to allege causation. First, he claims that the State's purported reason for his transfer was in error. If this is true, it can be evidence of causation. *See Bennett v. Goord,* 343 F.3d 133, 139 (2d Cir.2003) (plaintiff's "allegations of retaliation are further supported by the fact that essentially all relevant adverse actions by DOCS officials were subsequently found to have been unjustified"). The DOCS directive attached to the complaint states that retention in Sing Sing's general confinement "will be determined by the inmate's continued ability to demonstrate conforming adjustment to facility living." Ex. M to Proposed Amended Compl. While not stated explicitly in plaintiff's proposed Second Amended Complaint, it is clear that he alleges that he had no behavioral issues while incarcerated at Sing Sing.[11] Thus, accepting the facts alleged in the complaint as true, it does appear as though plaintiff's transfer may have been in error.

[11]    Plaintiff's proposed pleading focuses on the fact that nothing in the DOCS directive states that retention in Sing Sing is based on the amount of "SHU/Keeplock [an inmate] serves within 12 months, prior to being transferred to Sing Sing." Second Amended Compl. ¶ 30. The clear implication is that he did not have any behavioral issues while incarcerated at Sing Sing. This point was also made more explicitly in plaintiff's Amended Complaint. While the proposed Second Amended Complaint will be the operative pleading going forward, we believe it is appropriate for the language of the Amended Complaint to help our understanding of later proposed amendments, given the special solicitude we grant *pro se* complaints.

**\*7** Second, there is the corrections officer's alleged comments warning plaintiff that he should "take it slow" because plaintiff "didn't know deputy superintendent Malin" and that Malin "would have [plaintiff] on the next thing smoking out of Sing Sing." Proposed Amended Compl. ¶ 14 (internal quotations omitted). Defendants argue that this statement is "pure speculation on the part of a Correction Officer" and is not attributable to Malin. Mem. of Law in Opp'n to Mot. to Amend at 15. While it is entirely possible, perhaps even likely, that this comment was based on "pure speculation," it is also possible that the officer had insight as to how Malin felt about plaintiff's complaints. At this early stage in the litigation, we do not

believe it would be appropriate to entirely disregard the officer's statements given plaintiff's other allegations.

Lastly, plaintiff notes that he was transferred to Auburn "within five-months of his arrival at Sing Sing." Proposed Amended Compl. ¶ 33. Furthermore, plaintiff's complaint references a letter sent to Malin on July 25, 2008. In that letter, he noted that the next Honor Day which the members of the NGE wished to observe was August 30, 2008. Plaintiff's transfer was on August 20, 2008. The Second Circuit has held that the "temporal proximity between an inmate's [complaint] and disciplinary action may serve as circumstantial evidence of retaliation." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 14 (2d Cir.1983)). In this case, the timeline of events can serve as such circumstantial evidence.

Despite these three allegations, defendants argue that plaintiff has not adequately alleged a claim of retaliation against Malin or Riddick because he cannot demonstrate that either had any personal involvement in the decision to transfer him. Specifically, defendants argue that plaintiff has not adequately alleged that Malin was involved in the decision to transfer him out of Sing Sing or that Riddick was aware of plaintiff's various informal complaints and administrative grievances. Therefore, according to the State, the claims against each defendant must fail.

Neither argument is persuasive at this stage. It is true that a plaintiff may not rely on conclusory allegations that a decision to transfer was retaliatory, and that plaintiff has no direct proof that Malin was involved in the decision to transfer him. However, the evidence detailed above as to the question of causation clearly applies with equal force to the issue of Malin's involvement. In other words, just as plaintiff has plausibly alleged that his transfer was in retaliation for his complaints, he has also plausibly alleged that Malin was involved in this decision. Likewise, while plaintiff does not specifically allege or have any irrefutable proof that Riddick had knowledge of his complaints, we do not believe it would be appropriate to dismiss the claim against Riddick at this stage on these grounds. Granting plaintiff every reasonable inference, it is fair to assume for purposes of this motion that his counselor at Sing Sing was aware of the fact that he was engaged in a significant amount of correspondence with the Deputy Superintendent of Programs and was actively challenging Sing Sing's treatment of the NGE. Indeed, some of the

McKethan v. New York State Department of Corrections..., Not Reported in...

Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 87 of 237

2011 WL 4357375

letters attached as exhibits to the complaint state that copies were sent to the plaintiff's "Guidance File" or "Central Files." Ex. H to Proposed Amended Compl.; Ex. F to Proposed Amended Compl. While we cannot say with certainty, it is plausible that plaintiff's counselor had access to and occasionally consulted these files.

 **\*8** Thus, we do not believe it would be appropriate to dismiss plaintiff's claims of retaliation at this time. Plaintiff's pleading alleges just enough facts to push his claim of retaliation across the threshold of plausibility. Having said that, we note that this is a close question, and that in order to prevail on his retaliation claim, or even survive a potential motion for summary judgment, plaintiff will have to demonstrate that his complaints were a "substantial or motivating factor" for his transfer. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). If he ultimately makes this showing, then "[the State] may evade liability if it demonstrates that it would have disciplined or transferred him even in the absence of the protected conduct." *Id.* (internal quotation omitted). Given this law, if the State has further information regarding the reasons for plaintiff's transfer, it should feel free to come forward and seek a motion for summary judgment. Documentary evidence demonstrating plaintiff's disciplinary history and affidavits detailing the reasons for his transfer could potentially make this case appropriate for summary judgment.

D. *Qualified Immunity*
We quickly note that defendants' claim of qualified immunity must fail. The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). This argument does not apply to defendant Lindquist because plaintiff appears to only seek damages for his retaliation claim, and he does not accuse Lindquist of retaliation.[12] As for defendants Malin and Riddick, assuming that they did transfer plaintiff because of his complaints and grievances, we cannot find that a reasonable prison official in their position would not have known that this was illegal.

[12]     If we are misreading the complaint, and the damages sought apply not only to the retaliation claim but also to the First Amendment claim, then we do believe Lindquist is a candidate for qualified immunity.

**CONCLUSION**

For the aforementioned reasons, plaintiff's motion to amend is granted in part. The State's motion to dismiss is denied. The parties are ordered to complete all discovery within ninety (90) days. The parties should submit letters describing any proposed dispositive motion following the conclusion of the discovery period.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4357375

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Phelan v. Hersh, N.D.N.Y., September 13, 2011

2007 WL 2903682
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Thyeem KEESH, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.

No. 04-CV-271A.
|
Oct. 1, 2007.

**Attorneys and Law Firms**

Tyheem Y. Keesh, Walkill, NY, pro se.

Michael A. Siragusa, New York State Attorney General's Office, Buffalo, NY, for Defendants.

ORDER

RICHARD J. ARCARA, Chief Judge.

 **\*1** The above-referenced case was referred to Magistrate Judge Marian W. Payson, pursuant to 28 U.S.C. § 636(b)(1). On September 14, 2007, Magistrate Judge Payson filed a Report and Recommendation, recommending that District Attorney Frank Clark's motion for summary judgment be granted, that the DOCS defendants' motion for summary judgment be granted in part and denied in part, and that plaintiff's cross-motion for summary judgment be denied.

The Court has carefully reviewed the Report and Recommendation, the record in this case, and the pleadings and materials submitted by the parties, and no objections having been timely filed, it is hereby

ORDERED, that pursuant to 28 U.S.C. § 636(b)(1), and for the reasons set forth in Magistrate Judge Payson's Report and Recommendation, District Attorney Frank Clark's motion for summary judgment is granted, the DOCS defendants' motion for summary judgment is granted in part and denied in part, and plaintiff's cross-motion for summary judgment is denied.

This case is referred back to Magistrate Judge Payson for further proceedings, including the assignment of pro bono counsel.

SO ORDERED.

*REPORT & RECOMMENDATION*

MARIAN W. PAYSON, United States Magistrate Judge.

*PRELIMINARY STATEMENT*

By Order of Hon. Richard J. Arcara, Chief Judge, United States District Court for the Western District of New York, dated November 14, 2006, all dispositive motions in the above-captioned case have been referred to this Court for report and recommendation pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C). (Docket # 85).

Plaintiff Tyheem Keesh ("Keesh"), an inmate who was formerly incarcerated in the Wende Correctional Facility ("Wende"), filed this action *pro se* under 42 U.S.C. § 1983. His Complaint raises claims of retaliation, First Amendment claims of access to the courts and free exercise of religion and due process violations. (Docket # 1). The defendants he has named include George Pataki, former Governor of the State of New York, [1] Frank J. Clark, Erie County District Attorney, Glenn S. Goord, former Commissioner of the New York State Department of Correctional Services ("DOCS"), Edward R. Donnelly, retired Superintendent of Wende, Thomas G. Eagen, Director of the Inmate Grievance Program at DOCS, and numerous members of the correctional staff at Wende.

[1] Although named as a defendant, former Governor Pataki has not been served with a summons and complaint in this action, and this Court thus has no jurisdiction to address Keesh's claims against him.

Currently before this Court are three separately-filed motions for summary judgment: the first by District Attorney Clark (Docket # 62); the second by the remaining defendants (hereinafter "the DOCS defendants") (Docket # 69); and, the third by Keesh (a cross-motion for summary judgment). (Docket # 83).

Keesh v. Smith, Not Reported in F.Supp.2d (2007)
Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 89 of 237
2007 WL 2903682

### *FACTUAL BACKGROUND*

The following factual summary is derived from Keesh's Complaint and the statements of undisputed facts submitted by the parties in connection with the pending motions. (Docket1, 63, 71, 84, 88, 90).

On March 23, 2001, an incident occurred at Wende involving an inmate, Christopher Simpson. During the incident, Simpson had an altercation with a corrections officer, knocked the officer unconscious and took his baton. Simpson then used the baton to strike and seriously injure several other corrections officers. A criminal investigation and prosecution was thereafter undertaken by the Erie County District Attorney's Office, which was handled by Assistant District Attorney ("ADA") Thomas E. Fowler, Jr. Simpson was indicted and eventually pled guilty to four counts of assault in the second degree.

 **\*2** While the criminal investigation was pending, Keesh sent a letter to the District Attorney's Office, dated March 23, 2001 (the "March 23 letter"). The letter was addressed to "the District Attorney's Office" and signed by Keesh. [2] In the letter, Keesh alleged that the corrections officers actually had assaulted Simpson. Martin Kearney, a DOCS Captain who worked at Wende and served as the liaison between Wende and the Erie County District Attorney's Office, was informed of Keesh's letter and initiated an investigation of Keesh's knowledge of the incident. According to Kearney's affidavit, he directed that Keesh's cell be searched as part of his investigation in order to determine whether Keesh possessed any documents or other evidence relating to the assault. Kearney also ordered the confiscation of Keesh's typewriter in order to investigate whether Keesh in fact had written the letter.

[2]    Keesh signed the letter with his religious name "Tyheem Y. Allah" and provided his inmate number.

As directed by Kearney, Corrections Officers John Ball and Daniel Hatfield conducted a search of Keesh's cell on March 30, 2001. Keesh's typewriter, several bowties, a religious instructional manual and other written materials, including legal papers, were taken. As a result of his investigation, Kearney concluded that Keesh was not present during the Simpson incident. The typewriter,

bowties and some written materials eventually were returned to Keesh . [3]

[3]    The bowties and some written materials were returned approximately one month after the search. The typewriter was returned approximately two and one-half months later. Keesh maintains that he never recovered his legal papers or his religious training manual.

ADA Fowler also received a copy of Keesh's letter, prompting him to interview Keesh. Based upon the interview, Fowler likewise determined that Keesh had not been present during the incident and had no personal knowledge of it. Although Fowler received a subsequent letter from Keesh, dated April 4, 2001, he had no further contact with him after their meeting.

Keesh thereafter filed a grievance and wrote to Superintendent Donnelly complaining that he was being harassed by the correctional staff in retaliation for his reporting the Simpson incident. The grievance was subsequently denied.

On April 18, 2001, defendant Ekpe Ekpe, former First Deputy Superintendent of Wende, had an encounter with Keesh concerning the confiscation of Keesh's typewriter and other property. As Ekpe was walking through the cellblock, Keesh asked permission to speak with him. Keesh complained to Ekpe that his typewriter and other items had been confiscated as part of an investigation relating to the Simpson assault. Suspecting that Keesh might have information relevant to the criminal investigation, Ekpe directed that Keesh be confined in his cell ("keeplocked") so that he could be interviewed. Ekpe later learned from Kearney that Keesh's knowledge was already being investigated and that his typewriter and other property were being held as possible evidence. At that point, Ekpe directed that Keesh be released from keeplock. Ekpe states that Keesh was keeplocked for approximately one hour; Keesh counters that the confinement lasted approximately twenty-four hours.

Corrections Officer Edwin Mendez conducted a second search of Keesh's cell on May 30, 2001. During the search, a weapon fabricated from the lid of an aluminum can was discovered under Keesh's mattress. Mendez then prepared a misbehavior report charging Keesh with possession of the weapon, and a disciplinary hearing was

conducted before Hearing Officer Thomas Schoellkopf. During the hearing, Keesh claimed that the weapon had been planted in his cell in retaliation for the March 23 letter. Schoellkopf found Keesh guilty and sentenced him to confinement in the Special Housing Unit and loss of privileges for 180 days. That ruling was subsequently reversed by Donald Selsky, the Director of Special Housing/Inmate Discipline, based upon his finding that the "circumstances of the case warranted further inquiry into the reason for [the] search."[4] (Docket # 82, Ex. C).

[4]    Director Selsky first upheld the determination and later expunged it upon reconsideration.

**\*3** Also in May 2001 Keesh sought election to the Inmate Grievance Resolution Committee (the "IGRC"), a committee consisting of inmates and appointed staff members that oversees the Inmate Grievance Program. Keesh was one of four candidates for two open inmate positions on the committee. The ballot reflected that Keesh received the fewest votes of the four candidates. Keesh maintains that the election was "rigged" against him in retaliation for the March 23 letter.

Keesh's Complaint raises the following claims. First, Keesh contends that defendants have retaliated against him for the March 23 letter and for complaining about such retaliation. Specifically, Keesh asserts that defendants unlawfully searched his cell on two occasions, assaulted and keelocked him, conspired to plant a weapon in his cell, filed a false misbehavior report relating to the discovery of the weapon and falsely reported the results of an election so as to deny him a position on the IGRC. Keesh also contends that the confiscation of his property-namely, his typewriter and bowties, religious manual and various legal papers-violated his First Amendment right of access to the courts and of free exercise of his religion. Finally, Keesh claims that he was denied due process of law because his disciplinary hearing was conducted by a biased hearing officer who had prejudged his guilt. (Docket # 1).

### DISCUSSION

Three motions for summary judgment are currently pending before the Court. District Attorney Clark seeks dismissal of the claims against him on the grounds that Keesh has not demonstrated his personal involvement

in any alleged constitutional deprivations. (Docket # 62). Three DOCS defendants-Commissioner Goord, Superintendent Donnelly and Director Eagen-also seek summary judgment on the same basis. (Docket # 69). In addition, all of the DOCS defendants seek dismissal of Keesh's claims on the grounds that they do not sufficiently allege constitutional violations. (Docket # 69). Finally, Keesh has cross-moved for summary judgment in his favor. (Docket # 83).

### I. *Standard for Summary Judgment*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In reaching this determination, the court must assess whether there exist any disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 166-67 (2d Cir.1991).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248; *Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see also Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

**\*4** The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, after which the nonmoving party must come forward with sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts. *Bryant v. Maffucci,* 923 F.2d at 982 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp. .,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The party seeking to avoid summary judgment "must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 ..., that there are specific factual issues

Keesh v. Goord, Not Reported in F.Supp.2d (2007)
Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 91 of 237
2007 WL 2903682

that can only be resolved at trial." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995); *see also Driscoll v. Townsend,* 60 F.Supp.2d 78, 80 (W.D.N.Y.1999).

As the Second Circuit has explained:

> [T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.... It must be kept in mind that only by reference to the substantive law can it be determined whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

Rule 56 of the Federal Rules of Civil Procedure provides that:

> When a motion for summary judgment is made and supported as provided in this Rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). "Affidavits opposing summary judgment must, among other things, be based "on personal knowledge." *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084

(2d Cir.1995). " 'An affidavit is not based on personal knowledge if, for example, it is based on mere suspicion, rumor, hearsay or secondhand information.' " *Batista v. Goord,* 2005 WL 2179420, *3 (N.D.N.Y.2005) (quoting *Applegate v. Top Assocs., Inc.,* 425 F.2d 92, 97 (2d Cir.1970)).

In cases brought by plaintiffs acting *pro se,* courts must construe the pleadings liberally and "interpret them 'to raise the strongest arguments that they suggest.' " *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). "Nevertheless, proceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Houston v. Zen Zen,* 388 F.Supp.2d 172, 173 (W.D.N.Y.2005) (quoting *Hernandez v. McGinnis,* 272 F.Supp.2d 223, 226 (W.D.N.Y.2003)).

## II. *Motions for Summary Judgment Based Upon Lack of Personal Involvement*

**\*5** Clark, Donnelly, Goord and Eagen contend that they cannot be held liable under Section 1983 because Keesh has failed to allege that they were personally involved in the events giving rise to his claims. (Docket65, 70). It is well-settled that " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Colon v. Coughlin,* 58 F.3d at 873 (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted)). Supervisors cannot be held liable under Section 1983 on a theory of vicarious liability or *respondeat superior. See Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "A plaintiff asserting a § 1983 claim against a supervisory official in his individual capacity must show that the supervisor was personally involved in the alleged constitutional deprivation." *Houghton v. Cardone,* 295 F.Supp.2d 268, 276 (W.D.N.Y.2003) (citing *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001)). A supervisory defendant's personal involvement may be demonstrated by evidence that:

(1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong,

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.*

In this matter, Keesh has not offered any evidence to suggest that Clark, Goord or Eagen created or continued policies or customs that resulted in the deprivation of his constitutional rights. In addition, no credible evidence has been presented to this Court to demonstrate that any of these defendants acted with gross negligence in their supervision of other DOCS employees. Finally, Keesh has provided no evidence that any of the defendants were aware of constitutional violations that they failed to correct or that they acted with deliberate indifference towards Keesh's constitutional rights.

With respect to his claims against Clark, Keesh alleges that Deputy Commissioner Leclaire and Captain Kearney told him that Clark had directed the search of his cell and the confiscation of his typewriter. (Docket # 1 at ¶¶ I-J; Docket # 84 at Exhibit ("Ex .") 37). According to Keesh, Clark's actions were "based on prosecutorial vindictiveness ... and [were] a pretext for a criminal investigation." (Docket # 84 at 38). Although I find that Keesh has adduced sufficient evidence to raise a genuine factual dispute as to whether Kearney ordered the search and confiscation of the typewriter at the direction or suggestion of the District Attorney's Office, [5] I find that he has not come forward with sufficient evidence to raise a triable issue of fact as to District Attorney Clark specifically. The record contains sworn assertions by both District Attorney Clark and ADA Fowler that Clark had no personal involvement in the investigation of Keesh's allegations. (Docket # 64-8, Responses 4 and 5; Docket # 64-2 at ¶¶ 11-12). While the record does contain a statement by Kearney that the typewriter was confiscated "at the behest of the D.A." (Docket # 78, Ex. B), the statement does not state that Kearney communicated directly with District Attorney Clark, as opposed to ADA Fowler or another member of the District Attorney's

Office. Indeed, the record is devoid of any specific factual allegations that District Attorney Clark himself participated in the decision to search Keesh's cell. In the absence of competent evidence that District Attorney Clark was personally involved in the decision, Keesh's Section 1983 claims against him should be dismissed.

[5] Kearney has submitted an affidavit attesting that it was he who ordered the cell search and the confiscation of Keesh's typewriter. (Docket # 79 at ¶ 8). Appended to his affidavit, however, is a report that was prepared by Kearney for Superintendent Donnelly concerning the cell search. Contrary to the representation in his current affidavit, Kearney states in his report, "at the behest of the D.A., [Keesh's] typewriter was confiscated." This apparent inconsistency is troubling to the Court and, regrettably, is not explained or even acknowledged in defendants' motion papers.

**\*6** Keesh alleges claims against Goord and Eagen based upon their purported failure to address satisfactorily his complaints and grievances. (Docket # 1 at ¶¶ O, Z, Zi, Zj, Zk, Zn, Zu). Keesh himself testified that neither Goord nor Eagen were present at Wende and were not involved in the incidents giving rise to his claims. (Docket # 72-2 at 100). At most, the record shows that Goord referred Keesh's complaints to other DOCS supervisors for investigation and response (Docket # 76 at ¶ 6) and that, as a nonvoting member of the Central Office Review Committee ("CORC") for the Inmate Grievance Program, Eagen signed determinations made by CORC on grievances filed by Keesh. (Docket # 71 at ¶ 57; Docket # 84, Appendix). These allegations are insufficient to give rise to Section 1983 claims against either Goord or Eagen. *See Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (affirming dismissal of Section 1983 claims against DOCS Commissioner who received letter from plaintiff and referred it for response to another supervisor); *H'Shaka v. Drown,* 2007 WL 1017275, \*17 (N.D.N.Y.2007) (noting Eagen's position as nonvoting member of the CORC and dismissing Section 1983 claim against him); *Ramsey v. Goord,* 2005 WL 2004144, \*8 (W.D.N.Y.2005) (allegation that Eagen denied grievance insufficient to give rise to Section 1983 claim); *Liner v. Goord,* 310 F.Supp.2d 550, 555 (W.D.N.Y.2004) (allegation that official ignored letters of complaint insufficient to establish Section 1983 claim); *Thomas v. Coombe,* 1998 WL 391143, \*6 (S.D.N.Y.1998) ("the fact that an official ignored a letter alleging unconstitutional conduct is not enough to

establish personal involvement"). "Where a supervisor's involvement in a prisoner's complaint is limited to forwarding of correspondence to appropriate staff, the supervisor has insufficient personal involvement to sustain a § 1983 cause of action." *Allah v. Poole,* 2007 WL 2317566, *15 (W.D.N.Y.2007) (quotation omitted). *Accord Barnes v. Henderson,* 490 F.Supp.2d 313, 319 (W.D.N.Y.2007); *Garvin v. Goord,* 212 F.Supp.2d 123, 126 (W.D.N.Y.2002). Accordingly, I find that Keesh has failed to sufficiently allege Section 1983 claims against either Goord or Eagen, and it is therefore my recommendation that summary judgment be granted in their favor.

I reach a contrary conclusion with respect to Keesh's claims against Superintendent Donnelly. Keesh alleges that Donnelly himself, as well as other defendants, informed him that his legal papers had been confiscated in retaliation for his filing lawsuits against DOCS employees. (Docket # 1 at ¶ H). He also alleges that Donnelly admitted to him that "he (Donnelly) knew I never had a weapon but he was gonna make sure I suffer because I filed a civil action and complaints against him in the past." (Docket # 1 at ¶ Zl). According to Keesh, he was also told by Corrections Officer Mendez that Donnelly and others sought to "set [him] up with a fabricated Misbehavior Report" in retaliation for having written grievances related to inmate Simpson. (Docket # 1 at ¶ Ze).

**\*7** Although the merits of these assertions must await the outcome of trial, I find that Keesh has adequately demonstrated the existence of disputes of material fact as to whether Donnelly personally participated in the alleged conduct underlying his Section 1983 claims. *See Houghton v. Cardone,* 295 F.Supp.2d at 276. I therefore recommend denial of Donnelly's motion for summary judgment on the grounds of lack of personal involvement.

### III. *DOCS Defendants' Motion for Summary Judgment*

Keesh's claims against the remaining DOCS defendants may be organized conceptually into three categories: retaliation claims; claims arising from the deprivation of property; and, due process claims. Keesh believes he is entitled to summary judgment on all of his claims; the DOCS defendants believe they are entitled to judgment on all of the claims. In my judgment, neither party is entirely correct.

**A.** *Keesh's Retaliation Claims:* Keesh alleges that the defendants subjected him to retaliatory treatment for writing the March 23 letter. Because he wrote that letter, Keesh claims, his cell was searched on March 30 and May 30, 2001, he was assaulted and keeplocked on April 11, 2001, the IGC election was "rigged" to ensure that he was not elected and a false misbehavior report was issued resulting in the imposition of a substantial disciplinary sentence. (Docket # 1).

The First Amendment protects inmates from retaliation by prison officials for exercising their constitutional rights to petition the government for redress of grievances. *See Colon,* 58 F.3d at 872 (citations omitted); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). To establish a retaliation claim under Section 1983, a prisoner must demonstrate that he engaged in constitutionally protected activity and that such activity was a substantial or motivating factor in the prison officials' decision to discipline him. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). If the plaintiff is able to make this showing, the burden shifts to the defendants to demonstrate, by a preponderance of the evidence, that the prisoner would have been disciplined "even in the absence of the protected conduct." *Id.* "Thus, if taken for both proper and improper reasons, [defendants'] action may be upheld if the action would have been taken based on the proper reasons alone." *Id. See also Sher v. Coughlin,* 739 F.2d 77, 82 (2d Cir.1984) ("the undisputed facts may demonstrate that the challenged action would have been taken on the valid basis alone, and such a conclusion will frequently be readily drawn in the context of prison administration where we have been cautioned to recognize that 'prison officials have broad administrative and discretionary authority over the institutions they manage' ") (quoting *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)).

The Second Circuit has recognized that retaliation claims brought by prisoners are particularly "prone to abuse." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the court has noted, "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001) (quoting *Flaherty v. Coughlin,* 713 F.2d at 13), *overruled*

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

*on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). For this reason, retaliation claims must be reviewed with special care. *Colon,* 58 F.3d at 872 ("because we recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, we examine prisoners' claims of retaliation with skepticism and particular care").

**\*8 1. The Cell Searches:** Keesh alleges that defendants retaliated against him when they performed a search of his cell on March 30, 2001. Specifically, Keesh contends that Captain Kearney, who ordered the search, and Corrections Officers Ball and Hatfield, who performed the search, were retaliating against him for having written the March 23 letter. Defendants do not contest that the decision to search was made in response to Keesh's letter, but argue that it was not motivated by retaliation.

Settled authority establishes that inmates have no constitutionally protected right of privacy in their cells. *See Hudson v. Palmer,* 468 U.S. 517, 527, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Indeed, the search of an inmate's cell, even if performed with a retaliatory motive, does not give rise to a constitutional claim for retaliation. *See id.; Bumpus v. Canfield,* 495 F.Supp.2d 316, 327 (W.D.N.Y.2007) ("[i]t is well settled ... that plaintiff cannot base a retaliation claim ... based on a cell search"); *Salahuddin v. Mead,* 2002 WL 1968329, \*5 (S.D.N.Y.2002) ("a retaliatory cell search is insufficient to support a First Amendment retaliation claim") (collecting cases); *Gadson v. Goord,* 1997 WL 714878, \*7 (S.D.N.Y.1997) ("searches of cells implicate no protected constitutional rights, even if the search is arbitrary or retaliatory in nature"); *Payne v. Axelrod,* 871 F.Supp. 1551, 1556 (N.D.N.Y.1995) (*"Hudson v. Palmer* [ ] permits even arbitrary cell searches in prison"). This well-established caselaw also disposes of Keesh's claim that the May 30, 2001 cell search constitutes actionable retaliation.[6]

[6]   While his retaliation claim may not be based upon the cell search itself, it may be based upon the issuance of a false misbehavior report. *See* discussion *infra* at 20-21.

Although the cell searches may not give rise to a retaliation claim, the confiscation or destruction of property taken at the time of the searches may. *Smith v.*

*City of New York,* 2005 WL 1026551, \*3 (S.D.N.Y.2005) ("retaliatory destruction of a prisoner's personal property has previously been found substantial enough to qualify as an adverse action"). Keesh alleges that Kearney, Ball and Hatfield conspired to retaliate against him when they confiscated his typewriter, bowties, religious training manuals and various legal papers. Having carefully reviewed the submissions by both parties, I find that neither side is entitled to summary judgment on this claim; rather, a genuine dispute of material fact exists as to the reason the property was taken.

On the one hand, Kearney affirms that he ordered the typewriter to be confiscated in order to investigate whether Keesh actually wrote the March 23 letter (Docket # 78, ¶¶ 7-12), and Ball and Hatfield have affirmed that they knew nothing about the March 23 letter when they performed the search (Docket # 73 at ¶¶ 4-6; Docket # 77 at ¶¶ 4-6). On the other, Keesh claims that all three defendants (Kearney, Ball and Hatfield) told him that his property was being taken from him because of his complaints and lawsuits. (Docket # 1 at ¶¶ G-H). In addition to these contrasting assertions, the record contains apparently inconsistent statements by Kearney himself concerning whether he or the District Attorney's Office ordered the confiscation of Keesh's typewriter. (*See* n. 5 *supra* ). These conflicting allegations sufficiently raise a triable issue of fact as to the impetus behind the decision to confiscate Keesh's property. *See Allah v. Greiner,* 2007 WL 1280657, \*5 (S.D.N.Y.2007) ( "given the plausible motivation for [defendant] to retaliate, the time of the confiscation, and [defendant's] own conflicting accounts as to the motivation for the search, defendants have not carried their burden of showing that [defendant] would have ordered the confiscation absent the alleged improper motives"; "[i]ssues of fact remain which require credibility determinations, a proper function of the jury and not this Court in review of a summary judgment motion").

**\*9 2. Keesh's Confinement to his Cell:** Keesh also asserts claims for assault and retaliation based upon an encounter he had with Superintendent Ekpe on April 11, 2001. (Docket # 1 at ¶¶ S-2). On that date, while Ekpe was making rounds, Keesh complained to him about alleged retaliation he perceived as a result of the March 23 letter. According to Keesh, Ekpe responded in a "violent, assaultive mannerism" by "yelling profanity and vulgarity" and directed that he be confined to his cell. (Docket # 1 at ¶¶ T-U).

In his affidavit, defendant Ekpe acknowledges that he had a conversation with Keesh about the Simpson matter and the confiscation of Keesh's property, as a result of which he directed that Keesh be confined to his cell. [7] (Docket # 75). Ekpe maintains that he decided to keeplock Keesh-not out of retaliation-but because he wanted Keesh to be interviewed regarding his knowledge of the Simpson incident without being tainted by information provided to him by other inmates. (Docket # 75 at ¶¶ 5, 7). In other words, Ekpe wanted to segregate Keesh before he was questioned-protocol that Ekpe describes as "standard procedure" in DOCS' investigations. (Docket # 75 at ¶ 7). According to Ekpe, approximately one hour later, he learned from Kearney that Keesh was already under investigation relating to the incident and directed that Keesh be released from keeplock. (Docket # 75 at ¶¶ 5-7). Ekpe states that Keesh was confined for "approximately one hour." (Docket # 75 at ¶ 7).

[7]    Keesh alleges that he spoke to Ekpe in the hallway of the Wende Correctional Facility on April 11, 2001. (Docket # 1). Ekpe references the same conversation twice in his affidavit. In the first, he states that it occurred on April 18, 2001 (Docket # 75 at ¶ 5); in the second, he states that it occurred on April 11, 2001 (Docket # 75 at ¶ 6). Viewing the entire record before the Court, which includes copies of memoranda and grievances referencing the incident on April 11, 2001, the reference to April 18, 2001 appears to be a mistake.

Keesh's allegations are insufficient to state a Section 1983 claim for assault against Ekpe. Keesh admits that he was not physically touched or harmed in any way. (Docket # 72-2 at 63-64). Rather, he contends that Ekpe used profanity and acted with "hostile" and "violent, assaultive mannerism[s]." (Docket # 1 at ¶ U). Such allegations are insufficient to support a Section 1983 claim. *See Amaker v. Foley,* 2003 WL 21383010, *4 (W.D.N.Y.2003)* ("[w]ithout more, [ ] allegations of verbal threats, abusive language and racial epithets cannot form the basis of a section 1983 claim"), *aff'd,* 117 Fed. Appx. 806 (2d Cir.2005); *Jermosen v. Coughlin,* 878 F.Supp. 444, 449 (N.D.N.Y.1995)* ("[v]erbal threats or abuses are not sufficient to state a constitutional violation cognizable under § 1983").

By contrast, Keesh's retaliation claim relating to his keeplock confinement should be permitted to proceed to trial. Although the issue is extremely close, I find that Keesh has alleged minimally sufficient facts to counter Ekpe's contention he was not motivated by retaliation in deciding to keeplock Keesh. In making this finding, I take particular note of a memorandum prepared by Ekpe several days after the incident, in which he describes Keesh's statements about the Simpson incident as "very frivolous and annoying." According to the memorandum, Ekpe replied that it was not Keesh's "prerogative to make misleading and false statements" and ordered him to "stand back in line and keep quiet." (*Id.*). This memorandum, when considered in connection with the entire record, adequately raises triable issues of fact concerning Ekpe's motivation in ordering Keesh confined to this cell. *See, e.g., Colon,* 58 F.3d at 872 (temporal proximity between an inmate's [exercise of his protected rights] and [adverse] action may serve as circumstantial evidence of retaliation").

**\*10** Defendants argue that this claim can nonetheless be dismissed because Keesh's keeplock confinement was *de minimis.* I disagree and find that summary judgment is inappropriate for either party on this claim.

"While ... the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes v. Walker,* 239 F.3d at 492-93; *see also Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (alleged retaliation must be more than *de minimis* ). Retaliation is actionable only if such retaliation is likely to "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Dawes,* 239 F.3d at 492-93. Otherwise, the retaliatory act is deemed *de minimis* and is not actionable under Section 1983. *Id.*

Defendants' contention that Keesh's keeplock confinement was *de minimis* is premised upon the assertion that its duration was approximately one hour. (Docket # 70 at 13). Keesh disputes that assertion, however. (Docket # 88 at ¶ 29). He maintains that it lasted one day, a representation that is supported by certain DOCS' records, including a memorandum prepared by Captain Kearney reflecting his investigation of that matter. (Docket # 88 at ¶ 29; Docket # 84 at Ex. 44). That memorandum states that Keesh was confined on April 11, 2007 and released the following morning. If true, and crediting Keesh's statements that he was confined at

approximately 8:00 a.m. on the 11th (Docket # 1 at ¶¶ 5-11), he would have been confined for nearly twenty-four hours. The record also suggests that Keesh may have been deprived of meals during his confinement. (Docket # 84, Ex. 9).

Considering these factual disputes, I cannot conclude that Keesh's confinement was *de minimis* as a matter of law. *See, e.g., Gill v. Tuttle,* 2004 WL 605281, *3 (2d Cir.2004) (reversing determination that nine days of keeplock confinement was *de minimis* ); *Lashley v. Wakefield,* 367 F.Supp.2d 461, 467 (W.D.N.Y.2005) (retaliation claims may be based on twenty-day keeplock confinement); *Gill v. Hoadley,* 261 F.Supp.2d 113, 123-24 (N.D.N.Y.2003) (same for four and twenty-one day periods). Rather, the jury should resolve those disputes and then determine whether a similarly-situated inmate would likely be deterred from exercising his rights as Keesh did. *See, e.g., Washington v. County of Rockland,* 373 F.3d 310, 320 (2d Cir.2004) (question of adverse action in retaliation claim "involved a material issue of fact that should have been reserved for a jury"); *Martinson v. Menifee,* 2007 WL 2106516, *7 (S.D.N.Y.2007) (same); *Zaire v. Doe,* 2006 WL 1994848, *5 (N.D.N.Y.2006) (same). Accordingly, Keesh should be allowed to proceed to trial on his claim that Ekpe retaliated against him by placing him in keeplock confinement on April 11, 2001.

**\*11 3. False Misbehavior Report:** I also find that Keesh should be permitted to proceed on the claim that defendants retaliated against him by planting a weapon in his cell and thereafter filing a false misbehavior report charging him with possession of the weapon. Such a claim fits within the exception to the general rule foreclosing Section 1983 claims based upon false misbehavior reports.

It is well-settled that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986) ("filing of unfounded charges [does] not give rise to a *per se* constitutional violation actionable under section 1983"). A Section 1983 claim based upon a false misbehavior report may proceed, however, "when the false charges are allegedly brought in retaliation for an inmate's exercise of his substantive constitutional rights." *Rodriguez v. Phillips,* 66 F.3d 470, 477 (2d Cir.1995); *see also Boddie v. Schnieder,* 105 F.3d at 862 (to state a Section 1983 claim based upon filing of false misbehavior reports,

"[t]here must be more, such as retaliation against the prisoner for exercising a constitutional right"); *Franco v. Kelly,* 854 F.2d at 589 (Section 1983 claim may properly be based upon claim that prison officials filed false disciplinary charges against prisoner in retaliation for his cooperation in investigation of inmate abuse).

Here, Keesh alleges that Officer Mendez told him that Donnelly, Monahan, Ekpe and Kearney were "seeking to set him up with a fabricated misbehavior report," and that Donnelly informed him that he knew Keesh never had a weapon, but was determined to make him suffer as a result of the lawsuits and complaints Keesh had filed against him. (Docket # 1 at ¶¶ Ze, Zl). Keesh further claims that "Monahan and Ekpe informed me that they knew I was set up but that they were going to make sure I suffered because I wrote complaints and grievances against officials for assaulting prisoner Simpson." (Docket # 1 at ¶ Zm). These specific allegations of retaliatory admissions counter defendants' sworn assertions that they did not retaliate against Keesh; the resulting factual dispute is material and must be resolved by a jury. Accordingly, Keesh should be permitted to proceed with his claim of retaliation based upon the filing of a false misbehavior report. *See Payne v. Axelrod,* 871 F.Supp. at 1556 (valid Section 1983 retaliation claim stated where prisoner alleged that corrections officers planted contraband evidence in his cell and falsely charged him with its possession).

**4. Election for Inmate Grievance Committee:** In his final retaliation claim, Keesh alleges that defendants fabricated the results of an inmate election to the IGRC, causing him to lose. Keesh has not presented any specific, non-conclusory evidence in support of this claim. (*See* Docket # 84 at ¶ 23 ("I sought to become a grievance representative ..., but due to Donnelly's retaliatory motives against me[,] the ballot was rigged so I would not be elected")). By contrast, Kieliszek has submitted an affidavit affirming that Keesh received the fewest votes of the four inmates who participated in the election.[8] (Docket # 79 at ¶ 5). According to Kieliszek, the votes were counted both by an inmate IGRC clerk and an inmate who was a member of the Inmate Liaison Committee. (*Id.*). Finally, Kieliszek declared that the votes were not altered in any way.

8    A copy of the official vote tally has been submitted to the Court. (Docket # 79, Ex. A).

**\*12** Considering the record in its totality, I find that Keesh has failed to present any credible evidence to counter Kieliszek's sworn assertions. *See McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004); *Houston v. Zen Zen,* 388 F.Supp.2d at 175; *Nichols v. Metropolitan Life Ins. Co.,* 180 F.Supp.2d 413, 419 (W.D.N.Y.2001). Keesh has offered nothing more than conclusory allegations to support his claim. Because I find them insufficient as a matter of law, I recommend that defendants' motion for summary judgment on this claim be granted.

**B. *Keesh's Access to the Courts and First Amendment Claims:*** Keesh also claims that his First Amendment rights of access to the courts and the free exercise of his religion were violated by the confiscation of his typewriter, legal papers, bowties and religious training manual. [9] (Docket # 1). Both parties seek summary judgment on these claims. For the reasons discussed below, I recommend that defendants' motion be granted.

9    It is unclear whether Keesh seeks to assert a Fourteenth Amendment due process claim for loss of property. If he does, such a claim is unavailing. Where the state provides an adequate post-deprivation remedy for property loss or destruction, a federal claim may not be brought. *See Hudson v. Palmer,* 468 U.S. at 533. In New York State, such a remedy is available under the New York Court of Claims Act and forecloses a federal claim. *See, e.g., Leitzsey v. Coombe,* 998 F.Supp. 282, 289 (W.D.N.Y.1998) (granting summary judgment for defendants on plaintiff's loss-of-property claim); *Gadson v. Goord,* 1997 WL 714878 at \*7 (dismissing plaintiff's claim for deprivation of his legal documents and medical records).

A prisoner's constitutional right of access to the courts is implicated when prison authorities "actively interfer[e] with inmates' attempts to prepare [or file] legal documents." *Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). To prevail on such a claim, the inmate must show a "relevant actual injury." *Id.* at 351. As the court has explained, the inmate must:

> [d]emonstrate that [prison practices] hindered his efforts to pursue a legal claim. He might show, for example,

> that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he suffered arguably actionable harm that he wished to bring before the courts, but was ... unable even to file a complaint.

*Id.* An inmate cannot satisfy this showing through mere conclusory assertions; rather, he must "designate[ ] specific facts showing a genuine issue for trial." *Arce v. Walker,* 58 F.Supp.2d 39, 44 (W.D.N.Y.1999) (quoting *Kensu v. Haigh,* 87 F.3d 172, 175 (6th Cir.1996)).

In the instant matter, Keesh asserts that the confiscation of his typewriter and legal materials denied him access to the courts by causing him to "receive unfavorable Court decisions." (Docket # 1 at ¶ L). During his deposition, Keesh explained that his "trial notes" were taken during the March 2001 cell search and that the loss of those notes deprived him of the ability to pursue a claim for ineffective assistance of counsel in his 1990 criminal trial. (Docket # 72-2 at 35-37). Keesh has not demonstrated, however, how the notes would support a claim of ineffective assistance of counsel, nor has he explained his failure to raise that claim at any time during the ten years between his conviction and the cell search. Although " 'the taking of an inmate's papers will often interfere with an inmate's right of access to courts,' the Court may not presume harm, and some showing of impaired access is required." *Arce v. Walker,* 58 F.Supp.2d at 44 (quoting *Goff v. Nix,* 113 F.3d 887, 892 (8th Cir.1997); *Oliver v. Fauver,* 118 F.3d 175, 178 (3d Cir.1997)). Keesh's conclusory assertions regarding his legal papers are insufficient to support his First Amendment access to the courts claim. *See Boswell v. Mayer,* 169 F.3d 384, 387 (6th Cir.1999); *Arce,* 58 F.Supp.2d at 44.

**\*13** Keesh's assertion that he was wrongfully deprived of his typewriter for two months is likewise insufficient to support a First Amendment claim. Specifically, Keesh alleges that "due to the confiscation of my typewriter, I was deprived of sending letters to family, friends, law offices and Courts. (Docket # 1 at ¶ L). Although it is clear that prison inmates have a First Amendment

right to send and receive mail, *see Wolfish v. Levi,* 573 F.2d 118, 130 (2d Cir.1978), *rev'd on other grounds, Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Knight v. Keane,* 247 F.Supp.2d 379, 384 (S.D.N.Y.2002), Keesh has not alleged a violation of that right. The First Amendment does not guarantee the use of a typewriter, *see Roston v. Mantello,* 1995 WL 129044, *3 (W.D.N.Y.1995) ("[i]nmates have no constitutional right to the use or possession of a typewriter"), and Keesh has not presented any evidence to suggest that he was unable to send handwritten letters during the two-month period. Indeed, the record is replete with copies of handwritten letters and grievances that Keesh prepared during the time he was without his typewriter, and he has admitted that nothing prevented him from writing his correspondence by hand. (Docket # 64-6 at 45). For these reasons, I find that Keesh has not sufficiently alleged a First Amendment claim based upon the temporary confiscation of his typewriter.

Summary judgment for defendants should also be granted on Keesh's free exercise of religion claim. Keesh alleges that his bowties and religious training manual were taken during the cell search. As a result, he asserts, he was unable say his prayers and groom himself according to the Nation of Islam "dress code." (Docket # 72-2 at 24-25). "The Free Exercise Clause of the First Amendment is an 'unflinching pledge to allow our citizenry to explore ... religious beliefs in accordance with the dictates of their conscience.' " *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999) (quoting *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984)). That citizenry includes prisoners. *Id.* ("[p]risoners retain their right to religious freedom [under the First Amendment] even when incarcerated"). To assess a free exercise of religion claim, a court must determine:

> (1) whether the practice asserted is religious in the [prisoner's] scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged [conduct] of prison officials infringes upon the religious belief; and (3) whether the challenged [conduct] of the prison officials furthers some legitimate penological objective.

*Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988).

The infringement upon the prisoner's belief must be more than a mere inconvenience; the prisoner "must first demonstrate that the state action substantially burdened his [ ] exercise of religion." *See Boomer v. Irvin,* 963 F.Supp. 227, 231 (W.D.N.Y.1997) (citing *Abdul-Malik v. Goord,* 1997 WL 83402, *7 (S.D.N.Y.1997)); *see also Davidson v. Davis,* 1995 WL 60732, *5 (S.D.N.Y.1995) ("This interference must be more than an inconvenience, the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine") (quoting *Graham v. Commissioner,* 822 F.2d 844, 851 (9th Cir.1987)).

**\*14** For purposes of this motion, the Court assumes that Keesh is sincere in his religious beliefs. His allegations, even when liberally read, nonetheless do not amount to a free exercise violation. Keesh does not contend that he was unable to attend religious services or that he was forced to alter or abandon any specific religious belief. While the loss of his training manual, which presumably could have been replaced, and the loss of his bowties, which were returned to him the next month, were likely an inconvenience, I do not find that they posed a substantial burden on Keesh's ability to practice his religion.

I therefore recommend that defendants' motion for summary judgment on Keesh's First Amendment access to the courts and free exercise of religion claims be granted.

**C. Keesh's Due Process Claim:** In his final claim, Keesh alleges that he was denied due process of law because he did not receive a fair disciplinary hearing on the misbehavior report charging him with possession of the weapon found during the Mary 2001 search of his cell. According to Keesh, Hearing Officer Thomas Schoellkopf was biased against him and told him that he had predetermined his guilt. (Docket # 84 at ¶ 36). He was convicted after the hearing and sentenced to confinement in the special housing unit ("SHU") and loss of privileges for 180 days. In September 2001, the disciplinary determination was reversed by defendant Selsky, Director of Special Housing/Inmate Discipline, based upon his finding that the "circumstances of the case warranted further inquiry into the reason for [the] search." (Docket # 82, Ex. C).

Keesh v. Goord, Not Reported in F.Supp.2d (2007)
Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 99 of 237
2007 WL 2903682

Under the Fourteenth Amendment, prison inmates may not be deprived of a protected liberty interest without due process of law. *Franco,* 854 F.2d at 587. To prevail on a Section 1983 due process claim, a prisoner must demonstrate that (1) he possessed a liberty interest; and (2) the defendants deprived him of that interest as the result of insufficient process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001). Determination of whether a liberty interest exists requires the court to consider whether the restraint at issue "imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* (citing *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). The "inquiry under *Sandin* [is] whether the duration of plaintiff's actual period of administrative or disciplinary confinement and the conditions manifest in both the general population of the prison and other segregative housing as to give rise to a liberty interest." *Id.*

Defendants in this matter do not appear to dispute that Keesh possessed a liberty interest. [10] Rather, they argue that Keesh received all the process he was due. Keesh, on the other hand, acknowledges that he was provided with a disciplinary hearing, but argues that such hearing did not satisfy the Due Process clause because the hearing officer had prejudged his guilt.

[10]    Although it is unclear precisely how long Keesh was confined in SHU before Director Selsky reversed the determination, I agree that the length of the confinement, which plainly extended over most of the summer of 2001, implicates a protectible liberty interest.

**\*15** A prison "inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 258 (2d Cir.1996). In addition, there must be at least "some evidence to support the findings made in the disciplinary hearing. *Superintendent v. Hill,* 472 U.S. 445, 457, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985); *Zavaro v. Coughlin,* 970 F.2d 1148, 1152 (2d Cir.1992); *Black v. Selsky,* 15 F.Supp.2d 311, 317 (W.D.N.Y.1998). Nevertheless, "the degree of impartiality required of prison hearing officers does not rise to the level required of judges generally." *Black v. Selsky,* 15 F.Supp.2d at 317 (citing *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989)). Rather, as the Supreme Court stated in *Wolff v. McDonnell,* 418 U.S. 539, 571, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the hearing officer must not be so insufficiently impartial as to pose a "hazard

of arbitrary decisionmaking." Keesh's sworn assertion that Schoellkopf told him he that he (Schoellkopf) had determined Keesh's guilt before conducting the hearing-the truth of which is vigorously disputed by Schoellkopf-adequately raises a triable issue of fact on his Section 1983 due process claim against Schoellkopf. Accordingly, I deny both parties' for summary judgment on this claim. [11]

[11]    Having reviewed the record carefully, I find that Keesh has allegedly no specific facts upon which a due process claim may be asserted against defendant Selsky, the DOCS official who reversed the disciplinary determination.

In sum, I recommend that defendants' motion for summary judgment be granted on plaintiff's (1) Section 1983 claims against defendants Clark, Goord and Eagen; (2) Section 1983 retaliation claims based upon the cell searches and IGRC election; (3) First Amendment claims of access to the courts and free exercise of religion; (4) Fourteenth Amendment due process claim against defendant Selsky. Retaliation claims against defendants Donnelly, Ekpe, Monahan, Kearney, Mendez, Ball and Hatfield should be permitted to proceed (other than as specified above), and the due process claim against defendant Schoellkopf also should be permitted to go forward. [12]

[12]    I reject defendants' assertion that they are entitled to qualified immunity. This defense is raised in wholly conclusory fashion (*see* Docket # 70 at 25), and defendants have failed to establish their entitlement to such protection.

## IV. *Keesh's Cross-Motion*

Plaintiff cross-moves for summary judgment on his claims against defendants. As noted above, I find that defendants have shown their entitlement to judgment as a matter of law on some of the claims. As to the others, I find that genuine disputes of material fact exist and render summary judgment on them inappropriate for either party.

## CONCLUSION

For the foregoing reasons, it is the recommendation of this Court that District Attorney Clark's motion for summary judgment **(Docket # 62)** be **GRANTED,** that the DOCS'

Keesh v. Smith, Not Reported in F.Supp.2d (2007)
Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 100 of 237
2007 WL 2903682

defendants motion for summary judgment **(Docket # 69)** be **GRANTED in PART and DENIED in PART** and that Keesh's cross-motion for summary judgment **(Docket # 83)** be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby **ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R.Civ.P. 72(b), 6(a) and 6(e) and Local Rule 72.3(a)(3).

 **\*16** The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See e.g. Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.,* 840 F.2d 985 (1st Cir.1988).

***Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.*** *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." ***Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection .***

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2903682

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 7356343
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Taheen HAYES, Plaintiff,
v.
T. DAHKLE, et al., Defendants.

No. 9:16-CV-1368 (TJM/CFH)
|
Signed 12/11/2018

**Attorneys and Law Firms**

Taheen Hayes, 05-A-3850, Elmira Correctional Facility,
P.O. Box 500, Elmira, New York 14902, Plaintiff pro se.

OF COUNSEL: HELENA O. PEDERSON, ESQ.,
Assistant Attorney General, Atorney General for the
State of New York, The Capitol, Albany, New York
12224, Attorney for Defendants.

## REPORT-RECOMMENDATION AND ORDER [1]

[1]    This matter was referred to the undersigned for
Report-Recommendation and Order pursuant to 28
U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff pro se Taheen Hayes ("plaintiff"), an inmate
who was, at all relevant times, in the custody of the
New York Department of Corrections and Community
Supervision ("DOCCS"), brings this action pursuant to
42 U.S.C. § 1983, alleging that defendants, Superintendent
("Supt.") Daniel F. Martuscello, Deputy Superintendent
of Security ("DSS") Raymond Shanley, Corrections
Officer ("C.O.") T. Dahkle, C.O. Jason A. Meier, C.O.
Gregory E. Langtry, C.O. Stephen A. Bence, C.O. E.
Coon, C.O. K. Hoffman, and Officer Rehabilitation
Counselor ("O.R.C.") James Iarusso – who, at all
relevant times, were employed at Coxsackie Correctional
Facility ("Coxsackie") – violated his constitutional rights
under the First and Eighth Amendments. Dkt. No. 12
("Am. Compl."). Presently pending before the Court
is defendants' Motion for Partial Summary Judgment
pursuant to Rule 56 of the Federal Rules of Civil
Procedure ("Fed. R. Civ. P."). Dkt. No. 58. Plaintiff

opposed defendants' motion, and defendants filed a
reply. Dkt. Nos. 67, 69. For the following reasons, it
is recommended that defendants' motion be granted on
the basis of plaintiff's failure to exhaust his claims,
excluding his Eighth Amendment sexual assault claim. As
to plaintiff's sexual assault claim, it is recommended that
such claim be dismissed on the merits. Alternatively, if
the District Judge should not agree with the undersigned's
recommendation as to plaintiff's failure to exhaust, it is
recommended that defendants' motion be granted in part
and denied in part.

## I. Background

### A. Plaintiff's Recitation of the Facts

The facts are related herein in the light most favorable
to plaintiff as the nonmoving party. See subsection II
infra. On or about April 15, 2016, C.O. Dahkle subjected
plaintiff to sexual abuse and retaliated against him in
response to plaintiff's February 2016 grievance against
him. Am. Compl. ¶ 1. While conducting the frisk, C.O.
Dahkle "had his lower body (genitals) pressed up against
[plaintiff's] butt" and tightly pressed his hands down
plaintiff's back and "into the crack of his butt (inside) all
the way down and around [his] [groin]." Id. ¶ 4. During
the subsequent search of plaintiff's cell, C.O. Dahkle
asked, "[d]o you consider yourself a male or female?" and
"[d]o you suck dick or fuck men?" Id. ¶ 6. On April 16,
2016, plaintiff reported the incident to the Prison Rape
Elimination Act ("PREA") hotline. Id. ¶ 7. The next day,
plaintiff again reported the incident to the PREA hotline
and filed a grievance with Coxsackie. Id. ¶¶ 8-9. On April
18, 2016, plaintiff reported the sexual assault to Supt.
Martuscello during the Superintendent's "rounds" in the
cafeteria. Id. ¶ 10. Supt. Martuscello informed plaintiff
that someone would contact him about the incident. Id. ¶
11. Later that day, plaintiff was interviewed by the Office
of Mental Health and Coxsackie Medical staff. Id. ¶ 12.

On May 15, 2016, C.O. Hoffman "falsified a misbehavior
report which subjected [plaintiff] to confinement for
retaliation ... because [plaintiff] filed a sexual assault
complaint against T. Dahkle and was rumored by
Coxsackie Correctional Officers to be working with the
Office of Special Investigation." Am. Compl. ¶¶ 19, 20.
The following day, plaintiff was placed in keeplock [2]

pending a disciplinary hearing for C.O. Hoffman's misbehavior report. Id. ¶ 20.

[2]   "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. COMP. CODES R. & REGS. tit. 7, § 301.6.

**\*2** On May 16, 2016, plaintiff met with C.O. Meier and non-party C.O. Rowe. Am. Compl. ¶ 21. When asked why he was keeplocked, plaintiff explained C.O. Hoffman's alleged retaliatory misbehavior report. Id. C.O. Meier called plaintiff a "fucking liar" and stated that he heard plaintiff telling other inmates to call the PREA hotline and falsely report incidents of sexual abuse. Id. Plaintiff assured C.O. Meier that he was mistaken, and C.O. Meier became "very upset" and agitated and ordered plaintiff back to his cell. Id. ¶¶ 21, 22. Later that day, plaintiff attended his keeplock admission interview with a non-party nurse while in the presence of C.O. Meier and C.O. Rowe. Id. ¶ 23. The nurse asked plaintiff if he had been sexually abused while in Coxsackie. Id. ¶ 24. When plaintiff answered affirmatively, C.O. Meier "went crazy," yelling, "faggots like you get C.O.'s [sic] fucking fired. You want to play these fucking games?" Id. C.O. Meier pointed his fingers directly in plaintiff's face and threatened to "fuck [plaintiff] up right now." Id. ¶¶ 26, 27.

On May 17, 2016, plaintiff was transferred to the Special Housing Unit ("SHU").[3] Am. Compl. ¶ 30. On May 23, 2016, plaintiff again expressed his fear and frustrations about his safety to Supt. Martuscello and DSS Shanley, showing them the allegedly false May 15, 2016 misbehavior report from C.O. Hoffman and explaining C.O. Meier's threats. Id. ¶ 32. Supt. Martuscello and DSS Shanley told plaintiff to resolve his problems at an upcoming disciplinary hearing. Id.

[3]   SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

On May 26, 2016, plaintiff filed a grievance for the "constant retaliatory practices by way of disciplinary action and harrasment [sic] from C.O. Hoffman, threats from C.O. Meier for filing grievances and a sexual complaint on Dahkle." Am. Compl. ¶ 36. In this grievance, plaintiff also "raise[d] the issue of the failure to protect" and how he feared for his life. Id. Plaintiff sent a copy of this grievance to Supt. Martuscello. Id. On June 10, 2016, plaintiff was released from SHU. Id. ¶ 37. When plaintiff asked his O.R.C. Counselor why a disciplinary hearing for C.O. Hoffman's misbehivor report had never been conducted, the Counselor told him that the misbehavior report did not exist. Id.

On June 11, 2016, Supt. Martuscello and DSS Shanley ordered plaintiff to the Captain's office. Am. Compl. ¶ 39. Supt. Martuscello yelled at plaintiff for filing complaints about the alleged sexual assault and other harassment to outside New York State agencies. Id. DSS Shanley warned plaintiff that because he was the Deputy Director of Security, if plaintiff initiated any further complaints, "anything [could] happen to [him]" for "security reasons." Id. Supt. Martuscello threatened that if plaintiff continued to "make an issue," he would place him back in SHU. Id. ¶ 41. Four days later, plaintiff filed a grievance regarding this meeting. Id. ¶ 42. Plaintiff also filed a complaint with non-party Anthony J. Annucci, the acting Commissioner of DOCCS, regarding the sexual abuse, threats, harassment, and retaliatory practices he experienced at Coxsackie. Id.

On June 20, 2016, plaintiff was transferred to a different housing unit. Am. Compl. ¶ 43. Upon arrival, C.O. Hoffman stated, "[d]on't get comfortable Hayes, you'll be out of here soon." Id. C.O. Hoffman further stated, "you mess with one of us (C.O.'s) you got to deal with all of us." Id. On July 7, 2016, C.O. Hoffman banged on plaintiff's cell, and told him that the May 15, 2016 misbehavior report he filed against plaintiff "don't [sic] exist" and that "Dahkle said hi." Id. ¶ 47.

On July 12, 2016, plaintiff attended a grievance hearing concerning a recent grievance for SHU mail pickup. Am. Compl. ¶ 48. O.R.C. Iarusso was present at the hearing. Id. Plaintiff requested permission to inquire about his grievance against Supt. Martuscello and DSS Shanley that had not been filed, and O.R.C. Iarusso denied that request, stating that he did not care about plaintiff's grievance. Id. ¶¶ 48, 49. He further informed plaintiff

that he had thrown away plaintiff's grievance and that "as far as [he] was concerned, any grievances about the Superintendent [he] would never personally file anyway." Id.

**\*3** On July 30, 2016, C.O. Meier attacked plaintiff from behind and slammed him into the ground. Am. Compl. ¶ 55. C.O. Meier then sat on plaintiff's back and repeatedly punched him in the back, head, and face with closed fists. Id. ¶ 56. C.O. Langtry, C.O. Bence, and C.O. Coon joined in, kicking and punching plaintiff all over his body as he lay handcuffed on the floor. Id. ¶ 57.

### B. Defendants' Recitation of the Facts

In support of this motion, defendants filed a Statement of Material Facts. [4]

[4]
Local Rule 7.1(a)(3) states:
Summary Judgment Motions
Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.
The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.
N.D.N.Y. L.R. 7.1(a)(3).

### 1. April 15, 2016 Pat Frisk

On April 15, 2016, plaintiff was the subject of a scheduled, routine cell search that had been pre-approved by DSS Shanley. Dkt. No. 58-3 ¶ 4. C.O. Dahkle carried out the search. Id. Pursuant to DOCCS policy, plaintiff was pat frisked prior to the cell search. Id. ¶¶ 5, 6. As part of the pat frisk, C.O. Dahkle patted down plaintiff's arms, shoulders, chest, back, each leg, in between each leg, and along the front of plaintiff's pants' zipper. Id. ¶ 8. C.O. Dahkle conducted the entire pat frisk outside of plaintiff's clothing. Id. "The standards for inspection of an inmate's person allow for contact with the genitalia, groin, breast, inner thighs, and buttocks." Id. ¶ 9. C.O. Dahkle conducted the April 15, 2016 pat frisk without incident, and no contraband was found. Id. ¶ 10.

After the pat frisk, C.O. Dahlke ordered plaintiff to stand on the wall and observe his cell being searched. Dkt. No. 58-3 ¶ 11. C.O. Dahkle did not find contraband in plaintiff's cell, and plaintiff returned to his cell. Id. Insofar as C.O. Dahkle made contact with plaintiff's genitalia or buttocks during the pat frisk, such contact was minimal and solely as a result of conducting the pat frisk. Id. ¶ 12. C.O. Dahkle did not make any sexual or derogatory comments toward plaintiff during the pat frisk. Id. ¶ 14. Nevertheless, plaintiff reported the pat frisk as an alleged sexual assault in violation of PREA. Id. ¶ 15. An investigation following the PREA complaint found no sexual contact or abuse by C.O. Dahkle. Id. ¶ 16. During plaintiff's physical examination by the medical staff, plaintiff did not complain of injuries from the April 15, 2016 pat frisk, and the medical staff did not observe any injuries. Id. ¶ 17.

### 2. May 15, 2016 Misbehavior Report

**\*4** On May 15, 2016, C.O. Hoffman issued plaintiff a Tier II misbehavior report, accusing plaintiff of creating a disturbance, refusing a direct order, harassment, lying, and threats. Dkt. No. 58-3 ¶ 18. Plaintiff served one day in keeplock pending review of the May 15, 2016 misbehavior report as plaintiff received a Tier III misbehavior report on May 16, 2016, "for which he would have been confined in keeplock pending review." Id. ¶ 19. Plaintiff served thirty days in keeplock and sustained a loss of certain privileges in relation to the May 16, 2016 misbehavior report. Id. Plaintiff received a Tier III misbehavior report on May 17, 2016, which resulted in ninety days in SHU and a loss of certain privileges. Id. ¶ 20.

Pursuant to the May 15, 2016 misbehavior report, C.O. Hoffman overheard plaintiff telling another inmate about calling the PREA hotline to make "bogus complaints in order to cause trouble for staff." Dkt. No. 58-3 ¶ 21. C.O. Hoffman gave plaintiff a direct order to stop yelling, and plaintiff stated that he had not been yelling. Id. C.O. Hoffman informed plaintiff that he had overheard his conversation, and gave plaintiff a second direct order to stop yelling. Id. The misbehavior report then states that plaintiff cursed at C.O. Hoffman, and threatened to file a complaint or lawsuit against him. Id. At the time he authored the May 15, 2015 misbehavior report, C.O. Hoffman was unaware of plaintiff's PREA complaint against C.O. Dahlke. Id. ¶ 25. Although the alleged misconduct was later corroborated during a subsequent investigation, the May 15, 2016 misbehavior report was later expunged for unknown reasons. Id. ¶¶ 27, 28-29.

### 3. Plaintiff's Verbal Complaints about C.O. Meier

"To the extent that [Supt.] Martuscello and [DSS] Shanley ever advised plaintiff to handle any issue through the disciplinary process, it would have been to handle his misbehavior reports through the disciplinary process." Dkt. No. 58-3 ¶ 30. Pursuant to DOCCS policy, "an inmate's verbal complaints of threats by a Correction Officer are delegated to a Sergeant for investigation." Id. ¶ 32. If an inmate's complaint was found to be credible, then the investigation would be referred to the Office of Special Investigations ("OSI"). Id. As such, Supt. Martuscello and DSS Shanley had no personal involvement in investigating plaintiff's complaints. Id. ¶ 33. Although neither Supt. Martuscello nor DSS Shanley recall speaking with plaintiff regarding any alleged threats by C.O. Meier in May 2016, "there is no reason to believe that the process for verbal complaints did not occur." Id. ¶ 34. Moreover, Supt. Martuscello and DSS Shanley do not have the authority to transfer plaintiff to another facility. Id. ¶¶ 41, 42. Supt. Martuscello and DSS Shanley also were not responsible for C.O. assignments, and, thus, could not assign C.O. Meier to a different housing block. Id. ¶ 43. The Use of Force report concerning C.O. Meier's alleged use indicates that "only necessary and appropriate force was used to regain control of the situation, and that such force was unrelated to any alleged threats made by [C.O.] Meier." Id. ¶ 45.

### 4. June 2016 Meeting with Supt. Martuscello and DSS Shanley

An inmate who has been penalized with time in SHU may have any portion of that time deferred up to 180 days. The Hearing Officer who handles the disciplinary hearing makes the decision to defer time. If the inmate has no disciplinary infractions during the deferral period, the penalty is expunged. However, if the inmate has a subsequent disciplinary infraction during the deferral period, the deferred time may be invoked following a hearing on the subsequent disciplinary infraction. The Hearing Officer, at his or her discretion, makes the decision to invoke deferred time following the hearing on the subsequent disciplinary infraction.

**\*5** Dkt. No. 58-3 ¶ 46 (internal citations omitted). Supt. Martuscello does not recall meeting with plaintiff on June 11, 2015. Id. ¶ 48. He did not threaten plaintiff with deferred SHU time, and, as Superintendent, does not make the decision as to whether to invoke an inmate's deferred SHU time. Id. ¶¶ 47, 49. If Supt. Martuscello did discuss deferred SHU time with plaintiff, "it would have been to remind Plaintiff of the rules for deferred SHU time: that if Plaintiff received a misbehavior report for a disciplinary infraction while he had deferred SHU time, the Hearing Officer could decide to invoke that deferred SHU time." Id. ¶ 51.

### 5. July 12, 2016 Grievance Hearing

On July 12, 2016, plaintiff attended a "grievance hearing" on his complaint regarding mail in SHU. Dkt. No. 58-3 ¶ 53. On that date, O.R.C. Iarusso worked as a staff representative for the Coxsackie Inmate Grievance Program ("IGP"). Id. ¶ 54. Prior to his July 12, 2016 grievance hearing, plaintiff had attempted, on

multiple occasions, to discuss other grievances, including a grievance against Supt. Martuscello, after O.R.C. Iarusso told him he would look into these grievances at a later date. Id. ¶ 56. O.R.C. Iarusso informed plaintiff that the purpose of the July 12, 2016 hearing was to discuss plaintiff's grievance regarding SHU mail. Id. ¶ 56. "As part of a broader exchange, after Plaintiff's persistent questions and demands about other grievances, Defendant Iarusso told Plaintiff that he, personally, would not file a grievance against the Superintendent." Id. ¶ 58. As a IGP Staff Representative, O.R.C. Iarusso is not responsible for filing inmate grievances. Id. ¶ 55. O.R.C. Iarusso did not tell plaintiff that he would not file plaintiff's grievance against Supt. Martuscello and DSS Shanley, and had no intention of deterring plaintiff from filing grievances against Coxsackie staff. Id. ¶¶ 59, 62. Further, O.R.C. Iarusso did not threaten to discard plaintiff's grievance against Supt. Martuscello and DSS Shanley, nor did he discard such grievance. Id. ¶¶ 63, 64. In fact, plaintiff's grievance against Supt. Martuscello and DSS Shanley was filed and consolidated with plaintiff's grievance concerning an alleged loss of programs. Id. ¶ 65.

### 6. July 30, 2016 Use of Force

On July 30, 2016, C.O. Coon and C.O. Bence "responded to a Watch Commander Response" that stated that plaintiff had attempted to assault C.O. Meier. Dkt. No. 58-3 ¶¶ 67, 68. C.O. Meier first used his body weight to restrict plaintiff's movement until at least one of plaintiff's arms could be secured, as plaintiff resisted C.O. Meier's attempts to regain control of the situation. Id. ¶ 69. C.O. Langtry then secured plaintiff's right arm behind his back. Id. ¶ 70. When C.O. Bence arrived, he assisted C.O. Meier and C.O. Langtry by securing plaintiff's left arm behind his back until mechanical restraints could be applied. Id. ¶ 71. When C.O. Coon arrived, he observed plaintiff laying on the floor with his hands secured behind his back by the other corrections officers. Id. ¶ 72. After the corrections officers secured plaintiff's arms behind his back, C.O. Coon applied mechanical restraints to plaintiff's wrists. Id. ¶ 73. An unnamed corrections officer then escorted plaintiff to the medical department. Id. ¶ 74.

C.O. Coon and C.O. Bence authored memorandum documenting their actions on July 30, 2016 using normal and ordinary DOCCS procedure following a Use of Force incident. Dkt. No. 58-3 ¶ 76. C.O. Bence used minimal

force to secure plaintiff's left arm behind his back in an attempt to regain control of the situation after plaintiff's alleged attempted assault on staff and resistance. Id. ¶ 77. C.O. Coon's only role in the July 30, 2016 Use of Force incident was to apply mechanical restraints to plaintiff's wrists. Id. ¶ 79. Plaintiff's medical records indicate that, following the July 30, 2016 Use of Force incident, he sustained a cut above his eye that required stitches.

## II. Discussion [5]

[5]     All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

### A. Legal Standard

**\*6** "A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. See id. "When no rational jury could find in favor of the non-moving party because the evidence

to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### B. Exhaustion

Defendants contend that plaintiff failed to exhaust his remaining claims except for his Eighth Amendment sexual assault claim. Def. Mem. of Law at 4 n.2, 6. Plaintiff claims that administrative remedies were unavailable to him. Dkt. No. 67-1 ("Pl. Opp.") at 4-6. The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. 983. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process,

such as monetary damages. Id. at 524, 122 S.Ct. 983. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

**\*7** Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, ––– U.S. ––––, 136 S.Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). Thus, the "special circumstances" exception in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).[6]

> [6]  In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See Williams, 829 F.3d at 123. The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." Id. (citing Ross, 136 S.Ct. at 1858-59).

Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S.Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) ). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking

advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

### 1. Did Plaintiff Exhaust his Administrative Remedies?[7]

[7]   First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii). Parties do not dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5.

**\*8**   Defendants do not dispute that plaintiff filed grievances pertaining to a majority of his claims in the underlying action. However, defendants argue that plaintiff "knowingly filed the complaint before he received notice of CORC's determinations" regarding his grievances. Def. Mem. of Law at 9 (emphasis omitted). On June 17, 2016, plaintiff filed a filed grievance (CX-18983-16) alleging that C.O. Hoffman falsified a misbehavior report in retaliation for plaintiff reporting an alleged sexual assault by C.O. Dahkle. Dkt. No. 58-2 ¶ 93. CORC rendered their determination on grievance CX-18983-16 on February 22, 2017, and mailed the disposition to plaintiff on March 3, 2017. Id. ¶ 94. On July 25, 2016, plaintiff filed a grievance (CX-19053-16) alleging that O.R.C. Iarusso informed plaintiff that he would not file plaintiff's grievances complaining about Supt. Martuscello. Id. ¶ 95. Plaintiff did not claim that O.R.C.

Iarusso's alleged actions were retaliatory. Id. CORC rendered their determination on grievance CX-19053-16 on April 12, 2017, and mailed the disposition to plaintiff on April 22, 2017. Id. ¶ 96.

On July 25, 2016, plaintiff filed a grievance (CX-19054-16) alleging that he had been removed from his mess hall job in retaliation for filing a PREA complaint. Dkt. No. 58-3 ¶ 97. Plaintiff also alleged that when he attempted to address his removal with Supt. Martuscello and DSS Shanley, they intimidated him, and Supt. Martuscello threatened to invoke plaintiff's "deferred time" in SHU. Id. Plaintiff claimed that Supt. Martuscello and DSS Shanley intimidated and threatened him after plaintiff brought up previous complaints and grievances. Id. CORC rendered their determination on grievance CX-19054-16 on May 3, 2017, and mailed the disposition to plaintiff on June 5, 2017. Id. ¶ 98. On August 9, 2016, plaintiff filed a grievance (CX-19094-16) alleging that C.O. Meier and other unnamed corrections officers assaulted him on July 30, 2016 in retaliation for reporting an alleged sexual assault by C.O. Dahkle. Id. ¶ 99. Plaintiff also alleged that Supt. Martuscello failed to take "responsible action to protect [plaintiff's] safety" prior to the July 30, 2016 incident. Id. Plaintiff did not allege DSS Shanley failed to protect him from the alleged excessive use of force. Id. ¶ 100. CORC rendered their determination on grievance CX-19094-16 on May 31, 2017, and mailed the disposition to plaintiff on July 10, 2017. Id. ¶ 102. Plaintiff filed the original complaint in this action on November 17, 2016. See Dkt. No. 1.

It is well-settled that "the PLRA requires that an inmate plaintiff must exhaust his available administrative remedies before commencing a lawsuit in federal court with respect to prison conditions." Peoples v. Beldock, 212 F.Supp.2d 141, 142 (W.D.N.Y. 2002); see McMillian v. Walters, No. 9:16-CV-0277 (MAD/DJS), 2017 WL 8894737, at *2 (N.D.N.Y. Dec. 18, 2017) ("The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action.") (citation omitted); White v. Drake, No. 10-CV-1034 (GTS/DRH), 2011 WL 4478988, at *3 (N.D.N.Y. Aug. 11, 2011) ("Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit.") (citation omitted). The record is clear that plaintiff filed this action on November 17, 2016,

and, at that time, CORC had yet to issue decisions on grievances CX-18983-16; CX-19053-16; CX-19054-16; and CX-19094-16. See Dkt. No. 58-18 at 9-21. DOCCS IGP Assistant Director Rachael Seguin declared that, based on her review of DOCCS records, CORC mailed their determinations on plaintiff's grievances CX-18983-16; CX-19053-16; CX-19054-16; and CX to the Coxsackie Inmate Grievance Review Committee ("IGRC") for transmittal to plaintiff on March 3, 2017; April 22, 2017; June 5, 2017; and July 10, 2017 – nearly three and a half months after plaintiff commenced this action. See Dkt. No. 58-18 ("Seguin Decl.") ¶¶ 16, 20, 24, 28. Moreover, the undersigned notes that the fact that plaintiff received the CORC responses after the filing of his original complaint does not cure the procedural defect. See Gizewski v. New York State Dep't of Corr. & Cmty. Supervision, No. 9:14-CV-0124(GTS/DJS), 2016 WL 3661434, at *13 (N.D.N.Y. July 5, 2016) ("It is well established that [r]eceiving a decision from CORC after filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies be exhausted before filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice.") (internal quotation marks and citations omitted). Thus, the record is clear that plaintiff did not fully exhaust his administrative remedies prior to filing this lawsuit as CORC's decisions were outstanding. See Peoples, 212 F.Supp.2d at 142; McMillian, 2017 WL 8894737, at *2; White, 2011 WL 4478988, at *3.

### 2. Availability of Administrative Remedies

**\*9** Plaintiff contends that he should be excused from the exhaustion requirement because administrative remedies were unavailable to him "due to the three rules of Ross v. Blake." Pl. Opp. at 4-5. First, plaintiff maintains that he "appealed every grievance in this instant matter to the CORC," and after CORC failed to respond within the thirty-day time frame, he "didn't know what else to do." Id. at 5. Second, plaintiff claims that he was confused how to grieve his retaliation claims as he had been "directed to write the Office of Special Investigation," but never received a reply. Id. at 6. Finally, plaintiff contends that Supt. Martuscello, DSS Shanley, C.O. Hoffman, O.R.C. Iarusso, and C.O. Meier "individually and collectively thwarted him from using the grievance process." Id.

As to plaintiff's claim that the grievance process was unavailable due to CORC's delay in rendering their decision on his grievances, the undersigned notes that this is a close question. There is no dispute that plaintiff completed the grievance procedure as to grievances CX-18983-16, CX-19053-16, CX-19054-16, and CX-19094-16. See Dkt. No. 58-18 at 9-21. Courts within this Circuit are split as to whether a delay by CORC constitutes unavailability that would excuse a plaintiff's failure to exhaust his administrative remedies. Compare Casey v. Brockley, No. 9:13-CV-01271 (DNH/TWD), 2015 WL 8008728, at *6 (N.D.N.Y. Nov. 9, 2015), report-recommendation and order adopted by 2015 WL 7864161 (N.D.N.Y., Dec. 03, 2015) ("CORC's failure to act within the time frame set out in the regulations does not constitute a special circumstance justifying the failure to exhaust.") and Ford v. Smith, No. 9:12-CV-1109 (TJM/TWD), 2014 WL 652933, at *3 (N.D.N.Y. Feb. 19, 2014) (concluding that CORC's six month delay in responding to his appeal did not render the grievance process unavailable) with Rossi v. Fischer, No. 13-CV-3167 (PKC)(DF), 2015 WL 769551, at *6 (S.D.N.Y. Feb. 24, 2015) ("Because prison officials failed to respond to plaintiff's grievance within the 30 day time limit set by regulation, administrative remedies were not available to the plaintiff and dismissal for failure to exhaust is not appropriate.") and Peoples v. Fischer, No. 11 Civ. 2694(SAS), 2012 WL 1575302, *6 (S.D.N.Y. 2012) on reconsideration in part, 898 F.Supp.2d 618 (S.D.N.Y. 2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has neglected to issue a final administrative determination.").

In High v. Switz, this Court excused the plaintiff's failure to exhaust his administrative remedies

> where the plaintiff had taken all steps he could to fulfill the last step of the appeal process; where CORC had neglected to respond, not just during the thirty day time limit, but for a period of numerous months thereafter; where CORC had further neglected to respond when Plaintiff wrote to CORC regarding the status

of his appeal; and where CORC had
only ultimately decided the appeal a
year later, after the present [motion]
had been filed.

High v. Switz, No. 9:17-CV-1067 (LEK/DJS), 2018
WL 3736794, at *5 (N.D.N.Y. July 9, 2018),
report-recommendation adopted by 2018 WL 3730175
(N.D.N.Y., Aug. 6, 2018). Although plaintiff authored
letters dated August 11, 2016 and September 10,
2016 requesting to appeal grievances CX-18983-16
and CX-19094-16 directly to CORC due to the
Superintendent's failure to render a decision within the
twenty-five calendar day time limit, see Seguin Decl. ¶¶
14, 26; Dkt. No. 58-5 at 16, 44-45, plaintiff has not
proffered evidence that he wrote to the Coxsackie IGRC
or CORC regarding the timeliness of CORC's response.
See 7 N.Y.C.R.R § 701.5(d)(3)(i) ("If a grievant does not
receive a copy of the written notice of receipt [by CORC]
within 45 days of filing an appeal, the grievant should
contact the IGP supervisor in writing to confirm that the
appeal was filed and transmitted to CORC.").

**\*10** Unlike the plaintiff in High, there is no indication
in the record that plaintiff wrote to CORC regarding
the status of his appeal and CORC further neglected
to respond. See 2018 WL 3736794, at *5. Thus,
the undersigned concludes that CORC's delay in
rendering a decision on plaintiff's grievances did not
excuse plaintiff from the exhaustion requirement. See
Couvertier v. Jackson, No. 9:12-CV-1282 (DNH/DEP),
2014 WL 2781011, at *5 (N.D.N.Y. June 19, 2014) ("An
administrative delay in processing or deciding an inmate's
appeal of a grievance, however, does not constitute a
special circumstance justifying excusal of the exhaustion
requirement.") (citing Ford v. Smith, No. 12-CV-1109,
2014 WL 652933, at *3 (N.D.N.Y. Feb. 19, 2014) )
("CORC's failure to act within the time frame set out in
the regulations does not constitute special circumstances
justifying the failure to exhaust."); cf. Henderson v.
Annucci, No. 14-CV-445A, 2016 WL 3039687, at *10
(W.D.N.Y. Mar. 14, 2016) ("Since plaintiff has been
awaiting a decision from CORC for more than two years
with respect to his grievance relating to the October 22,
2013 incident, such an administrative remedy is no longer
available to him for purposes of exhaustion under the
PLRA.").

Next, plaintiff claims that he was confused how to grieve
his retaliation claims as he had been "directed to write
the Office of Special Investigation," but never received a
reply. Pl. Opp. at 6. Plaintiff further states that "through
the confusing text and decision [he] didn't know what
to do or who should he address the retaliation from
defendants about his PREA complaints." Id. In support
of his argument, plaintiff cites to five entries in the
record, including (1) the CORC decision's for grievances
CX-18983-16, CX-19054-16, and CX-19094-16; (2) an
email from non-party IGP Coordinator Chris VanBergen
to the Office of Special Investigations stating that
grievance CX-19054-16 appears to be related to plaintiff's
April 17, 2016 PREA complaint, and forwarding that
grievance to that office "for whatever action is deemed
appropriate"; and (3) a memorandum authored by non-
party Lt. E. Pahl, dated September 21, 2016, concerning
grievance CX-19094-16 and C.O.'s Meier's alleged use
of excessive force. See Dkt. No. 58-5 at 731, 761, 767,
775, 788. To the extent that plaintiff's argument can be
interpreted as suggesting that he was unsure how to grieve
his retaliation claim against O.R.C. Iarusso, this claim
must fail. It is clear that plaintiff knew of the grievance
process at Coxsackie, as he appealed the grievances in
this action to CORC; moreover, plaintiff filed at least two
grievances alleging retaliation by Coxsackie staff members
in the underlying action. See generally Dkt. No. 58-5.
Thus, plaintiff's argument suggesting that he was confused
as to how to file a retaliation grievance is misplaced.

Finally, plaintiff contends that defendants Supt.
Martuscello, DSS Shanley, C.O. Hoffman, C.O. Meier,
and O.R.C. Iarusso thwarted him from using the
grievance process. Pl. Opp. at 6. Plaintiff claims that
"every[ ]time [he] use[d] the Coxsackie grievance system
to report misconduct or retaliation from defendants ...
[he] was further retaliated against." Dkt. No. 67-3 ¶
65. "Administrative remedies are not available if prison
officials 'interfere[ ] with an inmate's pursuit of relief'
by, for example, misinforming an inmate as to the
applicability of the grievance process to the inmate's
claims." Kendall v. Cuomo, No.1:12-CV-3438 (ALC)
(RLE), 2017 WL 4162338, at *3 (S.D.N.Y. Sept. 19, 2017)
(citing Ross, 136 S.Ct. at 1860); see also Veloz v. New
York, 339 F.Supp.2d 505, 515-16 (S.D.N.Y. 2004) (noting
that "[w]hen an inmate's reasonable attempts to exhaust
administrative remedies are impeded by a correctional
officer" the remedy is unavailable). The undersigned
concludes that there is no evidence in the record that any

of the defendants interfered with plaintiff's pursuit of the grievance procedure. In fact, the record clearly establishes that plaintiff was able to access the grievance process as he filed six grievances while housed at Upstate. See Seguin Decl. at 9.

**\*11** As plaintiff's bare assertions that defendants thwarted his attempts to file grievances are insufficient to render the grievance process unavailable, defendants have met their burden of showing that plaintiff has failed to exhaust his administrative remedies as to all of his remaining claims, with the exception of his Eighth Amendment sexual assault claim. Accordingly, it is recommended that defendants' Motion for Partial Summary Judgment be granted as to these claims.

### C. Eighth Amendment

#### 1. Sexual Assault Claims

Plaintiff claims that C.O. Dahlke sexually assaulted him during a pat frisk on April 15, 2016. Am. Compl. ¶ 1. Defendants argue that plaintiff's Eighth Amendment claim must fail because any contact C.O. Dahlke made with plaintiff's body was incidental and a necessary component of the pat frisk. Def. Mem. of Law at 10-13. "Because sexual abuse of a prisoner by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims." Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir. 1997).

In Crawford v. Cuomo, the Second Circuit stated that a single incident of sexual abuse may violate the Eighth Amendment if it is "sufficiently severe or serious." 796 F.3d 252, 257 (2d Cir. 2015). The Crawford Court explained:

> [t]o show that an incident or series of incidents was serious enough to implicate the Constitution, an inmate need not allege that there was penetration, physical injury, or direct contact with uncovered genitalia. A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment. Similarly, if the situation is reversed and the officer intentionally brings his or her genitalia into contact with the inmate in order to arouse or gratify the officer's sexual desire or humiliate the inmate, a violation is self-evident because there can be no penological justification for such contact.

Id. Ultimately, in assessing whether an Eighth Amendment violation has occurred, "the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." Id. at 257-58 (citing Whitley v. Albers, 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (determining that an Eighth Amendment inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.") ).

Plaintiff claims that during the pat frisk, C.O. Dahlke "had his lower body (genitals) pressed-up against [his] butt," as his hands "press[ed] tightly down [plaintiff's] back and into the crack of [his] butt (inside) all the way down and around [his] groan." Am. Compl. ¶ 4. However, as defendants indicate, the pat frisk occurred prior to a scheduled, routine search of plaintiff's cell, and pat frisks are required before a corrections officer undertakes a cell search. See Def. Mem. of Law at 11; DOCCS Dir. 4910, Dkt. No. 58-10 at 17 ("Each day, the living quarters of a number of inmates in each housing unit will be searched by correctional employees in accordance with a schedule issued by the Deputy Superintendent of Security or equivalent.... Inmates present shall be pat frisked and may also be scanned with a hand-held metal detector."). Such pat frisks relate to the safety and security of the facility by ensuring that inmates do not possess contraband. See Def. Mem. of Law at 12. Pursuant to Directive 4910, "[c]ontact through the clothing with the genitalia ... and

buttocks is a necessary component of a thorough pat frisk. However, staff must avoid any penetration of the anal or genital opening through the clothing during a pat frisk." Dkt. 58-10. Although plaintiff contends that C.O. Dahkle "press[ed] tightly down [plaintiff's] back and into the crack of [his] butt," Am. Compl. ¶ 6, and testified that the search "felt funny" and "more so [a] massage or a caress," there is no indication that C.O. Dahkle penetrated plaintiff's anus, intentionally or otherwise, or in any way squeezed or fondled his genitals. See Dkt. No. 58-9 ("Pl. Dep.") at 58; Def. Mem. of Law at 12. In fact, plaintiff testified that the search occurred outside of his clothing. See Pl. Dep. at 54. Further, that C.O. Dahkle conducted a thorough search and "may have made contact with [p]laintiff's genitalia and/or buttocks" is insufficient to establish that he conducted the search with an intent to humiliate plaintiff or arouse himself. See Shaw v. Prindle, 661 F. App'x 16, 19 (2d Cir. 2016) (summary order) (concluding that the court "cannot infer solely from the thoroughness of the search" — described as "excessive searching of [the] crotch area and in between his buttocks and massaging of his rectum and groin area" — that the defendant "intended to search ... with intent to arouse or gratify [his] sexual desires or to humiliate [the plaintiff]") (alterations and internal quotation marks omitted).

**\*12**  Moreover, although plaintiff contends that C.O. Dahkle made statements like "[d]o you consider yourself a male or female?" and "[d]o you suck dick or fuck men?", Am. Compl. ¶ 6, these comments, made subsequent to the pat frisk, are insufficient to establish that C.O. Dahkle initiated the frisk to humiliate plaintiff or otherwise sexually gratify himself. See Shepherd v. Fischer, No. 08-CV-9297 (RA), 2018 WL 3122053, at \*4 (S.D.N.Y. June 26, 2018) ("Comments by a defendant during an interaction thus constitute relevant evidence."); Allen v. Graham, No. 9:16-CV-0047 (GTS/ATB), 2017 WL 5957742, at \*6 (N.D.N.Y. Dec. 1, 2017) (concluding that the plaintiff's allegations that the defendant corrections officer "made a few callous and/or offensive remarks while caressing Plaintiff's chest and repeatedly groping Plaintiff's genitals and buttocks" does not amount to an Eighth Amendment violation) (citing Amaker v. Fischer, No. 10-CV-0977A, 2014 WL 8663246, at \*3 W.D.N.Y. Aug. 27, 2014) (recommending the dismissal of Eighth Amendment sexual-assault claim based on a pat-frisk in which defendant "rub [bed] plaintiff's penis, fondl[ed] and squeez[ed] plaintiff's buttocks and [ran] his index finger across plaintiff's anus," while making inappropriate

remarks to plaintiff), report-recommendation adopted by 2015 WL 1822541 (W.D.N.Y. Apr. 22, 2015) ). The undersigned also notes that the substance of C.O. Dahkle's alleged comments, while inappropriate, are not of the kind courts find sufficient to implicate the Eighth Amendment. See Allah v. Morrison, No. 14-CV-6735, 2016 WL 4017340, at \*3-4 (W.D.N.Y. July 22, 2016) ("[The defendant's] alleged taunts to [the plaintiff], including the statements, 'you know what I want' and 'give me what I want and you'll get what you want', suggest that [the defendant's] conduct was designed to humiliate [the plaintiff], gratify herself, or both."); see also Crawford, 796 F.3d at 259 ("[The defendant's] demeaning comments, including the statements '[t]hat doesn't feel like a penis to me,' [and] 'I'll run my hands up the crack of your ass if I want to' ... suggest that [the defendant] undertook the search in order to arouse himself, humiliate [the plaintiff], or both.").

Thus, the undersigned finds that C.O. Dahkle's alleged contact with plaintiff was incidental to a routine pat frisk, see Crawford, 796 F.3d at 257, and it is recommended that defendants' motion on this ground be granted.

### 2. Excessive Force

Defendants move for summary judgment on plaintiff's excessive force claim as it pertains to C.O. Bence and C.O. Coon. See Def. Mem. of Law at 19-22. Plaintiff contends that during the July 30, 2016 use of force incident, C.O. Bence and C.O. Coon kicked and punched him all over his body as he lay handcuffed on the floor. Am. Compl. ¶ 57. To state a prima facie claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999). The objective element of the excessive force analysis is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (internal citations omitted); Blyden, 186 F.3d at 262. However, "the malicious use of force to cause harm [ ] constitute[s an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9, 112 S.Ct. 995). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily

excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10, 112 S.Ct. 995 (internal quotation marks and citations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Sims v. Artuz, 230 F.3d 14, 22 (2d Cir. 2000) (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Sims, 230 F.3d at 21 (internal quotation marks and citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " Id. (quoting Hudson, 503 U.S. at 7, 112 S.Ct. 995). In determining whether a defendant acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "[1] the extent of the injury and the mental state of the defendant[;] [2] ... the need for the application of force; [3] the correlation between that need and the amount of force used; [4] the threat reasonably perceived by the defendants; and [5] any efforts made by the defendants to temper the severity of a forceful response." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

**\*13** The undersigned concludes that plaintiff has failed to establish both the objective and subjective elements of his prima facie excessive force claim. Both C.O. Bence and C.O. Coon declared that they responded to a "Watch Commander Response" on July 30, 2016 under the belief that plaintiff had attempted to assault C.O. Meier. Dkt. No. 58-11 ("Bence Decl.") ¶ 5; Dkt. No. 58-12 ("Coon Decl.") ¶ 5. C.O. Bence declared that when he arrived at the incident, he assisted other officers in securing plaintiff's left arm behind his back until mechanical restraints could be applied. Bence Decl. ¶ 7. After both of plaintiff's arms were secured behind his back, a third corrections officer applied mechanical restraints to plaintiff's wrists. Id. ¶ 8. C.O. Coon declared that he assisted in applying the mechanical restraints. Coon Decl. ¶ 7. Plaintiff was then escorted to the medical department. Bence Decl. ¶ 9. Although plaintiff contends that C.O. Coon and C.O. Bence kicked and punched him while he lay handcuffed on the ground, Am. Compl. ¶ 57, plaintiff's medical records are not

consistent with such injuries. See Dkt. No. 58-8 at 18-20. [8] Moreover, plaintiff's medical records do not show injuries to plaintiff's arms or wrists that belie C.O. Bence and C.O. Coon's statements that they only secured plaintiff's arm behind his back and applied mechanical restraints, respectively. See id.; Bence Decl. ¶ 7-8; Coon Decl. ¶ 7. Still, "certain actions, including malicious use of force to cause harm, constitute Eighth Amendment violations *per se.*" Blyden, 186 F.3d at 263 (emphasis in original). Although plaintiff's medical records do not support the injuries plaintiff purports to have incurred, "any or even no injuries resulting from the events plaintiff described could amount to a per se constitutional violation." Brown v. Dubois, No. 9:15-CV-1515 (LEK/CFH), 2017 WL 2983305, at \*9 (N.D.N.Y. June 16, 2017) (citing Baskerville v. Mulvaney, 411 F.3d 45, 48-49 (2d Cir. 2005) ); Tafari v. McCarthy, 714 F.Supp.2d 317, 352 (N.D.N.Y. 2010) (internal quotation marks and citation omitted) (denying the defendants' motion for summary judgment because although the plaintiff's injuries were de minimis, "the extent of injury suffered by the inmate is only one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.")

[8]   Although plaintiff's medical records indicate a laceration over his eye, plaintiff attributed that injury to C.O. Meier. Pl. Dep. at 103-04.

The undersigned finds that there is no indication in the record that C.O. Bence or C.O. Coon acted with malicious or sadistic intent. Both defendants declared that they arrived at the incident with the understanding that plaintiff had assaulted a staff member. Bence Decl. ¶ 5; Coon Decl. ¶ 5; Dkt. No. 58-8 at 2. C.O. Bence declared that the "minimal force [he] used to secure [p]laintiff's left arm behind his back was necessary and appropriate under the circumstances, given his attempted assault on staff and resistance to staff attempts to regain control of the situation." Bence Decl. ¶ 12. Thus, "the force exerted upon plaintiff was applied in a good-faith effort by [the defendants] to maintain or restore discipline following [plaintiff's alleged] ... behavior." Chambliss v. Rosini, 808 F.Supp.2d 658, 669 (S.D.N.Y. 2011). Moreover, as defendants point out, plaintiff testified that he "assume[d]" C.O. Bence and C.O. Coons were kicking and punching him, but that there was a possibility that they did not take part in the alleged excessive force. See

Pl. Dep. at 109-110. Although plaintiff seems to walk back on this testimony in his opposition papers, see Pl. Opp. at 15-17, plaintiff has failed to proffer evidence, aside from his conclusory allegations, that contradicts defendants' account of events.

Thus, because plaintiff has not submitted "proof that tends to show that the alleged force used against him was employed maliciously and sadistically to cause harm, he has failed to satisfy the subjective prong of his excessive force claim." Chambliss, 808 F.Supp.2d at 669 (citing Engles v. Dunbar, No. 09 Civ. 2457(NRB), 2010 WL 5538517, at *7 (S.D.N.Y. Dec. 30, 2010) (concluding that the subjective component of excessive force test not satisfied where uncontroverted evidence established that force was used not maliciously or sadistically, but instead to transport the plaintiff in order to receive medical attention); Houston v. Horn, No. 09 Civ. 801(DLC), 2010 WL 1948612, at *12 (S.D.N.Y. May 13, 2010) (concluding that the plaintiff failed to satisfy subjective element of excessive force claim where he failed to submit proof that contradicted evidence that force was only used to restore discipline after the plaintiff failed to comply with an officer's order) ). As such, plaintiff has failed to establish the "necessary level of culpability, shown by actions characterized by wantonness." Sims, 230 F.3d at 21. Accordingly, it is recommended that defendants' motion on this ground be granted.

### D. First Amendment

**\*14** Defendants move for summary judgment on plaintiff's retaliation claims as they pertain to C.O. Hoffman, Supt. Martuscello, and O.R.C. Iarusso. Plaintiff claims that: (1) C.O. Hoffman "falsified a misbehavior report which subjected [plaintiff] to confinement for retaliation ... because [plaintiff] filed a sexual assault complaint against T. Dahkle and was rumored by Coxsackie Correctional Officers to be working with the Office of Special Investigation," Am. Compl. ¶¶ 19, 20; (2) Supt. Martuscello threatened to invoke plaintiff's "deferred SHU time" if he continued to file grievances against Coxsackie staff, id. ¶¶ 39-41; and (3) O.R.C. Iarusso intentionally destroyed his grievances against Supt. Martuscello, id. ¶ 49.

Courts are to "approach [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]'

" See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ). A retaliation claim under Section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " Espinal v. Goord, 558 F.3d 119, 126 (2d Cir. 2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds by Swierkiewicz, 534 U.S. at 560, 122 S.Ct. 992).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal, 558 F.3d at 128. The Second Circuit has concluded that use of the prison grievance system constitutes a protected activity. See Gill, 389 F.3d at 384; Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988) ("Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (alteration and internal quotation marks omitted); see also Rosebore v. Gillespie, 791 F.Supp.2d 353, 367 (S.D.N.Y. 2011) (finding that the filing of a grievance is a protected activity); Mateo v. Fischer, 682 F.Supp.2d 423, 433 (S.D.N.Y. 2010) (same). As plaintiff alleges that C.O. Hoffman, Supt. Martuscello, O.R.C. Iarusso retaliated against him because of his PREA complaint, plaintiff has satisfied the first prong of the test as he has engaged in a protected activity. See Gill, 389 F.3d at 384; Am. Compl. ¶¶ 19, 20, 39-41, 49.

### 1. C.O. Hoffman

Defendants argue that plaintiff's retaliation claim against C.O. Hoffman concerning the alleged falsified May 15, 2016 misbehavior report must fail because plaintiff cannot establish adverse action or causal connection. See Def. Mem. of Law at 15-16. In the prison context, "adverse action" is objectively defined as conduct "that would

deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Davis, 320 F.3d at 353. "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." Jackson v. Onondaga Cnty., 549 F.Supp.2d 204, 215 (N.D.N.Y. 2008). A defendant's retaliatory filing of a falsified misbehavior report that results in disciplinary segregated confinement constitutes adverse action. See Gill, 389 F.3d at 384 (finding that a false misbehavior report that resulted in the plaintiff's placement in keeplock constituted adverse action); Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (emphasis added) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983.").

 *15 The record indicates that plaintiff spent one day in keeplock as a result of the May 15, 2016 misbehavior report. See Dkt. No. 58-7 at 2-4. Courts in this Circuit are split as to what length of time in disciplinary segregation constitutes adverse action. See Gill v. Hoadley, 261 F.Supp.2d 113, 123-24 (N.D.N.Y. 2003) (finding that keeplock confinement of four and twenty-one days constitutes adverse action); Gill v. Tuttle, 93 F. App'x 301, 303-04 (2d Cir. 2004) (summary order) (declining to grant summary judgment on the plaintiff's retaliation claim where the plaintiff spent nine days in keeplock). In Keesh v. Goord, the Western District of New York found that the plaintiff's one day in keeplock pursuant to an alleged false misbehavior report constituted adverse action where the record suggested that plaintiff may have been deprived of meals during his confinement. See Keesh v. Goord, No. 04-CV-0271, 2007 WL 2903682, at *10 (W.D.N.Y. Oct. 1, 2007). Similarly, in Gill v. Tuttle, the Second Circuit found that a "genuine, material question of fact [existed] as to whether a similarly situated person of ordinary firmness would have filed such a grievance, particularly in light of the continued denial of permission to attend religious callouts." Gill, 93 F. App'x at 304. Unlike in Keesh and Gill, there is no indication that plaintiff suffered adverse conditions such as lack of food or denial of religious services during his one-day confinement. See id.; Keesh, 2007 WL 2903682, at *10. As such, the undersigned declines to conclude that C.O. Hoffman's May 15, 2016 misbehavior report that resulted in one-day confinement in keeplock constituted an adverse action.

Even assuming plaintiff had established adverse action, the undersigned finds that such adverse action is not causally connected to plaintiff's filing of the PREA complaint against C.O. Dahlke. The plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle, 313 F.3d at 682. A plaintiff "may do so with circumstantial evidence if it is 'sufficiently compelling[.]' " Kotler v. Donelli, 382 F. App'x 56, 57-58 (2d Cir. 2010) (summary order) (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) ).

> In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation.

Baskerville v. Blot, 224 F.Supp.2d 723, 732 (S.D.N.Y. 2002).

Although C.O. Hoffman's misbehavior report occurred one month after plaintiff filed the PREA complaint against C.O. Dahlke, and, therefore, demonstrates temporal proximity between the protected activity and the adverse action, see Smith v. Miller, No. 15-CV-9561 (NSR), 2017 WL 4838322, at *8 (S.D.N.Y. Oct. 23, 2017) (concluding that the plaintiff had established temporal proximity where the plaintiff's grievance and the alleged false misbehavior report were separated by only one month), plaintiff fails to establish that his PREA complaint against C.O. Dahkle was a substantial or motivating factor in C.O. Hoffman's decision to issue him a misbehavior report. See Gayle, 313 F.3d at 682. Plaintiff seems to suggest that because C.O. Dahkle and C.O. Hoffman worked on the same unit floor on May 14 and 15, 2016, C.O. Hoffman was aware that plaintiff had filed a PREA complaint, see Pl. Opp. at 10; however, there is no indication that C.O. Hoffman knew of plaintiff's

PREA complaint at the time he authored the misbehavior report. C.O. Hoffman declared that he was not aware of the PREA complaint on May 15, 2016. See Dkt. No. 58-14 ("Hoffman Decl.") ¶ 10. Plaintiff does not allege that C.O. Hoffman made any reference to the PREA complaint when he authored the misbehavior report on May 15, 2016. See Tirado v. Shutt, No. 13-CV-2848, 2015 WL 774982, at *10 (S.D.N.Y. Feb. 23, 2015) ("Absent evidence that any defendant knew about his ... grievance, [the plaintiff] has failed to provide any basis to believe that they retaliated against him for a grievance in which they were not named."), adopted in relevant part by 2015 WL 4476027 (S.D.N.Y. July 22, 2015); Am. Compl. ¶¶ 19, 20.

*16  To the extent that plaintiff references statements that C.O. Hoffman allegedly made on June 20, 2016 and July 7, 2016, warning plaintiff not to get comfortable in his housing unit because "[you] mess with one of the C.O.'s [you] got to deal with all of [us]," and stating that "you won't fucking quit complaining right, well the misbehavior report don't exist anymore" and "Dahkle said hi," the undersigned notes that the Court already concluded that these statements lacked the specificity and seriousness to deter inmates from exercising their First Amendment rights. See Dkt. No. 33 at 18-19. Moreover, plaintiff alleges that these statements were made well after C.O. Hoffman issued the misbehavior report, and, therefore, do not establish that C.O. Hoffman had a retaliatory motive when he issued the misbehavior report on May 15, 2016.

Furthermore, the undersigned notes that retaliation is not "reasonably inferred" where a plaintiff's complaint does not involve the defendant alleged to have retaliated against him. Olutosin v. Lee, No. 14-CV-00685 (NSR), 2018 WL 4954107, at *11 (S.D.N.Y. Oct. 12, 2018) (citing Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) ). "Retaliation claims have been dismissed when they are supported only by conclusory allegations that the retaliation was based upon complaints against another officer." Jones v. Fischer, No. 9:10-CV-1331 GLS/ATB, 2013 WL 5441353, at *21 (N.D.N.Y. Sept. 27, 2013) (citing Hare v. Hayden, 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") ). Plaintiff's speculation that C.O. Hoffman retaliated against him because of his PREA complaint against C.O. Dahkle is not supported by the record. Accordingly, it is

recommended that defendants' motion on this ground be granted.

### 2. Supt. Martuscello

Defendants argue that plaintiff's retaliation claim against Supt. Martuscello must fail because plaintiff cannot establish adverse action or causal connection. See Def. Mem. of Law at 17-18. As to plaintiff's allegation that Supt. Martuscello threatened to invoke plaintiff's "deferred SHU time" if he continued to file grievances against Coxsackie staff, Am. Compl. ¶¶ 39-41, the undersigned concludes that this does not amount to adverse action. "Case law reflects that verbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered." Lunney v. Brureton, No. 04 CIV. 2438LAKGWG, 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007). Plaintiff contends that during an interview with Supt. Martuscello on June 11, 2016, Supt. Martuscello "started yelling at [him] about all [his] complaints to outside agencies" and reminded plaintiff of his deferred SHU time, "implying that if [plaintiff] continued to make a[n] issue, [Supt. Martuscello would] set [him] up and put [him] back in [SHU]." Am. Compl. ¶¶ 39-41. Supt. Martuscello declared that

> an inmate who has been penalized with time in SHU may have any portion of that time deferred up to 180 days. The Hearing Officer who handles the disciplinary hearing makes the decision to defer time. If the inmate has no disciplinary infractions during the deferral period, the penalty is expunged. However, if the inmate has a subsequent disciplinary infraction during the deferral period, the deferred time may be invoked following a hearing on the subsequent disciplinary infraction.

Dkt. No. 58-17 ("Martuscello Decl.") ¶ 9. Although Supt. Martuscello declared that he did not recall meeting with plaintiff on June 11, 2016, he stated that, he recalled that

plaintiff had several disciplinary infractions at Coxsackie, and, to the extent that he discussed plaintiff's deferred SHU time, "it would have been to remind him of the rules for deferred SHU time: that if he received a misbehavior report for a disciplinary infraction while he had deferred SHU time, the Hearing Officer could decide to invoke that deferred SHU time." Id. ¶ 13.

**\*17** Although the undersigned previously found that, given the context and specificity of Supt. Martuscello's statements – referencing plaintiff's deferred SHU time and discussing plaintiff's grievances and complaints – similarly-situated person of ordinary firmness could be deterred from filing grievances, Dkt. No. 33 at 22, the fully developed record now establishes that, as Superintendent, Supt. Martuscello did not have the authority to determine whether to invoke an inmate's deferred SHU time. Martuscello Decl. ¶ 10. Moreover, the fact that Supt. Martuscello never followed through on his threats "softens the deterrent considerably." Mateo v. Fischer, 682 F.Supp.2d 423, 434 (S.D.N.Y. 2010).

Furthermore, as defendants note, insofar as Supt. Martuscello did make the alleged statements, there is no indication in the record that plaintiff's complaints and/ or grievances were a substantial or motivating factor in doing so, as Supt. Martuscello declared that to the extent that he spoke about deferred SHU time with plaintiff, it would have been to remind him of the rules concerning the implementation of deferred SHU time. See Martuscello Decl. ¶ 15; Def. Mem. of Law at 17-18. As defendants further note, the record indicates that plaintiff's grievances against Supt. Martuscello post-date this alleged incident, and, therefore, cannot be the basis of plaintiff's retaliation claim. See Williams v. Smith, No. 9:11-CV-0601 (LEK/TWD), 2015 WL 1179339, at \*10 (N.D.N.Y. Mar. 13, 2015) ("Adverse actions that predate protected conduct cannot form the basis of a retaliation claim."); Am. Compl. ¶¶ 39, 42 (noting that the meeting between plaintiff and Supt. Martuscello occurred on June 11, 2016 and plaintiff filed a grievance against Supt. Martuscello on June 15, 2016). As such, plaintiff fails to demonstrate a causal connection between his protected conduct and Supt. Martuscello's alleged adverse action.

As plaintiff fails to set forth a prima facie retaliation claim against Supt. Martuscello, it is recommended that defendants' motion on this ground be granted.

### 3. O.R.C. Iarusso

Defendants argue that plaintiff's retaliation claim against O.R.C. Iarusso must fail because plaintiff cannot establish adverse action or causal connection. See Def. Mem. of Law at 18-19. O.R.C. Iarusso declared that on July 12, 2016, plaintiff attended a grievance hearing concerning a complaint about mail in SHU. See Dkt. No. 58-15 ("Iarusso Decl.") ¶ 12. Plaintiff attempted to discuss other grievances with O.R.C. Iarusso, who informed him that he would look into those grievances at a later date as the purpose of the hearing was to discuss the grievance regarding SHU mail. Id. ¶ 13. Plaintiff continued to discuss other grievances, and O.R.C. Iarusso informed him that he, "personally, would not file a grievance against the Superintendent" — meaning it was not his responsibility, as IGP Staff Representative, to file inmate grievances. Id. ¶¶ 11, 14.

To the extent that plaintiff interpreted O.R.C. Iarusso's statement as a threat, "[t]hreats made to an inmate, without more, do not rise to the level of a constitutional violation." Pledger v. Hudson, No. 99 CIV.2167LTS/ THK, 2005 WL 736228, at \*5 (S.D.N.Y. Mar. 31, 2005) (citing Dawes, 239 F.3d at 489). Even if plaintiff interpreted O.R.C. Iarusso's comment as a threatening to not file his grievance against Supt. Martuscello, the record indicates that plaintiff's grievance against Supt. Martuscello was filed and combined with grievance CX-19054-16. See Iarusso Decl. ¶ 20; Dkt. No. 58-5 at 35-45. As defendants note, plaintiff testified that he knew that his grievance against Supt. Martuscello had been filed and consolidated with his grievance concerning loss of programs. Pl. Dep. at 163-64. As such, plaintiff fails to demonstrate that O.R.C. Iarusso took adverse action against him. Moreover, there is no indication in the record that plaintiff's complaints and/or grievances were a substantial or motivating factor in O.R.C. Iarusso's alleged threat. Accordingly, it is recommended that defendants' motion on this ground be granted.

### E. Supervisory Liability

**\*18** "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950

F.2d 880, 885 (2d Cir. 1991) ). Thus, supervisory officials may not be held liable merely because they held a position of authority. Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation[;]

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[;]

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom[;]

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[;] or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (spacing added) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986) ). However, where a plaintiff's sole claim of involvement of the supervisory defendant is that a superintendent affirmed a denial of a grievance, such is not sufficient to establish personal involvement. Joyner v. Greiner, 195 F.Supp.2d 500, 506 (S.D.N.Y. 2002). Moreover, a supervisor may delegate the responsibility to others, and personal involvement does not lie where the only allegation was that the defendant referred a complaint to the appropriate department or staff for investigation. See Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F.Supp.2d 342, 347 (W.D.N.Y. 2007). Finally, assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. See, e.g., Brown v. Artus, 647 F.Supp.2d 190, 200 (N.D.N.Y. 2009).

Absent an underlying constitutional violation by a subordinate, there can be no supervisory liability. Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see Elek v. Inc. Vill. of Monroe, 815 F.Supp.2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because [p]laintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability").

Plaintiff alleges that Supt. Martuscello and DSS Shanley failed to protect him from C.O. Meier's alleged retaliation and excessive force. See Am. Compl. ¶ 32. Defendants argue that plaintiff "cannot demonstrate that [DSS] Shanley and [Supt.] Martuscello failed to act on his verbal complaints about [C.O.] Meier because, as an initial matter, an inmate's verbal complaints of threats by a Correction Officer are delegated to a Sergeant for investigation." Def. Mem. of Law at 24. Defendants further argue that Supt. Martuscello and DSS Shanley took steps to address plaintiff's concerns. See id.[9]

[9] The undersigned addresses supervisory liability under the fifth Colon factor only as previously determined in the October 30, 2017 Report-Recommendation and Order. See Dkt. No. 33 at 35-37.

DSS Shanley declared that

[w]hen an inmate makes a verbal complaint about alleged threats from a CO, a Sergeant is assigned to assess the credibility of the complaint and determine whether a formal investigation is required. As part of a formal investigation, the Sergeant will interview the inmate and direct the accused CO to provide written response to the allegations. Neither the Superintendent nor DSS are involved in the investigation. When an inmate files a grievance about alleged threats from a CO, the process is similar to the process for verbal complaints; the grievance is delegated to a Sergeant to investigate the grievance, and that Sergeant will interview the inmate and direct the accused CO to provide a written response to the allegations. Neither the Superintendent nor DSS are involved in the grievance investigation. If an inmate makes a verbal complaint and files a grievance about alleged threats from a Correction Officer, the grievance investigation serves as the formal investigation on the

verbal complaint in order to avoid duplicating efforts.

**\*19** Dkt. No. 58-16 ("Shanley Decl.") ¶¶ 13-15. If an inmate's complaint regarding a staff member is found to be credible, the investigation is referred to OSI. Id. ¶ 16. Both Supt. Martuscello and DSS Shanley declared that, as Superintendent and Deputy Superintendent of Security, respectively, they had no involvement in the investigation of plaintiff's complaints. See Martuscello Decl. ¶ 6; Shanley Decl. ¶ 13. Both defendants reference an exhibit attached to plaintiff's amended complaint that they argue demonstrates that plaintiff's complaints regarding C.O. Meier were being handled by other staff. See Martuscello Decl. ¶ 8; Shanley Decl. ¶ 18; Dkt. No. 12-2 at 13. However, as plaintiff notes, the May 19, 2016 letter from plaintiff's social work counselor pre-dates the May 23, 2016 meeting wherein plaintiff contends that he informed Supt. Martuscello and DSS Shanley of his complaints regarding C.O. Meier. Pl. Opp. at 18; Dkt. No. 12-2 at 13. Moreover, although the May 19, 2016 letter does state that "Mr. Martuscello is looking for [it] as he informed me - 'it is being handled,' " there is no indication that Supt. Martuscello was "looking into" plaintiff's complaints against C.O. Meier. See Dkt. No. 12-2 at 13.

The undersigned also notes that although defendants argue that the lack of documentation of plaintiff's verbal complaint and/or a subsequent investigation into that verbal complaint means that the assigned Sergeant found that plaintiff's complaint was not credible, Def. Mem. of Law at 24, plaintiff contends that he was never interviewed by a sergeant or other Coxsackie staff member. Pl. Opp. at 18. While C.O. Meier's alleged threats and verbal harassment do not amount to constitutional violations for which Supt. Martuscello and DSS Shanley can be held liable, they can serve as "circumstantial evidence of [his] retaliatory intent" in the alleged use of excessive force against plaintiff. See Baskerville, 224 F.Supp.2d at 733 n.6 (finding that, although the defendant's comments "did not violate plaintiff's constitutional rights" as First Amendment harassment, the plaintiff's allegations "support[ed] his retaliation claim" as "circumstantial evidence of retaliatory intent."). [10] Drawing all reasonable inferences in plaintiff's favor, a rational jury could find that Supt. Martuscello was personally involved in the alleged

constitutional violations because he was in a position to refer plaintiff's complaints regarding C.O. Meier to a sergeant for investigation, and there is no indication in the record that such referral occurred. As such, it is recommended that defendants' motion, as it pertains to Supt. Martuscello's referring plaintiff's complaints against C.O. Meier for investigation, be denied.

[10]  Notably, defendants do not move for summary judgment on plaintiff's Eighth Amendment excessive force and First Amendment retaliation claims against C.O. Meier. See Def. Mem. of Law at 4 n.1.

As to DSS Shanley, the undersigned notes that Ms. Seguin declared that plaintiff failed to grieve his claim that DSS Shanley failed to protect him from C.O. Meier's alleged excessive force. Seguin Decl. ¶ 25. Although IGP regulations do not require that an inmate's grievance contain the name of the offending officer, Espinal, 558 F.3d at 126, prison officials must be afforded the time and opportunity to address a complaint internally, and "[i]n order to exhaust ... inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004). In grievance CX-19094-16, plaintiff specifically refers to Supt. Martuscello's "failure to take reasonable action to protect [him]," Dkt. No. 58-5 at 50; however, there is nothing in plaintiff's grievance that would alert prison officials to investigate a subsequent failure to intervene claim against DSS Shanley; thus, such claim was not properly grieved. See Luckerson v. Goord, No. 00 Civ. 9508(JSR), 2002 WL 1628550, at \*2 (S.D.N.Y. July 22, 2002) (determining the plaintiff's claim to be unexhausted and stating, "[f]or [the defendants] now to have to litigate a federal lawsuit premised on allegations that ... they had no reason to address [in the IGRC] would make a mockery of the exhaustion requirement."). Indeed, "the mere fact that plaintiff filed some grievance, and fully appealed all the decisions on that grievance, does not automatically mean that he can now sue anyone who was in any way connected with the events giving rise to that grievance." Turner v. Goord, 376 F.Supp.2d 321, 324 (W.D.N.Y. 2005). As such, it is recommended that defendants' motion, as it pertains to DSS Shanley, be granted.

**\*20** To the extent that plaintiff argues that Supt. Martuscello or DSS Shanley should have transferred him to a different facility or re-assign C.O. Meier to a different housing block, neither the Superintendent nor the Deputy

Superintendent of Security have the authority to transfer inmates between facilities or assign corrections officers to housing blocks; these tasks are handled by the Office of Classification and Movement and the Chart Sergeants, respectively. Shanley Decl. ¶ 22.

Accordingly, it is recommended that defendants' motion be granted as to plaintiff's supervisory claims against DSS Shanley. It is further recommended that defendants' motion be denied on to plaintiff's supervisory claims against Supt. Martuscello.

## F. Qualified Immunity

Defendants argue that, even if plaintiff's First and Eighth Amendment claims are substantiated, they are entitled to qualified immunity. Def. Mem. of Law at 25-27. Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted). A court must first determine whether, if the plaintiff's allegations are accepted as true, there would be a constitutional violation. See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken v. Nixon, 236 F.Supp.2d 211, 230 (N.D.N.Y. 2002).

Here, plaintiff has not established a constitutional violation to satisfy the first prong of the qualified immunity test as to a majority of his claims. See subsection II.C.-D. supra, at 24-41. Because there is no constitutional violation, the undersigned does not reach whether plaintiff's constitutional rights were clearly established at the time of the alleged violation. See Aiken, 236 F.Supp.2d at 230. As to plaintiff's supervisory claims against Supt. Martuscello, the undersigned rejects defendants' argument that Supt. Martuscello was "acting in accordance with established constitutional rights when ... [he] referred [p]laintiff's verbal complaints to a Sergeant for handling" as there is no indication that such referral occurred. See subsection II.E. supra, at 41-46. Accordingly, it is recommended that defendants' motion on this ground be denied in part as to plaintiff's supervisory claim against Supt. Martuscello, and granted in part as to plaintiff's remaining claims.

## III. Conclusion

WHEREFORE, for the reasons stated herein, it is hereby:

RECOMMENDED, that defendants' Motion for Partial Summary Judgment (Dkt. No. 58) be GRANTED, and the following claims be DISMISSED with prejudice:

> (1) Insofar far as it seeks dismissal for plaintiff's failure to exhaust his First Amendment retaliation claims, Eighth Amendment excessive force claims, and supervisory liability claims,

> *21 (2) Insofar as it seeks dismissal of plaintiff's Eighth Amendment sexual assault claim against C.O. Dahkle,

In the alternative, should the District Judge reach the merits of plaintiff's First Amendment, Eighth Amendment, and supervisory claims, it is recommended that defendants' Motion for Partial Summary Judgment be GRANTED as to plaintiff's (1) First Amendment retaliation claims against C.O. Hoffman, Supt. Martuscello, and O.R.C. Iarusso; (2) Eighth Amendment excessive force claims against C.O. Bence and C.O. Coon; (3) Eighth Amendment sexual assault claim against C.O. Dahkle; and (4) supervisory liability claim against DSS Shanley, and DENIED as to plaintiff's supervisory liability claim against Supt. Martuscello; and it is

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on the parties in accordance with Local Rules.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2018 WL 7356343

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

2018 WL 3079764
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Keith WATERS, Plaintiff,
v.
Sgt. A. MELENDEZ and C.O. Muschett, Defendants.

No. 15-CV-0805 (TJM/CFH)
|
Signed 05/18/2018

**Attorneys and Law Firms**

Keith Waters, 06-A-2999, Wallkill Correctional Facility,
Box G, Wallkill, NY 12589, pro se.

HON. ERIC T. SCHNEIDERMAN, OF COUNSEL:
NICOLE E. HAIMSON, ESQ., Assistant Attorney
General, Attorney for the State of New York,
The Capitol, Albany, New York 12224-0341, Attorney for
Defendants.

## REPORT-RECOMMENDATION AND ORDER [1]

[1] This matter was referred to the undersigned for report
and recommendation pursuant to 28 U.S.C. § 636(b)
and N.D.N.Y.L.R. 72.3(c).

**CHRISTIAN F. HUMMEL**, U.S. MAGISTRATE
JUDGE

**\*1** Plaintiff pro se Keith Waters ("Waters"), an inmate
who was, at all relevant times, in the custody of the
New York Department of Corrections and Community
Supervision ("DOCCS"), brings this action pursuant
to 42 U.S.C. § 1983 alleging that Defendants Sgt.
A. Melendez ("Defendant" or "Melendez") and C.O.
Muschett ("Defendant" or "Muschett")—who, at all
relevant times, were employed at Coxsackie Correctional
Facility ("Coxsackie")—violated his rights under the First
Amendment. Dkt. No. 23 ("Sec. Am. Compl."). Presently
pending before the Court is Defendants' motion for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 81.
Waters opposed the motion, and Defendants submitted
a reply. Dkt. Nos. 83, 84, 85. For the following reasons,
it is recommended that Defendants' motion for summary

judgment be granted on the basis of plaintiff's failure
to exhaust. Alternatively, if the District Court Judge
should not agree with the undersigned's recommendation,
it is recommended that Defendants' motion for summary
judgment be granted in part and denied in part.

## I. Background

### A. Procedural History

On July 1, 2015, plaintiff filed his complaint in the pending
action. Dkt. No. 1 ("Compl."). On July 25, 2015, Plaintiff
filed a motion to amend with a proposed amended
pleading asserting that Sgt. Melendez, Lt. Sheridan
("Sheridan"), Hearing Officer ("H.O.") Eric Gutwein
("Gutwein"), and Director of SHU/Inmate Disciplinary
Program Albert Prack ("Prack") retaliated against him,
and disciplined him in violation of his due process
rights. Dkt. No. 5-2. The Court accepted the Amended
Complaint and, upon review, directed Defendants to
respond. Dkt. Nos. 10 and 11 ("Am. Compl."). On
October 7, 2015, Waters filed a motion to amend, and
added Muschett and John/Jane Doe defendants. Dkt.
Nos. 13-2, 13-3 at 2. The Court accepted the Second
Amended Complaint and directed Defendants to respond.
Dkt. Nos. 22; Sec. Am. Compl. On February 11, 2016,
Defendants filed an Answer to the Second Amended
Complaint. Dkt. No. 33. On March 10, 2016, after defense
counsel identified the John/Jane Doe defendants, the
Second Amended Complaint was amended to include
Scott Lamphere ("Lamphere"), Opal Rivera ("Rivera"),
and Corey Bedard ("Bedard") as Defendants. Dkt. No.
36. Additionally, Lt. Sheridan was terminated as a
defendant. [2] Dkt. No. 37.

[2] Defense counsel advised that Sheridan was deceased.

On June 21, 2016, Defendants filed a motion to dismiss
the Second Amended Complaint as duplicative of Waters
v. Prack, No. 9:13-CV-1437 (LEK/DEP) (N.D.N.Y. Nov.
20, 2013) ("Waters I"), a concurrent action pending in
this District. [3] Dkt. No. 53. Alternatively, defendants
Bedard, Lamphere, and Rivera moved for dismissal of
the Second Amended Complaint for failure to state
a claim. Id. In a Report-Recommendation and Order
filed on January 31, 2017 (the "January Order"), the
undersigned recommended the dismissal of the claims
against Gutwein and Prack as duplicative, holding that:

"[t]he claims alleged against Gutwein and Prack in each suit arise from the same MBR and subsequent disciplinary proceedings. In both suits, plaintiff has asserted First Amendment retaliation and Fourteenth Amendment due process claims against Gutwein and Prack." Dkt. No. 63 at 7.[4] The Court also recommended dismissal of Waters' claims against Bedard, Lamphere, and Rivera as conclusory and insufficient to state a claim.[5] Dkt. No. 63. On March 13, 2017, the District Court Judge Thomas J. McAvoy adopted the undersigned's Report-Recommendation and Order. Dkt. No. 68. Thus, the only claims surviving dismissal are First Amendment claims against Sgt. Melendez and C.O. Muschett based upon an alleged January 2013 false misbehavior report issued in retaliation for Waters filing a sexual harassment claim against a non-party officer, and providing legal assistance to other inmates. Id.

[3]     The complaint in Waters I, filed in November 2013, included procedural due process and retaliation claims against Gutwein and Prack. Waters I, Dkt. No. 42.

[4]     Throughout this Report-Recommendation, references to page numbers in items that appear on the docket refer to the pagination of the header numbers generated by CM/ECF, not to the page numbers used by the parties in the individual documents.

[5]     On March 13, 2017, the Court issued a Decision and Order adopting the Report-Recommendation and Order. Dkt. No. 68.

**B. Record and Judicial Notice [6]**

[6]     All unpublished decisions cited herein, unless otherwise indicated, are attached to this Report-Recommendation.

**\*2**  In support of their motion, Defendants filed a Statement of Material Facts. Dkt. No. 81-1.[7] Pursuant to N.D.N.Y. Local Rule 7.1(a)(3), Waters responded, and admitted facts contained in certain paragraphs of Defendants' Statement of Material Facts. Dkt. No. 83-2. Both parties annexed exhibits to their submissions, without objection, related to the authenticity of documents. See generally Dkt. Nos. 81, 83. Therefore, to the extent that the "facts" asserted by the parties are supported by the record, the undersigned will consider the facts and relevant exhibits and/or documents in the

context of the pending motion. See U.S. v. Painting known as Hannibal, No. 07-CV-1511, 2010 WL 2102484, at \*1, n.2 (S.D.N.Y. May 18, 2010) (citing Daniel v. Unum Provident Corp., 261 Fed.Appx. 316, 319 (2d Cir. 2008) (summary order) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party.") ).

[7]     Local Rule 7.1(a)(3) states:
        Summary Judgment Motions
        Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established.
        The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. *Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*
        Local Rule 7. 1(a)(3) (emphasis in original).

Additionally, the undersigned will consider relevant exhibits and documents filed with the Court under Docket No. 84. On October 2, 2017, the same date that Waters filed his response to Defendants' motion, Waters filed documents obtained during the course of discovery. Dkt. No. 84. In his opposition to the motion for summary judgment, Waters cites to these documents and incorporates them by reference. See generally Dkt. No. 83. Because defendants did not object to the filing of these documents, and do not object to the authenticity of these documents, the undersigned will also consider the relevant exhibits and/or documents in the context of the within motion.

Finally, the undersigned will consider documentation and exhibits filed in Waters I. During the course of litigation in Waters I, Waters and defendants filed motions for summary judgment and memorandums in opposition to those motions. Waters I, Dkt. Nos. 24, 47, 48, 110, 116,

120. In support and in opposition to the motions for summary judgments, the parties submitted documents and exhibits including: (1) the transcript from Waters' January/March 2013 disciplinary hearing; (2) the Decision and Order on Waters' Article 78 petition; (3) Waters' Disciplinary History; and (4) records related to Waters' appeal of the disciplinary determination. Waters I, Dkt. No. 110-4 at 21-33; Dkt. No. 116-2 at 15-18; Dkt. No. 116-3 at 2; Dkt. No. 110-5 at 14. The parties did not dispute the authenticity of these public records. When deciding a motion for summary judgment, a Court may take judicial notice of its own records of prior litigation, particularly when the records of prior litigation "closely relate" to the case before it. See In re Brooklyn Navy Yard Asbestos Litig., 971 F.2d 831, 839 (2d Cir. 1992) (citing, inter alia, St. Louis Baptist Temple, Inc. v. FDIC, 605 F.2d 1169, 1171-72 (10th Cir. 1979) ) ("[A] court may: consider applications, concessions of counsel, transcripts, exhibits and other papers[.]"); see also Graham v. City of New York, 869 F.Supp.2d 337, 343 (E.D.N.Y. 2012) (incorporating by reference a petition that the plaintiff referred to in the complaint, was in the plaintiff's possession, and was relied on by him in pleading); Bernier v. Koenigsmann, No. 9:17-CV-254 (DNH/ATB), 2017 WL 8230891, at *5 (N.D.N.Y. Nov. 22, 2017) ("[T]he court may consider matters of which judicial notice may be taken, such as public filings and administrative decisions.") (citations omitted). Accordingly, the court will, sua sponte, take judicial notice of certain relevant records in Waters I. [8]

[8]   In opposition to the within motion, Waters provided excerpts of the transcript from his disciplinary hearing and a portion of the Decision and Order granting his Article 78 petition. Dkt. No. 84. The complete transcript from the disciplinary hearing and complete Decision on the Article 78 petition were annexed as exhibits to defendants' motion for summary judgment in Waters I.

## C. Facts

**\*3** The facts are reviewed in the light most favorable to Waters as the non-moving party. See subsection II(A) infra. At the time of the incident described in the Second Amended Complaint, Waters was confined at Coxsackie and Greene Correctional Facility ("Greene"). See Sec. Am. Compl.

From June 2006 until January 17, 2013, Waters was confined at Coxsackie C.F. Dkt. No. 81-5 at 13. From December 2006 until August 2011 and from October 2011 until January 2013, Waters worked as a clerk in the law library. Id. at 17. As a law library clerk, Waters was not permitted to accept compensation in exchange for legal services provided to other inmates. Id. at 65.

In June 2010, Waters filed a Prison Rape Elimination Act ("PREA") sexual assault complaint against non-party Corrections Officer Jody Slater ("Slater"), a Cocksackie law library supervisor. Dkt. No. 81-5 at 20-22. A copy of his complaint was filed with the Eastern District of New York in support of Waters' habeas corpus petition. [9] Id. at 51.

[9]   Waters filed a Habeas Corpus Petition pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of New York. See Waters v. Martuscello, No. 1:10-CV-5700, Dkt. No. 1 (E.D.N.Y. Nov. 24, 2010) ("Waters II"). During the course of the litigation, Waters filed a letter addressed to the presiding Judge and dated June 13, 2010, but received by the Court on June 22, 2011. Waters II, Dkt. No. 21. In that letter, Waters advised that Slater intimidated and threatened him with "special confinement." Id. at 2. On June 22, 2011, the Court received a letter, dated June 15, 2011, from Waters accusing Slater of forcing him to perform a sexual act. Waters II, Dkt. No. 22. The second letter was filed, under seal.

Waters alleges that his PREA complaint was "common knowledge" within the facility. Dkt. No. 81-5 at 24. From September 2012 until November 2012, Sgt. Melendez threatened Waters with disciplinary action for providing legal assistance to certain inmates, and specifically mentioned Slater and the PREA complaint. Dkt. No. 81-5 at 19, 27-30. Waters also claims that Sgt. Melendez referred to him as "Johnnie Cochran" and asked Waters to provide legal assistance for his nephew. Id. at 30-37. Sgt. Melendez asked Waters how much it would cost for Waters to assist his nephew, who "might come up north" to Coxsackie. Id. Waters assumed that Sgt. Melendez was attempting to "set him up," and he informed Sgt. Melendez that he did not charge for legal assistance. Id. at 37.

On January 17, 2013, Waters was transferred to Greene C.F. Dkt. No. 81-6 at 2. On January 18, 2013, Sgt.

Melendez, who was assigned to the Coxsackie Special Housing Unit issued plaintiff an Inmate Misbehavior Report (the "misbehavior report"), charging him with disobeying a direct order (106.10) and receiving compensation for legal services (180.17). Dkt. No. 81-11 ¶ 20; Dkt. No. 81-13. Waters received the misbehavior report the next day. Dkt. No. 81-5 at 85. On January 18, 2013, Sgt. Melendez, who was assigned to the Special Housing Unit ("SHU"), issued the misbehavior report and charged Waters with disobeying a direct order and receiving compensation for legal services. Dkt. No. 81-11 at ¶ 20; Dkt. No. 81-13. In that misbehavior report, Sgt. Melendez alleged that:

> **\*4**  On the above date and approx 2:00 p.m., while retrieving a hearing tape that was illegally sent to the law library by Inmate Burroughs. [10] A letter was found in an envelope that was addressed to inmate Waters 06A2999, who used to work in the law library. In this letter, Burroughs insinuates that he was and in the past has paid for legal services from inmate Waters. A copy of the letter is attached but states as follow: "We will do the same agreement as the first time, that will get to you in about 2 weeks. You know I am a man of my word." I confronted Burroughs with the letter, he immediately admitted to paying inmate Waters for the legal services he had provide to him in the past and of his willingness to pay for it this time again. Officer Muschett, the law library officer, informed me that he has advised inmate Waters in the past that he is not allowed to receive compensation for legal services provided to other inmates.

Dkt. No. 81-13 at 2.

[10]    Inmate Burroughs' name was redacted from the misbehavior report. Dkt. No. 81-13 at 2.

The misbehavior report did not include the date, time, or place that Burroughs allegedly paid Waters for legal services. See Dkt. No. 81-11 ("Melendez Decl.") ¶ 24; Dkt. No. 81-13 at 2. The "Incident Date" reflects the date that the letter arrived in the law library. Melendez Decl. ¶ 24. Sgt. Melendez did not preserve the envelope or cassette tape seized from Burroughs. Dkt. No. 83 ¶¶ 6, 7.

Sgt. Melendez investigated the incident, and interviewed Burroughs and C.O. Muschett. Melendez Decl. ¶¶ 16, 18, 19. C.O. Muschett advised Sgt. Melendez that when he became the Law Library Officer in 2009, he re-instructed

Waters that he could not accept compensation. Melendez Decl. ¶¶ 18, 19. Sgt. Melendez also claims that Burroughs admitted that he previously paid Waters for legal services and was attempting to do so again. Id. ¶¶ 2, 3, 16.

Waters asserts that Sgt. Melendez's report is "fictitious." Dkt. No. 81-5 at 46. Waters claims that all outgoing communication from the SHU would have been searched, confiscated as contraband, photographed as evidence, and preserved for a disciplinary hearing. Dkt. No. 83 at ¶¶ 3, 4. Waters maintains that although he previously provided legal services for Burroughs, he never accepted favors, commissary, money, cigarettes, or any items in exchange for the services. See Dkt. No. 81-5 at 55-60. Waters testified that he never traded for legal services with any inmate. Id. Waters also asserts that when C.O. Muschett assumed the role of library supervisor, he did not direct Waters not to accept compensation or reiterate the rules. Id. at 70-71.

On January 22, 2013, H.O. Gutwein presided over a Tier III disciplinary hearing related to the misbehavior report. Dkt. No. 84 at 7; Waters I, Dkt. No. 110-4 at 21-32. During the disciplinary hearing, C.O. Muschett testified that he was not aware of Waters charging Burroughs, or any other inmate, for legal services. Dkt. No. 84 at 9-10. Sgt. Melendez testified that his investigation did not reveal the type of assistance Waters provided Burroughs or the form of compensation that Waters received. Waters I, Dkt. No. 110-4 at 27-28.

At the conclusion of the hearing, H.O. Gutwein found Waters not guilty of refusing a direct order, but guilty of providing unauthorized legal assistance. Dkt. No. 84 at 7. H.O. Gutwein sentenced three months of SHU confinement, with a loss of packages, commissary, and telephone privileges for a corresponding period, and recommended that Waters forfeit three months of good time credits. Dkt. No. 84 at 7.

In March 2013, Plaintiff appealed the disciplinary determination to Prack. Dkt. No. 81-7. On May 8, 2013, Prack affirmed the decision. Waters I, Dkt. No. 110-5 at 14. In May 2013, Waters commenced a proceeding pursuant to Article 78 of the New York Civil Practice Law and Rules challenging the Tier III determination. Dkt No. 84 at 12-14. Plaintiff's Article 78 petition was granted and, the Albany County Supreme Court concluded that the misbehavior report failed to comply with the notice

requirements under 7 N.Y.C.R.R. § 251-3.1. Id. The Court ordered that H.O. Gutwein's determination be annulled and all references to it be expunged from Waters' records. Id.; Dkt. No. 81-5 at 80. By the time the Article 78 determination was issued and implemented, Waters had already served seventy days of his sentence. Waters I, Dkt. No. 42 at 13.

**\*5** During his confinement with DOCCS, Waters was familiar with the grievance process and, specifically, DOCCS' Directive 4040. Dkt. No. 81-5 at 75-76. Waters previously advised other inmates on the grievance process and filed a grievance on his own behalf, unrelated to Sgt. Melendez, C.O. Muschett, or retaliation. Dkt. No. 81-5 at 76; Dkt. No. 81-8 ("Seguin Decl.") ¶ 13. While Waters was confined at Greene, the inmate grievance process was available, and he successfully received and sent mail.[11] Dkt. No. 81-5 at 80, 84-85. Waters did not file any grievance against Defendants for alleged retaliation. Id. at 74, 76, 88. In 2014 and 2015, Waters filed two grievance appeals unrelated to Sgt. Melendez, C.O. Muschett, or retaliation. Seguin Decl. ¶ 14.

[11]   Plaintiff remained at Greene C.F. until March 29, 2013. Dkt. No. 81-6 at 3.

## II. Motion for Summary Judgment

Waters contends that Defendants retaliated against him in violation of the First Amendment. See generally Sec. Am. Compl. Defendants move for summary judgment on the grounds that: (1) Waters cannot establish a retaliation claim against Defendants; and (2) Waters failed to exhaust his administrative remedies. See generally Dkt. No. 81.

### A. Legal Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

**\*6** Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

## B. Exhaustion

Sgt. Melendez contends that the motion for summary judgment must be granted because Waters failed to exhaust his administrative remedies through available grievance procedures. See Dkt. No. 81-2 at 9-14. The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. 983. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Id. at 524, 122 S.Ct. 983. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, — U.S. —, 136 S.Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). Thus, the "special circumstances" exception in Hemphill v. New York, 680 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).[12]

---

[12]    In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See Williams, 829 F.3d at 123. The Williams Court stated that "Ross largely supplants Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." Id. (citing Ross, 136 S.Ct. at 1858-59).

Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S.Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) ). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

## 1. Application[13]

---

[13]    First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii). Parties do not dispute that at all relevant times,

DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5.

**\*7** In support of the motion for summary judgment, defendants proffer the declarations of Assistant Director of the Inmate Grievance Program ("IGP") Rachel Seguin and Greene IGP Supervisor Thomas Mauro. See Seguin Decl.; Dkt. No. 81-10 ("Mauro Decl."). Both Ms. Seguin and Mr. Mauro aver that a claim of retaliation is the proper subject for a grievance. Seguin Decl. ¶ 9; Mauro Decl. ¶ 9. A review of DOCCS records establishes that Waters did not file any grievances while housed at Greene in 2013, nor did he appeal any grievances to CORC during that year. Seguin Decl. ¶¶ 10, 12; Mauro Decl. ¶ 12. Waters concedes that he did not file a grievance related to the alleged retaliation. Dkt. No. 81-5 at 74. As there is no dispute that Waters failed to exhaust his administrative remedies, the undersigned must only assess whether administrative remedies were available to Waters. In that regard, Waters sets forth three arguments to establish that administrative remedies were not available to him.

### a. Transfer to Greene C.F.

First, Waters alleges that he was unable to file a grievance related to incidents that occurred at Coxsackie because he was housed at Greene. Dkt. No. 83-3 at 10. While the incident that was the subject of the misbehavior report allegedly occurred at Coxsackie, Waters received the misbehavior report when he was housed at Greene. Dkt. No. 81-8 at 85; Dkt. No. 81-13 at 2. Waters does not assert that the grievance process was unavailable to him at Greene, concedes that he was familiar with the grievance process, and testified that he had no issues with his mail while housed at Greene. Dkt. No. 81-5 at 75, 85. Accordingly, this argument lacks merit. See Rodriguez v. Senkowski, 103 F.Supp.2d 131, 134 (N.D.N.Y. 2000) ("[T]he mere fact that Plaintiff has been transferred to another prison facility does not necessarily render the exhaustion requirement moot. It is not clear to the Court why the Plaintiff cannot initiate a grievance against Defendants from his current facility, thereby instigating a review of these individuals' behavior that could lead to sanctions, discipline, and/or a change in the administration of medical care."); see also Rodriguez v. Westchester Cty. Jail Corr. Dep't, Assoc., No. 98 Civ. 2743, 2002 WL 1933953, at *3 (S.D.N.Y. Aug. 21, 2002)

(finding that the inmate had ample time to file a grievance, notwithstanding his subsequent transfer.)

### b. Untimely

Waters claims that he did not file a grievance because he was not subjected to a "final adverse action" until sixty-three days after the misbehavior report was issued, and, thus, unable to file a grievance within the twenty-one day period. Dkt. No. 83-3 at 10. Waters further asserts that he was not eligible for an exception to the time limit. Id. As discussed supra, an inmate must submit a grievance within twenty-one calendar days of the alleged occurrence. See N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(a). "An inmate may request an exception to the time limit for filing a grievance, ... and the IGP supervisor may grant an exception to the time limit for filing a grievance based on mitigating circumstances[.]" Id. at § 701.6(g). Here, Waters concedes that he never filed a grievance nor did he file a request for an extension of time. Thus, because "Plaintiff's failure to exhaust his administrative remedies cannot be excused based upon [his] mere speculation that his grievance would have been denied," this argument does not suffice to excuse his failure to exhaust. Tomony v. Cnty. of Suffolk, No. 10-CV-5726, 2013 WL 55821, at *4 (E.D.N.Y. Jan. 3, 2013) (citation omitted).

### c. Non-Grievable Issue

Waters also claims that the language of § 701.3(e) [14] is "opaque and confusing," and that he decided not to file a grievance for retaliation because he considered it a "non grievable" issue related to the disciplinary process. Dkt. No. 83-3 at 8-11. Waters asserts that the facility provided "mixed messages" with respect to the proper process to grieve retaliation arising from a misbehavior report. Dkt. No. 81-5 at 87. Based upon his interpretation of DOCCS' regulations and procedures, inmates are required to raise retaliation claims, related to disciplinary hearings, during the disciplinary process. Id. at 76-78. Although Waters admits that he did not file a grievance against Sgt. Melendez, Waters claims that he exhausted his administrative remedies when he filed an appeal of the disciplinary determination and an Article 78 petition. Id. at 80. Waters could not recall whether he addressed retaliation in the disciplinary hearing or in any appeal. Id.

14    A list of "non grievable" issues is set forth in Section 701.3(e) and DOCCS' Directive # 4040:

e) Non-grievable issues.

(1) An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered non-grievable.

(2) An individual decision or disposition of the temporary release committee, time allowance committee, family reunion program or media review committee is not grievable. Likewise, an individual decision or disposition resulting from a disciplinary proceeding, inmate property claim (of any amount), central monitoring case review or records review (freedom of information request, expunction) is not grievable. In addition, an individual decision or disposition of the Commissioner, or his designee, on a foreign national prisoner application for international transfer is not grievable.

(3) The policies, rules, and procedures of any program or procedure, including those above, are grievable.

Note: If an inmate is unsure whether an issue is grievable, he/she should file a grievance and the question will be decided through the grievance process in accordance with section 701.5 of this Part.

N.Y. Comp. Codes R. & Regs. tit. 7, § 701.3.

**\*8** Waters' argument is misplaced. Courts in this District have held that "[t]hough a disciplinary appeal is sufficient to exhaust a claim that Plaintiff was deprived of due process at a disciplinary hearing, 'allegations of staff misconduct related to the incidents giving rise to the discipline must be grieved.' " Barker v. Smith, No. 16-CV-76, 2017 WL 3701495, at \*3 (S.D.N.Y. Aug. 25, 2017) (quoting Scott v. Gardner, 287 F.Supp.2d 477, 489 (S.D.N.Y. 2003), on reconsideration in part, 344 F.Supp.2d 421 (S.D.N.Y. 2004), and on reconsideration in part, 2005 WL 984117 (S.D.N.Y. Apr. 28, 2005) ); see also Labounty v. Johnson, 253 F.Supp.2d 496, 501 (W.D.N.Y. 2003) ("An appeal from a disciplinary hearing does not satisfy the grievance exhaustion requirement for a [constitutional] claim, even if the hearing is based on the same set of facts underlying the grievance."). "Where the inmate is asserting both retaliation claims and procedural due process claims, he must separately exhaust both types of claim, using the procedure appropriate to each type of claim." Johnson v. Fraizer, No. 16-CV-6096, 2016 WL 7012961, at \*4 (W.D.N.Y. Dec. 1, 2016) (citing,

inter alia, Washington v. Chaboty, No. 09 CIV. 9199, 2015 WL 1439348, at \*7 (S.D.N.Y. Mar. 30, 2015) ("In certain circumstances, however, courts have deemed a disciplinary appeal inadequate to exhaust a claim under the PLRA. Inmate Grievance Program exhaustion has been required, for example, where an inmate alleges retaliation, including retaliation based on the filing of an allegedly false misbehavior report.") (citation omitted) ).

Even if the undersigned accepts Waters' claim that DOCCS' regulations regarding the proper grievance procedures for retaliation are confusing and irreconcilable, Waters' excuse nonetheless lacks merit. During the disciplinary hearing, Waters stated that the misbehavior report failed to provide him with adequate notice of the charges, but did not make any reference to retaliation. Waters I, Dkt. No. 110-4 at 21-32. Waters was given the opportunity to question Sgt. Melendez, but did not pose any questions related to retaliation or non-party officer Slater. Id. at 27-28. Similarly, while Waters appealed the disciplinary determination, his objections involved issues related to the process afforded at the hearing, including the sufficiency of the evidence presented. See Dkt. No. 81-7. Specifically, Waters referred to H.O. Gutwein's refusal to provide documents and the absence of "some evidence" supporting the charge. Id. at 2. Waters also claimed that "[t]he hearing was in retaliation of complaints and legal action challenging Greene's procedure of imposing dorm sanction in violation of due process and First Amendment filed by petitioner in the Northern District Court of New York"— a retaliation claim entirely unrelated to Sgt. Melendez and the misbehavior report. Id. With respect to the misbehavior report, Waters claimed that it lacked "the date, time, place or special acts of petitioner to support the charge." Id. Finally, in the Decision and Order granting the Article 78 petition, the Albany County Supreme Court noted that Waters challenged the insufficiency of the misbehavior report because it failed to comply with the regulatory particularity requirements. Dkt. No. 84 at 12-14. Notably absent from the disciplinary transcript or Waters' appeals, is any claim that Sgt. Melendez retaliated against Waters when he issued the misbehavior report.

Waters' argument that the facility was "on notice" of his retaliation claim through the appellate procedure is unsupported by the record. Indeed, the only reference to retaliation in the record is contained in Waters' pleadings and deposition. See Dkt. Nos. 23, 81-5, 83. In cases

in this District with similar factual scenarios, Courts have concluded that an appeal of a misbehavior report does not suffice to exhaust retaliation claims, "even if that misconduct formed the basis of the disciplinary proceeding." Smith v. Ashley, No. 9:15-CV-496 (BKS/ATB), 2016 WL 8732642, at *8 (N.D.N.Y. April 1, 2016); see Crosby v. LaValley, No. 9:15-CV-1125 (BKS/ATB), 2017 WL 7050647, at *6 (N.D.N.Y. Dec. 15, 2017) (finding that retaliation claims related to misbehavior report were not properly exhausted due to the absence of any reference to retaliation in disciplinary hearing transcript, grievances, and use of force report). Therefore, defendants have met their burden of showing that Waters has failed to exhaust his administrative remedies. Accordingly, as exhaustion is a prerequisite to filing an action in federal court (Woodford, 548 U.S. at 85, 126 S.Ct. 2378), it is recommended that Sgt. Melendez's motion for summary judgment be granted.

**\*9** Traditionally, if it is found that the plaintiff has not exhausted all available administrative remedies, his or her case should be dismissed without prejudice. See Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec's. Dealers, Inc., 560 F.3d 118, 124 (2d Cir. 2009) (citation omitted). "[F]ailure to exhaust administrative remedies is often a temporary, curable procedural flaw," and "[i]f the time permitted for pursuing administrative remedies has not expired, a prisoner ... can cure the defect by exhausting [the available remedies] and reinstating his suit." Berry v. Kerik, 366 F.3d 85, 87 (2d Cir. 2003) (amended 2004) (quoting Snider v. Melendez, 199 F.3d 108, 111-12 (2d Cir. 1999) (internal quotation marks omitted) ). In this instance however, because the events that gave rise to Waters' claims occurred in January 2013 and the time to cure the defect has expired, the undersigned recommends that the dismissal be with prejudice. See Bridgeforth v. Bartlett, 686 F.Supp.2d 238, 240 (W.D.N.Y. 2010) ("Since the time limits for plaintiff to file an administrative appeal have long since passed, administrative remedies are no longer available to him, as a result of his own inaction. This case, then, is precisely the kind of case that the PLRA was intended to foreclose. It is therefore dismissed with prejudice."); Martin v. Howard, No. 9:03-CV-0712 (LEK/DEP), 2008 WL 323835, at *9 (N.D.N.Y. Feb. 5, 2008) (granting summary judgment, with prejudice, because the plaintiff had "well over one year to exhaust the administrative remedies available to him.").

## C. First Amendment

Alternatively, if the District Judge were not to adopt or confirm the undersigned's recommendation for dismissal with prejudice on the basis of exhaustion, the undersigned addresses the merits of plaintiff's claim.

### 1. C.O. Muschett

During Waters' deposition, he testified that C.O. Muschett should be dismissed as a defendant in this action. Dkt. No. 81-5 at 18 ("Muschet [sic], I don't want to say that he retaliated against me because I've never had a problem with Officer Muschet [sic]. So if anything, I think Muschet [sic] actually would more than likely probably need to be dismissed from this action."), 90 ("Again, with Muschet [sic], I'm really not claiming anything against him because I really don't see how any issue against Muschet [sic] can survive."). In opposition to the motion for summary judgment, Waters presented arguments pertaining only to Sgt. Melendez. See generally Dkt. No. 83-3. In light of Waters' assertions at his deposition, and his failure to present any argument in opposition to C.O. Muschett's motion, the undersigned recommends that the motion for summary judgment, as it pertains to C.O. Muschett, be granted. See Feacher v. Intercontinental Hotels Grp., 563 F.Supp.2d 389, 399 (N.D.N.Y. 2008) ("The failure to oppose a motion for summary judgment on a certain claim is deemed abandonment of the claim, and, in the Northern District of New York, is deemed consent to granting that portion of the motion.") (internal citation omitted) (citing N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.") ).

### 2. Sgt. Melendez

Waters claims that Sgt. Melendez subjected him to a false misbehavior report in retaliation for filing a PREA complaint against Slater, and providing legal assistance to inmates. Dkt. No. 83-3 at 11-23. Sgt. Melendez argues that

Waters has failed to establish a causal connection between the misbehavior report and protected speech. Dkt. No. 81-2 at 15-18.

Courts are to "approach [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]' " See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ). A retaliation claim under Section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds by Swierkiewicz, 534 U.S. at 560, 122 S.Ct. 999). If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his exercising of the protected conduct. See Graham v. Henderson, 89 F.3d 75, 81 (2d Cir. 1996).

### a. Protected Speech or Conduct

**\*10** To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal, 558 F.3d at 128. The Second Circuit has concluded that use of the prison grievance system constitutes a protected activity. See Gill, 389 F.3d at 384; Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988) ("Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (alteration and internal quotation marks omitted); see also Roseboro v. Gillespie, 791 F.Supp.2d 353, 367 (S.D.N.Y. 2011) (finding that the filing of a grievance is a protected activity); Mateo v. Fischer, 682 F.Supp.2d 423, 433 (S.D.N.Y. 2010) (same). Moreover, providing authorized legal assistance to other inmates

is constitutionally protected conduct. See Auleta v. LaFrance, 233 F.Supp.2d 396, 401 (N.D.N.Y. 2002) (acknowledging that "[t]he Supreme Court found that the prison regulation that prohibited inmates from providing legal assistance to other inmates was unconstitutional unless inmates had alternatives to inmate assistance.") (citing Johnson v. Avery, 393 U.S. 483, 490, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) ). Plaintiff contends that he was disciplined due to a PREA complaint filed against a non-party officer, as well as his past legal assistance to other inmates. See Dkt. No 83-3 at 12. Thus, Waters satisfies the first prong of the test as he has engaged in a protected activity. See id.; Gill, 389 F.3d at 384.

### b. Adverse Action

In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Davis, 320 F.3d at 353. "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." Jackson, 549 F.Supp.2d at 215. A defendant's retaliatory filing of a falsified misbehavior report that results in disciplinary segregated confinement constitutes adverse action. See Gill, 389 F.3d at 384 (finding that a false misbehavior report that resulted in the plaintiff's placement in keeplock constituted adverse action); Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (emphasis added) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983.").

At the conclusion of the January 2013 disciplinary hearing, H.O. Gutwein sentenced Waters to three months of confinement in the SHU with a loss of packages, commissary, and telephone privileges and recommended that Waters forfeit three months of good time credits. Dkt. No. 84 at 7. When Waters' Article 78 petition was ultimately granted in September 2013, he had already served seventy days of the three-month SHU confinement ordered by H.O. Gutwein. Waters I, Dkt. No. 42 at 13. Because Waters has established that Sgt. Melendez's misbehavior report resulted in a period of segregated confinement, the undersigned finds that Waters has satisfied the second prong of the test. See Gill, 389 F.3d at 384

### c. Causal Connection

The plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle, 313 F.3d at 682. A plaintiff "may do so with circumstantial evidence if it is 'sufficiently compelling[.]' " Kotler v. Donelli, 382 Fed.Appx. 56, 57-58 (2d Cir. 2010) (summary order) (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) ).

> In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation.

Baskerville v. Blot, 224 F.Supp.2d 723, 732 (S.D.N.Y. 2002). In assessing temporal proximity,

> **\*11** [t]here is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

Burton v. Lynch, 664 F.Supp.2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

Waters alleges that he filed his PREA complaint against the non-party officer Slater in 2010. Dkt. No. 81-5 at 21. In or about September 2012, Sgt. Melendez began threatening Waters, stating that Slater still worked at the facility, and that Waters "didn't get that much ... accomplished with him, so ... [you won't] get much accomplished against any of us." Id. at 27. Sgt. Melendez referred to Waters as "Johnnie Cochran," stated that he was going to "get rid of [his] black ass," and requested that he assist his nephew with legal matters if he became incarcerated. Id. at 30, 35, 38. In January 2013, Sgt. Melendez issued plaintiff the misbehavior report. Dkt. No. 81-13 at 2. Two years between Waters' PREA complaint and the alleged false misbehavior report is too attenuated to support an inference of a causal connection. See Moore v. Kwan, No. 12-CV-4120, 2016 WL 9022575, at \*15 (S.D.N.Y. Mar. 30, 2016), aff'd, 683 Fed.Appx. 24 (2d Cir. 2017) ("Courts have found causation based upon temporal proximity where the lapse between the protected act and the adverse action consisted of a few months, not years."); see also See Espinal, 558 F.3d at 129; Kasiem v. Rivera, No. 09 Civ. 9665(DLC), 2011 WL 166929, at \*7 (S.D.N.Y. Jan. 18, 2011) (dismissing the plaintiff's retaliation claim where the adverse action occurred nearly two years after the protected conduct as "twenty months is too long a gap in time to support [an inference of causation]."); cf. Jordan v. Garvin, No. 01CIV4393LTS/GWG, 2004 WL 302361, at \*6 (S.D.N.Y. Feb. 17, 2004) ("[T]he existence of a temporal connection as close as the one present here—just two days—is sufficient by itself to establish the requisite inference of a causal connection."). However, even assuming plaintiff could establish retaliatory motive via temporal proximity, "without more, such temporal proximity is insufficient to satisfy [the plaintiff's] burden to bring forward some evidence of pretext." Simpson v. N.Y.S. Dep't of Civil Servs., 166 Fed.Appx. 499, 502 (2d Cir. 2006) (summary order).

Despite this gap, the undersigned finds that the record includes circumstantial evidence that creates a genuine issue of material fact regarding the motivation behind Sgt. Melendez's decision to issue the misbehavior report. In support of the motion for summary judgment, Sgt. Melendez avers that he was not assigned to the law library in 2013 and that he was not aware of any legal assistance

that Waters provided to other inmates. Melendez Decl. ¶¶ 32, 33. Sgt. Melendez states that he did not speak to Waters or non-party officer Slater about any grievance or lawsuit filed against non-party officer Slater, and had no knowledge of any lawsuit. Id. ¶¶ 30, 31.

However, in further support of his claim of retaliatory intent, Waters testified his PREA complaint against non-party officer Slater was "common knowledge," and that Sgt. Melendez made numerous references to the PREA complaint when he harassed and threatened him in September 2012. Dkt. No. 81-5 at 24, 27. Specifically, Sgt. Melendez told Waters, "... you know, Slater's still here" and "you really didn't get that much done —accomplished with him[.]" Id. at 27. Waters also contends that Sgt. Melendez told him not to provide certain inmates with legal assistance because they "create problems." Id. at 29-30. Waters identified these inmates, by name, during his deposition. Id. As to his prior good disciplinary record, Waters testified that he served as a law library clerk for seven years and was never accused or charged with accepting compensation for legal services. Id. at 17, 37. Indeed, the record establishes that from 2007 until January 2013, Waters received only three misbehavior reports resulting in two Tier II hearings and one Tier III hearing.[15] Waters I, Dkt. No. 116-3 at 2. Finally, as to whether plaintiff was vindicated, the record establishes that Waters' Article 78 petition was granted resulting in H.O. Gutwein's determination being overturned and expunged from Waters' records. Dkt. No. 84 at 12-14. However, the undersigned notes that the Article 78 proceeding challenged only Waters' Fourteenth Amendment due process rights, and did not discuss whether Sgt. Melendez retaliated against him. See id.

[15]    DOCCS conducts three types of inmate disciplinary hearings. See 7 N.Y.C.R.R. § 270.3; see also Hynes v. Squillace, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. Hynes, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. Id. Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. Id.

*12    Even disregarding Waters' disciplinary hearing vindication, a determination of whether Sgt. Melendez was aware of the PREA complaint or threatened Waters for providing legal assistance to certain inmates involves an issue of credibility that is inappropriate to be decided for purposes of this motion. Taking the lack of disciplinary history, coupled with the statements attributed to Sgt. Melendez, which, if true, strongly suggest that he was motivated by retaliatory intent, these circumstances present genuine issues of material fact concerning the nexus element of the retaliation test, which preclude the entry of summary judgment in connection with the retaliation claim. See Roland v. McMonagle, No. 12-CV-6331, 2015 WL 5918179, at *6 (S.D.N.Y. Oct. 9, 2015) (finding an issue of fact as to retaliation despite the gap in time between the protected conduct and alleged attack as the plaintiff presented evidence that the defendants were aware of the complaints and mocked him for filing grievances during the attack).

### d. Discipline Absent Protected Conduct

Sgt. Melendez argues that, even assuming the evidence creates a material question of fact as to whether he had retaliatory intent, he would have issued the misbehavior report even in the absence of the protected conduct. Dkt. No. 81-2 at 16-18. "[T]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." Hynes, 143 F.3d at 657 (quoting Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir. 1994). "Defendants [may meet] their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct if 'it was undisputed that [the inmate plaintiff] had in fact committed the prohibited conduct' for which he had been cited in a misbehavior report." Id.

Here, Waters did not concede to the charges, and has denied accepting compensation for legal assistance from any inmate. See Dkt. No. 81-5 at 67. The record does not contain any evidence that Waters was previously disciplined for accepting compensation for legal services. Indeed, C.O. Muschett testified that he was not aware of Waters accepting compensation for legal services. See Dkt. No. 84 at 4. Thus, affording Waters special

solicitude, there is a genuine issue of material fact related to whether Waters attempted to trade compensation for legal services. See Gayle, 313 F.3d at 684 (denying summary judgment where it is disputed whether the plaintiff committed the prohibited conduct); see Rivera v. Lawrence, No. 9:05-CV-0967 (TJM/GHL), 2009 WL 1734735, at *6 (N.D.N.Y. June 18, 2009) (finding an issue of fact where the plaintiff denied the charge and the documentary evidence and testimony at the disciplinary hearing did not support the charge). As Sgt. Melendez has not met his burden of establishing that he would have filed the misbehavior report even in the absence of the protected conduct, it is recommended that his motion for summary judgment on this ground be denied.

### III. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for summary judgment (Dkt. No. 81) be **GRANTED** with prejudice on the grounds that plaintiff failed to exhaust his administrative remedies. Alternatively, if reached, Defendants' motion for summary judgment should be **GRANTED** as to plaintiff's First Amendment retaliation claims against C.O. Muschett, and **DENIED** as his plaintiff's First Amendment retaliation claims against Sgt. Melendez; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72. [16]

[16]    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**All Citations**

Slip Copy, 2018 WL 3079764

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

**Attorneys and Law Firms**

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

***MEMORANDUM DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kenneth Carl Groves, Sr. ("Plaintiff"),
against numerous employees of New York State or the
Central New York Psychiatric Center ("Defendants"),
are Plaintiff's motion to proceed *in forma pauperis,* his
motion for a temporary restraining order and preliminary
injunction, and his motion for appointment of counsel.
(Dkt.Nos.2, 3, 4.) [1] For the reasons set forth below,
Plaintiff's motion to proceed *in forma pauperis* is granted;
his motion for a preliminary injunction is denied; his
motion for appointment of counsel is denied; Plaintiff's
claims of deliberate indifference to his mental health
needs against Defendants Bill, Carver and DeBroize are
*sua sponte* dismissed with prejudice; Plaintiff's claims
against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged
personal involvement in the August 8, 2011 assault are

*sua sponte* dismissed without prejudice and with leave to
amend in this action in accordance with Fed.R.Civ.P.
15; Sgt. Sweet is *sua sponte* dismissed without prejudice
as a Defendant in this action; the Clerk is directed to
issue summonses, and the U.S. Marshal is directed to
effect service of process on Defendants Davis, Sill, and
Nicolette.

[1]     This is the fourth civil rights action filed by Plaintiff
        in this District. Generally, two of these actions arose
        out of Plaintiff's refusal to consent to a strip search
        and the subsequent actions taken against Plaintiff
        as a result of his refusal. *See Groves v. New York,*
        09–CV–0406, Decision and Order (N.D.N.Y. filed
        May 11, 2009) (Hurd, J.) (*sua sponte* dismissing
        complaint pursuant to 28 U.S.C. § 1915[e][2][B] );
        *Groves v. The State of New York,* 9:09–CV–0412,
        Decision and Order (N.D.N.Y. filed Mar. 26, 2010)
        (Sharpe, J.) (granting defendants' motion to dismiss
        the complaint pursuant to Fed.R.Civ.P. 12[b][6] ).
        The third action alleged numerous violations of
        Plaintiff's constitutional rights during the period July
        23, 2009, and August 26, 2009, and was dismissed
        without prejudice upon Plaintiff's request in October,
        2010. *See Groves v. Maxymillian,* 9:09–CV–1002,
        Decision and Order (N.D.N.Y. filed Oct. 8, 2010)
        (Suddaby, J.). As a result, it does not appear that
        the current action is barred because of res judicata,
        collateral estoppel, and/or the rule against duplicative
        litigation.

**I. RELEVANT BACKGROUND**

On November 7, 2011, Plaintiff commenced this action
*pro se* by filing a civil rights Complaint, together with
a motion to proceed *in forma pauperis.* (Dkt. Nos.1,
2.) [2] Liberally construed, Plaintiff's Complaint alleges
that the following constitutional violations against him
occurred during his confinement at Central New York
Psychiatric Center ("CNYPC"): (1) Defendants Davis and
Sill used excessive force against him under the Eighth
and/or Fourteenth Amendments; (2) Defendant Nicolette
knew of and failed to take action to protect Plaintiff
from the assault under the Eighth and/or Fourteenth
Amendments; (3) Defendants Bill, Carver, and DeBroize
were deliberately indifferent to his mental health needs
under the Eighth and/or Fourteenth Amendments;
and (4) Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, Bosco, and Hogan failed to "adequately
train the staff under their supervision" and to take
appropriate action in response to the incident. (*See*

Groves v. State's Nat'l Reporter Service, Inc., 917 F.Supp.2d (2012)
Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 135 of 237
2012 WL 651919

*generally* Dkt. No. 1.) For a more detailed description of Plaintiff's claims, and the factual allegations giving rise to those claims, the reader is referred to Part III.B of this Decision and Order.

[2]     At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

## II. MOTION TO PROCEED *IN FORMA PAUPERIS*

Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis.* (Dkt. No. 2.)

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT

In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case at any time if the court determines that —... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

[3]     The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

### A. Governing Legal Standard

   **\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by

the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[6]

[4]    *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[5]    *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[6]    It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under Fed.R.Civ.P. 8(a) (2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009). [7]

[7]    *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them

that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

## 1. Excessive Force Claims Against Defendants Davis, Still and Nicolette

**\*4**  Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an

Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp.

35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).). [8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. [9]

[8]   Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

[9]   Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment

Groves v. Davis, Not Reported in F.Supp.2d (2012)
Case 9:17-cv-01003-BKS-TWD Document 65 Filed 06/21/19 Page 139 of 237
2012 WL 651919

when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading. [10] Rather, this claim is hereby dismissed with prejudice.

[10] The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [11]

[11] *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not

establish supervisory liability." *Watson v. McGinnis*, 964 F.Supp. 127, 130 (S.D.N.Y.1997).[12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally*, 9–CV–1198, 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011).[13]

[12]  See also *Gillard v. Rosati*, 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin*, 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin*, 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

[13]  See also *Bernstein v. N.Y.*, 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force

on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e) (2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court— to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7**  Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

### IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole*, 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker*, 00–CV–912, 2006 WL 618576, at *3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington*, 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted

Groves v. Davis, Not Reported in F.Supp.2d (2012)
Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 141 of 237
2012 WL 651919

unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV– 0403, 2008 WL 2944642, at *2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at *2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at *2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill,

Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

Groves v. Travers, Not Reported in F.Supp.2d (2012)
2012 WL 651919
Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 142 of 237

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case. [14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

[14]    For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2)

it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10  ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is *GRANTED;* [15] and it is further

[15]    Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is *DENIED;* and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is *DENIED* **without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte DISMISSED* with prejudice pursuant to 28

U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* **DISMISSED without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* **DISMISSED without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General,

together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 843872
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Derrick THOMPSON, Plaintiff,

v.

Mr. CARLSEN, Superintendent of
Ulster Correctional Facility; White, Ms.,
Administrative Nurse; Franza, Nurse,
Ulster Correctional Facility; Crawley, Nurse,
Ulster Correctional Facility, Defendants.

Civ. No. 9:08-CV-487 (TJM/RFT).
|
March 10, 2010.

**Attorneys and Law Firms**

Derrick Thompson, Rego Park, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

**\*1** This *pro se* action brought pursuant to 42 U.S.C.
§ 1983 was referred to the Hon. Randolph F. Treece,
United States Magistrate Judge, for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c). No objections to the Report-
Recommendation and Order dated February 16, 2010
have been filed, and the time to do so has expired.
Furthermore, after examining the record, this Court has
determined that the Report-Recommendation and Order
is not subject to attack for plain error or manifest
injustice. Accordingly, the Court adopts the Report-
Recommendation and Order for the reasons stated
therein.

It is therefore,

**ORDERED** that Defendants' Motion for Summary
Judgment (Dkt. No. 24) is **GRANTED** and the Complaint
(Dkt. No. 1) is **DISMISSED** in its entirety. The Clerk
of the Court is instructed to enter judgment in favor of
Defendants and to close the file in this matter.

**IT IS SO ORDERED.**

**REPORT-RECOMMENDATION and ORDER**

RANDOLPH F. TREECE, United States Magistrate
Judge.

*Pro se* Plaintiff Derrick Thompson has filed a civil
rights action, pursuant to 42 U.S.C. § 1983, alleging
that Defendants were deliberately indifferent to his
serious medical needs and therefore violated his Eighth
Amendment rights. Dkt. No. 1, Compl. Defendants now
move for summary judgment pursuant to FED. R. CIV.
P. 56(c). Dkt. No. 24. Plaintiff opposes the Motion. Dkt.
No. 26. For the reasons that follow, it is recommended
that the Defendants' Motion be **GRANTED.**

**I. FACTS**

The following facts were derived mainly from the
Defendants' Statement of Material Facts, submitted in
accordance with N.D.N.Y.L.R. 7.1, which were not,
in their entirety, specifically countered nor opposed by
Plaintiff. *See* N.D.N.Y.L.R. 7.1(a)(3) ("*Any facts set forth
in the Statement of Material Facts shall be deemed admitted
unless specifically controverted by the opposing party.*"
(emphasis in original)). However, where Plaintiff has
contradicted Defendants' Statement of Material Facts,
either in his Complaint or in his Response in Opposition
to Defendants' Motion, we will not deem those facts
admitted for the purposes of addressing this Motion.

At around 9 a.m. on October 9, 2007, while Plaintiff was
housed at Ulster Correctional Facility ("Ulster"), Plaintiff
complained to his dorm officer about pain in his chest.
Dkt. No. 24, Defs.' 7.1 Statement at ¶ 1. The dorm officer
called Defendant Nurse Franza and informed her that
Plaintiff wished to be seen by medical staff as soon as
possible. *Id.* at ¶ 2. At the time Franza received that call,
the regular sick call for that day was over, nonetheless, an

emergency sick call procedure is available every day for inmates who need to be seen for a medical emergency. *Id.* at ¶¶ 3-4.

At around 9:30 a.m. that morning, Defendant Nurse Crawley received a phone call from a corrections officer working in Plaintiff's housing dorm, stating that Plaintiff was complaining about burning in his chest and wanted to be seen by medical staff. *Id.* at ¶ 9. Crawley advised the corrections officer that Plaintiff should sign up for the next available sick call. *Id.* at ¶ 10; Pl.'s Resp. in Opp'n to Defs.' Mot., Mem. of Law at p. 2. The corrections officer asked Crawley whether Plaintiff should be sent for emergency sick call, to which Crawley responded that Plaintiff's description of his medical problem did not seem to constitute a medical emergency. Defs.' 7.1 Statement at ¶¶ 11-12. Crawley questioned the officer about whether Plaintiff was showing any signs of distress, including profuse sweating, chest pain and/or difficulty breathing. *Id.* at ¶ 13; Pl.'s Mem. of Law at pp. 3-4. There was no indication that Plaintiff was exhibiting any such symptoms. Defs.' 7.1 Statement at ¶ 14.

**\*2** Thereafter, a sergeant sent Plaintiff to the infirmary to be seen by medical staff. *Id.* at ¶ 15. Nurse Crawley attended to Plaintiff upon his arrival in the infirmary, where he complained of chest pain. *Id.* at ¶¶ 16-17; Pl.'s Mem. of Law at p. 2. Plaintiff left the emergency room area without permitting Crawley to complete a more thorough physical examination. Defs.' 7.1 Statement at ¶ 21. Crawley issued Plaintiff a Misbehavior Report, alleging that after he arrived at the infirmary on October 9, 2007, Crawley denied his request for non-emergency medication and Plaintiff became loud, argumentative, and refused further assessment. *Id.* at ¶ 22; Dkt. No. 24-10, Nurse W. Crawley Aff., dated June 10, 2009, Ex. C, Misbehavior Rep., dated Oct. 9, 2007 (hereinafter "Misbehavior Rep."). In the Misbehavior Report, Plaintiff was charged with interference with an employee, harassment, and disobeying a direct order. Defs.' 7.1 Statement at ¶ 22; Misbehavior Rep. Plaintiff pled guilty to all three charges. Defs.' 7.1 Statement at ¶ 23.

On October 10, 2007, Plaintiff again went to the infirmary and was seen by Defendant Franza. *Id.* at ¶ 24. Plaintiff filed a Grievance regarding the allegedly inappropriate medical care provided on October 9, 2007. *Id.* at ¶ 25. That Grievance was processed pursuant to departmental policy and was ultimately denied. *Id.* at ¶¶ 28-29.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and [the moving party] is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any,' " that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set out specific facts showing [that there is] a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736,

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 146 of 237
Thompson v. Carlsen, Not Reported in F.Supp.2d (2010)
2010 WL 843872

742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

**B. Eighth Amendment Claim**

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The plaintiff must allege conduct that is " 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992)) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105-06).

To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Hathaway I,* 37 F.3d 63, 66 (2d Cir.1994)). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir.1992)). The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301-03 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

**\*4** In this case, Plaintiff asserts that Defendants Franza and Crawley were deliberately indifferent to his serious medical needs when they allegedly denied him treatment for his chest pain on October 9 and 10, 2007.

*1. Claims against Crawley*

In his Complaint, Plaintiff alleges that on October 9, 2007, Defendant Crawley denied his request to see a doctor and denied him medical treatment. Compl. at p. 3. Plaintiff further asserts that he was seen by a doctor on the following day, and was diagnosed as having a heart murmur. *Id.* In his Grievance, dated October 9, 2007, Plaintiff made the following allegations: On October 9th, Crawley denied his request to see a doctor through a corrections officer with whom she was speaking on the telephone. Grievance at p. 2. Thereafter, Plaintiff was sent down to the medical clinic, where Crawley again denied him the medical attention he needed. *Id.*

In her Affidavit submitted in support of the Motion for Summary Judgment, Crawley affirms that on the morning of October 9th, she received a phone call from a corrections officer working in Plaintiff's housing dorm,

who told her that Plaintiff "was complaining of burning in his chest and that he was out of his acid reflux medication and wanted to be seen by medical staff as soon as possible."[1] Crawley Aff. at ¶¶ 5-6. Crawley swears that she asked the officer "whether plaintiff was showing any signs of distress, including profuse sweating, chest pain and/or difficulty breathing, which would have been indicators of some sort of cardiac event." Crawley Aff. at ¶ 8. However, because "[t]here was no indication that plaintiff was suffering any such symptoms," Crawley concluded that it was not an emergency situation, and "advised the Corrections Officer that [Plaintiff] should sign up for the next available regular sick call." Crawley Aff. at ¶¶ 7-9. Crawley states that shortly thereafter, a sergeant called and informed her he was sending Plaintiff to the infirmary. *Id.* at ¶ 10. According to Crawley, upon Plaintiff's arrival at the infirmary, he showed no signs of physical distress, complained only of a burning sensation in his chest, and asked for more acid reflux medication, showing her a prior prescription for acid reflux medication. *Id.* at ¶ 11. Plaintiff denies asking for medication, Pl.'s Mem. of Law at p. 2, however, he stated in his Grievance that *"when I asked for something for the pain* [ ] ... I was told no," and that he "tried to show [Crawley] what a [ ] doctor on Riker's Island gave [him] when [he] had this problem [ ]," Grievance at p. 2 (emphasis added). Thus, Plaintiff's statement in his Grievance confirms that he did in fact ask for medication to remedy his chest pain.

In his Response to Defendants' Motion, Plaintiff denies complaining of burning in his chest. Pl.'s Resp. at p. 4. However, we note that Plaintiff stated in his Complaint that his "chest was burning," Compl. at p. 3, and complained in his Grievance that he "was stuck in a dorm left with a burning chest!," Grievance at p. 2.

Crawley "advised Plaintiff that in order to have his medication refilled, [she] could not do so as a Nurse, he would have to sign up for regular sick call." Crawley Aff. at ¶ 12. At that point, Plaintiff "became very loud and argumentative[,] insisting that he be given medication at that time. He then left the emergency room area without permitting me to complete a more thorough examination." *Id.* As a consequence, Crawley issued Plaintiff a Misbehavior Report on October 9th charging him with interference with an employee, harassment, and disobeying a direct order; Plaintiff later pled guilty to all three charges.[2] *Id.* at ¶ 15; Dkt. No. 24-16, Scott

Carlsen Aff., dated June 22, 2009, Ex. C, Disciplinary Hr'g Tr., dated Oct. 20, 2007, at p. 4 (pleading guilty with an explanation to all three charges).

[2] In his Complaint, Plaintiff does not bring any claims related to the filing of the Misbehavior Report. In his Response to Defendants' Motion, Plaintiff alleges that the Misbehavior Report was false and retaliatory in nature. These new and conclusory claims are addressed below in Part II.B.3.

**\*5** Crawley asserts that Plaintiff has failed to demonstrate any deliberate indifference on her part. We agree. Plaintiff has offered no evidence to rebut Crawley's sworn Affidavit. Furthermore, based on the allegations contained in Plaintiff's Grievance, it appears that Crawley examined Plaintiff, determined his condition was non-severe based on his subjective complaints and his lack of symptoms, and told him to submit his request for medicine in accordance with standard non-emergency procedures. Even assuming Crawley was incorrect in her medical assessment of Plaintiff's condition,[3] such a misdiagnosis does not constitute deliberate indifference and therefore is not a valid basis for an Eighth Amendment claim. *Estelle v. Gamble,* 429 U.S. at 106 (a claim that a medical professional "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Thus, to the extent Plaintiff brings this § 1983 claim on a theory of negligence, *see* Compl. at p. 5, that claim must fail. *Id.* Finally, Plaintiff's preference for a different course of treatment than the one provided does not form the basis of a valid § 1983 claim; a prisoner does not have the right to the treatment of his choice. *Chance v. Armstrong,* 143 F.3d at 703.

[3] Defendants do not challenge Plaintiff's factual allegation that he suffered from a heart murmur condition nor his legal conclusion that his condition was sufficiently serious under the objective prong of the Eighth Amendment test. Thus, for the purposes of addressing Defendants' Motion, we need not address those issues.

Because Plaintiff has failed to demonstrate that a material question of fact exists with respect to his Eighth Amendment claim based on Crawley's medical treatment, it is recommended that Summary Judgment be **granted** on this claim.

### 2. *Claims against Franza*

In his Complaint, Plaintiff alleges that Franza denied his request to see a doctor when the corrections officer in his unit called the infirmary on October 9, 2007. Compl. at p. 3. In support of his Motion for Summary Judgment, Franza has submitted an Affidavit in which he states that the corrections officer who called the infirmary on October 9th told him that "inmate Thompson was complaining of heartburn and was out of his acid reflux medication and wanted to be seen by medical staff as soon as possible." Dkt. No. 24-14, C. Franza Aff., dated June 10, 2009, at ¶ 5. Franza states that neither heartburn nor a request for a medication refill constitute a medical emergency and therefore, he advised Plaintiff to sign up for the next regular sick call day. *Id.* at ¶ 8. Finally, Franza states that his "entire understanding of inmate Thompson's condition was based on what the Corrections Officer told [him]. In [his] professional opinion, there was nothing in the description provided to [him] by the officer that led [him] to believe plaintiff was in any danger or had a condition requiring immediate medical attention." *Id.* at ¶ 9.

Again, Plaintiff has failed to rebut Franza's Affidavit, in which he swears that based on the information provided to him by the corrections officer, he determined that Plaintiff did not require immediate medical attention. As previously discussed, such a medical assessment, even if wrong, does not constitute deliberate indifference. *Estelle v. Gamble,* 429 U.S. at 106.

**\*6** For the above reasons, it is recommended that Summary Judgment be **granted** on Plaintiff's Eighth Amendment claim against Franza.

### 3. *Allegations against Crawley and Franza raised in Plaintiff's Response in Opposition to Defendants' Motion*

Although unmentioned in the Complaint, Plaintiff alleges in his Response to Defendants' Motion that he saw Franza during another emergency sick call on October 10, 2007. Pl.'s Mem. of Law at pp. 2-3. Plaintiff alleges that Franza threatened him during his sick call visit and conspired with Crawley to "pre-date" the Misbehavior Report in retaliation for Plaintiff's October 9th Grievance. These

new allegations were not added to the Complaint by amendment, and are therefore improper. However, even if we were to consider the merits of these new claims, they would still fail.

It is well-settled in this Circuit that "threats do not amount to violations of constitutional rights." *Moncrieffe v. Witbeck,* 2000 WL 949457, at \*3 (N.D.N.Y. June 29, 2000) (quoting *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995)). Furthermore, there is "no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)); *see also Gill v. Riddick,* 2005 WL 755745, at \*7 (N.D.N.Y. Mar. 31, 2005). Finally, Plaintiff's claim that Franza and Crawley conspired to file a false Misbehavior Report against him in retaliation for the Grievance he filed against them on October 9th is wholly conclusory and belied by the record. *See Bell. Atl. Corp. v. Twombly,* 550 U.S. 544-45 (stating that a valid claim must have enough factual allegations "to raise a right to relief above the speculative level"). Plaintiff pleaded guilty to all the charges brought in Crawley's Misbehavior Report. Disciplinary Hr'g Tr. at p. 4. Moreover, the Misbehavior Report is dated October 9, 2007, and, although Plaintiff claims that Crawley and Franza "pre-dated" the Misbehavior Report, there is no evidence on the record of such action. Nor is there any other evidence to suggest that the Misbehavior Report was issued for anything other than Plaintiff's violation of the rules, for which he admitted guilt and accepted responsibility. Thus, Plaintiff's retaliation and conspiracy claims are also without merit.

For the above reasons, it is recommended that these claims be **dismissed.**

### C. Supervisory Liability

Plaintiff names Superintendent of Ulster Correctional Facility Carlsen and Administrative Nurse Ms. White as Defendants. Beyond listing these Defendants in his Complaint, Plaintiff provides no details concerning his claims against these Defendants. However, given their supervisory roles, we assume Plaintiff seeks damages against these Defendants based on a theory of supervisory liability.

If a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

> *7 in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

In this case, because we find that Plaintiff's underlying Eighth Amendment claims are without merit, none of the above bases for supervisory liability are applicable. *See Blyden v. Mancusi,* 186 F.3d 252, 265 (2d Cir.1999) ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation."). Therefore, to the extent Plaintiff intended

to bring claims of supervisory liability against Defendants Carlsen and White, it is recommended that Summary Judgment be **granted** on those claims.

## III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Defendants' Motion for Summary Judgment (Dkt. No. 24) be **GRANTED** and the Complaint (Dkt. No. 1) **DISMISSED** in its entirety; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 843872

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3604242
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jerry RAMRATTAN, Plaintiff,

v.

Brian FISCHER, et al., Defendants.

No. 13 Civ. 6890(KPF).
|
Signed June 9, 2015.

*OPINION AND ORDER*

KATHERINE POLK FAILLA, District Judge.

**\*1** Plaintiff Jerry Ramrattan, a New York State prisoner proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S .C. § 2000cc ("RLUIPA"), and the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 to 12213 (the "ADA"). Plaintiff alleges that the failure of the New York State Department of Corrections and Community Supervision ("DOCCS") to hire a Hindu chaplain and provide meals compliant with his religious beliefs violates his rights under the Free Exercise Clause of the First Amendment and RLUIPA. Plaintiff also brings an ADA claim in connection with his claimed need for hearing aids. Defendants have moved to dismiss the Complaint for failure to state a claim. For the reasons discussed herein, that motion is granted.

**BACKGROUND** [1]

[1] The facts alleged herein are drawn from Plaintiff's Complaint ("Compl." (Dkt.# 2)), and are assumed true for the purposes of this Opinion. Citations to the Complaint are made using the page-numbering convention imposed by this Court's electronic case filing ("ECF") system. Plaintiff attached a large volume of documents to his Complaint, and it was therefore docketed as 12 separate PDFs. To the extent this Opinion cites documents contained within the first PDF (Dkt.# 2), those will be referenced as "Compl. [page number]." To the extent this Opinion cites documents contained in the other 11 PDFs,

docket entries 2–1 to 2–11, those will be referenced as "Dkt. # 2–1 at [page number]," and so on. Defendants' memorandum of law in support of their motion to dismiss (Dkt.# 71) will be referred to as "Def. Br." As discussed further below, Plaintiff's opposition to Defendants' pre-motion letter (Dkt.# 46) will be referred to as "Pl. Opp."; Plaintiff did not submit any formal opposition to Defendants' motion.

**A. Factual Background**

Plaintiff practices the Hindu religion. (Compl.5). Upon arriving in DOCCS custody, Plaintiff identified himself as a member of the Hindu faith, and attempted to seek out a Hindu chaplain who could assist him in the practice of his religion. (*Id.*). Plaintiff was informed that DOCCS did not employ a Hindu chaplain. (*Id.*). Plaintiff then began filing grievances and writing letters to various officials within and outside of DOCCS, complaining about the lack of a Hindu chaplain and advocating for the hiring of one. (*Id.*). In response to his numerous inquiries, Plaintiff was informed that it was not fiscally possible for DOCCS to employ a chaplain for every religious group, especially where the population of inmates practicing a particular religion was very small. (*See, e.g.,* Dkt. # 2–2 at 18). In the case of Hinduism, he was told, far less than one percent of the prison population had identified as Hindu (*viz.,* fewer than 50 inmates out of a population of over 55,000). (*See id.*). Plaintiff was repeatedly advised to follow the procedure set forth in DOCCS Directive # 4202 on Religious Programs and Practices and was encouraged to work with the coordinating chaplain at his facility to locate a religious volunteer to assist him in the practice of his religion. (*See id.; see also* Dkt. # 2–2 at 31, 32, 35, 36, 38; Dkt. # 2–3 at 3, 4; Dkt. # 2–6 at 31).

Plaintiff did write the coordinating chaplain at Auburn Correctional Facility, who informed Plaintiff that he would help provide materials and support. (Compl.37). He further explained that although DOCCS could not accommodate a "group meet" or other group-oriented religious services for "just one person," Plaintiff "MOST CERTAINLY" [*sic* ] would be "allowed to worship in the privacy of [his] cell as needed." (*Id.*). The coordinating chaplain at Great Meadow Correctional Facility [2] later provided Plaintiff with a similar response. (*See* Dkt. # 2–6 at 31). Despite these communications, Plaintiff alleges that DOCCS's failure to hire a Hindu chaplain has interfered with his ability to practice his religion and constitutes unlawful religious discrimination. (Compl.5–6). Plaintiff further complains that he has been forced to eat foods that

do not comport with his religious dietary restrictions, and that he has been unable to observe unspecified "religious holy days and rites." (*Id.* at 5).

2    Plaintiff has moved between facilities several times. Discerning the exact timeline of Plaintiff's facility moves is not necessary to the resolution of the instant motion.

**\*2** In addition to his claims based on religion, Plaintiff also alleges that, in response to his numerous grievances, he has been subjected to retaliation by Defendants. (Compl.8–9). Finally, in a single sentence near the end of his narrative, Plaintiff alleges that Defendants have violated his rights under the ADA. (*Id.* at 9).

**B. Procedural Background**
On September 27, 2013, Plaintiff initiated this lawsuit against Defendants, seeking $25 million in damages, including "punitive rewards for deliberate indifference, pain (spiritual and emotional), religious suffering, religious discrimination, physical suffering, discriminatory hiring practices, violations of my constitutional rights ... and direct harm from foods ingested." (Compl.11). Plaintiff also sought injunctive relief in that DOCCS be required to hire a Hindu chaplain and that DOCCS "provide for [his] religious needs in all aspect[s]." (*Id.*).

On October 31, 2013, this Court issued an order of service. In addition to directing Plaintiff to complete the paperwork that would permit the United States Marshals Service to effect service on his behalf, the Order also dismissed DOCCS from the case as an entity that could not be sued under Section 1983 due to Eleventh Amendment immunity. (Dkt.# 6). [3] Between November 2013 and March 2014, Plaintiff sent the Court numerous letters setting out Plaintiff's allegations concerning retaliation against him for filing the instant lawsuit, and seeking a protective order. (*See* Dkt. # 7, 9–12, 14, 18–21). The Court denied Plaintiff's requests contained within those letters and provided guidance as to how to proceed with new complaints. (Dkt.# 20). Nonetheless, Plaintiff continued to submit numerous letters to the Court concerning matters outside the scope of his claims in this lawsuit. (*See, e.g.,* Dkt. # 22–24, 34, 41).

3    Given that Plaintiff styled his Complaint as based entirely on Section 1983, and only referenced the ADA in a single line, the Court did not at that time construe Plaintiff to have brought valid claims under any statutes under which Congress had abrogated the states' immunity. *See Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 40 (2d Cir.1977) (finding that Congress has not abrogated the states' Eleventh Amendment immunity under Section 1983); *cf. United States v. Georgia,* 546 U.S. 151, 159 (2006) (establishing three-part process for determining whether Congress had validly abrogated a state's immunity from suit for certain ADA claims).

On June 27, 2014, Defendants submitted a pre-motion letter describing their proposed motion to dismiss and requesting a conference. (Dkt.# 43). On July 24, 2014, Plaintiff submitted a response to Defendants' pre-motion letter that addressed the substance of Defendants' proposed motion. (Dkt.# 46). The Court held a telephonic pre-motion conference with all parties on July 29, 2014. (*See* Dkt. # 52 ("July 29, 2014 Tr.")). Among other things, at that conference, the Court ensured that Plaintiff understood that he would have another opportunity to respond more fully to Defendants' motion once they filed it. (*Id.* at 4–5). As it happened, Plaintiff did not submit an opposition to Defendants' motion to dismiss; accordingly, given Plaintiff's *pro se* status, the Court accepts Plaintiff's opposition to Defendants' pre-motion letter as his opposition to their motion.

In their motion papers, Defendants argue that the Complaint should be dismissed because: (i) Plaintiff cannot maintain an ADA claim against individuals; (ii) damages against Defendants in their official capacities are barred by the Eleventh Amendment; (iii) money damages are not available to Plaintiff under RLUIPA; (iv) Plaintiff fails adequately to allege the individual Defendants' personal involvement in any alleged constitutional violation; (v) Plaintiff fails to state a cognizable constitutional violation to sustain a Section 1983 claim; and (vi) Plaintiff fails to state a cognizable claim for retaliation. (Def.Br.1–2, 4–12). In his opposition, Plaintiff argues that he has stated claims, and provides incremental factual information, as discussed further below. (*See generally* Pl. Opp.).

**DISCUSSION**

**A. Motions to Dismiss Under Fed.R.Civ.P. 12(b)(6)**

**\*3** Defendants have moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). When considering such a motion, a court should "draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.,* 648 F.3d 98, 104 (2d Cir.2011) (internal quotation marks omitted) (quoting *Selevan v. N.Y. Thruway Auth.,* 584 F.3d 82, 88 (2d Cir.2009)).

A plaintiff will survive a motion to dismiss if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [a plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)). The Court is not, however, bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon v. Henneman,* 517 F .3d 140, 149 (2d Cir.2008) (citation and internal quotation marks omitted).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable LLC,* 622 F.3d 104, 111 (2d Cir.2010). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (per curiam)).

"[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted) (citing *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)); *accord McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999). "That said, the liberal pleading standard accorded to *pro se* litigants is not without limits, and all normal rules of pleading are not absolutely suspended."

*Hill v. City of New York,* No. 13 Civ. 8901(KPF), 2015 WL 246305, at \*2 (S.D.N.Y. Jan. 20, 2015) (internal quotation marks omitted). Further, even where Defendants have not sought dismissal of a particular claim, the Court has the authority to screen *sua sponte* an *in forma pauperis* complaint at any time and must dismiss a complaint, or portion thereof, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998).

**B. Plaintiff's ADA Claims Are Dismissed**

**1. Applicable Law**

**\*4** The purpose of the ADA is to "eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and the able-bodied." *Andino v. Fischer,* 698 F.Supp.2d 362, 378 (S.D.N.Y.2010) (internal quotation marks omitted). Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

To state a claim under the statute, then, a plaintiff must plead "[i] that he is a 'qualified individual' with a disability; [ii] that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and [iii] that such exclusion or discrimination was due to his disability." *Varney v. Many,* No. 13 Civ. 5285(VB), 2015 WL 1730071, at \*3 (S.D.N.Y. Apr. 14, 2015) (citing *Hargrave v. Vermont,* 340 F.3d 27, 34–35 (2d Cir.2003)). Critically, plaintiff must allege his mistreatment "was motivated by either discriminatory animus or ill will due to disability." *Id.* (internal quotation marks omitted). "Courts routinely dismiss ADA suits by disabled inmates that allege inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability." *Id.* (citing *Elbert v. N.Y. State Dep't of Corr. Servs.,* 751 F.Supp.2d 590, 595 (S.D.N.Y.2010) (collecting cases)).

**2. Analysis**

Plaintiff contends that "all the defendants and employees and staff violated the ADA [ ][be]cause I have hearing aids." (Compl.9). Defendants argue that Plaintiff's claims must be dismissed because an ADA claim cannot be brought against individuals; Defendants do not otherwise address the merits of Plaintiff's claim. (Def.Br.4).

### a. Plaintiff's ADA Claims Against Individual Defendants Are Dismissed with Prejudice

Defendants are correct that "individuals cannot be named as defendants in ADA suits in either their official or representative capacities." *Tavares v. N.Y.C. Health & Hosps. Corp.,* No. 13 Civ. 3148(PKC)(MHD), 2015 WL 158863, at *7 n. 8 (S.D.N.Y. Jan. 13, 2015) (citing *Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 441 (S.D.N.Y.2004) (dismissing ADA claims against individuals)); *see also Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001) (holding that Title II of the Americans with Disabilities Act does not provide "for individual capacity suits against state officials"). Plaintiff's ADA claims are therefore dismissed with prejudice against the individual Defendants.

### b. Plaintiff's ADA Claims Against the State Are Dismissed Without Prejudice

Construed liberally, Plaintiff's complaint can be read to assert an ADA claim against New York State (or DOCCS, the State's agency). Such a claim is actionable under *Tennessee v. Lane,* 541 U.S. 509 (2004), which upheld the ADA's abrogation of a State's Eleventh Amendment immunity, and found that liability extends to include state and local governments, as well as their agencies and instrumentalities. Even if the State or DOCCS were currently party to this action, however, Plaintiff's claim must nevertheless be dismissed.

**\*5** Plaintiff's claim fails because it is a bare, conclusory allegation that does not provide "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 569. First, Plaintiff does not adequately allege any disability, nor does he allege that Plaintiff was prevented from participating in or benefiting from prison programs and services because of his disability: his mere recitation of "because I have hearing aids" is not enough. He does not allege that he has hearing loss or any other disability. When an ADA claim fails to allege that plaintiff was a "qualified individual with a disability," it must be dismissed. *See, e.g., Veloz v. New York,* 178 F. App'x 39,

41 (2d Cir.2006) (summary order) (affirming dismissal of ADA claim where inmate did not demonstrate he was a "qualified individual with a disability").

Likewise, when an ADA claim does not state that a plaintiff was *excluded* from a prison service or program, it must be dismissed. *See Carrasquillo,* 324 F.Supp.2d at 443 (dismissing ADA claim where inmate alleged only that he had difficulty walking to law library and infirmary, not that he was prevented altogether from accessing them, and admitted access on several occasions); *Devivo v. Butler,* No. 97 Civ. 7919(HB), 1998 WL 788787, at *4 (S.D.N.Y. Nov. 10, 1998) (dismissing ADA claim where blind inmate failed to allege that he was denied services in prison because he was blind). Finally, Plaintiff does not allege any discriminatory animus, or that he was excluded from any public service because of ill will against his disability. *See Varney,* 2015 WL 1730071, at *3. Accordingly, Plaintiff's ADA claims are dismissed in their entirety.

Plaintiff has not sought leave to amend his Complaint. However, the principle that the "court should freely give leave [to amend a pleading] when justice so requires," *Fed R. Civ. P. 15(a)(2)*, is particularly applicable to *pro se* plaintiffs, *see Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003). "A *pro se* complaint should not be dismissed without the court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (internal quotation marks omitted). "Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend." *Lucente v. Int'l Bus. Mach. Corp.,* 310 F.3d 243, 258 (2d Cir.2002) (internal quotation marks omitted).

Plaintiff's opposition to Defendants' pre-motion letter provides information, albeit sparse, suggesting that an amendment of his ADA claim may not be futile. Specifically, Plaintiff asserts that he has been classified by an audiologist as "HL 30," and argues that he is entitled to certain accommodations under DOCCS Directive # 2612, which addresses accommodations for inmates with hearing impairments. (Pl.Opps.3). [4] He also contends that he has been "denied access" to certain services, including the "Resource Room and the tele-fax machine," although he does not make clear that the denial of access is *because of* ill will towards his disability, or whether he

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

was already excluded from those services. (*Id.*). He also claims that he "can't use the regular telephone" since he has not been provided with hearing aids. (*Id.*).[5] But even if Plaintiff's alleged hearing disability does prevent him from using certain services, this is not enough: not receiving proper treatment for a disability is not enough to sustain an ADA claim. Rather, Plaintiff must allege that he was mistreated *because of* his disability. *See Elbert,* 751 F.Supp.2d at 596 (dismissing ADA claims where "Plaintiff [was] claiming that Decedent was not properly treated *for* his [disability], not that he was mistreated *because of* his [disability]" (emphases in original)); *see also Varney,* 2015 WL 1730071, at *3.

[4]    The Court takes notice that the classification of "HL 30" means the inmate has "non-significant hearing loss" under the Directive, but may nonetheless be entitled to some accommodations. *See, e.g., Rosales v. LaValley,* No. 11 Civ. 106(MAD)(CFH), 2012 WL 7688115, at *1 (N.D.N.Y. Nov. 2, 2012) (discussing and quoting text of Directive # 2612), *report and recommendation adopted in part, rejected in part,* 2013 WL 992547 (N.D.N.Y. Mar. 13, 2013).

[5]    In this regard, the Court cautions Plaintiff that false or frivolous claims will be dismissed. In particular, Plaintiff's allegations that he cannot use a telephone strain credulity where he has participated in a telephone conference with the Court unaided, and heard and responded to everything the Court said. (*See generally* July 29, 2015 Tr.).

**\*6**  The Court therefore will permit Plaintiff to amend his ADA claims, if he believes he can allege facts that support the elements of such a claim as set forth herein. If Plaintiff chooses to amend his ADA claims, he may also amend to add the public entity DOCCS, despite its prior dismissal from this action. If Plaintiff fails to re-plead these claims adequately, they may be dismissed with prejudice.

## C. Plaintiff's Claims of Religious Deprivation Are Dismissed

Plaintiff brings his religious-liberty claims pursuant to two separate statutes: 42 U.S.C. § 1983 and Section 3 of RLUIPA, 42 U.S.C. § 2000cc–1.

### 1. Applicable Law

#### a. Claims Under Section 1983

Plaintiff first relies on Section 1983, which establishes liability for deprivation, under the color of state law, "of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. "The purpose of [Section] 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole,* 504 U.S. 158, 161 (1992). As such, a "[Section] 1983 claim has two essential elements: [i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of h[is] federal statutory rights, or h[is] constitutional rights or privileges." *Annis v. County of Westchester,* 136 F.3d 239, 245 (2d Cir.1998).

In attempting to ascertain the putative violation of rights underlying Plaintiff's Section 1983 claim, Defendants have construed the Complaint to allege violations of the Free Exercise Clause of the First Amendment, which guarantees the right to the free exercise of religion. Convicted felons do not relinquish this right upon incarceration. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987) ("Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." (internal citations omitted)); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) ("Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." (internal citation omitted)). It is well-accepted, however, that a prisoner's right to exercise his religion involves considerations that do not apply to persons outside of the penal system. Namely, "the prisoner's right is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Woodward v. Perez,* No. 12 Civ. 8671(ER), 2014 WL 4276416, at *3 (S.D.N.Y. Aug. 29, 2014) (internal quotation marks omitted); *see also Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) ("A prisoner's right to practice his religion is ... not absolute."). Accordingly, free exercise claims of prisoners are judged "under a reasonableness test less restrictive than that ordinarily applied: a regulation that burdens a protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone,* 482 U.S. at 349); *see Vann v. Fischer,* No. 11 Civ.1958(KPF), 2014 WL 4188077, at *8–14 (S.D.N.Y. Aug. 25, 2014) (finding burdens imposed

on inmates wearing religious beads were reasonably related to legitimate penological interest of inmate safety), *reconsideration denied,* No. 11 Civ.1958(KPF), 2015 WL 105792 (S.D.N.Y. Jan. 7, 2015).

**\*7** Under this reasonableness test, a prisoner asserting a free exercise claim "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d at 274–75. [6] "The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Id.* at 275 (alterations and internal quotation marks omitted).

[6] "It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a 'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.' " *Holland v. Goord,* 758 F.3d 215, 220 (2d Cir.2014) (quoting *Salahuddin v. Goord,* 467 F.3d at 27475). However, because here the Court finds that Plaintiff has not pleaded sufficient facts to allege the personal involvement of any Defendants or to establish any burden on his religious beliefs, the Court need not grapple with the weight of the burden at this time.

"A substantial burden on religious exercise exists when an individual is required to choose between following the precepts of his religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of his religion on the other hand." *Vann,* 2014 WL 4188077, at \*9 (alterations and internal quotation marks omitted) (citing *Westchester Day Sch. v. Village of Mamaroneck,* 504 F.3d 338, 348 (2d Cir.2007)). Plaintiff need not show that the disputed conduct impedes a religious practice mandated by his religion, but he must show that it burdens a religious practice that is "central or important" to his practice of religion. *Ford,* 352 F.3d at 593–94. "Significantly, the plaintiff's burden in demonstrating substantial burden is not a particularly onerous task." *Woodward,* 2014 WL 4276416, at \*4 (internal quotation marks omitted); *see also McEachin v. McGuinnis,* 357 F.3d 197, 202 (2d Cir.2004).

Although Defendants do not address it, this Court also construes Plaintiff to have alleged violations of the First Amendment's Establishment Clause. Indeed, in his opposition to Defendants' pre-motion letter,

Plaintiff specifically refers to the Establishment Clause. (Pl.Opp.4). The First Amendment's Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. In deciding an Establishment Clause claim, courts in this Circuit continue to apply the three-prong test articulated by the Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602 (1971). *See Bronx Household of Faith v. Bd. of Educ. of N.Y.C.,* 650 F.3d 30, 40 n. 9 (2d Cir.2011) ("Although the *Lemon* test has been much criticized, the Supreme Court has declined to disavow it and it continues to govern the analysis of Establishment Clause claims in this Circuit."). Under *Lemon,* "government action which interacts with religion [i] must have a secular purpose, [ii] must have a principal or primary effect that neither advances nor inhibits religion, and [iii] must not foster an excessive government entanglement with religion." *Bronx Household of Faith,* 650 F.3d at 40 (alterations and internal quotation marks omitted) (citing *Lemon,* 403 U.S. at 612–13). "[A]t the heart of the Establishment Clause [is] that government should not prefer one religion to another, or religion to irreligion." *Pugh v. Goord,* 571 F.Supp.2d 477, 494 (S.D.N.Y.2008) (quoting *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,* 512 U.S. 687, 703 (1994)).

**\*8** Given that plaintiff is a prisoner challenging a DOCCS action or regulation, "the *Lemon* test is tempered by the test laid out by the Supreme Court in [*Turner v. Safley,* 482 U.S. 78 (1987) ], which found that a prison regulation that impinges on an inmate's constitutional rights is nevertheless valid if it is reasonably related to legitimate penological interests." *Pugh,* 571 F.Supp.2d at 494 (internal quotation marks omitted). Additionally, "in the prison context, the [E]stablishment [C]lause has been interpreted in the light of the affirmative demands of the [F]ree [E]xercise [C]lause." *Muhammad v. N.Y.C. Dep't of Corr.,* 904 F.Supp. 161, 198 (S.D.N.Y.1995) (internal quotation marks omitted); *see also id.* ("In order to permit inmates to freely exercise their religion, *some* entanglement is necessary." (emphasis in original)). As discussed further below, regardless of the underlying constitutional violation Plaintiff alleges—whether under the Free Exercise Clause, the Establishment Clause, or something else entirely—he must allege the personal involvement of Defendants to state a claim under Section 1983. *See Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006).

### b. Claims Under RLUIPA

"RLUIPA offers similar protections to prisoners as the Free Exercise Clause but heightens the standard for both plaintiffs and defendants." *Woodward,* 2014 WL 4276416, at *6 (citation and internal quotation marks omitted). "RLUIPA protects inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise'[ ] of inmates in certain institutions unless the government shows that the burden furthers a compelling interest by the least restrictive means." *Salahuddin v. Goord,* 467 F.3d at 273 (footnote omitted) (quoting 42 U.S.C. § 2000cc–1(a)). "Only if a plaintiff shows that his religious exercise has been substantially burdened, do the defendants need to show something more than a rational relationship between the policy at issue and a governmental interest." *Woodward,* 2014 WL 4276416, at *6. If the plaintiff demonstrates that the "state has imposed a substantial burden on the exercise of his religion[,] ... the state may overcome a RLUIPA claim by demonstrating that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest." *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (citing 42 U.S.C. § 2000cc–1(a)).

**2. Analysis**

**a. Official Capacity Damages Claims Brought Under Section 1983 Are Dismissed**

The Eleventh Amendment, as a general matter, makes states immune from suit. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54 (1996). Eleventh Amendment immunity applies also to state officials sued in their official capacities. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 101–02 (1984). "Employees of DOC[C]S and its facilities, when sued in their official capacities, have been held to be subject to the State's Eleventh Amendment immunity." *Lyerly v. Phillips,* No. 04 Civ. 3904(PKC), 2005 WL 1802972, at *3 (S.D.N.Y. July 29, 2005) (collecting cases). "The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his individual or personal capacity." *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (internal quotation marks omitted). Thus, to the extent Plaintiff sues Defendants in their official capacities under Section 1983, his claims are dismissed. He may still, however, seek money damages against Defendants in their personal capacities.

**b. Official and Individual Capacity Damages Claims Brought Under RLUIPA Are Dismissed**

**\*9** RLUIPA does not afford a plaintiff a cause of action for money damages against individual defendants in either their official capacities, *Sossamon v. Texas,* 131 S.Ct. 1651, 1663 (2011), or their individual capacities, *Washington v. Gonyea,* 731 F.3d 143, 145 (2d Cir.2013). Accordingly, to the extent Plaintiff seeks monetary damages under RLUIPA, those claims are dismissed.

Plaintiffs may, however, seek injunctive relief against officials in their official capacities. *See Sossamon,* 131 S.Ct. at 1658 (holding that "a waiver of sovereign immunity to other types of relief does not waive immunity to damages"); *id.* at 1666 (Sotomayor, J., dissenting) (observing that "the majority appears to accept that equitable relief is available to RLUIPA plaintiffs"); *see also Goode v. Bruno,* No. 10 Civ. 1734(SRU), 2013 WL 5448442, at *7 (D.Conn. Sept. 30, 2013) (permitting a RLUIPA claim for injunctive relief to continue past summary judgment). [7] All that remains for this Court's consideration, then, are his claims for injunctive relief under RLUIPA and his claims for personal capacity monetary damages under Section 1983.

[7]   Although Defendants do not make this argument, it is also possible that Plaintiff's RLUIPA claims for injunctive relief should be dismissed as moot. In this Circuit, "an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Salahuddin v. Goord,* 467 F.3d at 272; *see also Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (per curiam) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility."). Plaintiff is currently incarcerated at Attica Correctional Facility, and all Defendants are employed elsewhere, potentially rendering his claims moot. Certain decisions in this District have allowed claims for injunctive relief against prison officials to proceed despite an inmate's transfer from the facility in question, under the theory that such claims may be "capable of repetition, yet evading review." *Pugh,* 571 F.Supp.2d at 489. However, the Court's determination that Plaintiff has not adequately pleaded a claim means that it will not consider the mootness issue at this time.

**Ramrattan v. Fischer, Not Reported in F.Supp.3d (2015)**
2015 WL 3604242
Case 9:17-cv-01003-BKS-TWD Document 65 Filed 06/21/19 Page 157 of 237

**c. Plaintiff Has Failed to Plausibly Allege the Personal Involvement of Defendants**

Plaintiff brings claims against 12 individual Defendants, including the Governor of the State of New York, the Commissioner of the New York State Police, the former Commissioner of DOCCS, six facility superintendents, and a DOCCS Director. As a prerequisite to relief under both Section 1983 and RLUIPA, a plaintiff must show the personal involvement of defendants in the alleged constitutional deprivations. *See Farrell,* 449 F.3d at 484 (Section 1983); *Covington v. Mountries,* No. 13 Civ. 343(VEC), 2014 WL 2095159, at *5 (S.D.N.Y. May 20, 2014) (RLUIPA). To show personal involvement, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly,* 550 U.S. at 555).

A court may consider supervisory personnel "personally involved" if a plaintiff plausibly alleges facts showing that those defendants: (i) participated directly in the alleged constitutional violation; (ii) failed to remedy the wrong after being informed of it; (iii) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (iv) were grossly negligent in supervising subordinates who committed the wrongful acts; or (v) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating there were ongoing unconstitutional acts. *Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). [8]

[8]    Courts have disagreed as to whether the five *Colon* factors continue to apply after *Iqbal. See generally McNaughton v. de Blasio,* No. 14 Civ. 221(KPF), 2015 WL 468890, at *5 n. 8 (S.D.N.Y. Feb. 4, 2015) (collecting cases). Any such uncertainty, however, does not alter settled law that "[t]he mere fact that a defendant possesses supervisory authority is insufficient to demonstrate liability for failure to supervise under [Section] 1983." *Styles v. Goord,* 431 F. App'x 31, 33 (2d Cir.2011) (summary order) (collecting cases).

**\*10**  "The bare fact that [an official] occupies a high position in the New York prison hierarchy is insufficient to sustain [a] claim." *Colon,* 58 F.3d at 874; *see also Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (explaining that sustaining a Section 1983 claim "requires a showing of more than the linkage in the prison chain of command; the doctrine of respondeat superior does not apply"). "Even where there has been a constitutional violation, receipt of letters or grievances is insufficient to impute personal involvement." *Dilworth v. Goldberg,* No. 10 Civ. 2224(RJH)(GWG), 2011 WL 3501869, at *19 (S.D.N.Y. July 28, 2011) (citation, alteration, and quotation marks omitted), *report and recommendation adopted,* 2011 WL 4526555 (S.D.N.Y. Sept 30, 2011). Further, "[t]he fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement." *Vann,* 2014 WL 4188077, at *7 (citation omitted). "Nor is a supervisor liable under [Section] 1983 when she receives a letter and forwards it to the appropriate staff personnel to handle, but takes no other action." *Id.; see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.2007) (affirming dismissal for failure to allege personal involvement where defendant referred one letter and responded to the next by informing plaintiff that a decision had been rendered). Additionally, after *Iqbal,* under both Section 1983 and RLUIPA, "an official's denial of a grievance alleging a constitutional deprivation, without more, does not amount to personal involvement in the deprivation of that right." *Joseph v. Fischer,* No. 08 Civ. 2824(PKC)(AJP), 2009 WL 3321011, at *18 (S.D.N.Y. Oct. 8, 2009). "Only where a supervisory official receives and acts on a prisoner's grievance (or substantively reviews and responds to some other form of inmate complaint) can the supervisor be held personally involved for [Section] 1983 purposes." *Vann,* 2014 WL 4188077, at *7 (internal quotation marks omitted). As Defendants argue, Plaintiff has not met the burden of pleading personal involvement for any of the 12 individual Defendants.

**i. Dr. Adams, C.O. Hayes, and Sgt. Hutti**
With regards to Dr. Adams, C.O. Hayes, and Sgt. Hutti, Plaintiff simply does not allege any involvement in, or even awareness of, his purported religious deprivations. Accordingly, to the extent that Plaintiff's complaint makes religious deprivation claims against Dr. Adams, C.O. Hayes, and Sgt. Hutti, those claims are dismissed.

### ii. Governor Cuomo, Former Commissioner Fischer, and Superintendent D'Amico

Plaintiff alleges that Governor Cuomo, Former Commissioner Fischer, and Superintendent D'Amico violated RLUIPA and the Free Exercise Clause by failing to hire a Hindu chaplain and failing to provide him with a special Hindu diet. (Compl.5–6.) As Defendants point out (Def.Br.6–7), Plaintiff does nothing more in his Complaint than name these individuals, reference their job titles, make conclusory allegations that they failed to provide him a Hindu chaplain and diet, and attach letters he sent them complaining about the lack of a Hindu chaplain. (*See* Compl. 5–6, 22; Dkt. # 2–2 at 22–24.) Receipt by these officials of letters of complaint, even if true, is simply not enough to establish personal involvement. *See Dilworth,* 2011 WL 3501869, at *19. [9] Plaintiff's claims against these Defendants are apparently predicated entirely upon their positions of authority within New York State. Accordingly, Plaintiff's religious deprivation claims against Governor Cuomo, Former Commissioner Fischer, and Superintendent D'Amico are dismissed.

[9]      At least one letter attached to the Complaint indicates that former Commissioner Fischer referred Plaintiff's letter to the appropriate official for handling. (*See, e.g.,* Dkt. # 2–2 at 18). Referring an inmate's complaint to the appropriate staff is not enough to establish personal involvement. *See Vann,* 2014 WL 4188077, at *7.

### iii. Superintendents Perez, Rock, Racette, Graham, LaValley, and Director Morris

**\*11** Plaintiff also alleges that Superintendents Perez, Rock, Racette, Graham, LaValley, and Director Morris violated RLUIPA and the Free Exercise Clause by failing to hire a Hindu chaplain and failing to provide him with a special Hindu diet. (Compl.5–6.) As with the other Defendants, Plaintiff does not include any specific factual allegations against these Defendants; he simply provides their names and titles and alleges they failed to hire a Hindu chaplain or provide him with a special diet. Claiming that these individuals are in the chain-of-command in the prison hierarchy is not enough to allege personal involvement. *See Colon,* 58 F.3d at 874. Plaintiff further attaches letters and grievance determinations to the Complaint; these attachments purport to demonstrate that these Defendants were copied on correspondence complaining about the lack of Hindu chaplain or that they reviewed Plaintiff's grievances. Significantly, however, alleging that these Defendants received and reviewed letters and grievances, or even that they denied the relief sought in grievances, is not enough to plead their personal involvement. Accordingly, Plaintiff's religious deprivation claims against Superintendents Perez, Rock, Racette, Graham, LaValley, and Director Morris are dismissed.

### d. Plaintiff Has Failed to State a Claim for Religious Deprivation

Plaintiff's Complaint is dismissed solely on the ground that he has failed to allege any personal involvement by Defendants. However, because Plaintiff is *pro se,* because his claims are dismissed without prejudice (except where specified), and because Plaintiff's claims as-pleaded are wholly inadequate, the Court will address the substance of Plaintiff's religious deprivation claims as well. Plaintiff does not adequately allege any facts that demonstrate that his ability to practice his religion has been unlawfully burdened by the failure of DOCCS to hire a Hindu chaplain or provide him a special religious diet.

### i. Plaintiff's Claims Regarding the Failure to Hire a Hindu Chaplain Are Deficient

Plaintiff's claims regarding religious discrimination are vague and conclusory. Plaintiff simply repeats in his Complaint that his "freedom of religion" has been "violated," that he has been subject to "religious discrimination," that there have been "important Holy Days and Rituals that [he] could not properly observe" due to religious discrimination, that Defendants have "disregard[ed][his] religious needs [and] religious rites," and that they have failed "to accommodate [him] religiously." (Compl.5–6). Plaintiff's opposition to Defendants' pre-motion letter is no better, incanting repeatedly the legal conclusion that his practice of religion has been substantially burdened. (Pl.Opp.1–2, 4).

The operative Complaint does not allege any facts that "nudge [Plaintiff's] claims across the line from conceivable to plausible." *In re Elevator Antitrust Litig.,* 502 F.3d at 50. Plaintiff makes no showing regarding how contact with Hindu advisors is "central or important" to the practice of his faith, necessary to sustain a Free Exercise claim. *Rossi v. Fishcer,* No. 13 Civ. 3167(PKC)(DF), 2015 WL 769551, at *10 (S.D.N.Y. Feb. 24, 2015) (dismissing free exercise claim based on lack of access

to advisors.) Nor does he explain how not having a Hindu advisor impermissibly burdens his practice of his religion. He claims his religious "needs" and "rites" have been disregarded, and that he has not been able to "properly" observe religious holidays. (Compl.6). But Plaintiff does not identify any specific needs, rites, or holidays; nor does he allege the facts of any occasion when any Defendant has actually interfered with the practice of his religion. Plaintiff simply complains that it is "religious discrimination" that DOCCS "provide[s] chaplains for Muslims, Jews, Catholics, Christians, Protestant[s], [and] Nation of Islam," but not for his religion, "which is an equally large religion." (Compl.6). These conclusory allegations are not enough to state a claim under the First Amendment or RLUIPA. [10]

[10]    Determining whether a challenged policy is reasonably related to a legitimate penological interest is a fact-laden inquiry that is generally ill-suited for resolution on a motion to dismiss. *See Ford, 352 F.3d at 596* (declining to determine whether defendants' conduct was reasonably related to legitimate penological interests on motion to dismiss because "the record [was] insufficient to resolve this fact—and context—specific dispute"). On this motion to dismiss, the Court declines to assess whether there is a "valid, rational connection" between Defendants' actions and their purported concerns. *See Turner, 482 U.S. at 89.*

   The Court notes, however, that Defendants advance strong arguments based on the record in this case, which is more voluminous than is typical on a motion to dismiss due to the number of documents Plaintiff attached to his Complaint. (Def.Br.11). Specifically, as Defendants argue, letters Plaintiff attached to his complaint strongly support that because so few inmates are Hindu—comprising less than one percent of the DOCCS prison population—it was not fiscally justifiable to employ a Hindu chaplain on staff. (*See* Dkt. # 2–2 at 18, # 2–11 at 13). The Court may revisit Defendants' arguments if further motion practice ensues.

### ii. Plaintiff's Claims Regarding the Failure to Provide a Special Religious Diet Are Deficient

**\*12**  Plaintiff also fails to state a claim as it concerns his diet. It is true that it has long been established that "prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson, 527 F.2d 492, 495 (2d Cir.1975);*

*see also McEachin, 357 F.3d at 203* ("[C]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights."). But Plaintiff again only makes conclusory allegations: he claims that the food that DOCCS provides is "not in accordance with my religious beliefs and religious diet," and that they have failed to accommodate his "dietary needs in accordance with [his] religion." (Compl.5–6). Plaintiff's opposition to Defendants' pre-motion letter does not fill in any detail; it simply claims, "For all food served in messhall, as well as[ ] sold in commissary, doesn't comply nor fall within the criteria for practicing Hinduism. Therefore, Plaintiff is forced to eat food that goes against his religious diet and belief." (Pl.Opp.2). Plaintiff does not allege what a Hindu diet is, or identify how the meals he is provided are not compatible with that diet.

Moreover, during the July 29, 2014 conference, Plaintiff suggested that his discontent with his prison diet stemmed not from the dictates of his religion, but from the fact that in accommodating his religious diet the facility often substituted animal proteins with soy protein, which is something Plaintiff does not personally eat. (July 29, 2014 Tr. 11–12). The Court cautions Plaintiff that DOCCS is under no obligation to accommodate his personal dietary preferences; it only must accommodate diets dictated by his practice of his religion. *See Kahane, 527 F.2d at 496* (holding that a prison was required to provide an orthodox Jewish rabbi with a diet that maintained his good health and did not violate Jewish dietary laws, but refusing to mandate any specific food item or method for fulfilling this order, as "[s]uch details are best left to the prison's management which can provide from the food supplies available within budgetary limitations"); *see also Rossi, 2015 WL 769551, at \*9* (finding plaintiff did not plausibly allege Free Exercise Clause claim where he did not allege that holy day meals were inconsistent with religious beliefs or explain how adding certain items to the meals was "central or important" to his religion).

### D. Plaintiff's Retaliation Claims Are Dismissed

Finally, Plaintiff alleges that Defendants retaliated against him for filing grievances by denying him needed medical care and otherwise subjecting him to "harassment, threats, [and] retaliation ." (Compl.9). To establish a First Amendment claim of retaliation, a plaintiff must show: "[i] that the speech or conduct at issue was protected,

[ii] that the defendant took adverse action against the plaintiff, and [iii] that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009) (citation omitted). In the prison context, "only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Wrobel v. County of Erie,* 692 F.3d 22, 31 (2d Cir.2012) (citation omitted). "Otherwise the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citation omitted); *see also Wrobel,* 692 F.3d at 31.

**\*13** When considering a prisoner's retaliation claims, the court must bear in mind that "prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Davis,* 320 F.3d at 353 (citation omitted). Since it is "near[ly] inevitabl[e]" that "prisoners will take exception" with the decisions of prison officials, and given "the ease with which claims of retaliation may be fabricated," the Second Circuit has cautioned that prisoners' retaliation claims must be "examin[ed] ... with skepticism and particular care." *Colon,* 58 F.3d at 872; *see also Davis,* 320 F.3d at 352. "To survive a motion to dismiss, such claims must be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Friedl v. City of New York,* 210 F.3d 79, 85–86 (2d Cir.2000) (citation omitted).

Although Plaintiff has satisfied the first prong of a retaliation claim—the First Amendment protects prisoners from retaliation for the filing of grievances and lawsuits, *Davis,* 320 F.3d at 352–53—his claims are stated in "wholly conclusory terms," *Friedl,* 210 F.3d at 86, and must be dismissed. With regards to "all defendants," Plaintiff alleges they violated his rights "in many ways as to harassment, threats, retaliation, false misbehavior reports, messing with legal mail and reg[ular] mail, moving around from one floor to other then moving me from facility to facility creating undue hardship as well as to my family and love[d] ones too with all the games by these defendants." (Compl.9). As Defendants argue (Def.Br.13), this claim must be dismissed because even under the most liberal reading of the Complaint, Plaintiff's allegations are wholly conclusory and lacking in facts sufficient to connect each Defendant to a retaliatory action. *See Dove v. Fordham Univ.,* 56 F.Supp.2d 330, 335 (S.D.N.Y.1999) (dismissing complaint where plaintiff

named defendants in caption but body of complaint contained no allegations explaining how defendants violated the law or injured plaintiff), *aff'd sub nom. Dove v. O'Hare,* 210 F.3d 354 (2d Cir.2000); *see also Kasiem v. Rivera,* No. 09 Civ. 9665(DLC), 2011 WL 166929, at *6 (S.D.N.Y. Jan. 18, 2011) (dismissing as too conclusory allegations that defendants made false reports and made death threats "solely on the basis of retaliatory reprisal").

In alleging his retaliation claims, Plaintiff does specifically name Defendants Dr. Adams, C.O. Hayes, Sgt. Hutti, and Superintendent LaValley. (Compl.8). Even so, Plaintiff's allegations against these Defendants are far too conclusory to state a claim. He alleges they retaliated by issuing him two "false tickets" and engaging in the "biggest set up" to have him transferred from the Clinton Correctional Facility. (*Id.*). Plaintiff does not specify who issued these "false tickets" or which grievances these allegedly retaliatory actions were in response to; he does not state what acts each of these Defendants took in retaliation; and he does not establish any time frame that might permit an inference of a causal connection. *See Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001) (finding that failure to set forth a time frame for the alleged events precludes inference of a causal relationship for purposes of retaliation claim), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508 (2002). Plaintiff has not pleaded enough facts to state a claim for retaliation. His retaliation claims are therefore dismissed without prejudice.

## CONCLUSION

**\*14** For the foregoing reasons, the Complaint is dismissed in its entirety. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

Should Plaintiff wish to attempt to re-plead those claims that were dismissed without prejudice, he may submit an amended complaint in accordance with this Opinion on or before **August 10, 2015,** and this case will be reopened. Plaintiff is cautioned that if submits an amended complaint that does not address—and rectify—the deficiencies discussed in this Opinion, some or all of his claims may be dismissed with prejudice.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3604242

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 22170610
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Andrew WILLIAMS, Plaintiff,

v.

Brian FISHER, Joseph Smith, John Perilli,
Kimberley Capuano, Phillip Williams,
Thomas Eagan, John MacNamara, Robert
Krusen, John Clark, Enrique Maldonado,
Melvin Goffe and Mr. Abraham, Defendants.

No. 02 Civ. 4558(LMM).
|
Sept. 18, 2003.

**Synopsis**

Prison defendants moved to dismiss prisoner's civil rights action alleging deliberate indifference to a serious medical condition and retaliation. The District Court, McKenna, J., held that: (1) prisoner adequately pled a claim of deliberate indifference to a serious medical condition against members of prison's security personnel; (2) allegations that a prison official failed to follow the orders of outside specialists and prison doctors were sufficient to satisfy the deliberate indifference standard of Eighth Amendment; (3) no section 1983 claim was stated against prison supervisory official since prisoner's allegations were conclusory in nature and failed to show how official was personally involved in the alleged constitutional violation; (4) prisoner stated valid claim of retaliation based on allegations that prison doctor revoked his necessary medical rehabilitative treatment because he filed a grievance against prison security personnel; and (5) qualified immunity would not shield prison defendants from § 1983 liability for deliberate indifference to prisoner's serious medical condition.

Motion granted as to one supervisory official and denied as to remaining defendants.

West Headnotes (8)

**[1]      Civil Rights**
    🔑 Prisons and Jails;Probation and Parole

Prisoner adequately pled a claim of deliberate indifference to a serious medical condition against members of prison's security personnel where he alleged that they deliberately denied and/or delayed the express instructions and orders of various outside orthopedic specialists and prison doctors. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[2]      Civil Rights**
    🔑 Prisons and Jails;Probation and Parole

Prisoner adequately pled a claim of deliberate indifference to a serious medical condition against prison physician's assistant where he alleged that assistant failed to follow a doctor's prescribed orders. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[3]      Civil Rights**
    🔑 Prisons and Jails;Probation and Parole

Prisoner adequately pled a claim of deliberate indifference to a serious medical condition against corrections officer who allegedly disregarded prisoner's medical elevator pass as well as the instructions of prisoner's physical therapist. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[4]      Prisons**
    🔑 Particular Conditions and Treatments

**Sentencing and Punishment**
    🔑 Medical Care and Treatment

Allegations that a prison official failed to follow the orders of outside specialists and prison doctors were sufficient to satisfy the deliberate indifference standard of Eighth Amendment. U.S.C.A. Const.Amend. 8.

1 Cases that cite this headnote

**[5]      Civil Rights**

👉 Prisons and Jails;Probation and Parole

No § 1983 claim was stated against prison supervisory official since prisoner's allegations were conclusory in nature and failed to show how official was personally involved in the alleged constitutional violation resulting from failure to honor prisoner's medical passes; only allegation regarding the actions of supervisory official was that he wrote general memoranda to the prison staff concerning the creation of unofficial policies and the honoring of inmate medical passes, and there were no allegations that supervisory official himself was aware of prisoner's personal claims. 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

**[6]    Civil Rights**

👉 Prisons and Jails;Probation and Parole

Prisoner's allegations stated § 1983 claim against prison supervisory official since prisoner sufficiently alleged personal involvement of official in the alleged constitutional violation resulting from failure to honor prisoner's medical passes and failure to follow the orders of outside specialists and prison doctors; official allegedly investigated prisoner's grievance against the members of security personnel and responded in their favor, and changed or tried to change the orders of prison doctor, the outside orthopedic specialists and several of the physical therapists. 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

**[7]    Civil Rights**

👉 Prisons and Jails;Probation and Parole

Prisoner stated valid claim of retaliation under § 1983 based on allegations that prison doctor revoked his necessary medical rehabilitative treatment because he filed a grievance against prison security personnel; allegations showed a causal connection between the constitutionally protected activity of filing a grievance and the adverse action. 42 U.S.C.A. § 1983.

8 Cases that cite this headnote

**[8]    Civil Rights**

👉 Prisons, Jails, and Their Officers;Parole and Probation Officers

Qualified immunity would not shield prison defendants from § 1983 liability for deliberate indifference to prisoner's serious medical condition. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

---

*MEMORANDUM AND ORDER*

MCKENNA, J.

**\*1**   Andrew Williams ("Plaintiff") an inmate at Sing Sing Correctional Facility ("Sing Sing"), brings this pro se civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Brian Fisher (Superintendent), Joseph Smith (First Deputy Superintendent), John Perilli (Facility Heath Service Director), Kimberly Capuano (Nurse Administrator), Phillip Williams (Physicians Assistant), Thomas Eagan (Grievance Director), John MacNamara (Sergeant), Robert Krusen (Sergeant), John Clark (Corrections Officer), Enrique Maldonado (Corrections Officer), Melvin Goffe (Corrections Officer) and Mr. Abraham (Physical Therapist) for reckless and deliberate indifference to his serious medical needs in violation of his constitutional rights under the Eighth Amendment. Plaintiff seeks injunctive relief as well as compensatory and punitive damages from each of the named Defendants.

Defendants filed a motion to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on the grounds that: (1) Plaintiff has failed to state a claim against all Defendants of deliberate indifference to serious medical needs upon which relief can be granted; (2) Plaintiff has failed to allege the personal involvement of Defendants Fisher and Eagan in the alleged constitutional violation; (3) Plaintiff has failed to establish a claim of retaliation against Defendant Perilli; and 4) all Defendants are entitled to qualified immunity.

Williams v. Goord, Not Reported in F.Supp.2d (2003)
2003 WL 22170610
Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 164 of 237

Statement of Facts [1]

[1]  The facts set forth below were taken from Plaintiff's Amended Complaint and Memorandum of Law in Reply to The Defendants' Motion to Dismiss the Complaint ("Pl.Opp.Br."). Ordinarily, " 'a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of pro se litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." ' *Burgess v. Goord,* No. 98 Civ.2077, 1999 U.S. Dist LEXIS 611, at *2 n. 1 (S.D.N.Y. Jan. 26, 1999) (quoting *Gadson v. Goord,* No. 96 Civ. 7455, 1997 U.S. Dist. LEXIS 18131, at *2 n. 2 (S.D.N.Y. Nov. 17, 1997); *see also Johnson v. Wright,* 234 F.Supp.2d 352, 356 (S.D.N.Y.2002) (considering pro se prisoner's factual allegations in brief as supplementing the complaint when ruling on a motion to dismiss), *Thompson v. State of N.Y.,* No. 99 Civ. 9875, 2001 U.S. Dist. LEXIS 9450, at *4 n. 1 (S.D.N.Y. Mar. 15, 2001)(relying on pro se plaintiff's factual allegations included in his memorandum of law as well as the facts alleged in his complaint).

On September 12, 1996 Plaintiff fell down a flight of stairs injuring his back. (Am. Compl. at 1). On January 25, 1997 an MRI was taken of Plaintiff's lumbar spine and the results revealed that Plaintiff had a central and bilateral disc herniation of the L5-S1, slightly larger on the left which reaches the SAC and the S1 nerve root. (*Id.* at 1-2). The MRI also revealed that at L4-5 there was a left foraminal and extra-foraminal disc herniation compromising the left nerve root. (*Id.* at 2). In addition to the disc herniation, Plaintiff also suffers from degenerative disc disease and hip bursitis. (*Id.*)

In December 1997, Plaintiff underwent surgery for his spinal injuries. (*Id.*) The surgery relieved the needle sensation Plaintiff had been experiencing, but Plaintiff continued to suffer from: (a) pain and spasms of the lumbosacral spine; (b) radiation of pain and spasms from the lumbar spine and hip down to the left leg and foot; (c) radiation of pain and spasms from the thoracic spine; and (d) pain radiating down his left arm causing numbness and needle sensation to his left thumb. (*Id.*) In addition, prior to the surgery Plaintiff was diagnosed with cervical spine herniation which occasionally causes him problems. (*Id.*) Due to his back injuries, Plaintiff has difficulty bending and twisting, is unable to move or lift heavy objects, and is unable to sit or stand for long periods of time. (*Id.*)

Plaintiff was referred to an outside orthopedic specialist, Dr. Galeno, and his assistant, at St. Agnes Hospital for treatment. (*Id.*) Dr. Galeno ordered or recommended that Plaintiff receive daily hot morning showers as part of a home therapeutic program to reduce pain and spasms and to facilitate bending and stretching. (*Id.*) The reason "morning" showers were ordered was because this is the time of day Plaintiff is in the most pain and has the greatest difficulty functioning. (Pl. Opp. Br. at 3). The same daily morning heat treatment was ordered or recommended by Dr. Holder, another physician at St. Agnes Hospital, as well as by several physical therapists. (Am. Compl. at 2).

**\*2**  On April 30, 1999, Plaintiff was issued his first medical pass to receive daily morning heat treatment, by Dr. Lofton, the former Facility Health Service Director at Sing Sing. (*Id.*) Dr. Lofton approved the treatment program on three additional occasions from July 8, 1999-September 14, 1999. (*Id.*) Subsequently, when Dr. Perilli took over as the Facility Heath Service Director at Sing Sing, he also approved the daily morning heat treatment on four separate occasions from November 16, 1999-August 5, 2000. (*Id.*)

Defendants Goffe, Maldonado, Krusen, [2] MacNamara and Smith

[2]  Housing Sergeant Robert Krusen has been named as a Defendant in the caption of the Amended Complaint and is discussed therein. However, Defendants' contend that he has not been served with the summons and Amended Complaint or requested representation pursuant to Public Officers Law § 17. *See* Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint at 1 n.1 ("Def.Mem."). However, Plaintiff has provided an acknowledgment of receipt of summons and complaint signed by Sergeant Robert Krusen. Because Defendant Krusen is similarly situated to Defendants Goffe, Maldonado, MacNamara and Smith, the Court has presumed that the same arguments contained in Defendants' motion to dismiss would have been made on his behalf had he sought representation. Accordingly, the Court has addressed the claims asserted against Defendant Krusen in its Memorandum and Order.

Williams v. Smith, Not Reported in F.Supp.2d (2003)
Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 165 of 237
2003 WL 22170610

Plaintiff alleges that members of the prison's personnel, specifically Defendants Goffe, Maldonado, Krusen, MacNamara and Smith, repeatedly refused to comply with his medical passes denying him his daily morning heat treatment in violation of his constitutional rights. (*Id.*) Plaintiff states that he first presented his medical pass to Galley Officers Goffe and Maldonado in April of 1999. (*Id.*) These Officers told Plaintiff that he could not have his daily morning heat treatment because there was a block policy requiring inmate showers be given only on the 3 p.m. to 11 p.m. shift. [3] (*Id.*)

[3]    Plaintiff asserts that he was already entitled to receive a 10 minute shower during the 3 p.m.-11 p.m. shift as treatment for a chronic skin disorder. (Pl. Opp. Br. at 7). Plaintiff claims that he was denied his morning shower because Defendants did not want to give him two showers a day. (*Id.*) Additionally, Plaintiff claims that there was no such block policy prohibiting morning showers, and if there was, it was unofficial. (*Id.*)

After Officers Goffe and Maldonado refused to honor Plaintiff's medical pass for morning showers, Plaintiff raised the issue with Defendants Krusen and MacNamara. (*Id.* at 2-3) They both concurred with the Galley Officers that the existing block policy allowed inmate showers only during the 3 p.m. to 11 p.m. shift. (*Id.*) Subsequently, Plaintiff filed a grievance with Sing Sing's grievance committee regarding Defendants' noncompliance with his medical pass for daily morning heat treatment. (*Id.* at 3.)

In response to Plaintiff's grievance, Defendant Eagan, a director at the central review committee in Albany, called Sing Sing to conduct an investigation. (*Id.*) Defendants Krusen and MacNamara communicated the existing block policy regarding inmate showers to Defendant Eagan. (*Id.*) Eagan also spoke with Defendant Smith, who communicated the same information concerning the block policy, and who additionally stated that there was no medical determination as to why Plaintiff needed morning showers. (*Id.*) Consequently, Eagan denied Plaintiff's grievance, stating that there was no requirement for Plaintiff to receive a morning daily shower and that what the doctor meant by "AM" was during the day and not a specific time. (*Id.* (citing grievance no: 30163-99)). Plaintiff asserts that Dr. Perilli and Dr. Halko (treating physician) specifically wrote "AM only (morning)" on the order to clarify that morning showers were necessary.

(*Id.*) Additionally, Plaintiff asserts that his medical records clearly indicate the reason, time and purpose for the treatment. (*Id.*)

In addition to the medical pass for daily morning heat treatment, Plaintiff was also issued bus, elevator, cane, flats and feed-up passes. (*Id.* at 5). At the same time Plaintiff presented his daily morning heat treatment pass to Goffe and Maldonado, Plaintiff also presented his feed-up and flats pass. [4] (*Id.*) While Defendants Goffe and Maldonado refused to honor Plaintiff's pass for daily morning heat treatment, they told him they would work on his feed-up and flats passes. (*Id.*)

[4]    Apparently, a feed-up pass allows an inmate to be fed his meals in his cell and a flats pass allows an inmate to be transferred to the first floor of the prison. At that time, Plaintiff resided on the fourth floor.

**\*3** The feed-up pass was honored about a month and a half after it was issued. (*Id.* at 5) However, it took approximately eighteen months to move Plaintiff to the flats, despite the fact that Plaintiff received flats passes every two to three months and made several requests to Defendants Goffe, Maldonado and Krusen. (*Id.* at 5-6). Plaintiff claims that when he continued to ask to be moved to the flats, Defendants Goffe and Maldonado told him, "the more you ask the longer you will wait." (Pl. Opp. Br. at 5). Plaintiff was finally moved to the flats in October of 2000. (Am. Compl. at 4). Plaintiff was told by Defendant Krusen that there had been a delay because all of the cells on the flats were occupied. (*Id.* at 6). However, Plaintiff asserts that other prisoners were being moved to the flats daily. (Pl. Opp. Br. at 5). Plaintiff claims that the Officers and Sergeants' acted with deliberate indifference to Plaintiff's serious medical condition by denying him his daily morning heat treatment and delaying his move to the flats. (Am. Compl. at 6).

**Defendant Perilli**

From November 16, 1999-August 5, 2000, Dr. Perilli and Dr. Halko approved Plaintiff's recommended daily morning heat treatment on four separate occasions. (*Id.* at 2). After Plaintiff filed a grievance against members of security for refusing to comply with his medical pass, a meeting was held with Dr. Perilli and members of security. [5] (*Id.* at 3). After discovering Plaintiff had filed a grievance against these individuals, Dr. Perilli became reluctant to continue ordering the treatment, despite the

fact that he had been issuing Plaintiff his medical passes for almost a year. (*Id.*) Plaintiff claims that Dr. Perilli told him that the security staff wanted him to reduce the number of medical passes issued to the inmate population and that he was revoking Plaintiff's medical pass to comply with the security personnel's protocol. (*Id.*) After Dr. Perilli rescinded Plaintiff's medical pass, Plaintiff filed a grievance against him. (*Id.*) This grievance was denied by Defendant Fisher and the central review committee in Albany. (*Id.* (citing grievance no: 33781)).

[5]     Plaintiff alleges that subsequent to this meeting, after discovering that Plaintiff had filed a grievance, Dr. Perilli revoked Plaintiff's medical pass. (Am. Compl. at 3). Although it is unclear in exactly what time frame these events occurred, the court is obligated to construe Plaintiff's complaint liberally in a light most favorable to the plaintiff. Therefore, for the purpose of deciding Defendants' motion to dismiss, the Court presumes all these events unfolded around the same time period.

In October of 2000, Plaintiff was moved to the flats where he received his daily morning heat treatment for one month. (*Id.* at 4). After receiving the treatment, Plaintiff's condition improved. (*Id.* at 5 (citing Plaintiff's medical chart dated 11/3/00)). On November 20, 2000 and May 1, 2001, Dr. Perilli noted in Plaintiff's medical chart that there was no medical indication for the daily morning heat treatment and that the outside specialist's orders or recommendations were simply received by him for appreciation.[6] (*Id.* at 3). Plaintiff's pass was revoked despite the fact that Plaintiff's condition had improved after receiving the daily morning heat treatment for one month. (*Id.* at 4). Plaintiff claims that Dr. Perilli's revocation of Plaintiff's medical pass was deliberately indifferent to Plaintiff's serious medical condition and was done in retaliation for Plaintiff filing a grievance against members of security.

[6]     There is a discrepancy between Plaintiff's claims that Dr. Perilli wrote in his medical chart on November 20, 2000 and May 1, 2000 that there was no medical indication for the treatment and the assertions on page 2 of the Amended Complaint that Dr. Perilli approved the heat treatment on various occasions up until August 5, 2000. For purposes of Defendants' motion to dismiss, the Court presumes Plaintiff made a typographical error and meant to write that Dr.

Perilli made these entries to his medical chart on November 20, 2000 and May 1, 2001.

**Defendant Williams**
**\*4** On March 31, 2000, Dr. Halko wrote a prescription for plaintiff to receive his daily morning heat treatment. (*Id.* at 5). Plaintiff asserts that the physicians assistant, Defendant Williams, cancelled Dr. Halko's order and wrote "not indicated." (*Id.*) Plaintiff asserts Defendant Williams acted with deliberate indifference to Plaintiff's serious medical needs.

**Defendant Clark**
On or about April 15, 2000, Plaintiff began receiving physical therapy for his back injuries at Fishkill Correctional Facility ("Fishkill"). (*Id.* at 6). On one occasion, Plaintiff arrived at Fishkill and the escorting Officer, Defendant Clark, informed Plaintiff that he had to walk up six flights of stairs to the treatment unit because the elevator was out of service. (*Id.*) Plaintiff walked up the stairs with difficulty and while waiting on the medical unit to be called, Plaintiff viewed people exiting the elevator. (*Id.*) Plaintiff and the transportation officers inquired about the functioning of the elevator and realized Officer Clark's statement concerning the elevator was false. (*Id.*) Plaintiff brought this issue to the attention of his physical therapist, Mr. Karlo, who at the end of the therapy session requested Defendant Clark use the elevator to transport the Plaintiff back down the stairs. (*Id.*) At this time, Plaintiff also presented his Sing Sing medical elevator pass to Defendant Clark. (*Id.*)

Despite Mr. Karlo's request and Plaintiff's medical elevator pass, which Officer Clark stated was not valid at Fishkill, Plaintiff was not allowed to take the elevator and had to walk down the six flights of stairs. (*Id.* at 7). Transportation Officers Brown and McCall issued reports concerning the incident.[7] (*Id.* (citing To-Forms, grievance no: 31413)). Despite Plaintiff's difficulty with the stairs, the medical staff at Sing Sing continued to send him to Fishkill for therapy. (*Id.*) However, after a brief period of time Plaintiff had to stop attending the therapy sessions because he was unable to climb the stairs.[8] (*Id.* (citing medical chart dated 12/18/00 and 12/19/00)).

[7]     Prior to this incident, Officer Clark made Plaintiff walk up the stairs on several occasions, but Plaintiff

Williams v. Fisher, Not Reported in F.Supp.2d (2003)
Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 167 of 237

2003 WL 22170610

was unaware that the elevator was functioning. Am. Compl. at 7.

8      Between the time Plaintiff stopped going to therapy at Fishkill and prior to the new hospital opening at Fishkill, Plaintiff briefly attended physical therapy sessions at Greenhaven Correctional Facility.

Plaintiff asserts that Defendant Clark's refusal to comply with the physical therapist's order to use the elevator and his refusal to honor Plaintiff's elevator pass demonstrated reckless and deliberate indifference to Plaintiff's serious medical needs.

### Defendant Abraham [9]

9      Mr. Abraham has been named in the caption of the Amended Complaint and discussed therein, but apparently he has not been served with the summons and Amended Complaint. (Def. Mem. at 1 n.1.) Further, the Plaintiff has not provided any proof that service of process has been accomplished. Therefore, while the allegations concerning Mr. Abraham's actions are discussed in the statement of facts, he is not addressed by Defendants' motion to dismiss and therefore, not addressed by this Memorandum and Order.

Upon returning to Fishkill for therapy, Plaintiff began seeing the new physical therapist, Mr. Abraham. (*Id.* at 7). Plaintiff noticed changes had taken place at the hospital and although prescribed, Plaintiff was no longer allowed to use the exercise machines, practice stretching techniques or receive massages. (*Id.*) Plaintiff alleges that he informed Dr. Halko and Dr. Galeno of the changes in his therapy program and they both reiterated to Plaintiff that he should be able to use the machines, practice the exercise techniques and receive massages. (*Id.*) Plaintiff claims that when he relayed this information to Mr. Abraham, Mr. Abraham stated that he did not touch inmates and that the only treatment given at Fishkill was heat and electric shock. (*Id.*) Because Mr. Abraham refused to comply with the outside orthopedic specialist's recommendations, Plaintiff filed a grievance against him. (*Id.* at 7-8).

**\*5**  Plaintiff asserts that Mr. Abraham demonstrated reckless and deliberate indifference to Plaintiff's serious medical needs by: (1) not complying with the outside orthopedic specialist's recommendations, (2) refusing to massage Plaintiff according to doctor's orders, (3) not allowing Plaintiff to practice any muscle strengthening

exercises, and (4) not allowing Plaintiff to use the muscle strengthening machines. Moreover, according to Plaintiff, Mr. Abraham did not instruct him in any rehabilitative treatment. (*Id.* at 8).

### Defendants Eagan and Capuano

Plaintiff alleges that in September of 1999 he filed a grievance against various members of Sing Sing's security personnel for their noncompliance with the medical passes he had been issued for daily morning heat treatment. (*Id.* at 4). Defendant Eagan, a member of the central review committee in Albany, called Sing Sing to investigate Plaintiff's grievance. (*Id.*) According to Plaintiff's medical chart dated December 23, 1999, Nurse Administrator Capuano told Eagan that Plaintiff did not need the recommended daily morning heat treatment. (*Id.*)

Eagan answered Plaintiff's grievance stating that there was no requirement for Plaintiff to receive the daily morning heat treatment and that "it [was] noted that the grievant's medical records now indicate that the heat treatment can be given at any time." (*Id.*) Plaintiff also alleges that Defendants Capuano and Eagan actually changed or tried to change the orders of Dr. Halko, the outside orthopedic specialists, and several other physical therapists. (*Id.*)

Pursuant to the investigation of Plaintiff's grievance against Defendant Abraham, Plaintiff claims that Defendant Capuano told the grievance committee that the orthopedic specialist recommended only heat and muscle strengthening. (*Id.* at 8). However, Plaintiff asserts that the outside orthopedic specialist specifically recommended "physical therapy with heat, massages and muscle strengthening exercises." (*Id.*) Plaintiff claims that Defendant Capuano intentionally gave inaccurate information to the grievance committee to undermine Plaintiff's treatment. (*Id.*) Plaintiff further alleges that he submitted a Freedom of Information Law ("FOIL") request to Defendant Capuano to have his medical records presented at the grievance hearing, but the records were withheld. (*Id.*) Consequently, Plaintiff filed a grievance against Defendant Capuano for noncompliance with Plaintiff's FOIL request. (*Id.* (citing grievance no: 35831-02)). Plaintiff asserts that the withholding of Plaintiff's medical records prevented the grievance department from making an accurate assessment concerning Plaintiff's treatment.

**Defendant Fisher**

Plaintiff alleges that there have been ongoing problems at Sing Sing with prison officials devising their own rules and not following the institution's policies and procedures. (Pl. Opp. Br. at 9). In response to inmate complaints, Defendant Fisher issued several memoranda instructing employees to discontinue this practice. (*Id.*) Plaintiff claims that after he filed a grievance against the security personnel for noncompliance with his medical passes, Defendant Fisher was put on notice of the alleged constitutional violations through an appeal process, but he failed to remedy the situation. (*Id.*) Additionally, Plaintiff alleges that Defendant Fisher failed to supervise subordinates. (*Id.*)

**Injury**

**\*6** Plaintiff claims that he continues to suffer from pain and spasms of the thoracic and lumbar spine. (Am. Comp. at 8). The pain Plaintiff suffers in his lower scrapula, hip, left foot, left arm and left thumb are new developments. (*Id.*) On June 11, 2001, a second MRI was taken of Plaintiff's lumbar spine which showed a herniated disc in Plaintiff's left foramen of L4-5 that was not indicated on the previous MRI taken in 2000. (*Id.* at 8-9). Plaintiff no longer has to climb stairs to receive therapy and he has been moved to the flats, although it took a year and a half for prison officials to accomplish the move. (*Id.* at 9). Plaintiff still is not receiving the recommended daily morning heat treatment as part of his home therapeutic program. (*Id.*)

**Legal Standard**

On a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), the court must accept as true all allegations set forth in the complaint and draw all positive inferences in favor of the pleader. *See Johnson v. Wright,* 234 F.Supp.2d 352, 358 (S.D.N.Y.2002). A case should be dismissed only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "At the Rule 12(b)(6) stage, 'the issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on

the face of the pleading that a recovery is very remote and unlikely but that is not the test." ' *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000) (quoting *Chance,* 143 F.3d at 701). Furthermore, since the Plaintiff is proceeding pro se his submissions should be judged on a more lenient standard than that accorded to formal pleadings drafted by lawyers. *See Johnson,* 234 F.Supp.2d at 359 (" 'Since most pro se plaintiffs lack familiarity with the formalities of pleading requirements, [a court] must construe pro se complaints liberally, applying a more flexible standard to evaluate their sufficiency." ' (quoting *Lerman v. Bd. of Elections,* 232 F.3d 135, 139-49 (2d Cir.2000)); *see also McNeil v. United States,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993).

**Discussion**

A plaintiff has a civil cause of action under § 1983 against:

> Every person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.

42 U.S.C. § 1983.

Plaintiff brings this action under § 1983 alleging Defendants acted with deliberate indifference to his serious medical needs in violation of his rights under the Eighth Amendment.

**I. Deliberate Indifference**

**\*7** The Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes, which includes punishments that "involve

the unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' prescribed by the Eighth Amendment" and "states a cause of action under § 1983." *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (citation omitted). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care, or intentionally interfering with the treatment once prescribed." *Id* . The Second Circuit has interpreted the deliberate indifference standard to consist of both an objective and subjective prong. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

### 1. *Serious Medical Need*

Under the objective prong of the deliberate indifference standard, the alleged deprivation must be sufficiently serious, "a condition of urgency, one that may produce death, degeneration or extreme pain." *Chance,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). At this time, for the purpose of Defendants' motion to dismiss, Defendants do not dispute that Plaintiff has pled an objectively serious injury. (Def. Mem. at 9). Therefore, the only question is whether Plaintiff has satisfied the subjective prong of the deliberate indifference analysis.

### 2. *Defendants' State of Mind*

Under the subjective prong, an official must act with a " 'sufficiently culpable state of mind' in depriving the prisoner of adequate medical treatment. *Johnson,* 234 F.Supp.2d at 360 (quoting *Hathaway,* 99 F.3d at 553). "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Therefore, "the subjective element of deliberate indifference entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge

that harm will result." *Hathaway,* 99 F.3d at 553 (quoting *Farmer,* 511 U.S. at 835).

Allegations that prison officials denied or delayed recommended treatment by medical professionals may be sufficient to satisfy the deliberate indifference standard. *See Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) ("Prison officials are more than merely negligent if they deliberately defy the express instructions of a prisoner's doctor."); *see also Johnson,* 234 F.Supp.2d at 361 ("Prison officials may not 'substitute their judgments for a medical professional's prescription." ') (quoting *Zentmyer v. Kendall County,* 220 F.3d 805, 812 (7th Cir.2000)); *Wandell v. Koenigsmann,* No. 99 Civ. 8652, 2000 U.S. Dist. LEXIS 10466, at *7 (S.D.N.Y. July 27, 2000) ("Proof of deliberate indifference may be found where a prison official or employee 'intentionally denies or delay[s] access to medical care or intentionally interferes with the treatment once prescribed." ' (quoting *Estelle,* 429 U.S. at 104-05)).

### A. Defendants Goffe, Maldonado, Krusen, MacNamara and Smith

**\*8** **[1]** Plaintiff alleges that he was issued valid medical passes on numerous occasions by members of Sing Sing's medical staff (Dr. Lofton, Dr. Perilli and Dr. Halko) endorsing the outside orthopedic specialists' order or recommendation that Plaintiff receive daily morning showers for his spinal injury as part of a home therapeutic program. Plaintiff claims that for over a year and a half, he presented these medical passes to Defendants Goffe, Maldonado, Krusen, MacNamara and Smith, who consistently refused to follow doctor's orders and allow Plaintiff "AM" showers.

During the same time period, Plaintiff alleges that Defendants were moved with flats passes ordering that Plaintiff be moved from the fourth floor of the prison to the first floor, so he would no longer have to climb stairs to reach his cell. Despite being issued passes every two to three months and making numerous requests to these named Defendants, Plaintiff alleges that his flats passes were not honored for a year and a half. *See Hernandez v. Keane,* No. 00-0347, 2003 U.S.App. LEXIS 17066, at * 18 (2d Cir. Aug. 20, 2003) (stating that in *Hathaway,* 37 F.3d at 67, the court held "that a prolonged delay in treatment could support an inference of deliberate indifference").

Because Plaintiff has adequately pled that Defendants Goffe, Maldonado, Krusen, MacNamara and Smith deliberately denied and/or delayed the express instructions and orders of various outside orthopedic specialists and prison doctors, he has adequately pled a claim of deliberate indifference to a serious medical condition sufficient to survive a motion to dismiss. *See Gill, 824 F.2d 192.* Thus, Defendants' motion to dismiss the Amended Complaint against Defendants Goffe, Maldonado, Krusen, MacNamara and Smith is denied.

### B. Defendant Williams

**[2]** Plaintiff alleges that on March 31, 2000, Dr. Halko wrote a prescription for Plaintiff to receive daily morning heat treatment. Plaintiff asserts that the physician's assistant, Defendant Williams, cancelled Dr. Halko's order and wrote "not indicated." Plaintiff asserts Defendant Williams' actions were deliberately indifferent to Plaintiff's serious medical needs. Once again, courts have held that the failure to follow a doctor's prescribed orders constitutes denial of adequate medical care. *See Gill,* 824 F.2d at 195. Therefore, Defendants' motion to dismiss the Amended Complaint against Defendant Williams is denied.

### C. Defendant Clark

**[3]** On or about April 15, 2000, Defendant Clark, an officer at Fishkill, was presented with Plaintiff's Sing Sing elevator pass and was told by Plaintiff's treating physical therapist, Mr. Karlo, that Plaintiff should be allowed to take the elevator to and from the therapy unit on the sixth floor. According to Plaintiff's allegations, Defendant Clark disregarded Plaintiff's pass as well as the instructions from his physical therapist to use the elevator. Because Defendant Clark disregarded Plaintiff's medical elevator pass as well as the instructions of Plaintiff's physical therapist, Defendants' motion to dismiss the Amended Complaint against Defendant Clark is denied.

### D. Defendant Eagan and Capuano

**\*9** **[4]** Plaintiff alleges that he filed a grievance in September of 1999 against various members of Sing Sing's security personnel. Defendant Eagan began an investigation of Plaintiff's grievance and received information from the Nurse Administrator, Defendant Capuano, in December of 1999 that Plaintiff did not need the daily morning heat treatment. This information

was communicated to Defendant Eagan despite the fact that the treatment had been ordered or recommended by various specialists at St. Agnes Hospital and by doctors on Sing Sing's medical staff since April 1999. Defendant Eagan's response to the grievance was that there was no requirement that Plaintiff receive the treatment in the morning. Additionally, Plaintiff claims that Defendants Eagan and Capuano changed or tried to change the orders of Dr. Halko and the outside orthopedic specialists.

Subsequently, in response to Plaintiff's grievance filed against Mr. Abraham for failure to follow the orders of the outside orthopedic specialists, Plaintiff alleges that Defendant Capuano gave the grievance committee false information concerning the treatment that had been ordered by the specialists and then failed to respond to Plaintiff's FOIL request to have his medical records produced during his grievance hearing. Because allegations that a prison official failed to follow the orders of outside specialists and prison doctors are sufficient to satisfy the deliberate indifference standard, Defendant's motion to dismiss Plaintiff's Amended Complaint against Defendants Eagan and Capuano is denied.

### II. Personal Involvement and § 1983

To state a claim under § 1983, a plaintiff must allege the personal involvement of each defendant in the alleged constitutional violation. *See Woods v. Goord,* No. 01 Civ. 3255, 2002 U.S. Dist. LEXIS 7157, at * 22 (S.D.N.Y. April 24, 2002). Personal liability cannot be imposed on a state official on the basis of respondeat superior. *See Hernandez,* 2003 U.S.App. LEXIS 17066 at *14-15. Therefore, the Plaintiff must plead that the defendant had direct involvement in or responsibility for the alleged misconduct. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). A supervisory official may be personally involved in a § 1983 violation where:

> (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred,

or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Id.*

**A. Defendant Fisher**

 **[5]**   The allegations set forth in Plaintiff's Amended Complaint against Defendant Fisher are conclusory in nature and fail to show how Defendant Fisher was personally involved in the alleged constitutional violation. The only allegation regarding the actions of Defendant Fisher is that he wrote general memoranda to the prison staff concerning the creation of unoffical policies and the honoring of inmate medical passes. (Pl. Opp. Br. at 9-10). There are no allegations that Defendant Fisher himself was aware of Plaintiff's personal claims. Moreover, it is unclear whether Defendant Fisher ever received any of Plaintiff's grievances personally, but even if he had received Plaintiff's grievances during the appeal process, allegations that a supervisor ignored an inmate's grievance letter of protest is insufficient to find that a supervisor is personally involved in an alleged constitutional violation. *See Zaire v. Artuz,* No. 99 Civ. 9817, 2003 U.S. Dist. LEXIS 1386, at *20-21 (S.D.N.Y. Feb. 4, 2003); *see also Walker v. Pataro,* No. 99 Civ. 4607, 2002 U.S. Dist. LEXIS 7067, at *42 (S.D.N.Y. April 23, 2002) ("where a supervisory official like the Commissioner of Corrections or a prison Superintendent receives letters or similar complaints from an inmate and does not personally respond, the supervisor is not personally involved and hence not liable"). Accordingly, Defendants' motion to dismiss the Amended Complaint against Defendant Fisher is granted.

**B. Defendant Eagan**

 **\*10  [6]**   "On the other hand, where a supervisory official receives and acts on a prisoner's grievance (or substantially reviews and responds to some other form of inmate complaint), personal involvement will be found under the second Colon prong: 'the defendant, after being informed

of the violation through a report or appeal, failed to remedy the wrong.' " *Walker,* 2002 U.S. Dist. LEXIS 7067 at *44 (quoting *Colon,* 58 F.3d at 873). Plaintiff alleges that Defendant Eagan investigated Plaintiff's grievance against the members of security and responded that there was no requirement that Plaintiff receive showers in the morning and that what the doctor meant by "AM" was just sometime during the day. Plaintiff also alleges that Defendant Eagan changed or tried to change the orders of Dr. Halko, the outside orthopedic specialists and several of the physical therapists. These allegations plead the personal involvement of Defendant Eagan sufficiently to survive a motion to dismiss. Accordingly, the motion to dismiss for lack of personal involvement of Defendant Eagan is denied.

**III. Retaliation**

 **[7]**   The Second Circuit has held that prison officials may not retaliate against prisoners for exercising their constitutional rights. *See Colon,* 58 F.3d at 872 (citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)). However, because of the ease of fabricating a claim of retaliation, the Second Circuit requires the court to handle such claims with particular care. *See Davis v. Goord,* No. 01-0116, 2003 U.S.App. LEXIS 13030, at *13 (2d Cir. Feb. 10 2003). In order to survive a motion to dismiss on a First Amendment claim for retaliation, the Plaintiff must plead " 'non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." ' *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002)(quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)).

 *1. Protected Conduct*
The law is clear that the filing of a grievance is a constitutionally protected activity. *See Davis,* 2003 U.S.App. LEXIS 13030 at *13. Accordingly, Plaintiff has sufficiently pled the first element of a claim for retaliation.

 *2. Adverse Action*
The second prong requires Plaintiff to adequately allege that a prison official subjected him to an adverse action. "To adequately plead an adverse action, a plaintiff must allege that defendants subjected him to 'conduct that would deter a similarly situated individual of ordinary

firmness from exercising his or her constitutional rights." ' *Morales,* 278 F.3d at 131 (citing *Dawes,* 239 F.3d at 493). Plaintiff alleges that after he filed a grievance against the members of security, the security personnel had a meeting with Dr. Perilli and told him to cut down on the number of medical passes issued to inmates. After discovering Plaintiff had filed this grievance, Dr. Perilli told Plaintiff that he was reluctant to continue ordering the daily morning heat treatment. Plaintiff alleges that although Dr. Perilli had been approving Plaintiff's treatment for almost a year, he rescinded Plaintiff's medical pass, stating to Plaintiff that he had to go along with the security personnel's protocol.

**\*11** Allegations that Dr. Perilli revoked Plaintiff's necessary medical rehabilitative treatment because he filed a grievance are sufficient to satisfy the second element of a retaliation claim. Plaintiff should have the opportunity to develop facts that would demonstrate that the revocation of necessary rehabilitative treatment would deter a reasonable inmate from pursuing grievances.

### 3. *Causal Connection Between Protected Speech and Adverse Action*

"In order to satisfy the causation requirement, allegations must be 'sufficient to support the inference that the speech played a substantial part in the adverse action." ' *Davis,* 2003 U.S. Dist. LEXIS 13030 at \*18 (quoting *Dawes,* 239 F.3d at 492). Plaintiff alleges that Dr. Perilli revoked his medical pass after participating in a meeting with security personnel and discovering Plaintiff had filed a grievance against them.

A prison doctor has the right to determine what medical treatment is appropriate for a particular inmate and "[a] difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference." *Sonds v. St. Barnabas Hospital,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001)(citing *Chance,* 143 F.3d at 703). Therefore, even if Plaintiff disagreed, had Dr. Perilli decided that in his medical opinion daily morning heat treatment was no longer appropriate to treat Plaintiff's condition, these actions would not support a claim for deliberate indifference to a serious medical condition. *See Id.* However, Plaintiff has alleged that Dr. Perilli revoked Plaintiff's medical pass because Plaintiff filed a grievance against members of security. These allegations show a causal connection between the constitutionally

protected activity and the adverse action and are sufficient to state a claim for retaliation. *See Walker v. Pataro,* 2002 U.S. Dist. LEXIS 7067 at \* 19 (" 'a claim for relief may be stated under § 1983 if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights" ' (quoting *Gill,* 824 F.2d at 194)). Thus, Defendants' motion to dismiss Plaintiff's claim for retaliation against Dr. Perilli is denied.

### IV. Qualified Immunity

**[8]** Defendants argue that should the court find that the Plaintiff states a claim under § 1983 they are nonetheless entitled to qualified immunity because their actions were objectively reasonable. (Def. Mem. at 19). Qualified immunity "shields public officials from liability for their discretionary acts that are 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ' *Hathaway,* 37 F.3d at 67 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

" 'Although qualified immunity is typically addressed at the summary judgment stage of the case, the defense may be raised and considered on a motion to dismiss. The motion will be granted if the complaint fails to allege the violation of a clearly established constitutional right." *See Woods,* 2002 U.S. Dist. LEXIS 7157 at \* 35. Here, Plaintiff has alleged a constitutional violation for deliberate indifference to his serious medical condition against Defendants Smith, Perilli, Capuano, Williams, Eagan, MacNamara, Krusen, Clark, Maldonado and Goffe. Because at this time the Court finds Plaintiff's allegations sufficiently allege that Defendants acted with deliberate indifference to Plaintiff's serious medical condition in violation of Plaintiff's Eighth Amendment rights, qualified immunity will not shield these defendants from § 1983 liability at this stage.

### Conclusion

**\*12** For the foregoing reasons, the Defendants' motion to dismiss the Amended Complaint is granted as to Defendant Fisher and denied as to Defendants Smith, Perilli, Capuano, Williams, Eagan, MacNamara, Krusen, Clark, Maldonado and Goffe.

So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 22170610

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1086001
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Nelson RODRIGUEZ, Plaintiff,
v.
Donald SELSKY, Defendant.

Civil Action No. 9:07–CV–0432 (LEK/DEP).
|
Jan. 25, 2011.

**Attorneys and Law Firms**

Nelson Rodriguez, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Aaron M. Baldwin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for the Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

 **\*1** Plaintiff Nelson Rodriguez, a New York state prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights. In his complaint, as amended, Rodriguez alleges that prison officials at the facility in which he was confined at the relevant times issued him two fabricated misbehavior reports ("MBRs") falsely accusing him of violating prison rules and denied him procedural due process during the course of the ensuing disciplinary hearing.[1] Plaintiff attributes those actions to retaliation for his having filed a civil action against a corrections employee who was not named as a defendant in his complaint.

[1]     As originally constituted, plaintiff's complaint recited other purportedly unlawful conduct, alleging that he was subjected to ongoing harassment, retaliation, and interference with his access to the courts. As a result of a series of court interventions the claims in this action, which was commenced elsewhere but later transferred to this district, have been significantly narrowed.

The sole remaining claim in this action is asserted against defendant Donald Selsky, the former Director of

Special Housing and Inmate Disciplinary Programs for the New York State Department of Correctional Services ("DOCS"), alleging deprivation of procedural due process arising out of plaintiff's disciplinary hearing and defendant Selky's review of the resulting determination.

Currently pending before the court is defendant's motion for summary judgment dismissing plaintiff's amended complaint. In his motion, defendant argues that 1) he was not sufficiently involved in the constitutional deprivation alleged to support a finding of liability; 2) plaintiff was afforded procedural due process in connection with the disciplinary proceedings at issue, and 3) in any event he is entitled to qualified immunity from suit. For the reasons set forth below, I recommend a finding that plaintiff was not deprived of procedural due process, and that his complaint therefore be dismissed.

I. *BACKGROUND* [2]

[2]     In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a prison inmate entrusted to the custody of the DOCS; at the times relevant to his due process claim plaintiff was housed at the Shawangunk Correctional Facility ("Shawangunk"), located in Wallkill, New York. Amended Complaint (Dkt. No. 7) ¶ 3; Selsky Decl. (Dkt. No. 62–3) ¶ 15.

As a result of an incident involving another inmate occurring on December 30, 2003, plaintiff was issued two MBRs. Amended Complaint (Dkt. No. 7) ¶¶ 12–15. Selsky Decl. (Dkt. No. 62–3) ¶ 16. The first, issued on December 30, 2003 and authored by Corrections Officer Goosby, charged Rodriguez with fighting and refusal to obey a direct order. Selsky Decl. (Dkt. No. 62–3) ¶ 17 and Exh. A (Dkt. No. 62–4). The second, issued on January 2, 2004 by Corrections Lieutenant Wright, addressed the same incident and accused Rodriguez of fighting, engaging in violent conduct, and participating in a demonstration detrimental to the order of the facility. Selksy Decl. (Dkt. No. 62–3) ¶ 18 and Exh. A (Dkt. No. 62–4).

The parties differ as to when the two MBRs were served upon Rodriguez. Plaintiff and defendant appear to be in agreement that the second MBR was served upon him on

January 2, 2004. Selsky Decl. (Dkt. No. 62–3) ¶ 19 and Exh. A (Dkt. No. 62–4); Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 68) ¶ 16. While defendant asserts that both MBRs were served on January 2, 2004, *see* Selsky Decl. (Dkt. No. 62–3) ¶ 19 and Exh. A (Dkt. No. 62–4), plaintiff denies that he received the December 30, 2003 MBR until the commencement of his disciplinary hearing.[3] Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 68) ¶ 16.

[3]    As will be seen I have assumed, as I must at this juncture, that plaintiff's version of the facts is correct. *See* pp. 21–32, *post.*

*2 The two MBRs were consolidated, over plaintiff's objection, and a Tier III disciplinary hearing was conducted, beginning on January 7, 2004, to address the charges set forth within them.[4],[5] Amended Complaint (Dkt. No. 7) ¶ 15; Selsky Decl. (Dkt. No. 62–3) ¶ 21 and Exhs. A (Dkt. No. 62–4) and B (Dkt. Nos. 62–5 and 62–6). In advance of the hearing plaintiff was given the opportunity to express his preferences for an assistant, and based upon his selection Corrections Counselor Roddy was assigned to assist him. Selsky Decl. (Dkt.62–3) ¶ 20 and Exh. A (Dkt. No. 62–4).

[4]    The DOCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3. Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions and can result in penalties which include confinement for a period of time in the Special Housing Unit ("SHU"). Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *See* Hynes v. Squillace, 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

[5]    Plaintiff's disciplinary hearing was originally scheduled to start on January 5, 2004, in order to meet the requirements of a state regulation mandating that a disciplinary hearing commence within seven days of a prisoner's confinement in a facility's SHU, 7 N.Y.C.R.R. § 251–5.1(a) (1983). Selsky Decl., Exh. B (Dkt. No. 62–5) pp. 18–19. While plaintiff assigns significance to the failure of prison officials to meeting the seven-day requirement, the record reveals that an extension was granted because plaintiff's assistant was unable to meet with him prior to January 5, 2004. *Id.* In any event, the

violation of state regulations is not cognizable under 42 U.S.C. § 1983. *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases). Plaintiff's claim of undue delay is instead subject to constitutional standards, which require only that the hearing be held within a "reasonable time" and not within any prescribed number of days. *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990) ("Federal constitutional standards rather than state law define the requirements of procedural due process."); *Donato v. Phillips,* No. 9:04–CV–1160, 2007 WL 168238, at *6 (N.D.N.Y. Jan. 18, 2007) (McAvoy, J.) (hearing that started nine days after plaintiff's confinement in the SHU was reasonable).

Following its commencement on January 7, 2004, the hearing officer twice adjourned the hearing, initially to January 8, 2004, and again from January 8, 2004 to January 13, 2004, to allow the plaintiff an opportunity to prepare his defense. Selsky Decl. (Dkt. No. 62–3) and Exh. B (Dkt. No. 62–5) pp. 4–20, 20–58. During the course of the hearing plaintiff was permitted to call at least eleven witnesses to testify on his behalf, and also to introduce documentary evidence in his defense Selsky Decl. (Dkt. No. 62–3) ¶ 44 and Exh. A (Dkt. No. 62–4); Exh. B (Dkt. No. 62–5) at pp. 60–86, 94–115, 136–83, 185–209, and Exh. B (Part 2) (Dkt. No. 62–6) at pp. 2–12, 30–43, 59–71, 72–78, 76–83, 105–111, 111–117, 117–21,122–26, 128–39. Two inmate witnesses listed by the plaintiff declined to testify, and executed refusal forms stating that they did not wish to be involved in the matter. Selsky Decl. (Dkt. No. 62–3) ¶ 42 and Exh. A (Dkt. No. 62–4). The hearing officer rejected plaintiff's request that he be permitted to adduce testimony from two other witnesses, his wife and his attorney, concluding that the testimony would not be relevant to the issues involved in the hearing. Selsky Decl., Exh. B (Part 2) (Dkt. No. 62–6) pp. 98–99.

At the conclusion of hearing, plaintiff was found guilty of fighting (one count), refusing to obey a direct order, engaging in violent conduct, and participating in a demonstration, but was acquitted on the second count of fighting. Selsky Decl. (Dkt. No. 62–3) ¶ 22 and Exh. A (Dkt. No. 62–4). Based upon his findings, which were both noted in writing and stated orally at the hearing, the hearing officer imposed a penalty that included twenty-four months of disciplinary SHU confinement and a corresponding loss of package, commissary and telephone privileges. Selsky Decl. (Dkt. No. 62–3) ¶ 23; *see also* Exh. A (Dkt. No. 62–4) and Exh. B (Part 2) (Dkt. No. 62–6) pp. 156–58.

On February 11, 2004, plaintiff appealed the disciplinary determination to defendant Selsky's office. *See* Amended Complaint (Dkt. No. 7) ¶ 21; Selsky Decl. (Dkt. No. 62–3) ¶ 26 and Exh. C (Dkt. No. 62–7). Plaintiff also submitted a supplemental appeal on or about March 12, 2004. Selsky Decl. (Dkt. No. 62–3) ¶¶ 26–27, Exhs. C (Dkt. No. 62– 7) and D (Dkt. No. 62–8). Defendant Selsky issued a determination on behalf of the DOCS Commissioner on April 8, 2004, modifying the results of the hearing by dismissing the charge of engaging in a demonstration and reducing the penalty imposed to twelve months of SHU confinement with a corresponding loss of privileges.[6] Selsky Decl. (Dkt. No. 62–3) ¶ 28 and Exh. E (Dkt. No. 62–9). That determination was based upon defendant Selsky's finding that the nature of the incidents giving rise to the MBRs did not warrant the full extent of the penalty imposed and that the charge of engaging in a demonstration was not substantiated. *Id.* at ¶ 28 and Exh. E (Dkt. No. 62–9). Based upon his review, however, Selsky concluded that plaintiff received all of the procedural due process mandated under the Fourteenth Amendment and that there was evidence in the record substantiating the charges for which Rodriguez was found guilty. *Id.* at ¶ 29.

[6]     Plaintiff's SHU term of disciplinary confinement and corresponding loss of privileges was further reduced to eighth months and nine days, ending on September 9, 2004, as a result of a discretionary time cut on or about July 14, 2004, occurring while plaintiff was housed at the Southport Correctional Facility. Selsky Decl. (Dkt. No. 62–3) ¶ 53.

## II. *PROCEDURAL HISTORY*

**\*3** This action was commenced on April 11, 2007 in the Southern District of New York, but was subsequently transferred to this district by order issued by Chief District Judge Kimba M. Wood on April 11, 2007.[7] Dkt. Nos. 1, 3. Plaintiff's original complaint challenged not only the MBRs issued and the disciplinary action that ensued, but also chronicled alleged continued harassment and acts of retaliation that he experienced following his transfer into the Attica Correctional Facility, naming as defendants several DOCS employees including Donald Selsky. *See* Complaint (Dkt. No. 1).

[7]     While plaintiff's complaint was not filed in the Southern District until April 11, 2007, the transfer order issued by Chief Judge Wood noted that the complaint was received in that district on February 26, 2007. *See* Dkt. No. 3, n. 1.

Upon transfer of the case to this district and the court's initial review of plaintiff's complaint and accompanying request for leave to proceed *in forma pauperis* ("IFP"), by order dated May 17, 2007, Senior District Judge Lawrence E. Kahn granted plaintiff IFP status but directed that he file an amended complaint, noting several deficiencies in the original pleading including, *inter alia,* the apparent untimeliness of certain of his claims. Dkt. No. 5. In accordance with the court's directive, plaintiff filed an amended complaint on June 26, 2007. Dkt. No. 7. Upon review of that pleading District Judge Kahn issued an order on July 19, 2007 accepting the amended complaint for filing, but dismissing plaintiff's claims against the majority of the defendants as time-barred and further directing dismissal of plaintiff's claims against a newly-added defendant, Corrections Sergeant Corcran, without prejudice to plaintiff's right to file a separate action against that defendant in the Western District of New York.[8] As a result, Donald Selsky was left as the sole remaining defendant in the action.

[8]     District Judge Kahn explained that "[s]ince the alleged wrongdoing by Defendant Corcran occurred in the Western District of New York, and Plaintiff's claims against Defendant Corcran are very recent, and thus not in jeopardy of being time-barred at this time, the Court will dismiss Defendant Corcran from the action, without prejudice to Plaintiff filing his claims against Defendant Corcran in the Western District of New York." Decision and Order (Dkt. No. 8) at p. 3.

After filing an answer generally denying plaintiff's allegations against him and asserting various affirmative defenses, *see* Dkt. No. 10, defendant Selsky moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings, urging dismissal of plaintiff's amended complaint on the ground that it failed to allege the requisite degree of his personal involvement in any wrongdoing to support a finding of liability. Dkt. No. 47. The motion resulted in my issuance of a report on February 25, 2010 recommending that the motion be denied. Dkt. No. 54. That recommendation was adopted by District Judge Lawrence E. Kahn by order issued on September 13, 2010. Dkt. No. 67.

On June 18, 2010, defendant again moved, this time for summary judgment dismissing plaintiff's complaint. Dkt.

No. 62. In his motion defendant reiterates his claim of lack of personal involvement, and additionally asserts that in any event plaintiff's due process claim lacks merit since the plaintiff was afforded all of the procedural safeguards required under the Fourteenth Amendment, and further that he is entitled to qualified immunity from suit. *Id.* Plaintiff has since responded in opposition to defendant's motion, Dkt. No. 68, and defendant has submitted a reply memorandum addressing plaintiff's arguments and further supporting his motion. Dkt. No. 74.

**\*4** Defendant's motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Summary Judgment Standard*
Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.

Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

#### B. *Personal Involvement*
**\*5** In his motion defendant Selsky renews an argument previously made and rejected—that his limited involvement in reviewing the disciplinary determination in question based upon plaintiff's appeal of that decision is insufficient to support a finding of liability for any procedural due process violation which may have occurred in the context of that hearing. In response, plaintiff counters that the record reveals facts from which a reasonable factfinder could conclude that the defendant personally participated in the due process violation, including by conducting an inadequate review of the disciplinary hearing record.

It seems clear, particularly in light of the Supreme Court's relatively recent decision in *Ashcroft v. Iqbal,* ––– U.S. –––– 129 S.Ct. 1937, 1948–49 (2009), that to be held accountable for a constitutional deprivation under section 1983 a defendant must have had personal involvement in the conduct giving rise to the deprivation. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (*citing Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978); *Scott*

*v. Fischer,* 616 F.3d 100, 110 (2d Cir.2010) ("In this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.") (quoting *McKinnon* ). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

As was noted in my prior report and recommendation, the question of whether defendant Selsky's review of an allegedly infirm disciplinary hearing provides grounds for establishing his personal involvement is one that has divided the courts. Some courts have found the mere allegation that Selsky has reviewed and affirmed a hearing determination that was the product of a due process deprivation is insufficient to establish liability for the underlying violation. *See, e.g., Abdur–Raheem v. Selsky,* 598 F.Supp.2d 367, 370 (W.D.N.Y.2009) ("The only allegation concerning Selsky in the case at bar is that he affirmed the disposition of plaintiff's administrative segregation hearing, pursuant to which plaintiff was confined to SHU.... That is not enough to establish Selsky's personal involvement."); *Ramsey v. Goord,* No. 05–CV–47A, 2005 WL 2000144, at *6 (W.D.N.Y. Aug. 13, 2005) ("[t]he fact that Commissioner Goord and SHU Director Selsky, as officials in the DOCS 'chain of command,' affirmed defendant Ryerson's determination on appeal is not enough to establish personal involvement of their part."); [9] *see also Odom v. Calero,* No. 06 Civ. 15527, 2008 WL 2735868, at *7 (S.D.N.Y. Jul. 10, 2008) (concluding that a due process violation is complete upon the hearing officer rendering a decision, even when the liberty interest deprivation persists, and therefore is not "ongoing" when an appeal is taken to Donald Selsky).

[9]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

**\*6** On the other hand, other courts have found that the act of reviewing and affirming a determination on appeal can provide a sufficient basis to find the necessary personal involvement of a supervisory employee like defendant Selksy. *See, e.g., Bennett v. Fischer,* No. 9:09–CV–1236, 2010 WL 5525368 (N.D.N.Y. Aug 17, 2010) (Peebles, M.J.) (finding questions of fact regarding Commissioner Fischer's personal involvement in disciplinary precluding summary judgment), *Report and*

*Recommendation Adopted,* 2011 WL 13826 (N.D .N.Y. Jan. 4, 2011) (Scullin, S. J.); *Baez v. Harris,* No. 9:01–CV–807, 2007 WL 446015, at *2 (N.D.N.Y. Feb. 7, 2007) (Mordue, C.J.) (fact that defendant Selsky responds personally to all disciplinary appeals by inmates found sufficient to withstand summary judgment motion based on lack of personal involvement); *Cepeda v. Coughlin,* 785 F.Supp. 385, 391 (S.D.N.Y.1992) ("The Complaint alleges that '[t]he Commissioner and/or his designee entertained plaintiff[']s appeal and also affirmed.' ... [T]he allegation that supervisory personnel learned of alleged misconduct on appeal yet failed to correct it constitutes an allegation of personal participation. Assuming that this allegation is true, as this court must on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) ..., Cepeda has pleaded personal involvement by Commissioner Coughlin sufficiently to withstand this motion.") (citations omitted); *Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N.Y.2001) (finding that plaintiff's complaint had sufficiently alleged personal involvement of Superintendent and Commissioner to withstand motion to dismiss because plaintiff alleged that both defendants had actual or constructive notice of the defect in the underlying hearing); *Ciaprazi v. Goord,* No. 9:02–CV–0915, Report–Recommendation, 2005 WL 3531464, at *16 (N.D.N.Y. Mar. 14, 2004) (Peebles, M.J.) (recommending that Selsky's motion for summary judgment for lack of personal involvement be denied because Selsky's review of plaintiff's disciplinary hearing appeal "sufficiently establishes his personal involvement in any alleged due process violations based upon his being positioned to discern and remedy the ongoing effects of any such violations."), *adopted,* 2005 WL 3531464, at *1– 2 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.).

In support of his argument regarding personal involvement defendant cites *Tafari v. McCarthy,* 714 F.Supp.2d 317 (N.D.N.Y. My 24, 2010), in which another magistrate judge of this court, in a report and recommendation adopted by the assigned district judge, wrote that "[t]he affirming of a disciplinary conviction does not constitute personal involvement in a constitutional violation." *Tafari,* 714 F.Supp.2d at 383. (citing *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002)). I respectfully disagree with my esteemed colleague and maintain that the cases holding that Selsky's affirmance, or that of someone in his corresponding position, of a constitutionally defective disciplinary determination at a time when the inmate is still serving his or her disciplinary sentence, and the

violation can therefore be abated, falls within the *Colon* factors articulated in the Second Circuit for informing the supervisory liability analysis. *See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995).* In any event, this case is distinguishable from *Tafari* since here plaintiff has alleged that through his own conduct in inadequately reviewing the underlying determination defendant Selsky committed a due process violation, *see* Amended Complaint (Dkt. No. 7) ¶ 21, thereby satisfying the Supreme Court's admonition that a defendant can only be held liable for his or own conduct for purposes of a civil rights violation. *Iqbal,* 129 S.Ct. at 1948.

**\*7** As I noted in my prior report, I believe that those cases concluding that a plaintiff's allegation that defendant Selsky reviewed and upheld an allegedly constitutionally-suspect disciplinary determination is enough to show his personal involvement in the alleged violation appear to be both better reasoned and more consonant with the Second Circuit's position regarding personal involvement. *See Black v. Coughlin, 76 F.3d 72, 75 (2d Cir.1996)* (criticizing a district court's denial of leave to amend to add Donald Selsky as a defendant in a due process setting and appearing to assume that Selsky's role in reviewing and affirming a disciplinary determination is sufficient to establish his personal involvement). While it may be true that the due process violations cited by Rodriguez occurred and were no longer ongoing when his appeal was taken to defendant Selsky, because it appears that the sentence imposed was still being served at the time of his review, the liberty interest deprivation allegedly effectuated without due process was therefore ongoing, and defendant Selsky was in a position to remedy the violation, at least in part, at a time when his intervention would still have been meaningful.

### C. *Merits of Plaintiff's Due Process Claim*
To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields, 280 F.3d 69, 79–80 (2d Cir.2000)* (citations omitted); *Hynes, 143 F.3d at 658; Bedoya v. Coughlin, 91 F.3d 349, 351–52 (2d Cir.1996).* Defendant concedes that plaintiff's eight months of SHU disciplinary confinement "at least arguably" impacted a protected liberty interest, *see* Defendant's Memorandum (Dkt. No. 62–14) at p. 3, and I agree. *See Colon v. Howard,*

*215 F.3d 227, 231 (2d Cir.2000)* (finding that disciplinary confinement for a period of 305 days is "a sufficient departure from the ordinary incidents of prison life to require procedurally due process protections."). Plaintiff's claim, then, boils down to whether he was provided the procedural safeguards guaranteed under the Fourteenth Amendment prior to that deprivation. [10]

[10]   It should be noted that in this case plaintiff goes beyond merely alleging defendant Selsky's failure to rectify a past due process violation. In his complaint plaintiff also alleges that defendant Selsky participated in or furthered the violation by failing to conduct an appropriate review. Amended Complaint (Dkt. No. 7) ¶ 21.

The procedural rights to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell, 418 U.S. 539, 564–67, 94 S.Ct. 2963, 2978–80 (1974).* [11] Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff, 418 U.S. at 564–67, 94 S.Ct. at 2978–80; see also Eng v. Coughlin, 858 F .2d 889, 897–98 (2d Cir.1988).* In addition, to pass muster under the Fourteenth Amendment the hearing officer's disciplinary determination must garner the support of at least "some evidence". *Superintendent v. Hill, 472 U.S. 445, 105 S.Ct. 2768 (1985).*

[11]   Many of the points raised in support of plaintiff's due process claim surround the alleged failure of prison officials to meet the requirements prescribed by regulation for disciplinary hearings. It is well established, however, that a violation of a state regulation is not actionable under section 1983. *Cusamano,* 604 F.Supp.2d at 482.

#### 1. *Notice of Charges*
**\*8** The record now before the court, when interpreted in a light most favorable to the plaintiff, suggests that while the second of the two MBRs addressed at plaintiff's disciplinary hearing was served on Rodriguez on January

2, 2004, the earlier report was not received by him until the date on which the hearing was to begin. [12] Under *Wolff,* an accused inmate is entitled to meaningful advance written notice of the charges against him; in this circuit, a minimum of twenty-four hours of advance notice is generally considered to be required. *Sira v. Morten,* 380 F.3d 57, 70 (2d Cir.2004). The purpose of the notice requirement is to place the inmate on notice of the charges faced in order to permit the preparation of an adequate defense. *Id.* (citing *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001); *see also Martin v. Mitchell,* No. 92–CV–716, 1995 WL 760651, at *2 (N.D.N.Y. Nov. 24, 1995) (McAvoy, J.) (citing *Wolff,* 418 U.S. at 564, 94 S.Ct. at 2978) (holding that the purpose of the twenty-four hour notice rule is to provide inmates with sufficient time to prepare a defense, "not to hold hearing officers to a rigid and useless requirement that they only may call an inmate into a hearing room once they are positive that the inmate received a copy of the misbehavior report at least twenty-four hours earlier").

[12]    As was previously noted, defendant disputes plaintiff's claim in this regard and asserts instead that both misbehavior reports were served on the plaintiff on January 2, 2004 by Corrections Officer Ferguson on January 2, 2004. Selsky Decl. (Dkt. No. 62–3) ¶ 19 and Exh. A.

In this instance, any failure on the part of prison officials to provide plaintiff with notice of the charges lodged against him prior to the scheduled hearing was harmless in light of the hearing officer's agreement to adjourn the hearing, initially from January 7, 2004 to January 8, 2004, and then again to January 13, 2004, in order to allow the Rodriguez to prepare his defense. The record clearly reflects that, during those intervening periods, he was afforded the opportunity to prepare a defense to both charges before any testimony was taken. *See* Plaintiff's Memorandum (Dkt. No. 68–1) at p. 5 (admitting that plaintiff was served with the first misbehavior report at the hearing prior to any testimony having been taken).

The notice requirements of *Wolff* were therefore satisfied in this case, and no reasonable factfinder could conclude otherwise.

    2. *Assistance in Preparation of a Defense*
Under *Wolff* and its progeny, a prisoner is entitled to an "employee assistant" to aid in the preparation for a disciplinary hearing when the inmate is illiterate, confined to the SHU, or unable to grasp the complexity of the issues involved. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993); *see also Eng,* 858 F.2d at 897. The Supreme Court has made it clear, however, that the assistance due prisoners is limited and is not equivalent of the right of a criminally accused legal counsel. *Wolff,* 418 U.S. at 570, 94 S.Ct. at 2981. An assistant is only required to act as the inmate's *"surrogate*—to do what the inmate would have done were he able." *Silva,* 992 F.2d at 22 ("The assistant is not obliged to go beyond the specific instructions of the inmate because if he did so he would then be acting as counsel.")

**\*9** Because Rodriguez had been relegated to SHU confinement by the time of the disciplinary hearing he was entitled to and was in fact assigned an employee assistant, Ms. Roddy, to help him prepare for the hearing. Rodriguez asserts that the assistant, however, refused to provide him with requested documents and threatened to "write him up" if he requested further assistance. Plaintiff's Memorandum (Dkt. No. 68–1) at pp. 14–17. Specifically, plaintiff claims that he was refused access to documents that would have helped prove his innocence, including a list of officers involved in the incidents involved, letters written by another inmate, video footage of a different inmate being led to the SHU, all misbehavior reports concerning other inmates' involvement in the incidents, and all pertinent "To/From" memoranda produced by staff or inmates with knowledge of the relevant events. *Id.* at p. 15.

A careful review of the assistant forms and attachments in the record shows that the assigned assistant fulfilled her duty as plaintiff's surrogate. Plaintiff provided several lists of documents requested to prepare his defense. [13] Selsky Decl., Exh. A (Dkt. No. 62–4) pp. 46–49, 54–61. Ms. Roddy indicated on the assistant form that she pursued all of plaintiff's requests and provided him with at least twenty pages of documents. *Id.* at pp. 17–18. On the handwritten lists, Ms. Roddy noted which documents were provided to plaintiff and gave brief explanations as to why some of the requested documents could not be produced. It was noted, for example, that plaintiff was denied access to the handwritten notes of another inmate, several requested "To/From" forms simply did not exist, and that the video footage would be available for viewing at the hearing if deemed pertinent to the pending charges. *Id.* at pp. 46–49.

Rodriguez v. Selsky, Not Reported in F.Supp.2d (2011)
2011 WL 1086001
Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 181 of 237

13    It is noted that plaintiff did not request that Ms.
      Roddy interview any inmates or other persons as
      potential witnesses and refused to sign the assistant
      form. Selsky Decl., Exh. A (Dkt. No. 62–4) p. 17.

There is no indication that any documents were withheld from plaintiff without justification or as a result of Ms. Roddy's ineffective assistance. Ms. Roddy's role as plaintiff's assistant was limited to acting as his surrogate; if he was not permitted to receive certain documents, Ms. Roddy likewise could not access them. Even assuming plaintiff's claim that Ms. Roddy was rude and hostile toward him is accurate, such conduct in and of itself does not violate his federal due process rights. *See Gates v. Selsky,* No. 02 CV 496, 2005 WL 2136914, at * 7 (W.D.N.Y. Sept. 02, 2005) (noting that the duty owed by an employee assistant is the provision of requested services in good faith and in the best interest of the inmate and to perform as instructed by the inmate). In short, there is no evidence now before the court from which a reasonable factfinder could conclude that plaintiff was denied effective assistance in preparing his defense to the pending disciplinary charges.

### 3. *Opportunity to Present Evidence*

The due process clause of the Fourteenth Amendment plainly guarantees the right of an accused inmate to present a defense to disciplinary charges. *Wolff,* 418 U.S. at 555–56, 94 S.Ct. at 2974. That right, however, is not unfettered and does not apply to the same extent as the constitutional guarantee to a criminally accused defendant of the right to present a meaningful defense. *Hernandez v. Selsky,* 572 F.Supp.2d 446, 454 (S.D.N.Y.2008) (citing *Wolff* ). Instead, in order to keep a disciplinary hearing to within reasonable limits, a hearing officer "must have the necessary discretion ... to refuse to all witnesses that may create a risk of reprisal or undermine authority" *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2980.

**\*10** An inmate's request to have specific witnesses called to testify may be refused if the hearing officer reasonably finds that such witnesses' testimony would be duplicative, non-probative, or would interfere with correctional goals. *See Russell v. Selsky,* 35 F.3d 55, 58 (2d Cir.1994). "[A] hearing officer does not violate due process by excluding irrelevant or unnecessary testimony." *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999).

In support of his claim that he was denied the opportunity to present a meaningful defense plaintiff first points to the hearing officer's refusal to allow him to call his mother and attorney as witnesses. According to the plaintiff, both would have substantiated his claim of retaliatory motives on the part of correctional officials. Plaintiff's Memorandum (Dkt. No. 68–1) at p. 8; *see also* Selsky Decl., Exh. B (Dkt. No. 62–6) pp. 98–99. Neither witness, however, was present in the prison during any of the events giving rise to plaintiff's claims. The only testimony those individuals could have offered would not only have been hearsay, but would have come directly from Rodriguez himself, who was present to testify. Accordingly, the hearing officer properly determined that such testimony would have been irrelevant or unnecessarily redundant.

Plaintiff also challenges the hearing officer's failure to submit written questions to two fellow inmates who refused to testify at the hearing. Despite plaintiff's claim to the contrary, a hearing officer is under no affirmative duty to compel a response from an inmate who refuses to testify at a disciplinary hearing. If a witness has indicated that he or she will not testify if called, it would be futile and unnecessary to pursue his or her testimony further. *Silva,* 992 F.2d at 22; *see also Johnson v. Doling,* No. 9:05–CV–376, 2007 WL 3046701, at *7 (N.D.N.Y. Oct. 17, 2007) (McAvoy, J. and Treece, M.J.) (the failure to summon the testimony of a witness who refuses to testify does not violate due process); *Dumpson v. Rourke,* No. CIVA96CV621, 1997 WL 610652, at *5 (N.D.N .Y. Sept. 26, 1997) (Pooler, J. and DiBianco, M.J.) (a hearing officer's failure to investigate why an inmate refused to testify does not constitute a due process violation).

Here, inmates Colon and Berrios flatly refused to testify at plaintiff's disciplinary hearing, signing the appropriate refusal forms on January 14, 2004. Selsky Decl., Exh. A (Dkt. No. 62–4) pp. 110–11. Colon explained his refusal by noting that he had not witnessed the incident, and Berrios likewise claimed to have no relevant information because he was sleeping in his cell at the relevant times. *Id.* Requesting further information from these inmates would have been futile and unnecessary since they claimed not to have actually witnessed the events that led to Rodriguez's charges. It was therefore not a violation of plaintiff's due process rights for the hearing officer to refuse to inquire further into their involvement.

#### 4. *Impartial Hearing Officer*

**\*11** Among the due process dictates arising under the Fourteenth Amendment is the requirement that a hearing officer assigned to address a disciplinary charge against an inmate be unbiased. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see also Davidson v. Capuano,* No. 78 Civ. 5724, 1988 WL 68189, at *8 (S.D.N .Y. June 16, 1988) (citing *McCann v. Coughlin,* 698 F.2d 112, 122 n. 10 (2d Cir.1983)). While the reality is that most hearing officers serving in that capacity are prison officials, and a prison hearing officer's impartiality generally does not have to mirror that of judicial officers, nonetheless the result of a disciplinary hearing should not be "arbitrary and adversely predetermined." *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). Here again, the inquiry focuses on whether plaintiff was afforded basic due process. *See Wright v. Conway,* 584 F.Supp.2d 604, 609 (W.D.N.Y.2009). Within that context, an impartial hearing officer is one who "does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990).

It should be noted that a plaintiff's disagreement with a hearing officer's rulings alone does not give rise to a finding of bias. *See Johnson,* 2007 WL 3046701, at *10 (hostile exchanges between plaintiff and the hearing officer throughout the proceeding and adverse rulings did not constitute bias where plaintiff was otherwise provided the opportunity to testify, call witnesses, and raise objections). Similarly, the mere involvement of a hearing officer in related investigations or proceedings does not evidence bias. *See Vega v. Artus,* 610 F.Supp.2d 185, 200 (N.D.N.Y.2009) (failing to find bias where the hearing officer conducted both the disciplinary proceeding and the investigation into the inmate's grievance against the involved corrections officer).

Because prison officials serving as adjudicators enjoy a rebuttable presumption that they are unbiased, *Allen,* 100 F.3d at 259, plaintiff's conclusory allegations of bias in this case are insufficient to overcome this presumption. Plaintiff claims that Hearing Officer Ewanciw was biased because he sought assistance from Lt. Wright, who authored one of the two MBRs in issue. Plaintiff's Memorandum (Dkt. No. 68–1) at pp. 18–20. However, Rodriguez fails to explain how this evidences bias against him, reflects a predetermination on the hearing officer's part, or impacted the outcome of the proceeding. The

record reflects that the hearing officer disclosed to the plaintiff that he had consulted with Lt. Wright, the "disciplinary lieutenant," for the purpose of ascertaining whether plaintiff was permitted to receive copies of redacted investigation documents. Selsy Decl., Exh. B (Dkt. No. 62–5) p. 130.

During the hearing plaintiff suggested that the hearing officer and Lt. Wright are friends outside of work. Selsy Decl., Exh. B (Dkt. No. 62–5) pp. 131–32. While the allegation denied by Hearing Officer Ewanciw, even if true this fact does not show that he was predisposed to rule against plaintiff.

**\*12** In sum, plaintiff has failed to adduce evidence from which a reasonable factfinder could conclude that the hearing officer assigned to preside over plaintiff's disciplinary hearing was biased, or had prejudged plaintiff's guilt prior to considering the evidence presented at the hearing.

#### 5. *Determination Supported by "Some Evidence"*

In addition to repeated verbal explanations of his rulings throughout the hearing and of his ultimate findings, Hearing Officer Ewanciw provided plaintiff with a written explanation of the evidence relied upon in reaching his conclusion. Selsy Decl., Exh. A (Dkt. No. 62–4) pp. 3–4. In his written explanation, Hearing Ewanciw acknowledged that he relied in part on information from confidential witnesses. Selsy Decl., Exh. A (Dkt. No. 62–4) p. 4. The question next presented is whether these findings were supported by at least some credible evidence.

The "some evidence" standard is extremely tolerant and is satisfied if "there is any evidence in the record that supports" the disciplinary ruling. *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000). Nonetheless to pass constitute muster, the supporting evidence must be reliable. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001). The Second Circuit has made clear that "the reliability of evidence is always properly assessed by reference to the totality of the circumstances and that an informant's record for reliability cannot, by itself, establish the reliability of bald conclusions or third-party hearsay." *Sira,* 380 F.3d at 82; *see also Dawkins v. Gonyea,* 646 F.Supp.2d 594, 614 (S.D.N.Y.2009) ("*Sira* clearly established that an independent assessment is necessary to satisfy the 'some evidence' standard when a disciplinary decision is based solely on confidential information.").

The hearing transcript reflects that the hearing officer did not make an independent inquiry into the reliability of the confidential inmate witnesses himself, but instead relied on Lt. Wright's independent finding of reliability. Selsky Decl., Exh. B (Dkt. No. 62–5) p. 128. Had the disciplinary decision been based solely on such confidential information, an issue of material fact might have been presented as to whether the "some evidence" standard was met. With defendant Selsky's reversal of plaintiff's conviction on the demonstration charge contained within the January 2, 2004 MBR, the remaining charges for which he was found guilty included fighting, refusing a direct order, and violent conduct. To support his finding of guilt on those counts Hearing Officer Ewanciw relied on a correctional officer's assertion that he witnessed plaintiff raise his fists, throw punches, and fail to stop fighting when instructed to do so—an account that was corroborated by another officer's investigation—as well as the results of an investigation into the incident and evidence found in plaintiff's cell tying him to the relevant events. There was therefore sufficient reliable evidence on which to base a disciplinary decision related to the charges, independent of the confidential witness statements, and no reasonable factfinder could conclude otherwise.

IV. *SUMMARY AND RECOMMENDATION*

 **\*13** Plaintiff has failed to establish the existence of a genuine issue of material fact regarding his procedural due process claim. Rodriguez received sufficient notice of the charges against him as well as adequate assistance in preparing a defense, and had ample opportunity to appear, call witnesses, and present evidence in his defense. In addition, the record fails to disclose any basis for concluding that Hearing Officer Ewanciw was biased, and the record before the court proves that he provided plaintiff with a written explanation of the reasons for his decision, which was supported by at least some reliable evidence. I therefore recommend dismissal of plaintiff's due process claim against defendant Selsky on the merits, and in light of this recommendation find it unnecessary to address defendant's claim of qualified immunity. It is therefore respectfully

RECOMMENDED, that defendant's motion for summary judgment (Dkt. No. 62) be GRANTED, and that the complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1086001

---

End of Document          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 12836864
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Melvin KIMBROUGH, Plaintiff,

v.

Brian FISCHER, Albert Prack, T. Fauss,
Abate, J. Hai, McCarthy, Defendants.

9:13-CV-0100 (FJS/TWD)
|
Signed 10/21/2014

**Attorneys and Law Firms**

MELVIN KIMBROUGH, 00-A-2134, Plaintiff pro se,
Attica Correctional Facility, Box 149, Attica, NY 14011.

HON. ERIC T. SCHNEIDERMAN, Attorney General
for the State of New York, OF COUNSEL: TIFFINAY
M. RUTNIK, ESQ., The Capitol, Albany, NY 12224,
Counsel for Defendants.

**REPORT-RECOMMENDATION and ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**\*1** This pro se prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to
me for Report and Recommendation by the Honorable
Frederick J. Scullin, Jr., Senior United States District
Judge, pursuant to 28 U.S.C. § 636(b) and Local
Rule 72.3(c). Plaintiff Melvin Kimbrough claims that
Defendants violated his constitutional rights when they
punished him for passing Black Nationalist literature to
another inmate. (Dkt. No. 1.) Currently pending before
the Court is Plaintiff's motion for summary judgment
pursuant to Federal Rule of Civil Procedure 56. (Dkt. No.
49.) For the reasons discussed below, I recommend that
the Court deny Plaintiff's motion in part and grant it in
part.

**I. FACTUAL AND PROCEDURAL SUMMARY**
Plaintiff alleges that in July 2003, when he was housed at
Upstate Correctional Facility ("Upstate"), he ordered and
received a pamphlet titled "Black Nationalism." (Dkt. No.

1 at 5. [1]) Officials at Upstate allowed him to possess the
pamphlet. Id. at 5-6.

[1] Citations to page numbers in the complaint refer to
the page numbers assigned by the Court's electronic
filing system.

In August 2003, Plaintiff was transferred to Auburn
Correctional Facility ("Auburn"). (Dkt. No. 1 at 6.) On
June 6, 2010, Plaintiff was informed that he would be
transferring to a medium security facility. Id. On June
7, 2010, Plaintiff passed "an abundance of papers" to
another inmate to throw away. Id. These papers included
Black Nationalist literature. Id. Defendant Correction
Officer J. Hai intervened and confiscated the papers from
the other inmate. Id.

Plaintiff arrived at Mohawk Correctional Facility
("Mohawk") on June 8, 2010, and was immediately
placed in solitary confinement without any explanation.
(Dkt. No. 1 at 6.) On June 9, 2010, Plaintiff was
issued a misbehavior report that charged him with
violating Rules 105.13 (Unauthorized Organizations),
105.14 (Unauthorized Organizational Activities), 113.22
(Possessing Prohibited Articles), and 114.10 (Smuggling).
Id.

On June 11, 2010, Defendant T. Fauss began the Tier
III disciplinary hearing regarding the June 9, 2010,
misbehavior report. (Dkt. No. 1 at 7.) He adjourned the
hearing to allow Plaintiff to receive assistance, a rule book,
and his personal property from Auburn. Id. This personal
property included Plaintiff's receipts for the allegedly
unauthorized materials. Id. at 6. Plaintiff was provided
with an outdated rule book. Id. at 7. His "efforts to retrieve
his receipts for Black Nationalist literature were thwarted
by prison officials." Id.

Plaintiff asked his assigned assistant to obtain copies of his
disbursement receipts from prison business office records.
(Dkt. No. 1 at 7.) The assistant was unsuccessful because
facility records only went back three years. Id. He advised
Plaintiff to obtain a monthly statement from the central
office of the Department of Corrections and Community
Supervision's ("DOCCS"). Id.

Defendant Fauss restarted the disciplinary hearing on
June 14, 2010. (Dkt. No. 1 at 7.) Plaintiff pleaded
not guilty to all of the charged violations. Id. Plaintiff
moved to dismiss the charges for violating Rules 105.13

and 105.14 because those rules were not listed in the copy of the rule book that had been given to him. *Id.* Plaintiff also argued that he should not be charged with violating Rule 105.13 because it pertained to gangs rather than unauthorized organizations. *Id.* Plaintiff argued that Defendant Hai had "attempted to enhance the magnitude of [the] alleged violation" by charging Plaintiff with violating both Rule 105.13 and 105.14. *Id.* Plaintiff testified that the Black Nationalist literature had been "reviewed, permitted and delivered to him" at Upstate and that it posed no threat to the safety and security of the institution. *Id.*

**\*2** The hearing continued on June 15, 2010, with testimony from the inmate to whom Plaintiff handed the materials and from Defendant Hai. (Dkt. No. 1 at 8.)

Defendant Fauss found Plaintiff guilty of all four rule violations. (Dkt. No. 1 at 8.) He imposed sanctions of 120 days' solitary confinement, 120 days' loss of good time credits, and loss of phone, commissary, and package privileges. *Id.*

Plaintiff alleges that after finding him guilty, Defendant Fauss turned off the tape recorder and said "You know what this is about, Mr. Hai told me about you. That Black Nationalist [b]ullshit is not tolerated!" (Dkt. No. 1 at 8.)

Plaintiff appealed Defendant Fauss' determination. (Dkt. No. 1 at 8.) On July 20, 2010, Defendant Albert Prack, Acting Director of Special Housing/ Inmate Disciplinary Program, modified Defendant Fauss' decision by dismissing the Rule 105.13 charge. *Id.* at 8, 25. Defendant Prack affirmed the other sanctions. *Id.* Defendant Prack did not reduce Plaintiff's solitary confinement time, his loss of good time credits, or his loss of privileges. *Id.*

Plaintiff alleges that while he was housed in solitary confinement, he was locked down for twenty-four hours a day in a sixty-foot double bunk cell. (Dkt. No. 1 at 10.) The light was kept on all night. *Id.* He had no privacy, was not allowed to participate in sports or social gatherings, was unable to attend religious services, was not allowed to have contact visits, and received the "bare minimum personal property and food rations." *Id.* Plaintiff was released from solitary confinement on April 21, 2012. *Id.*

Plaintiff filed an Article 78 proceeding in state court challenging his disciplinary conviction. (Dkt. No. 1 at 8.) On June 21, 2012, the appellate division ruled in Plaintiff's favor and ordered DOCCS to expunge the disciplinary conviction, restore all of Plaintiff's privileges, and restore Plaintiff's good time credits. *Kimbrough v. Fischer*, 96 A.D.3d 1251, 946 N.Y.S.2d 714 (3d Dep't 2012). The court stated that:

> On the record before us, we cannot conclude that substantial evidence supports the determination finding petitioner guilty of possessing unauthorized organizational material. The disciplinary rule at issue provides, in pertinent part, that '[a]n inmate shall not ... possess printed or handwritten material relating to an unauthorized organization where such material advocates either expressly or by clear implication, violence based upon race, religion, sex, sexual orientation, creed, law enforcement status or violence or acts of disobedience against department employees or that could facilitate organizational activity within the institution by an unauthorized organization.' Significantly, the documents that petitioner possessed did not refer to any particular organization nor did they advocate violence or acts of disobedience. Further, as no evidence was presented in the misbehavior report, the hearing testimony, or elsewhere in the record to sustain the remaining charges on a basis independent of a finding that the materials petitioner possessed were unauthorized, those charges must also be annulled.

*Id.* at 714-15 (citations omitted).

Plaintiff filed this action on January 28, 2013. (Dkt. No. 1.) The complaint asserts the following causes of action: (1) a First Amendment claim against Defendant Hai for confiscating Plaintiff's papers and issuing the misbehavior report and against Defendant Abate [2] for failing to dismiss the misbehavior report (*id.* at 10-11); (2) a due process claim against Defendant Fauss for his conduct during the disciplinary hearing, against Defendant Prack for affirming the majority of the hearing results, and against Defendant Fischer for failing to reverse the disciplinary decision (*id.* at 11, 13); (3) an equal protection claim against Defendants Hai, McCarthy, and Fauss (*id.* at 12-13); and (4) an Eighth Amendment claim against Defendants Hai, Abate, Fauss, Prack, and Fischer (*id.* at 14-15). Plaintiff requests declaratory and injunctive relief, compensatory damages, and punitive damages. *Id.* at 15-16.

[2]      The complaint does not make any reference to Defendant Abate other than asserting that he had the authority to dismiss the misbehavior report.

**\*3** Defendants moved for summary judgment. (Dkt. No. 47.) On September 29, 2014, I issued a Report-Recommendation recommending that the Court grant Defendants' motion in part and dismiss (1) the First Amendment claims against Defendants Hai and Abate; (2) the equal protection claims against Defendants Hai, McCarthy, and Fauss; and (3) the Eighth Amendment claims against Defendants Hai, Abate, Fauss, Prack, and Fischer. (Dkt. No. 62 at 30-31.) In light of that recommendation, I recommended that the Clerk terminate Defendants Hai, Abate, McCarthy, and Fischer from the docket. *Id.* at 31. I recommended that the Court deny Defendants' motion for summary judgment as to the due process claim against Defendants Fauss and Prack. *Id.*

Plaintiff moves for summary judgment. (Dkt. No. 49.) Defendants have opposed the motion. (Dkt. Nos. 50.) Plaintiff has filed a reply. (Dkt. No. 53.) Plaintiff's motion was filed before the Report-Recommendation on Defendants' motion was issued, and thus both his papers and Defendants' papers address all of the causes of action in the complaint.

## II. LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* at 273. The nonmoving party must do more than "rest upon the mere allegations ... of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [3] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

[3]      A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

## III. ANALYSIS

### A. Moot Claims

Plaintiff moves for summary judgment in his favor on his First Amendment, equal protection, and Eighth Amendment claims. (Dkt. No. 49-3 at 2-3. [4] ) I previously recommended that the Court grant Defendants' motion for summary judgment on those claims. (Dkt. No. 62 at 30-31.) In light of that recommendation, I recommend that the Court deny Plaintiff's motion for summary judgment on those claims as moot.

[4]      References to page numbers in Plaintiff's memorandum of law refer to the page numbers assigned by the Court's electronic filing system.

### B. Due Process Claim

Plaintiff alleges that Defendants Fauss and Prack violated his right to procedural due process. [5] (Dkt. No. 1 at 6-11.) I previously recommended denying Defendants' motion for summary judgment on this claim. (Dkt. No. 62 at 17-24.) Plaintiff moves for summary judgment in his favor on this claim. (Dkt. No. 49-3 at 16-23.) Defendants oppose the motion, relying on the memorandum of law submitted in support of their own motion for summary judgment. (Dkt. No. 50-1 at 2, [6] incorporating Dkt. No. 47-1 by reference.) For the reasons discussed below, I recommend that the Court (1) find, as a matter of law, that Defendants Fauss and Prack violated Plaintiff's right to procedural due process; and (2) direct the parties to file further briefing regarding the issue of relief.

[5]      The complaint also asserts a due process claim against Defendant Fischer but, as discussed in the earlier Report-Recommendation, summary judgment should be granted for Defendant Fischer because

he was not personally involved in the alleged constitutional violation. (Dkt. No. 62 at 16-17.)

6   References to page numbers in citations to Defendants' opposition to Plaintiff's motion for summary judgment refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

**\*4** In order to prove that procedural due process rights were violated, a plaintiff must show that he was deprived of a cognizable liberty or property interest without due process of law. *McKithen v. Brown*, 626 F.3d 143, 151 (2d Cir. 2010). An inmate has a liberty interest in remaining free from a confinement or restraint where the confinement or restraint imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

Defendants concede for the purposes of this motion "that the penalty imposed here, four months in special housing, implicated a liberty interest." (Dkt. No. 47-1 at 10.) Defendants, however, "dispute whether plaintiff was deprived of that interest as a result of insufficient process." *Id.*

Due process is satisfied if an inmate facing disciplinary charges receives (1) advanced written notice of the charges against him; (2) a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; (3) a fair and impartial hearing officer; and (4) a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken. *Wolff v. McDonnell*, 418 U.S. 539, 559, 563-67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). Here, Plaintiff does not challenge the sufficiency of the written notice he received, allege that he was not given a reasonable opportunity to call witnesses and present evidence, or challenge the sufficiency of the written statement of the disposition. (Dkt. No. 49-3 at 16-23.) Rather, he argues that Defendant Fauss was not a fair and impartial hearing officer and that Defendant Prack should not have affirmed the hearing decision. *Id.*

It is well settled "that the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally." *Espinal v. Goord*, 180 F.Supp.2d 532, 539 (S.D.N.Y. 2002) (citing *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ). Due process

in this context requires only that the hearing officer's decision not be "arbitrary." *Wolff*, 418 U.S. at 571, 94 S.Ct. 2963. A decision is not "arbitrary" if it is supported by "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). "This standard is extremely tolerant and is satisfied if 'there is *any* evidence in the record that supports' the disciplinary ruling." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (emphasis in original) (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000) ). In contrast to this "extremely tolerant" federal standard, "New York law requires prison disciplinary rulings to be supported by 'sufficiently relevant and probative' information to constitute *substantial* evidence. This requirement is sterner than the 'some evidence' standard necessary to afford due process." *Sira*, 380 F.3d at 76 n.9 (emphasis added) (internal citations omitted).

Here, there was not "some evidence" that Plaintiff violated Rule 105.13. That rule states that an inmate:

> shall not engage in or encourage others to engage in gang activities or meetings, or display, wear, possess, distribute or use gang insignia or materials including, but not limited to, printed or handwritten gang or gang related material. Note: For purposes of this rule, a gang is a group of individuals, having a common identifying name, sign, symbol or colors, who have individually or collectively engaged in a pattern of lawlessness (e.g., violence, property destruction, threats of harm, intimidation, extortion, or drug smuggling) in one or more correctional facilities or that are generally recognized as having engaged in a pattern of lawlessness in the community as a whole. For purposes of this rule, printed or handwritten gang or gang related material is written material that, if observed in the inmate's possession, could result in an inference being drawn about the inmate's gang affiliation, but

excludes published material that the inmate has obtained through the facility library or that has been approved for the inmate to possess through the media review process.

**\*5** N.Y. Comp. Codes R. & Regs. tit. 7, § 270.2(B)(6)(IV) (2013). There was no evidence presented at the disciplinary hearing that Plaintiff distributed gang materials. Defendant Fauss' guilty finding on this charge was subsequently reversed. (Dkt. No. 1 at 8, 25.) That reversal does not protect Defendant Fauss from liability because it is well established in the Second Circuit that subsequent administrative reversals do not cure procedural defects in disciplinary hearings. *Walker v. Bates*, 23 F.3d 652, 657 (2d Cir. 1994).

There was also not "some evidence" that Plaintiff violated Rule 105.14. That rule states that an inmate:

> shall not engage in or encourage others to engage in unauthorized organizational activities or meetings, or possess printed or handwritten material relating to an unauthorized organization where such material advocates either expressly or by clear implication, violence based upon race, religion, sex, sexual orientation, creed, law enforcement status or violence or acts of disobedience against department employees or that could facilitate organizational activity within the institution by an unauthorized organization.... This rule excludes possession of published material that the inmate has obtained through the facility library or that has been approved for the inmate to posses through the media review process.

N.Y. Comp. Codes R. & Regs. tit. 7, § 270.2(B)(6)(V) (2013).

The rule clearly states that inmates who possess published material that has been approved through the media review process cannot be found guilty of violating the rule. Plaintiff raised this issue at his disciplinary hearing, noting that the publications were from an approved vendor and that "I shouldn't be penalized or punished just by having this." (Dkt. No. 47-11 at 50.) As Plaintiff correctly notes (Dkt. No. 49-3 at 19), Defendant Fauss did not dispute that Plaintiff had received permission to possess the publications. Rather, Defendant Fauss stated that:

> I have had numerous hearings where guys have been ... charged with having possession of things that they shouldn't have whether it be gang related or things that they purchased ... and ... the staff at the facilities do their best to review things and if it is stuff that is not allowed in they stop it. They don't allow it to come in, but the reality is that they can't review every little thing that comes into the facility, so the responsibility is placed on the person receiving it, the inmate receiving the material. If you are in possession of something that you are not supposed to have that is on you because that is in your possession and that is the way it is looked at.... Just to let you know.

(Dkt. No. 47-11 at 51.)

Defendants argue that Defendant "Fauss correctly explained to [Plaintiff] that it is the responsibility of the inmate to ensure that his possessions ultimately conform with DOCCS rules, not the officials who screen materials coming into the prison." (Dkt. No. 47-1 at 11-12.) Defendants, however, cite no authority for the proposition that this was a "correct" statement of the rules. On the record before the Court, in fact, Defendant Fauss' statement directly contradicts the plain language of Rule 105.14. The undisputed evidence presented to Defendant Fauss showed that Plaintiff had received approval through the media review process to possess

the publications. Pursuant to this evidence, Plaintiff's conduct fell within the exception to the disciplinary rule. Accordingly, there was no evidence to support Defendant Fauss' guilty finding. Therefore, I recommend that the Court grant Plaintiff's motion for summary judgment in his favor on the due process claim against Defendant Fauss.

### 1. Defendant Prack

**\*6** Plaintiff's due process claim against Defendant Prack is premised on the fact that he affirmed the majority of Defendant Fauss' decision. (Dkt. No. 1 at 8, 11.) Defendants appear to argue that this allegation is insufficient to implicate Defendant Prack's personal involvement. (Dkt. No. 47-1 at 13.) For the reasons discussed below, I recommend that the Court find that Defendant Prack was personally involved in the constitutional violation.

Defendants correctly note that "[d]istrict courts are split in the Second Circuit on the issue of whether simply affirming an allegedly unconstitutional disciplinary decision will implicate the requisite personal involvement for § 1983 liability." (Dkt. No. 47-1 at 13 n.3.) Courts declining to find personal involvement conclude that there is no "ongoing" violation for the supervisory official to "remedy" in such a situation. *See Jamison v. Fischer*, No. 11 Civ. 4697 (RJS), 2012 U.S. Dist. LEXIS 144307 at \*14-15, 2012 WL 4767173, at \*5 (S.D.N.Y. Sept. 27, 2012) ("Despite the fact that Plaintiff continued to be housed in the SHU, Bezio's involvement and review of the matter was distinct from whatever took place at the hearing, and he cannot be held liable ... for violations that occurred at the hearing and were not ongoing."). [7] *See also Abdur-Raheem v. Selsky*, 598 F.Supp.2d 367, 370 (W.D.N.Y. 2009); *Chavis v. vonHagn*, No. 02-CV-0119 (SR), 2009 U.S. Dist. LEXIS 6871 at \*198-99, 2009 WL 236060, at \*68 (W.D.N.Y. Jan. 30, 2009); *Odom v. Calero*, No. 06 Civ. 15527 (LAK) (GWG), 2008 U.S. Dist. LEXIS 52408 at \*16-20, 2008 WL 2735868, at \*6-7 (S.D.N.Y. July 10, 2008); *Ramsey v. Goord*, No. 05-CV-47A, 2005 U.S. Dist. LEXIS 42953 at \*18-20, 2005 WL 2000144, at \*6 (W.D.N.Y. Aug. 13, 2005).

[7]    The Court provided Plaintiff copies of the unpublished decisions cited in this section with his

copy of the previous Report-Recommendation in this case. (Dkt. No. 62 at 33-165.)

Other district courts in this circuit have found personal involvement where a supervisory official affirms an allegedly constitutionally infirm hearing decision. *See Thomas v. Calero*, 824 F.Supp.2d 488, 509-10 (S.D.N.Y. 2011); *Holmes v. Fischer*, 764 F.Supp.2d 523, 539-40 (W.D.N.Y. 2011); *Rodriguez v. Selsky*, No. 9:07-CV-0432 LEK/DEP, 2010 U.S. Dist. LEXIS 23811 at \*14-20, 2010 WL 9 [8] 80273, at \*6 N.D.N.Y. Mar. 15, 2010 ; *Baez v. Harris*, No. 9:01-CV-807, 2007 U.S. Dist. LEXIS 8728 at \*6, 2007 WL 446015, at \*2 (N.D.N.Y. Feb. 7, 2007); *Johnson v. Coombe*, 156 F.Supp.2d 273, 278 (S.D.N.Y. 2001). These courts find that there is an "ongoing" violation because having the power to vacate an allegedly unconstitutional decision, refusing to do so, and allowing an inmate to remain in the SHU "knowingly continu[es] a deprivation of liberty without due process of law." *Delgado v. Bezio*, No. 09 Civ. 6899 (LTS), 2011 U.S. Dist. LEXIS 51917 at \*27, 2011 WL 1842294, at \*9 (S.D.N.Y. May 9, 2011).

[8]    Lexis and Westlaw list different dates for this decision. The Court has used the date listed by Westlaw, which represents the date on which the district court judge adopted the magistrate judge's report-recommendation.

I agree with Magistrate Judge David E. Peebles that the cases finding personal involvement in such situations "appear to be both better reasoned and more consistent with the Second Circuit's position regarding personal involvement." *Bennett v. Fischer*, No. 9:09-CV-1236 (FJS/DEP), 2010 U.S. Dist. LEXIS 139587 at \*38-39, 2010 WL 5525368, at \*12 (N.D.N.Y. Aug. 17, 2010). Therefore, I recommend that the Court find that Defendant Prack was personally involved in the alleged constitutional violation and grant Plaintiff's motion for summary judgment in his favor on the due process claim against Defendant Prack.

### 2. Relief

**\*7** Having recommended that the Court grant summary judgment in Plaintiff's favor on his due process claims against Defendants Fauss and Prack, the issue of the appropriate relief remains. Plaintiff seeks declaratory and injunctive relief, compensatory damages, and punitive

2014 WL 12836864

damages. (Dkt. No. 1 at 15-16.) The parties have not addressed the issue of relief.

Plaintiff's ability to recover damages is limited by the Prison Litigation Reform Act ("PLRA"). Pursuant to the PLRA, "[n]o Federal civil action may be brought by a prisoner ... for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e) (2006). Prisoners who bring civil actions without a prior showing of physical injury are limited to recovering compensatory damages for actual injury, nominal damages, punitive damages, injunctive relief, and declaratory relief. Thompson v. Carter, 284 F.3d 411, 416 (2d Cir. 2002). Here, Plaintiff does not allege that he suffered any physical injury as a result of the due process violation. Thus, his right to recover damages is limited by the PLRA.

Judges in the Northern District of New York have occasionally granted summary judgment for prisoners regarding procedural due process violations and, in the same order, awarded the prisoner nominal damages. See, e.g., Hinton v. Prack, No. 9:12-CV-1844 LEK/RFT, 2014 U.S. Dist. LEXIS 126 [9] 955 at *41-45, 2014 WL 4627120, at *16-17 N.D.N.Y. Sept. 11, 2014 . [10] Hinton is distinguishable, however. In that case, the prisoner did not receive a formal written statement of the reasons for his disciplinary conviction until "at least six months after the hearing was actually held." Hinton, 2014 WL 4627120, at *15. The Court found that the failure to timely provide the formal written statement violated the prisoner's procedural due process rights. Id. at *16. However, the Court also found that the prisoner had not suffered any actual injury from the due process violation because he could not show that the failure to provide the notice hampered his efforts to appeal his disciplinary conviction. Id. The Court noted, in particular, that the prisoner's attempts to appeal the disciplinary decision were unsuccessful even after the judge granted him permission to reapply with a copy of the written notice after he received it. Id. Thus, the Court concluded, the due process violation neither caused nor lengthened the prisoner's SHU term. Id. The prisoner did not seek declaratory or injunctive relief. Hinton v. Prack, No. 9:12-CV-1844 (LEK/RFT), Dkt. No. 1.

[9]    Lexis and Westlaw list different dates for this decision. The Court has used the date listed by Westlaw, which represents the date on which the

district court judge adopted the magistrate judge's report-recommendation.

[10]    The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in Lebron v. Sanders, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Here, unlike in Hinton, the Court simply does not have enough information to assess damages on the record and briefing before it. Unlike the prisoner in Hinton, Plaintiff was, in fact, confined to the SHU as a direct result of the due process violation and thus suffered an actual injury (although that injury was not physical). Plaintiff seeks $200,000 in compensatory damages. (Dkt. No. 1 at 16.) It is not clear whether Plaintiff considers any of that amount to be compensatory damages for his actual injury, such as, inter alia, the loss of prison job wages or the value of his property. Moreover, Plaintiff seeks and, if the Court adopts this Report-Recommendation, is entitled to a declaratory judgment that Defendants Fauss and Prack violated his due process rights. He may also be entitled to injunctive relief. The injunctive relief he seeks is the "return of all [P]laintiff's material that was confiscated from him" and the reversal and expungement of his disciplinary conviction. (Dkt. No. 1 at 15.) It is not clear from the briefing and evidence currently before the Court whether (a) Plaintiff is entitled to the return of materials that, by his own admission, he gave to another inmate in order to place in the trash (id. at 6); (b) whether those materials are still in existence; or (c) whether Plaintiff's disciplinary conviction has already been expunged as a result of his Article 78 proceeding. In short, the Court simply needs more information before it can assess the appropriate relief in this case. Therefore, if the Court adopts this Report-Recommendation, it is recommended that the parties be allowed an opportunity to brief the issue of the appropriate relief and the best method for determining that relief.

**8 ACCORDINGLY**, it is

RECOMMENDED that Plaintiff's motion for summary judgment (Dkt. No. 49) be GRANTED IN PART AND DENIED IN PART. Specifically, it is recommended that Plaintiff's motion for summary judgment of the First Amendment, equal protection, and Eighth Amendment claims be denied as moot and that Plaintiff's motion for summary judgment of the due process claims against Defendants Fauss and Prack be granted; and it is further

Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 191 of 237

**RECOMMENDED** that the Court direct the parties to file briefs regarding relief; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Hinton v. Prack*, No. 9:12-CV-1844 (LEK/RFT), 2014 U.S. Dist. LEXIS 126955 at *41-45, 2014 WL 4627120, at *16-17 (N.D.N.Y. Sept. 11, 2014).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam) ); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

**All Citations**

Slip Copy, 2014 WL 12836864

---

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 1843292
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Bernard JOHNSON Plaintiff,
v.
Superintendent J.T. SMITH, Defendant.

No. 9:03CV1050 (FJS/DEP).
|
June 29, 2006.

**Attorneys and Law Firms**

Bernard Johnson, Sullivan Correctional Facility, Fallsburg, New York, Plaintiff, pro se.

Office of the New York State Attorney General, The Capitol, Albany, New York, for Defendant, David L. Fruchter, AAG, of counsel.

Hon. Eliot Spitzer, Attorney General of the State of New York, The Capitol, Albany, New York, for Defendant.

David Fruchter, Assistant Attorney General, of counsel.

## MEMORANDUM-DECISION AND ORDER

SCULLIN, Senior J.

### I. INTRODUCTION

**\*1** On January 29, 2003, Plaintiff was playing basketball in the Shawangunk Correctional Facility's gymnasium.[1] While rebounding a ball, Plaintiff landed on a large bubble in the gymnasium floor causing his foot to roll beneath him. Although Plaintiff attempted to "deal" with his injury by taking ibuprofen and elevating his foot, he sought medical attention when his foot began to swell and the pain worsened. The facility's medical center treated Plaintiff later that day; they wrapped his foot, gave him crutches and provided him with ibuprofen for the pain. X-rays taken the next day revealed no fractures or breaks; however, Plaintiff continued to experience pain in his right foot and sought regular medical attention for it until he was transferred out of Shawangunk on March 10, 2003.

[1]     At all relevant times, Plaintiff was an inmate confined at the Shawangunk Correctional Facility located in Wallkill, New York, and Defendant Smith was the superintendent of that facility.

Prior to Plaintiff's accident, prison officials, including Defendant, had been made aware of the problems with the gymnasium floor. In fact, over the years, several attempts to fix the floor were unsuccessful; and, in 1995, the conclusion was reached that replacement of the entire floor was necessary.[2] In 1995, the facility submitted a request to the Office of Facilities Planning for funding to underwrite the expense of replacing the gymnasium floor. However, funding was not approved until after Plaintiff's accident in 2003. Defendant assumed the role of superintendent in October 2002; and, at that time, he was informed of the defects in the gymnasium floor and of the pending request for funding to replace the floor. Plaintiff's evidence shows that inmates who had been injured due to the deteriorating condition of the floor had filed grievances prior to his accident. However, the officials did not limit the use of the gymnasium floor until after Plaintiff's accident.

[2]     The orignal floor was constructed in 1985 and was made of cement and vinyl overlay. The vinyl overlay over time developed bubbles.

Plaintiff commenced this action pursuant to 42 U.S.C. § 1983 alleging that Defendant Smith was deliberately indifferent to his health and safety by failing to provide him with safe living conditions. Specifically, Plaintiff alleges that he suffered physical injury when he was allowed onto the facility's basketball court despite known defects in the floor. Currently before the Court are Defendant's objections to Magistrate Judge Peebles' December 7, 2005 Report and Recommendation in which he recommended that the Court deny Defendant's motion for summary judgment on Plaintiff's Eighth Amendment claim and that the Court deny Defendant's motion for summary judgment based upon the ground of qualified immunity without prejudice to Defendant's right to renew that defense at trial.

### II. DISCUSSION

**A. Defendant's Objections**
Defendant asserts that Magistrate Judge Peebles erred in each of his determinations with respect

Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 193 of 237
Johnson v. Smith, Not Reported in F.Supp.2d (2006)
2006 WL 1843292

to Defendant's motion. First, Defendant asserts that Magistrate Judge Peebles erred in concluding that Plaintiff satisfied the objective requirement of an Eighth Amendment confinement claim because Plaintiff "has not demonstrated that the condition of the gym floor resulted in 'unquestioned and serious deprivations of basic human needs.' " See Defendant's Objections at ¶ 1 (quotation omitted). Second, Defendant asserts that Magistrate Judge Peebles erred in concluding that Plaintiff had satisfied the subjective requirement of an Eighth Amendment confinement claim because Plaintiff cannot demonstrate a culpable state of mind on the part of Defendant. See id. at ¶ 2. Third, Defendant asserts that Magistrate Judge Peebles erred in concluding that Defendant was not entitled to summary judgment based upon a qualified immunity defense because Defendant did not violate any clearly established rights of Plaintiff and it was objectively reasonable for him to wait for a determination from the Office of Facilities Planning before taking further action to repair the gym floor. See id. at ¶ 3. Finally, Defendant asserts that Magistrate Judge Peebles "erred in not concluding that, even accepting plaintiff's allegations as true for purposes of this motion, that plaintiff has done nothing more than assert a claim for negligence." See id. at ¶ 4 (emphasis added).

## B. Standard of Review

**\*2** "The Court must make a 'de novo determination of those portions of the Report or specified proposed findings or recommendations to which an objection is made.' " Doe v. Goord, No. 04CV00570, 2006 WL 1041130, *1 (S.D.N.Y. Apr. 18, 2006) (quoting 28 U.S.C. § 636(b)(1)(C)) (other citation omitted). In conducting its de novo review, the court may " 'arrive at its own, independent conclusions' regarding those portions [of the Report and Recommendation] to which objections were made." Id. (quotation omitted).

"Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law." Smith v. Oritz, No. 01 Civ. 5848, 2006 WL 1458404, *2 (S.D.N.Y. May 25, 2006) (citing Fed.R.Civ.P. 56(c)) (other citations omitted). Summary judgment shall be granted " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " Id. at

**\*3** (quoting Fed.R.Civ.P. 56(c)). Furthermore, the court must draw all factual inferences and resolve all ambiguities in favor of the non-moving party. See id. (citations omitted). The rule is best stated as follows: " '[v]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier [of fact] could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate.' " Id. (quoting Binder v. LILCO, 933 F.2d 187, 191 (2d Cir.1991)). Moreover, when a plaintiff proceeds pro se, the court must construe his pleadings liberally; however, " 'bald assertion[s],' unsupported by evidence, [are] not sufficient to overcome a motion for summary judgment." Id. (quotation omitted).

## C. Eighth Amendment Conditions of Confinement Claim

The conditions of an inmate's confinement are subject to scrutiny under the Eighth Amendment. See Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citation omitted). Prison officials must provide humane conditions of confinement and "must ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " Id. (quotation and other citations omitted) (emphasis added); see also Helling v. McKinney, 509 U.S. 25, 32 (1993) (listing " 'food, clothing, shelter, medical care, and reasonable safety' " as basic human needs (quotation omitted)). "In order to establish a violation of his Eighth Amendment rights, an inmate must show (1) a deprivation that is 'objectively, sufficiently serious' that he was denied 'the minimal civilized measure of life's necessities;' " Gaston v. Coughlin, 249 F.2d 156, 164 (2d Cir.2001) (quoting [Farmer,] at 834, 114 S.Ct.1970), if the allegations are based upon a failure to prevent harm, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm," Farmer, 511 U.S. at 834, and "(2) a 'sufficiently culpable state of mind' on the part of the defendant official, such as deliberate indifference to inmate health or safety[,]" Gaston, 249 F.2d at 164 (quoting [Farmer,] at 834, 114 S.Ct.1970).

**\*3** In assessing whether a deprivation is "objectively, 'sufficiently serious,' " a court must assess not only the seriousness and likelihood of potential harm but also

whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

*Helling,* 509 U.S. at 36; *see also Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) ("[T]o establish the objective element of an Eight [sic] Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency" (citations omitted)); *Gomez v. Warden of Otisville Corr. Facility,* No. 99 Civ. 9954, 2000 WL 1480478, *5 (S.D.N.Y. Sept. 29, 2000) (citations omitted) (finding that allegations of slippery waxed floor, "arguably posed a substantial risk of harm sufficient to satisfy the objective component" (citations omitted)); *Baumann v. Walsh,* 36 F.Supp.2d 508, 513-14 (N.D.N.Y.1999) (holding that a substantial risk of serious harm existed when the plaintiff inmate was required "to climb along shelves and stand on boxes to retrieve material from the top shelves of the storage room" and stating that "[s]uch conditions, if proven to be true, are inherently unsafe and dangerous").

In determining whether the prison official acted with deliberate indifference, the inquiry is whether "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. Furthermore, although "[m]ere negligence ... does not suffice to establish a violation of the Eighth Amendment," *Goris v. Breslin,* slip copy, No. 04-CV-5666, 2006 WL 1313823, *1 (E.D.N.Y. May 12, 2006) (citing *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996)), "allegations ... [that] 'involve more than ordinary lack of due care for the prisoner's interests or safety ... state a colorable claim under the Eighth ... Amendment ...,'" *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (internal quotation and citations omitted).

*1. Objective Requirement*

Plaintiff's allegations are based upon a failure to protect, and thus he needs to show that the conditions under which he was incarcerated posed a substantial risk of serious harm. Reasonable safety has been found to be a basic human need, and Plaintiff presents evidence to support his claim that the deteriorating gym floor caused injury not only to him but to at least two or three inmates before him. *See* Plaintiff's Opposition at Exhibit "C." He also presents medical reports indicting that his ankle was sprained and that his ankle continued to cause him problems and pain for more than nine months, even though x-rays showed no fractures. *See id.* at Exhibit "E." Although Defendant does not dispute the condition of the gym floor or that Plaintiff and others were injured on the floor, Defendant states that he did not believe that the condition posed a threat to the safety of inmates or staff. *See* Affidavit of Joseph T. Smith, sworn to March 17, 2005 ("Smith Aff."), at ¶ 8. Defendant, however, also provides evidence that officials, including Defendant, knew that, over time, the vinyl overlay on the floor had developed bubbles in it, repairs had been unsuccessful, and eventually in 1995 concluded that the floor needed to be replaced and began applying for funding. *See* Affidavit of John Ewanciw, sworn to March 17, 2005 ("Ewanciw Aff."), at ¶¶ 5-6.

**\*4** Based upon this evidence, the Court concludes that there is an issue of fact as to whether a "substantial risk of serious harm" existed with respect to the deteriorating gym floor and Plaintiff's use of it. A reasonable fact-finder could conclude that the deteriorating gym floor and bubbling overlay posed a substantial risk of serious harm to inmates. Accordingly, the Court affirms Magistrate Judge Peebles' conclusion that Plaintiff has satisfied the objective prong of his Eighth Amendment claim.

*2. Subjective Requirement*

Defendant candidly admits that he knew of the deteriorating condition of the gym floor. *See* Smith Aff. at ¶ 4. However, he states that he did not think that it posed any threat to inmate or staff safety and therefore did not limit the use of the gym floor prior to Plaintiff's accident. *See id.* at ¶ 8. Furthermore, he thought that the best course of action was to wait for a determination regarding funding for the replacement of the gym floor. *See id.* at ¶ 5.

Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 195 of 237

Plaintiff submits evidence of inmates injured due to the floor's condition prior to his own accident. *See* Plaintiff's Opposition at Exhibit "C." These inmates filed grievances, and Defendant signed the grievance determinations. This evidence creates the inference that Defendant was aware that inmates had suffered injury due to the deteriorating gym floor. *See id.* at Exhibits "A"-"B." Furthermore, Plaintiff's submissions indicate that Defendant did not place any limitation on the floor until *after* Plaintiff's accident. *See id.;* Smith Aff. at ¶ 8.

Construing this evidence in the light most favorable to Plaintiff, the Court concludes that an issue of fact exists as to whether Defendant was deliberately indifferent to Plaintiff's safety. In other words, a reasonable fact-finder could conclude that Defendant was aware of facts from which he could draw the inference that a substantial risk of serious injury existed and that Defendant drew that inference. [3] Therefore, the Court affirms Magistrate Judge Peebles' conclusion that Plaintiff has satisfied the subjective element of his Eighth Amendment Claim.

[3]   Plaintiff's allegations involve more than a mere lack of due care for a prisoner's safety considering that he alleges, and provides evidence which supports his allegations, that Defendant knew of the deterioration and knew of two or three inmates who had been injured, during the same month but prior to Plaintiff due to the floor's conditions. Thus, his allegations may support a claim for cruel and unusual punishment under the Eighth Amendment. *See Gill, 824 F.2d at 195* (citations omitted).

Accordingly, since Plaintiff has created an issue of fact regarding both the objective and subjective elements of his Eighth Amendment claim, the Court denies Defendant's motion for summary judgment.

D. Qualified Immunity

Under 42 U.S.C. § 1983, a public official is entitled to qualified immunity if [his] acts did not violate clearly established rights of which a reasonable officer would have known, or if [he] reasonably believed that [his] conduct did not violate those rights.... The test is whether, in light of the clearly established federal right, it was objectively reasonable for the official to believe that his ... actions were constitutional....

*Desulma v. City of N.Y.,* No. 98 Civ.2078, 2006 WL 798002, *8 (S.D.N.Y. July 6, 2001) (internal citations omitted).

If reasonable officials could disagree as to whether the actions at issue violate the Constitution then the official is entitled to qualified immunity. *See id.* However, summary judgment will not be granted based upon qualified immunity " '[i]f any reasonable trier of fact could find that the defendants' actions were objectively unreasonable....." ' *Id.* (quotation omitted). "The Eighth Amendment right of inmates '[t]o be furnished with the basic human needs, one of which is "reasonable safety" ' is both clearly established and well-settled." *Armstrong v. Breslin,* slip copy, No. 05 CV 2876, 2006 WL 436009, *5 (E.D.N.Y. Feb. 22, 2006) (quoting *Helling,* 509 U.S. at 33).

**\*5** Since Plaintiff has stated a claim for a violation of a clearly established right, the right to reasonable safety under the Eighth Amendment, to be entitled to summary judgment based upon qualified immunity, Defendant's actions must have been objectively reasonable. Defendant argues that it was objectively reasonable for him "to believe that his plan to wait for a determination from the Office of Facilities Planning before taking further action to repair the gym floor was sufficient and did not pose a threat to the safety of inmates or staff." *See* Defendant's Objections to R & R at 3.

The record before this Court clearly indicates that Defendant knew about the condition of the floor, decided not to repair it until a determination was made regarding funding for a new gym floor, and did not restrict use of the deteriorating areas of the floor until after Plaintiff was injured, despite prior injuries to inmates due to the gym floor's condition. *See* Smith Aff. at ¶¶ 4-5, 8, 10; Plaintiff's Opposition at Exhibits "B" & "C." However, the issue is not whether Defendant's decision to wait for funding before repairing the floor was reasonable; the issue is whether it was unreasonable for Defendant to leave the deteriorating areas of the floor unrestricted despite his knowledge that inmates had been injured due to the floor's condition. [4] A jury could find such action, or lack thereof, objectively unreasonable. Accordingly, the Court adopts Magistrate Judge Peebles' recommendation and denies Defendant's motion for summary judgment based upon qualified immunity, without prejudice to Defendant's right to renew this defense at trial.

Johnson v. Smith, Not Reported in F.Supp.2d (2006)
Case 9:17-cv-01003-BKS-TWD   Document 65   Filed 06/21/19   Page 196 of 237
2006 WL 1843292

**4**     The issue is "whether a substantial *risk* of serious harm was present, not whether serious harm actually occurred[;]" a plaintiff can establish a case for unsafe prison conditions without suffering serious physical injury. *Baumann,* 36 F.Supp.2d at 514 (citation omitted).

## III. CONCLUSION

After carefully considering Magistrate Judge Peebles' December 7, 2005 Report and Recommendation, Defendant's objections thereto, the relevant parts of the record, and the applicable law, and for the reasons stated herein, the Court hereby

ORDERS that Magistrate Judge Peebles' December 7, 2005 Report and Recommendation is ADOPTED in its entirety; and the Court further

ORDERS that Defendant's motion for summary judgment is DENIED; and the Court further

ORDERS that the parties are to contact Magistrate Judge Peebles' chambers within ten (10) days of the date of this Order to schedule a final pre-trial conference.

IT IS SO ORDERED

*REPORT AND RECOMMENDATION*

PEEBLES, Magistrate J.

Plaintiff Bernard Johnson, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 against the Superintendent of the prison facility in which he was housed at the relevant times, alleging deprivation of his civil rights. In his complaint, which is well framed, plaintiff alleges that he was subjected to cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution, when allowed onto the facility's basketball court despite defects in its floor, resulting in his suffering physical injury requiring extensive medical treatment. As relief, plaintiff seeks damages in a relatively modest amount of not less than $9500.

**\*6** Currently pending before the court is a motion by the defendant for summary judgment dismissing plaintiff's complaint. Defendant's motion squarely presents the question of whether a prison superintendent's decisions to allow inmates to continue utilizing a gymnasium known to be potentially hazardous transcends mere negligence and rises to a level of constitutional significance and, if so, also deprives him of the benefit of qualified immunity. For the reasons set forth below I find that when interpreted in a light most favorable to the plaintiff, the record could support a finding of an Eighth Amendment violation, given the fact of the defect and defendant's awareness of it prior to plaintiff's accident. I further find that the court is not presently positioned to hold, as a matter of law, that under the circumstances presented the prison superintendent is entitled to qualified immunity. I therefore recommend denial of defendant's summary judgment motion.

I. *BACKGROUND*

The facts of the case are simply stated and, refreshingly, not particularly controversial. At the relevant times plaintiff was a New York State prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"), and confined within the Shawangunk Correctional Facility ("Shawangunk"), located in Wallkill, New York. Complaint (Dkt. No. 1) ¶ 2. Defendant John T. Smith is the superintendent of that facility, having held that position since October of 2002. Smith Aff. (Dkt. No. 29) ¶ 1.

On January 29, 2003, while playing basketball in the Shawangunk gymnasium, and in the course of securing a rebound, Johnson landed on a large bubble in the gymnasium floor, causing his foot to roll under him. Complaint (Dkt. No. 1) ¶ 12. While plaintiff initially attempted to deal with his injury by taking ibuprofen and elevating his foot, his foot began to swell and the pain worsened, requiring him to seek medical attention. *Id.* Plaintiff was seen at the prison medical facility later on the day of his accident, and was given crutches as well as ibuprofen for his pain, and his foot was wrapped. *Id.*

X-rays of plaintiff's foot taken on the following day revealed no fractures or breaks. Plaintiff continued to experience pain in his right foot, however, and sought regular medical attention for that condition until his transfer out of Shawangunk on March 10, 2003. *Id.; see also* Plaintiff's Exhibits (Dkt. No. 31) Exh. E.

Prior to the time of plaintiff's accident prison officials at Shawangunk, including Superintendent Smith, had been made aware of the problems associated with the gymnasium floor. Smith Aff. (Dkt. No. 29) ¶ 4; Ewanciw Aff. (Dkt. No. 29) ¶¶ 5-6. That surface, which was apparently constructed shortly prior to the opening of the facility in or about 1985, was originally comprised of cement with a vinyl overlay. Ewanciw Aff. (Dkt. No. 29) ¶ 5. Unfortunately, over time the vinyl overlay developed bubbles. *Id.* Several attempts to repair the gymnasium floor proved unsuccessful, leading to the conclusion in or about 1995 that it should be replaced in its entirety. *Id.* ¶ 6.

**\*7** A request was made to the DOCS Office of Facilities Planning in or about 1995 for funding to underwrite the expense associated with replacing the Shawangunk gymnasium floor. *Id.* ¶ 6. Notification that the funding had been approved was received at the facility in February of 2003, shortly after plaintiff's accident. *Id.* ¶ 7. The replacement of the gymnasium floor began in November of 2004, and was scheduled to have been completed in April of this year. Smith Aff. (Dkt. No. 29) ¶ 7.

Upon assuming his role as the Shawangunk Superintendent in October of 2002, defendant Smith was advised of the existence of defects in certain portions of the gymnasium floor where bubbles had formed under the vinyl overlay, and of the pending request to the DOCS central office for the funds necessary to replace the floor. Smith Aff. (Dkt. No. 29) ¶ 4. Evidence submitted by the plaintiff, in the form of inmate grievances, reflects that prior to the time of his injury, other inmates had sustained injuries as a result of the defects in the gymnasium floor. Plaintiff's Exhibits (Dkt. No. 31) A & C. Despite those injuries and the floor's deteriorating condition, however, prior to the time of plaintiff's accident use of the gymnasium floor was not limited. [1] Smith Aff. (Dkt. No. 29) ¶ 8.

[1]    Following plaintiff's accident, some limitations were placed by prison officials on use of the gymnasium. Smith Aff. (Dkt. No. 29) ¶ 8.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on August 22, 2003. Dkt. No 1. As the sole defendant, plaintiff's complaint names Shawangunk Superintendent J.T. Smith, asserting a single cause of action against him for violation of Johnson's Eighth Amendment rights. [2] Issue was joined on December 5, 2003 by the filing of an answer on behalf of defendant Smith. Dkt. No. 8.

[2]    As defendant notes, any claim for damages against Superintendent Smith in his official capacity would be barred by the Eleventh Amendment. *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361 (1991); *Kentucky v. Graham,* 473 U.S. 159, 166-67, 105 S.Ct. 3099, 3105 (1985). To the extent that plaintiff's complaint, generously construed, could be considered to assert a tort claim for negligence against the defendant in his individual capacity, such a cause of action is precluded under N.Y. Correction Law § 24. *Ierardi v. Sisco,* 119 F.3d 183, 186-87 (2d Cir.1997) (citations omitted); *Baker v. Coughlin,* 77 F.3d 12, 14-16 (2d Cir.1996). I have therefore construed plaintiff's complaint as solely asserting an Eighth Amendment cause of action against defendant Smith.

Following the completion of discovery, defendant moved on March 18, 2005 for summary judgment dismissing Johnson's complaint. Dkt. No. 29. In his motion defendant argues that plaintiff's claim, while perhaps reflecting potential negligence, does not rise to a level sufficient to support an Eighth Amendment violation. *Id.* Defendant also seeks a finding that he is shielded from liability on the basis of qualified, good faith immunity. *Id.* Plaintiff has since submitted papers in opposition to defendant's motion, arguing the existence of genuine issues of material fact which must be resolved prior to determination of his claim on the merits. Dkt. No. 31.

Defendant's motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S.

317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if "it might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*8** When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. *Fed.R.Civ.P. 56(e)*; *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

B. *Merits of Plaintiff's Claim*

In his motion defendant asserts that even when interpreted in a light most favorable to the plaintiff, the facts reflected in the record do not suffice to satisfy both the objective and subjective requirements associated with a cruel and unusual punishment claim under the Eighth Amendment. Voicing his disagreement, plaintiff argues that the record demonstrates the existence of genuine issues of material fact in that regard.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are "incompatible with the evolving standards of decency that mark the progress of a maturing society." [3] *Estelle v. Gamble,* 429 U.S. 97, 102-03, 97 S.Ct. 285, 290 (1976) (citations and internal quotations omitted); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment " 'does not mandate comfortable prisons' ', neither does it not tolerate inhumane ones; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

[3]    That amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and a subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at \*2 (same).

**\*9** Conditions of confinement only constitute an Eighth Amendment violation if they involve the deprivation of a single identifiable human need or denial of the minimum civilized measure of life's necessities, and the defendants' state of mind was one of "deliberate indifference" to that deprivation. *Farmer,* 511 U.S. at 83, 114 S.Ct. at 1977; *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399. In considering the types of conditions that can present a substantial risk of harm, the court considers not only seriousness of the potential harm and the likelihood that the harm will actually occur, but evidence that unwilling exposure to that risk violates contemporary standards of decency, in that society does not choose to tolerate this risk in its prisons. *Helling v. McKinney,* 509 U .S. 25, 36, 113 S.Ct. 2475, 2482 (1993); *see Gomez v. Warden of the Otisville Corr. Fac.,* No. 99 Civ. 9954, 2000 WL 1480478, at \*5 (S.D.N.Y. Sept. 29, 2000) (allegations of slippery, waxed floor causing injury to the plaintiff "arguably posed a substantial risk of harm sufficient to satisfy the objective component.") (citations omitted); *Baumann v. Walsh,* 36 F.Supp.2d 508, 513-14 (N.D.N.Y.1999) (Scullin J.) (allegations that plaintiff was required to climb along shelves and stand on boxes to retrieve materials from a storage room, if true, could demonstrate the existence of an inherently unsafe and dangerous condition).

Based upon the record now before the court, analyzing the objective component against the backdrop of the relevant test under *Farmer,* I am unable to say no reasonable factfinder could conclude that exposure of inmates to a deteriorating gymnasium floor and accompanying bubbling of the vinyl overlay did not present a substantial risk of serious harm to inmates.

Turning to the subjective element, without question facts which, if proven, support only a finding of negligence do not alone suffice to establish the subjective element of an Eighth Amendment claim in a case such as this. *Howard v. Headly,* 72 F.Supp.2d 118, 124 (E.D.N.Y.1999). Allegations which involve more than mere lack of due care for a prisoner's safety, however, may support a claim of cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987). Defendant's candid acknowledgment of the defective condition, coupled with evidence submitted by Johnson from which the superintendent's awareness of injuries suffered by other inmates prior to the date of plaintiff's accident can be inferred, distinguish this case from others finding no basis to conclude that the

subjective element could be met. *See, e.g., Gomez,* 2000 WL 1480478, at \*5-\*6; *see Harding v. Kuhlmann,* 588 F.Supp. 1315, 1317 n. 8 (S.D.N.Y.1984) (finding no reason to believe that the defendant in that case, the superintendent of the facility at issue, had knowledge of or reason to be aware of bubbling on the basketball court floor). The circumstances of this case, when interpreted in a light most favorable to the plaintiff, are sufficient to establish the subjective element of plaintiff's claim, at least for purposes of the pending motion.

**\*10** In sum, finding that a reasonable factfinder could conclude the objective and subjective elements of an Eighth Amendment conditions of confinement claim are met in this case, I recommend denial of defendant's summary judgment.

### C. *Qualified Immunity*

Defendant argues that even if triable issues of material fact preclude the entry of summary judgment dismissing plaintiff's claims on the merits, he is entitled to qualified immunity.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)). The law of qualified immunity seeks to strike a balance between overexposure by government officials to suits for violations based upon abstract rights and an unduly narrow view which would insulate them from liability in connection with virtually all discretionary decisions. *Locurto v. Safir,* 264 F.3d 154, 162-63 (2d Cir.2001); *Warren,* 196 F.3d at 332. As the Second Circuit has observed,

> [q]ualified immunity serves important interests in our political system, chief among them to ensure

that damages suits do not unduly inhibit officials in the discharge of their duties by saddling individual officers with personal monetary liability and harassing litigation.

*Provost v. City of Newburgh,* 262 F.3d 146, 160 (2d Cir.2001) (internal quotations omitted) (citing, *inter alia, Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir.1972)).

The qualified immunity analysis entails a three step inquiry. *Harhay v. Town of Ellington Bd. of Ed.,* 323 F.3d 206, 211 (2d Cir.2003). As a threshold matter it must first be determined whether, based upon the facts alleged, plaintiff has facially established a constitutional violation. *Id.* If the answer to this inquiry is in the affirmative, the court must then turn its focus to whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132-33 (2d Cir.2002). Finally, if at the relevant times the plaintiff had a clearly established, constitutionally protected right which was violated, he or she must demonstrate that it was not objectively reasonable for the defendant to believe that his or her action did not violate such law. *Harhay,* 323 F.3d at 211; *Poe,* 282 F.3d at 133 (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (quoting, in turn, *Salim,* 93 F.3d at 89)).

**\*11** The finding of the existence of a stated claim for violation of the Eighth Amendment suffices to surpass the first hurdle under *Saucier,* and directs the court's focus to the second element. In this instance, based upon defendant's awareness of the defective gymnasium floor condition and, in all likelihood, of prior injuries to inmates resulting from that condition, I am unable to recommend a finding, as a matter of law, that it was "objectively reasonable" to allow this potentially hazardous circumstance to exist. Accordingly,

I recommend denial of the portion of defendant's motion which seeks to invoke qualified immunity in defense of plaintiff's claims, without prejudice to plaintiff's right to renew the argument at trial. *Scott v. Abate,* No. CV-93-4589, 1995 WL 591306, at \*7 (E.D.N.Y. Sept. 27, 1995).

IV. *SUMMARY AND RECOMMENDATION*

The record in this action, considered in a light most favorable to the plaintiff, a prison inmate, reveals that he fell and injured himself as a result of a defective gymnasium floor. The superintendent of the prison facility in which the accident occurred acknowledges his prior awareness of the defective condition, and was at least potentially aware of injuries suffered prior to the time of plaintiff's accident by other inmates as a result of the floor condition. Under these circumstances, I am unable to conclude that no reasonable factfinder could find liability under the Eighth Amendment, and am similarly unable to conclude at this juncture that it was objectively reasonable for the defendant to believe that in allowing the condition to languish, he was not violating plaintiff's constitutional right to be free from cruel and unusual punishment. Based upon the foregoing, it is therefore

RECOMMENDED that defendant's motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 29) be DENIED in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1843292

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Caution
As of: June 21, 2019 4:41 PM Z

# *Johnson v. City of Syracuse*

United States District Court for the Northern District of New York

April 11, 2018, Decided; April 11, 2018, Filed

5:16-cv-00622 (BKS/DEP)

**Reporter**
2018 U.S. Dist. LEXIS 73764 *

ELIJAH JOHNSON, Plaintiff, v. THE CITY OF SYRACUSE, POLICE OFFICER MAURO, POLICE OFFICER LASHOMB, POLICE OFFICER QUONCE and UNIDENTIFIED SYRACUSE POLICE OFFICERS, all sued herein in their capacity as individuals, Defendants.

**Subsequent History:** Related proceeding at *Franco v. City of Syracuse, 2019 U.S. Dist. LEXIS 52675 (N.D.N.Y., Mar. 28, 2019)*

Motion granted by, in part, Motion denied by, in part, Reserved by *Johnson v. Mauro, 2019 U.S. Dist. LEXIS 92208 (N.D.N.Y., June 3, 2019)*

Motion granted by *Johnson v. Mauro, 2019 U.S. Dist. LEXIS 98492 (N.D.N.Y., June 12, 2019)*

## Core Terms

excessive force, intervene, police officer, punched, summary judgment, resisting arrest, parties, dragged, qualified immunity, Defendants', arrived, resist, genuine issue of material fact, objectively reasonable, Unidentified, handcuffs, nonmoving, friends, summary judgment motion, material fact, arrest, rocks, feet, legs

## Case Summary

### Overview
HOLDINGS: [1]-Defendants' motion for partial summary judgment in an excessive force claim in violation of the *Fourth Amendment* was denied because the court could not determine whether an officer's conduct was objectively reasonable since there remained genuine issues of material fact as to both the severity of the force applied and the extent of that officer's role in the alleged excessive force; [2]-That officer was not entitled to qualified immunity because the court could not conclude that it was objectively reasonable for him to

believe that his actions were lawful since there were issues of material fact still in dispute. Therefore, summary judgment was precluded; [3]-Plaintiff's claims against unidentified officers was dismissed because plaintiff failed to identify those officers through discovery when he had the sufficient opportunity to do so.

### Outcome
Motion granted in part, denied in part.

## LexisNexis® Headnotes

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

### *HN1*[ ] Entitlement as Matter of Law

Under *Fed. R. Civ. P. 56(a)*, summary judgment may be granted only if all the submissions taken together show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. A fact is material if it might affect the outcome of the suit under the governing law, and is genuinely in dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. The movant may meet this burden by showing that the nonmoving party has failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Summary judgment is appropriate where the non-moving party fails to come forth with evidence sufficient to permit a reasonable



juror to return a verdict in his or her favor on an essential element of a claim.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

*HN2*[⬇] **Nonmovant Persuasion & Proof**

If the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party must set out specific facts showing a genuine issue for trial. When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant. Still, the nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts, and cannot rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. Furthermore, mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

*HN3*[⬇] **Excessive Force**

All claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the *Fourth Amendment* and its reasonableness standard. A determination of reasonableness under the *Fourth Amendment* requires a careful balancing of the nature and quality of the intrusion on the individual's *Fourth Amendment* interests against the countervailing governmental interests at stake. In conducting that balancing, courts are guided by consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. The

reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Moreover, the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

Constitutional Law > Bill of Rights > State Application

*HN4*[⬇] **State Application**

The *Fourth Amendment* applies to the States through the *Fourteenth Amendment*.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

*HN5*[⬇] **Defenses**

Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law. The defendants bear the burden of establishing qualified immunity. The right of an individual not to be subjected to excessive force has long been clearly established.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

*HN6*[⬇] **Excessive Force**

In general, a police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it. Liability may attach only when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene. In cases premised on excessive force, an officer is



excused from liability, despite his presence, if the assault is sudden and brief, such that there is no real opportunity to prevent it. When a police officer is a direct participant in the allegedly excessive use of force, the failure to intervene theory of liability is inapplicable.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

**HN7[↧] Excessive Force**

A defendant may not be held liable both for using excessive force and for failing to prevent the use of excessive force. The defendant may, however, be held liable for one or the other, as the Federal Rules of Civil Procedure recognize both that a party may set out two or more statements of a claim alternatively and that a party may state as many claims as it has, regardless of consistency. *Fed. R. Civ. P. 8(d)(2)*, *(3)*. Thus, the flexibility afforded by *Rule 8* is especially appropriate in civil rights cases, even at the summary judgment stage of litigation.

Civil Procedure > Parties > Real Party in Interest > Fictitious Names

**HN8[↧] Fictitious Names**

Typically, courts resist dismissing suits against John Doe defendants until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials. Dismissal of a claim, however, is appropriate where discovery has closed and the plaintiff has had ample time and opportunity to identify and serve John Doe defendants' but has failed to do so.

**Counsel:** [*1] For Plaintiff: Fred Lichtmacher, The Law Office of Fred Lichtmacher, P.C., New York, NY.

For Defendants: Joseph H. Fahey, Senior Assistant Corporation Counsel, Syracuse, NY.

**Judges:** Hon. Brenda K. Sannes, United States District Judge.

**Opinion by:** Brenda K. Sannes

# Opinion

**MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

Plaintiff Elijah Johnson brings this action under *42 U.S.C. § 1983*, alleging that Defendant Police Officers Joseph Mauro, William LaShomb, and Gordon Quonce subjected him to excessive force and failed to intervene in violation of the *Fourth* and *Fourteenth Amendments* during an incident that occurred on the evening of July 5, 2014 into the early morning of July 6, 2014 in Syracuse, New York. (Dkt. No. 22). Defendants now move for partial summary judgment under *Rule 56 of the Federal Rules of Civil Procedure*, (Dkt. No. 57), and Plaintiff has opposed the motion, (Dkt. No. 61). For the reasons that follow, Defendants' motion is granted in part and denied in part.

## II. FACTS[1]

On the evening of July 5, 2014 at approximately 11:00 p.m., Plaintiff and two of his friends, Patrick Johnson and Jafonta Johnson,[2] went to a party on Comstock Avenue near Syracuse University in Patrick's blue Cadillac. (Dkt. No. 57-16, ¶ 1). Plaintiff was wearing Polo boots, cream-colored pants, and a green Polo shirt with a yellow [*2] stripe around the midsection. (*Id.* ¶ 2). When they arrived at the Comstock Avenue party, there were approximately sixty people socializing in the street and listening to music playing from vehicles parked nearby. (*Id.* ¶ 2). The crowd continued growing, and approximately one hour later, there were about two hundred people on the street—around that time, the

---

[1] The facts stated herein are drawn from the parties' submissions, including the parties' statements of material facts and responses (Dkt. Nos. 57-16; 61-1) and the exhibits the parties have submitted, to the extent that they would be admissible as evidence. Where facts stated in a party's statement of material facts are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court has found such facts to be true. *See N.D.N.Y. L.R. 7.1(a)(3)*; *Fed. R. Civ. P. 56(e)*.

[2] Patrick Johnson and Jafonta Johnson are brothers, and are not related to Plaintiff. (Dkt. No. 57-4, at 22, 54-55; Dkt. No. 57-16, ¶ 11).



police arrived to break up the crowd. (Id. ¶¶ 2-3). Plaintiff and his friends then returned to the Cadillac and left for another party they had heard about on nearby Sumner Avenue. (Id. ¶ 3). There were approximately sixty to eighty people outside at the Sumner Avenue party when Plaintiff and his friends arrived. (Id. ¶ 5). They had been there for approximately thirty minutes, when the police arrived and directed the people there to leave the street. (Id. ¶¶ 6-7). Defendants testified that partygoers had thrown rocks at them repeatedly throughout the evening. (Dkt. No. 57-9, at 26; Dkt. No. 57-10, at 29, 36-37; Dkt. No. 57-11, at 64-65). Officer Ahmad Mims testified that Officer Mauro told other officers that night that he observed a black male wearing a green shirt with a yellow stripe throw a rock at police officers. (Dkt. No. [*3] 57-9, at 26-27).

As the police arrived at the Sumner Avenue party, Plaintiff and his friends left in the Cadillac to go to another party on Miles Avenue. (Dkt. No. 57-16, ¶ 7). Patrick parked the Cadillac in the driveway of 223 Miles Avenue, even though the party was located in the backyard of 219 Miles Avenue. (Id. ¶ 8). Again, the police arrived to break up the party—this time after Plaintiff and his friends were there for approximately five minutes—and again, Plaintiff and his friends got back into Patrick's Cadillac, along with four other individuals: Mario Franco, Kenny McFadden, Mike Henry, and Preston Fagen. (Id. ¶¶ 9-11). Plaintiff and the six others sat in Patrick's Cadillac for ten to fifteen minutes with the windows down, during which time Plaintiff did not hear police in the area. (Id. ¶ 12). Plaintiff was sitting in the back seat, behind the driver, when two police officers approached the Cadillac. (Id. ¶¶ 13-14). Officer Mims approached from the passenger side, shined a flashlight into the vehicle, and the officers told the seven occupants of the vehicle to put their hands up. (Id. ¶ 15-16). As more officers began to arrive at the scene, the police removed Mario Franco, [*4] Jafonta Johnson, Michael Henry, and Preston Fagen from the Cadillac and placed them into custody. (Id. ¶ 17-20).

As Plaintiff moved to exit through the rear driver's side door, an unknown officer who was standing at the rear driver's door told Plaintiff to wait. (Id. ¶ 23). Plaintiff testified that the officer used a radio on his shoulder to report "we have a green shirt." (Dkt. No. 57-4, at 68). After one or two minutes, Officer Mauro approached the rear driver's side door, where Plaintiff was seated. (Dkt. No. 57-16, ¶ 26). Mario Franco, Kenneth McFadden, Preston Fagen, and Plaintiff all testified that Officer Mauro asked Plaintiff if he "like[d] throwing rocks at cops," and forcefully removed him from the Cadillac.

(Dkt. No. 61-1, ¶ 26; Dkt. No. 57-5, at 52-53; Dkt. No. 57-6, at 83; Dkt. No. 57-7, at 45-46). Officer Mauro testified that he only asked Plaintiff to get out of the vehicle. (Dkt. No. 57-12, at 48). Officers Quonce and LaShomb testified that they were focused on the other occupants of the vehicle, (Dkt. No. 57-10, at 15; Dkt. No. 57-11, at 20), but Officer LaShomb testified that he "realized or saw a struggle between [Plaintiff] and Officer Mauro," and that Plaintiff [*5] "wasn't going into the handcuffs."[3] (Dkt. No. 57-11, at 20). Plaintiff testified that even though he did not resist Officer Mauro's attempt to place him in handcuffs, Officer Mauro punched him in the face anyway. (Dkt. No. 57-4, at 78).

Although the parties dispute the order of events, Plaintiff testified that Officer Mauro "slammed" him against the trunk area of the car, again asked if he "like[d] throwing rocks at cops," and punched Plaintiff in the face with a closed fist. (Dkt. No. 57-4, at 78). Plaintiff testified that he was punched again in the "back right," and his legs were swept from under him by an unknown officer. (Id. at 80). Officer Mauro testified that he "tackle[d]" Plaintiff to the ground to prevent Plaintiff from further resisting the handcuffs. (Dkt. No. 57-12, at 34). Officers Quonce and LaShomb testified that they did not see how Plaintiff ended up on the ground. (Dkt. No. 57-10, at 22; Dkt. No. 57-11, at 22). Officer Mauro also testified that Officers Quonce and LaShomb "assisted once [Plaintiff] began to resist." (Dkt. No. 57-12, at 48).

Plaintiff testified that he was dragged by "the initial officer that punched" him and one other officer approximately six to eight [*6] feet away from the Cadillac by his legs and shoulders. (Dkt. No. 57-4, at 84-85). Officer Quonce stated that he dragged Plaintiff by the leg away from the Cadillac because he was concerned that the other occupants of the car might be armed and might attempt to assist Plaintiff while Officer Mauro struggled to take Plaintiff into custody. (Dkt. No. 57-10, at 33). Plaintiff testified that after he was dragged face down and away from the vehicle, three officers

---

[3] The record contains conflicting testimony as to whether Plaintiff was handcuffed as he was being beaten by the officers. Plaintiff testified that he felt the handcuff come off his left hand just before he was punched for the second time while his right hand was free. (Dkt. No. 57-16, ¶ 32). Preston Fagen, meanwhile, testified that Plaintiff was handcuffed behind his back within "the first ten seconds [after being taken] out of the car." (Dkt. No. 57-7, at 51, 55-56). Defendant LaShomb testified that he was "100 percent" certain that Plaintiff was not in handcuffs by the time Plaintiff was taken to the ground. (Dkt. No. 57-11, at 10).



approached him and struck him on the face, head, ribs, and stomach, while an unknown female officer held his legs. (Dkt. No. 57-4, at 87-88). While Officer LaShomb claims that it was necessary to use force against Plaintiff because he was "thrashing" around and actively resisting arrest, (Dkt. No. 57-11, at 11), both Officers LaShomb and Mauro testified that Plaintiff did not attempt to punch or kick the officers while he was on the ground, (Dkt. No. 57-11, at 45; Dkt. No. 57-12, at 71). Officer LaShomb testified that he punched Plaintiff in the face and delivered two "knee strikes" to Plaintiff's midsection while Plaintiff was "on the ground just lying there motionless . . . thrashing from side to side with his hands tucked underneath [*7] his upper torso." (Dkt. No. 57-11, at 11). Plaintiff testified that, while he was on the ground and surrounded by the three officers, he repeatedly said: "Stop. I'm not resisting." (Dkt. No. 57-4, at 86). Officer LaShomb testified that he and Officer Quonce helped Officer Mauro "subdue" Plaintiff while he was resisting arrest. (Dkt. No. 57-11, at 11). Plaintiff testified that, as two unidentified police officers brought Plaintiff to his feet, the "initial officer that was there" punched him again in the face and asked: "Do you like how I broke your fucking nose?" (Dkt. No. 57-4, at 89, 96). According to testimony of Defendants and non-party witnesses, the altercation lasted anywhere from thirty to sixty seconds. (Dkt. No. 57-11, at 29; Dkt. No. 57-5, at 74; Dkt. No. 57-6, at 74).

Plaintiff was then arrested and charged with inciting a riot, rioting in the second degree, trespassing, and resisting arrest. (Dkt. No. 57-16, ¶ 45). After independently seeking medical attention the next day, Plaintiff was diagnosed with a bloody sclera, mild concussion, fractured nose, abrasions on his face, bruised ribs, and cuts and bruises on his back. (Dkt. No. 61-1, ¶ 73). Plaintiff was ultimately convicted [*8] of rioting in the second degree and trespassing, (Dkt. No. 57-16, ¶ 45), and was acquitted of resisting arrest, (Dkt. No. 61-1, ¶ 45).

## III. STANDARD OF REVIEW

HN1[⬆] Under *Federal Rule of Civil Procedure 56(a)*, summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; see also *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The moving party bears

the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex, 477 U.S. at 323*. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248*; see also *Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005)* (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, 477 U.S. at 322*; see also *Selevan v. N.Y. Thruway Auth., 711 F.3d 253, 256 (2d Cir. 2013)* (summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element [*9] of a claim" (internal quotation marks omitted)).

HN2[⬆] If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson, 477 U.S. at 248, 250*; see also *Celotex, 477 U.S. at 323-24*; *Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009)*. "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003)*. Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*, and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986)* (quoting *Quarles v. Gen. Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985)*). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010)* (quoting *Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)*).

## IV. DISCUSSION

### A. Excessive Force



2018 U.S. Dist. LEXIS 73764, *9

Defendants argue that Plaintiff's excessive force claim against Defendant Quonce[4] should be dismissed because Defendant Quonce's actions were "objectively reasonable under the circumstances." (Dkt. No. 57-17, at 8). Plaintiff responds that, because there is a genuine issue of material fact as to Defendant Quonce's conduct [*10] and the severity of the force he used, summary judgment would be inappropriate. (Dkt. No. 61, at 3-6). The Court agrees with Plaintiff.

The Supreme Court has held that *HN3*[⬆] "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the *Fourth Amendment* and its 'reasonableness' standard." *Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)*.[5] A determination of reasonableness under the *Fourth Amendment* "requires a careful balancing of the nature and quality of the intrusion on the individual's *Fourth Amendment* interests against the countervailing governmental interests at stake." *Id. at 396* (internal quotation marks omitted). "In conducting that balancing, [courts] are guided by consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010)*. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham, 490 U.S. at 396*. Moreover, "[t]he calculus [*11] of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id. at 396-97*.

Here, Plaintiff has raised an issue of fact as to whether Defendant Quonce used excessive force in dragging Plaintiff away from the vehicle and assisting Defendants LaShomb and Mauro with the arrest. Plaintiff testified that he did not resist arrest or otherwise do anything to justify being dragged away from the vehicle. (Dkt. No. 57-4, at 74-83). Meanwhile, Defendant Quonce testified that, "when [Plaintiff] was resisting arrest with Officer Mauro, [Quonce] grabbed [Plaintiff] by his leg and dragged him" approximately fifteen feet away from the vehicle. (Dkt. No. 57-10, at 10-11). Mario Franco testified that Defendant Quonce was one of "two to three" officers who dragged Plaintiff away from the vehicle "very aggressively," after which Plaintiff was "screaming and crying" and telling the officers that he "wasn't resisting." (Dkt. No. 57-5, at 59-61). Furthermore, the parties dispute whether Defendant Quonce had any further involvement [*12] in the altercation. While Defendant Quonce testified that he did not punch or kick Plaintiff, (Dkt. No. 57-10, at 20), Defendant LaShomb indicated at deposition that Defendant Quonce helped to "subdue" Plaintiff. (Dkt. No. 57-11, at 11-12). Officer Mauro also testified that Officer Quonce "assisted once [Plaintiff] began to resist." (Dkt. No. 57-12, at 48). And, although the parties dispute whether Plaintiff was resisting arrest or "dodging the punches" thrown by Defendants, (Dkt. No. 61-8, at 3), Defendants Mauro and LaShomb testified that Plaintiff did not attempt to punch, kick, or escape them during the struggle. (Dkt. No. 57-11, at 8; Dkt. No. 57-12, at 70).

From this record, the Court cannot determine whether Defendant Quonce's conduct was "objectively reasonable" under the circumstances, because there remain genuine issues of material fact as to both the severity of the force Defendant Quonce applied and extent of his role in the excessive force alleged. *See Brown v. City of New York, 798 F.3d 94, 103 (2d Cir. 2015)* (concluding that "a jury will have to decide whether *Fourth Amendment* reasonableness was exceeded" when the plaintiff was taken to the ground by police officers); *Picciano v. McLoughlin, 723 F. Supp. 2d 491, 505 (N.D.N.Y. 2010)* (denying summary judgment on excessive force claim where "admissible record [*13] evidence exists from which a rational factfinder could conclude that Defendant's application of force was objectively unreasonable in light of the facts and circumstances confronting him"). Accordingly, Defendants' motion for summary judgment as to Plaintiff's excessive force claim against Defendant Quonce must be denied.

## B. Qualified Immunity

Defendants argue that, even if the record indicates an issue of material fact as to Plaintiff's excessive force

---

[4] Defendants do not move for summary judgment as to the excessive force claim against Officers Mauro or LaShomb.

[5] *HN4*[⬆] The *Fourth Amendment* applies to the States through the *Fourteenth Amendment*. *Jackler v. Byrne, 658 F.3d 225, 236 (2d Cir. 2011)*.



claim, Officer Quonce is protected by the doctrine of qualified immunity. (Dkt. No. 57-17, at 6-12). Plaintiff responds that Defendant Quonce is not entitled to qualified immunity because there are genuine issues of material fact as to whether it was objectively reasonable for Officer Quonce to believe that his actions were lawful in dragging Plaintiff approximately fifteen feet. (Dkt. No. 61, at 9-11).

HN5[] "Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Doe, 779 F.3d 84, 92 (2d Cir. 2015)* (quoting *Russo v. City of Bridgeport, 479 F.3d 196, 211 (2d Cir. 2007)); see also Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*. Defendants bear the [*14] burden of establishing qualified immunity. *Vincent v. Yelich, 718 F.3d 157, 166 (2d Cir. 2013) cert. denied sub nom. Annuci v. Vincent, 135 S. Ct. 948, 190 L. Ed. 2d 830 (2015)*. The Second Circuit has recognized that "[t]he right of an individual not to be subjected to excessive force has long been clearly established." *Calamia v. City of New York, 879 F.2d 1025, 1036 (2d Cir. 1989)*.

As discussed above, Plaintiff has adduced evidence sufficient to indicate that the actions of Defendant Quonce violated his right to be free from excessive force. Thus, the relevant inquiry is whether it was objectively reasonable for Officer Quonce to believe that his actions did not violate that right. There are issues of material fact in dispute as to whether Plaintiff complied with police commands, struggled with Officer Mauro's attempts to handcuff him, or otherwise resisted arrest, and viewing the facts in the light most favorable to the Plaintiff, the Court cannot conclude that it was objectively reasonable for Officer Quonce to believe that his actions were lawful.[6] Summary judgment is therefore inappropriate. *See Stephenson v. Doe, 332 F.3d 68, 77 (2d Cir. 2003); see also Picciano, 723 F. Supp. 2d 491, 505 (N.D.N.Y. 2010)* ("[I]t is impossible to 'determine whether [Defendant] *reasonably* believed that [his] force

---

[6] Defendant argues that "Plaintiff may not use his declaration to contradict his prior testimony" regarding whether Defendant Quonce played a role in holding Plaintiff's arms while Plaintiff was punched in the face a final time. (Dkt. No. 62, at 5). Even disregarding Plaintiff's declaration, however, there is a genuine issue of material fact as to Plaintiff's excessive force claims. Accordingly, the Court need not address the content of Plaintiff's declaration here.

was not excessive when several material facts [are] still in dispute, [and therefore,] summary judgment on the basis of qualified immunity [is] precluded.'") [*15] (quoting *Thomas v. Roach, 165 F.3d 137, 144 (2d Cir. 1999))*. Accordingly, Defendants' motion for summary judgment based on qualified immunity as to Defendant Quonce must be denied.

## C. Failure to Intervene

Defendants argue that Plaintiff's failure to intervene claims should be dismissed because: (i) Officers Mauro and LaShomb cannot be liable for failure to intervene, as they are alleged to have been direct participants in the excessive use of force; and (ii) Officers LaShomb and Quonce were "not in a position to intervene" during the incident. (Dkt. No. 57-17, at 13-14). Plaintiff responds that: (i) the courts "have allowed excessive force and failure to intervene claims to proceed simultaneously beyond the summary judgment stage" by structuring the verdict sheet so as to prevent "possible inconsistencies in the verdict"; and (ii) it is "undeniable" that "there was a realistic opportunity for officers present to intervene." (Dkt. No. 61, at 13-14).

HN6[] In general, "[a] police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it." *Figueroa v. Mazza, 825 F.3d 89, 106 (2d Cir. 2016)* (citing *O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988))*. "Liability may attach [*16] only when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008)*. In cases premised on excessive force, "an officer is excused from liability, despite his presence, if the assault is sudden and brief, such that there is no real opportunity to prevent it." *Cusamano v. Sobek, 604 F. Supp. 2d 416, 429 n.9 (N.D.N.Y. 2009)* (internal quotation marks omitted). When a police officer is "a direct participant in the allegedly excessive use of force, the failure to intervene theory of liability is inapplicable." *Cuellar v. Love, No. 11-cv-3632, 2014 U.S. Dist. LEXIS 51622, at *23, 2014 WL 1486458, at *8 (S.D.N.Y. Apr. 11, 2014)*.

When viewed in the light most favorable to Plaintiff, the testimony of Plaintiff and the other non-party witnesses



establishes that (i) Officer Mauro, Officer LaShomb, and one or two other officers punched and kicked Plaintiff for anywhere between thirty and sixty seconds; (ii) the altercation took place approximately six to fifteen feet away from the Cadillac; (iii) Officers Mauro, LaShomb, and Quonce were all in the area for duration of the incident; (iv) none of the officers attempted to stop any of the [*17] others from using force against Plaintiff; and (v) Plaintiff was not resisting arrest. Plaintiff has raised a triable issue of fact as to whether Officers LaShomb and Quonce should have known that Officer Mauro's use of force against Plaintiff was excessive, had the opportunity to act to prevent it, and nevertheless failed to take reasonable steps to intervene. Although it is a somewhat closer issue as to whether Officer Mauro had an adequate opportunity to stop Officers Quonce and LaShomb, it is nevertheless a question of fact appropriate for determination by a jury.

Finally, Defendants are correct that *HN7*[↑] a defendant "may not be held liable both for using excessive force and for failing to prevent the use of excessive force." *Buchy v. City of White Plains, No. 14-cv-1806, 2015 U.S. Dist. LEXIS 163469, at *3-4, 2015 WL 8207492, at *3 (S.D.N.Y. Dec. 7, 2015)*. They may, however, be held liable for one or the other, as the Federal Rules of Civil Procedure recognize both that a party may "set out two or more statements of a claim . . . alternatively" and that "[a] party may state as many claims . . . as it has, regardless of consistency." *Fed. R. Civ. P. 8(d)(2), (3)*. Thus, "[t]he flexibility afforded by *Rule 8* . . . is especially appropriate in civil rights cases," *Adler v. Pataki, 185 F.3d 35, 41 (2d Cir. 1999)*, "even at the summary judgment stage [*18] of litigation," *Polanco v. Gargir, No. 14-cv-7986, 2018 U.S. Dist. LEXIS 54758, at *27-28 (S.D.N.Y. Mar. 28, 2018)*.[7] Accordingly, Plaintiff's failure to intervene claims against Defendants Quonce, LaShomb, and Mauro may proceed past summary judgment. *See id.* ("To the extent that defendants' motion for summary judgment relies on the abstract notion that both excessive force and failure to intervene claims may not proceed past summary judgment against the same defendant, we reject it."); *Cumberbatch v. Port Auth. of New York & New Jersey, No. 03-cv-749, 2006 U.S. Dist. LEXIS 88853, at *35, 2006 WL 3543670, at *11 (S.D.N.Y. Dec. 5, 2006)* ("The Court will thus construe these claims as pleading in the alternative . . . *i.e.*, the Officers either used excessive force, or one or both of them failed to intervene while another officer used excessive force.").

**D. Unidentified Syracuse Police Officers**

Defendants argue that, because discovery is now closed and Plaintiff has failed to identify the Defendant "Unidentified Syracuse Police Officers," Plaintiff's claims against those unidentified defendants "must be dismissed as a matter of law." (Dkt. No. 57-17, at 5 n.1). Plaintiff has not responded to this argument.

*HN8*[↑] Typically, courts "resist dismissing suits against John Doe defendants 'until the plaintiff has had some opportunity for discovery [*19] to learn the identities of responsible officials.'" *Kearse v. Lincoln Hosp., No. 07-cv-4730, 2009 U.S. Dist. LEXIS 52895, at *4, 2009 WL 1706554, at *3 (S.D.N.Y. June 17, 2009)*. Dismissal of a claim, however, "is appropriate '[w]here discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe defendants' but has failed to do so." *Pilgrim v. LaValley, No. 11-cv-1331, 2016 U.S. Dist. LEXIS 44766, at *16, 2016 WL 1714576, at *6 (N.D.N.Y. Mar. 30, 2016)* (quoting *Jones v. Rock, No. 12-cv-0447, 2015 U.S. Dist. LEXIS 21650, at *57-58, 2015 WL 791547, at *21 (N.D.N.Y. Feb. 24, 2015)*) (alterations in original), *adopted by 2016 U.S. Dist. LEXIS 55846, 2016 WL 1700409 (N.D.N.Y. Apr. 27, 2016)*. Here, Plaintiff has had sufficient opportunity to identify the unknown police officers through discovery, but has failed to do so. Accordingly, Plaintiff's claims against Defendant Unidentified Syracuse Police Officers must be dismissed.

**V. CONCLUSION**

For these reasons, it is hereby

**ORDERED** that Defendants' motion for partial summary judgment (Dkt. No. 57) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that Plaintiff's claims against Defendant Unidentified Syracuse Police Officers are **DISMISSED without prejudice** and these Defendants are **DISMISSED** from the action; and it is further

**ORDERED** that Defendants' motion for partial summary judgment (Dkt. No. 57) is otherwise **DENIED** in all other respects;

**IT IS SO ORDERED.**

Dated: April 11, 2018

---

[7] Westlaw citation unavailable.

2018 U.S. Dist. LEXIS 73764, *19

Syracuse, New York

/s/ Brenda K. [*20]  Sannes

**Brenda K. Sannes**

**U.S. District Judge**

---

**End of Document**





Positive
As of: June 21, 2019 4:40 PM Z

## *Davis v. Rhoomes*

United States District Court for the Southern District of New York

July 8, 2010, Decided; July 8, 2010, Filed

07 Civ. 6592 (JGK) (THK)

**Reporter**
2010 U.S. Dist. LEXIS 103562 *

SAMUEL DAVIS, Plaintiff, -against - CORRECTION OFFICER RHOOMES, et al., Defendants.

**Subsequent History:** Adopted by, Summary judgment granted, in part, summary judgment denied, in part by, Motion denied by *Davis v. Rhoomes, 2010 U.S. Dist. LEXIS 103579 (S.D.N.Y., Sept. 30, 2010)*

**Prior History:** *Davis v. Rhoomes, 2009 U.S. Dist. LEXIS 12891 (S.D.N.Y., Feb. 18, 2009)*

## Core Terms

grievance, misbehavior, retaliation, disciplinary hearing, law library, charges, adverse action, allegations, inmates, retaliatory, contends, retaliation claim, summary judgment, legal papers, summary judgment motion, Defendants', supervisory, causal connection, documents, days, law law law, disciplinary, conclusory, harassment, investigated, photocopier, keeplock, denies, prison, constitutional violation

**Counsel:** [*1] Samuel Davis, Plaintiff, Pro se, Beacon, NY.

For Correction Officer Rhoomes, Mid-Orange Correctional Facility, Correction Officer Andino Mid-Orange Correctional Facility, Robert Jones, Deputy Superintendent for Programs, Mid-Orange Correctional Facility, Correction Sergeant Degnan, Mid-Orange Correctional Facility, Faliski, Correction Lieutenant, Mid-Orange Correctional Facility, Superintendent Diane L. Van Buren, Mid-Orange Correctional Facility, C. Jacobsen, Deputy Superintendent for Programs, Mld Orange Correctional Facility, C.O. Kornies, Mid-Orange Correctional Facility, Niles, Mid-Orange Correctioal Facility, Defendants: Maria Barous Hartofilis, Attorney General of the State of New York, New York, NY.

**Judges:** THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE. HON. JOHN G. KOELTL, UNITED STATES DISTRICT JUDGE.

**Opinion by:** THEODORE H. KATZ

## Opinion

**REPORT AND RECOMMENDATION**

<u>Pro se</u>

TO: HON. JOHN G. KOELTL, UNITED STATES DISTRICT JUDGE

FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE

Plaintiff Samuel Davis ("Plaintiff"), proceeding <u>pro se</u>, brings this prisoner's civil rights action against Defendants Correction Officer Aretha Rhoomes ("Rhoomes"), Correction Officer Sabrina Andino ("Andino"), Correction Lieutenant [*2] Paul Faliski ("Faliski"), Deputy Superintendent of Programs Robert Jones ("Jones"), and Superintendent Diane Van Buren ("Van Buren") (together, "Defendants"). Plaintiff alleges that, while he was incarcerated at the Mid-Orange Correctional Facility, Defendants Rhoomes, Andino, and Faliski retaliated against him for filing a grievance and this lawsuit, in violation of his *First Amendment* rights. Plaintiff also claims that Defendant Jones negligently supervised Defendant Rhoomes, and Defendant Van Buren was grossly negligent in managing, supervising, and training Defendants Rhoomes and Andino, leading to their retaliatory acts.

Defendants have moved for summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure*. Defendants contend that they took no adverse actions against Plaintiff, they had legitimate bases for their allegedly retaliatory actions, and that no causal connection exists between Plaintiff's protected activities and these acts. Defendants also argue that Plaintiff cannot establish the personal involvement of

2010 U.S. Dist. LEXIS 103562, *2

Defendants Van Buren and Jones to warrant a finding of supervisory liability. Finally, Defendants contend that Defendants Rhoomes, Andino, Falaski, [*3] and Jones are entitled to qualified immunity. (See Defendants' Memorandum of Law in Support of Motion for Summary Judgment, dated Nov. 20, 2009 ("Defs'. Mem.").)

Plaintiff has opposed the motion and separately moved to preclude Defendants from relying on certain documents in this litigation, arguing that they have been altered or otherwise fabricated. (See Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment, dated Dec. 30, 2009 ("Opp. Mem."); Plaintiff's Motion for Preclusion, dated Dec. 28, 2009 ("PL's Mot.").)

Both motions were referred to this Court for a Report and Recommendation, under 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons that follow, this Court recommends that Defendants' motion be granted in part and denied in part, and Plaintiff's motion be denied.

## BACKGROUND

The following facts, except as otherwise noted, are undisputed and drawn primarily from the parties' affidavits and statements pursuant to Local Civil Rule 56.1 of the Southern District of New York.

## I. The March 2007 Law Library Incidents

Plaintiff is a prisoner in the custody of the New York State Department of Correctional Services ("DOCS"), and at all relevant times, was incarcerated at [*4] the Mid-Orange Correctional Facility ("Mid-Orange"). (See Affidavit of Samuel Davis, dated Dec. 30, 2009 ("Davis Aff.") ¶ 7.) Beginning in March of 2007, Plaintiff requested, on several occasions, a statutory law book from the Mid-Orange law library. (See id., ¶ 18.) Although inmates are only permitted to check out books from the law library overnight, and not for any extended duration of time, on each occasion, Plaintiff was told that the book was checked out. (See id., ¶¶ 19-20.)

On March 25, 2007, after a library clerk told Plaintiff that the book was again unavailable, Plaintiff became "irate." (See Declaration of Aretha Rhoomes, dated Nov. 13, 2009 ("Rhoomes Decl.") ¶ 6.) Defendant Rhoomes, a correction officer who worked as the Law Library Officer at Mid-Orange, spoke with Plaintiff and informed him that once the book was found, she would set it aside for him. (See id., ¶¶ 2, 7.) According to Defendant

Rhoomes, Plaintiff was dissatisfied with this response, and "became angrier and stated he was being denied access." (Id. ¶ 7.) As a result of Plaintiff's alleged behavior, Defendant Rhoomes issued Plaintiff a verbal warning. (See id., ¶ 8.) The issuance of the verbal warning was [*5] documented by Defendant Rhoomes in the "Mid-Orange Law Library Warnings/Ticket Log." (See id., Ex. A.)

Plaintiff denies that he was issued a warning that day or that he became "irate." (See Plaintiff's 56.1 Statement ("PL's 56.1") ¶¶ 5-7.) The following day, Plaintiff filed a grievance against Defendant Rhoomes, alleging that she deprived him of access to the library's resources by permitting inmates to take books to their housing areas for multiple days at a time. (See Davis Aff. Exs. C & D; see also Defendants' 56.1 Statement ("Defs'. 56.1") ¶ 30.)

Plaintiff's grievance was referred to Defendant Jones, who was the Deputy Superintendent of Programs at Mid-Orange. (See Defs'. 56.1 ¶¶ 26, 30.) After reviewing the grievance, Defendant Jones met with the Law Library Coordinator, who confirmed that inmates are only permitted to keep books overnight. (See id., ¶ 31; see also Declaration of Robert A. Jones, dated Nov. 16, 2009 ("Jones Decl") ¶ 8.) Defendant Jones reiterated this policy to Defendant Rhoomes, and the grievance was "informally resolved" on March 29, after the book Plaintiff sought was located and set aside for Plaintiff's use. (See Defs'. 56.1 ¶¶ 31-32; PL's 56.1 ¶¶ 31-32.) Plaintiff [*6] asserts that Defendant Jones assured Plaintiff, after meeting with him, that Defendant Rhoomes would not retaliate against him for filing the March 26 grievance. (See Davis Aff. ¶ 34.) Defendant Jones neither admits nor denies this claim.

Later that same day, Plaintiff returned to the library to photocopy legal papers. [1] He handed the papers to Defendant Rhoomes to copy, as was customary at Mid-Orange. (See Defs'. 56.1 ¶ 9; PL's 56.1 ¶ 9.) Plaintiff then asked her for the law book that had previously been missing. Defendant Rhoomes brought Plaintiff to the book clerk's desk to sign out the book. (See Defs'. 56.1 ¶ 10; PL's 56.1 ¶ 10.) Shortly thereafter, Defendant Rhoomes heard the slamming of books and

---

[1] Defendant Rhoomes states that Plaintiff was not supposed to be in the law library on March 29, due to his enrollment in a "Phase III" program. (See Rhoomes Decl. ¶ 15.) Plaintiff states that he was not [*7] required to attend the Phase III program, despite his enrollment. (See PL's 56.1 ¶ 14.) As this fact is immaterial to the instant motion, it bears no further discussion.



Plaintiff speaking in a loud voice to the book clerk. Defendant Rhoomes told Plaintiff that he was causing a disturbance, and instructed him to speak with her if he had any further problems. (See Rhoomes Decl. ¶ 12.) She again issued Plaintiff a verbal warning. (See id. ¶ 13 & Ex. A.)

Defendant Rhoomes also spoke to Correction Counselor Little about Plaintiff's behavior that day; Little was making rounds in the law library. This conversation is reflected in a memo from Little to Defendant Jones regarding Plaintiff's behavior in the library. [2] (See Rhoomes Decl. ¶ 14 & Ex. B.)

Plaintiff denies that he was disruptive or received a verbal warning on March 29. (See PL.'s 56.1 ¶ 11.) Rather, Plaintiff claims it was Defendant Rhoomes who acted inappropriately, and he filed a second grievance for what he perceived as retaliation for his earlier grievance about the missing book. According to Plaintiff, Defendant Rhoomes harassed him and failed to safeguard the papers Plaintiff gave her to copy, exposing them to potential loss or destruction by other inmates in the library. (See Davis Aff. ¶ 37 & Ex. E; Defs.' 56.1 ¶ 35.) Defendant Rhoomes denies that she [*8] mishandled Plaintiff's papers. (See Rhoomes Decl. ¶ 10.) Plaintiff also wrote a letter to Defendant Jones on March 29, in which he purported to withdraw his acceptance of the informal resolution of the March 26 grievance, and expressed his concern that, despite Defendant Jones's assurances that Defendant Rhoomes would not retaliate against him, she harassed him and mishandled his legal papers. [3] (See Davis Aff. Ex. E-1.)

On March 30, 2007, Plaintiff again returned to the library. Defendant Rhoomes was in the back of the library near the photocopier, speaking with Defendant Andino, another Mid-Orange correction officer. (See Defs.' 56.1 ¶ 15; PL's 56.1 ¶ 15.) According to Defendant Rhoomes, Plaintiff interrupted the officers' conversation, and loudly yelled, "you got my copies." (Rhoomes Decl. ¶ 16.) Defendant Rhoomes directed

Plaintiff to stop yelling, but Plaintiff ignored her. Defendant Rhoomes then [*9] ordered Plaintiff to stop yelling, and told him that if he wanted his copies, he would have to ask for them in a proper manner. Plaintiff became "belligerent and irate," and Defendant Andino asked him to step outside of the library and speak with her privately. (See id.; Declaration of Sabrina Andino, dated Nov. 15, 2009 ("Andino Decl."), ¶ 6; PL's 56.1 ¶ 16.) Defendant Rhoomes followed them out of the library and reminded Plaintiff that she had already warned him twice about his disruptive behavior. Defendant Rhoomes then returned to her desk and called Sergeant Degnan, the area supervisor. (See Rhoomes Decl. ¶ 17.)

Upon arriving at the law library, Sergeant Degnan tried to intervene, but Plaintiff "continued to be argumentative with [Defendant] Rhoomes," and was "visibly aggravated, upset, and angry." (Declaration of Charles Degnan, dated Nov. 7, 2009 ("Degnan Decl."), ¶¶ 7-8.) Sergeant Degnan instructed Plaintiff to return to his cell in order to calm down. (See id. ¶ 11.) Plaintiff was given his original legal papers and their photocopies before leaving the library, although he claims certain pages were missing. (See Defs.' 56.1 ¶ 16; PL.'s 56.1 ¶ 16.)

Based on Plaintiff's behavior [*10] that day and the two previous verbal warnings, Defendant Rhoomes issued Plaintiff a misbehavior report, charging him with creating a disturbance, violating a direct order, and interfering with an employee. (See Rhoomes Decl. ¶ 18 & Ex. D.) Defendant Andino signed the report as a witness to the incident, and Sergeant Degnan signed the report based on his conversations with Plaintiff and Defendant Rhoomes. (See Andino Decl. ¶ 7; Degnan Decl. ¶ 12.) Plaintiff denies all of the allegations in the misbehavior report, and claims that he never raised his voice in the library or was otherwise disruptive on that day. (See PL.'s 56.1 ¶ 17.)

Plaintiff also filed a third grievance, in which he claimed that Defendant Rhoomes harassed him and lost or destroyed three of the 71 pages of legal papers he had left for photocopying, again in retaliation for his first grievance against Defendant Rhoomes. (See Davis Aff. ¶ 38 & Ex. F.)

On April 5, 2007, Defendant Jones investigated Plaintiff's second and third grievances. Defendant Jones interviewed Plaintiff and, at Plaintiff's request, he interviewed two inmate witnesses. Plaintiff claims he showed the legal papers to Defendant Jones to prove that Defendant [*11] Rhoomes had lost certain pages.

---

[2] Plaintiff has submitted a copy of the library log book, which does not reflect a visit by Little to the library that day. (See Davis Aff. ¶ 83 & Ex. Z.)

[3] Defendant Jones does not recall receiving this letter, but the issues in the letter were addressed on April 5, see infra, when he interviewed Plaintiff regarding the second grievance which contained similar complaints about Defendant Rhoomes's alleged retaliation. (See Jones Decl. ¶ 10.)



Defendant Jones also requested and reviewed memos from Defendants Rhoomes and Andino and Correction Counselor Little regarding the events in the law library on March 29 and 30. (See Defs.' 56.1 ¶¶ 35-41; PL's 56.1 ¶¶ 35-41; see also Davis Aff. Exs. V, W, X, and Y.) On April 10, Defendant Jones concluded in a memo to Defendant Van Buren, Superintendent of Mid-Orange, that "[t]here clearly is a perception on the part of [Plaintiff] that there is retaliation[, but] . . . I find no harassment on the part of [Defendant] Rhoomes." (Jones Decl. Ex. C; see also id. Ex. E.) Defendant Jones also noted in the April 10 memo that Defendant Rhoomes no longer worked in the law library. (Jones Decl. Exs. C & E.)

Defendant Van Buren signed the official denial of both grievances, and Plaintiff unsuccessfully appealed the denials. (See Second Amended Complaint, dated Feb. 5, 2008 ("Second Am. Compl."), ¶¶ 37-39; Davis Aff. Ex. G.) Plaintiff contends that Defendant Van Buren "failed to adequately investigate" his claims of harassment against Defendant Rhoomes and "to remedy the wrong[s] after learning about them through the facility grievance appeals process." (Second Am. [*12] Compl. ¶ 145.) Plaintiff also contends that Defendant Van Buren knew or should have known that the misbehavior report written by Defendant Rhoomes, and signed by Defendant Andino, was false, because the law library's photocopier was not operational, despite Defendant Rhoomes's statement in the report that she was making copies in the law library that day. (See id. ¶ 150.)

Defendant Van Buren claims that she "do[es] not recall personally receiving any complaints from inmates about the operation of the law library" or Defendants Rhoomes or Andino. (Declaration of Diane Van Buren, dated Nov. 16, 2009 ("Van Buren Decl."), ¶¶ 12-13.) She further maintains that "the Superintendent does not personally investigate the allegations contained in an inmate grievance. As Superintendent, I relied on the investigations conducted by my staff into the allegations contained in the grievances." (Id. ¶ 14.)

## II. The April 2007 Disciplinary Hearing

On April 7, and continuing on April 11, 2007, Defendant Faliski, a correction lieutenant at Mid-Orange, conducted a disciplinary hearing on the misbehavior report issued to Plaintiff by Defendant Rhoomes. (See Defs.' 56.1 ¶ 45; PL.'s 56.1 ¶ 45.) At the hearing, [*13] Plaintiff called two inmate witnesses and Defendant Andino to testify. Plaintiff also testified on his

own behalf. Plaintiff requested that Defendants Rhoomes and Jones testify, but Defendant Faliski denied this request. (See Declaration of Paul Faliski, dated Nov. 13, 2009 ("Faliski Decl."), ¶ 10; see also Transcript of April 2007 Disciplinary Hearing ("Apr. Tr."), attached as Exhibit B to Faliski Decl.) Defendant Faliski declined to hear the testimony of Defendant Jones, because he "was not present in the Law Library on the incident date and time." (Apr. Tr. at 40-41.) Defendant Faliski denied Plaintiff's request to call Defendant Rhoomes, because she "is the writer of the [misbehavior report] and . . . her testimony would only prove to be redundant to the . . . incident." (Id. at 41.) Defendant Faliski called two additional inmate witnesses to testify, but both refused. (See id. at 67.) Defendant Faliski also reviewed Plaintiff's three grievances against Defendant Rhoomes. (See id. at 25.) Plaintiff had no procedural objections to the disciplinary hearing. (See id. at 69.)

After hearing all of the evidence, Defendant Faliski found Plaintiff not guilty of creating a disturbance, but [*14] guilty of interfering with an employee and refusing a direct order. (See id. at 70.) In his decision, Defendant Faliski wrote:

> Although I determined that the general atmosphere of the Law Library was not disturbed that particular evening, I do find evidence that you did interfere with the duties and failed to follow orders from [Defendant] Rhoomes. Testimony was given [by Plaintiff's inmate witness] that you did appear irritated upon entering the Law Library that day and further testimony [by Defendant Andino] confirms your loud tone of voice was indeed unusual. The fact that a supervisor had to respond to the area only confirms that an incident did take place.

(Id. at 70-71.) As a result of his findings, Defendant Faliski imposed a penalty of fifteen days' loss of recreation, packages, commissary, and telephone access. (See id. at 70.) Defendant Faliski expressly advised Plaintiff of his right to file an appeal and supplied Plaintiff with an appeal form. (See id. at 71-72.) Plaintiff contends, however, that after the hearing concluded, Defendant Faliski threatened to have Plaintiff charged with further violations if he filed an appeal, and later called Plaintiff's housing area to tell [*15] other officers to issue Plaintiff a similar warning. (See Davis Aff. ¶ 51; PL's 56.1 ¶ 53.) Defendant Faliski denies this allegation, although Plaintiff did not appeal the decision. (See Faliski Decl. ¶ 14.)

In the instant case, Plaintiff has proffered additional facts and arguments that he claims undermine the



2010 U.S. Dist. LEXIS 103562, *15

veracity of the misbehavior report and the disposition of the disciplinary hearing. First, Plaintiff points to a statement by Defendant Rhoomes in the misbehavior report that she was making copies in the library with Defendant Andino when Plaintiff first approached her. (See Davis Aff. ¶ 41.) Because Defendant Andino signed the misbehavior report, Plaintiff attributes the allegedly incredible statement regarding the photocopier to Defendant Andino as well. (See id. ¶ 40.) Plaintiff argues that the law library photocopier was out of service for the entire month of March 2007. (See id. ¶ 42.) As support, Plaintiff submits a response to a Freedom of Information Law ("FOIL") request, which states that, as of August 2007, the machine "ha[d] been down since 11/06." (See id. Ex. I.) Defendant Rhoomes contends that while the law library photocopier was not operating at 100% efficiency, [*16] it was capable of making copies. (See Rhoomes Decl. ¶ 20.) Defendants submit the law library photocopier log book to show that a limited number of copies were made in March 2007. (See id. Ex. E.) Plaintiff argues that this is "preposterous," because had the library photocopier been operating on March 30, any funds derived from its use would be deposited into the Inmate Liaison Committee Fund Account, pursuant to DOCS policy. (See Davis Aff. ¶ 54 & Ex. K.) Yet, Plaintiff states that there are no records of any funds deposited in that account during that time period. (See Davis Aff. ¶ 54 & Ex. L.)

Plaintiff further contends that Defendant Andino never testified at the disciplinary hearing that Defendant Rhoomes gave Plaintiff a direct order. (See Davis Aff. ¶ 99.) According to the transcript, Defendant Andino testified as follows: "There was a statement of direct order . . . ." (Apr. Tr. at 60-61.) According to Plaintiff, Defendant Andino stated that "there was no direct order given by defendant Rhoomes," and the transcript was altered. (Davis Aff. ¶ 99.)

Plaintiff also argues that Defendant Andino's hearing testimony was not credible, because she testified that there were twenty inmates [*17] in the library on March 30, when the library could only comfortably hold about ten. (See Davis Aff. ¶¶ 102-03.) Finally, Plaintiff claims that he overheard Defendant Faliski coaching Defendant Andino prior to her testimony at the disciplinary hearing. (See id. ¶ 48.) Plaintiff did not make this allegation in the Second Amended Complaint, and it appears for the first time in opposition to the instant motion. Nevertheless, Defendant Andino wrote a memo to Defendant Jones several days prior to the hearing, in which her version of the events of March 30 parallels much of her testimony given at the hearing. (See id. Ex. Z-1; see also Apr. Tr. at 55-66.)

### III. The October 2007 Misbehavior Reports

As a result of the events of March and April 2007, Plaintiff filed the initial Complaint in this action on July 23, 2007. Service was made upon Defendants Rhoomes, Andino, and Faliski on October 2, 2007. (See Davis Aff. Exs. O, P, & R.) Three days later, on October 5, Plaintiff was issued a misbehavior report by Correction Officer Fox, a non-party. (See Faliski Decl. Ex. D.) Officer Fox had discovered two large stones wrapped inside a towel in Plaintiff's possession. As a result, Plaintiff was charged [*18] with possession of a weapon, possession of contraband, and possessing property in an unauthorized area. Defendant Faliski, in his role as a lieutenant and a disciplinary review officer, reviewed this report on October 9, and, pursuant to a DOCS Directive, determined the appropriate disciplinary level for the charges as Tier III. This was based on the type of contraband and the area of Mid-Orange in which it was found. (See Faliski Decl. ¶¶ 19-20.) Pursuant to the same DOCS Directive, Defendant Faliski had had the authority to return the misbehavior report to Officer Fox, and have him rewrite it, if necessary. (See id. ¶ 16.)

Plaintiff believes that Defendant Faliski added the weapons charge to the report, in retaliation for the filing of this action, which resulted in the Tier III, as opposed to Tier II, classification. (See Pl.'s 56.1 ¶ 55.) In support, Plaintiff has submitted a copy of the October 5 misbehavior report that has a notation in the top-right hand corner that reads "II" and "III." (See Davis Aff. Ex. N.) By contrast, Defendants' copy of the October 5 misbehavior report has only the "III" notation. (See Faliski Decl. Ex. D.) Plaintiff contends that Defendants altered this document [*19] to conceal the original Tier II classification. (See Davis Aff. ¶ 60.) Plaintiff argues that had the weapons charge been on the original report, he would have been immediately placed in keeplock. (See id. ¶ 61.) A DOCS Directive provides that an officer may confine an inmate "[w]here [he] has reasonable grounds to believe that an inmate . . . represents an immediate threat to the safety, security or order of the facility or is an immediate danger to other persons or to property."[4] (See id. Ex. T.)

On October 15 and 16, 2007, a disciplinary hearing was

---

[4] Contrary to Plaintiff's suggestion, this Directive does not mandate immediate confinement in keeplock.

held on the charges in the misbehavior report. As the officer who reviewed the report, Defendant Faliski could not act as the hearing officer at this proceeding. Plaintiff pled guilty to the charges of possession of contraband and possessing property in an unauthorized area, and not guilty to the charge of possession of a weapon, claiming that he had the towel with the rocks as some sort of rehabilitation device for his injured knee. [5] (See Second Am. Compl. ¶ 171.) Because Plaintiff admitted possessing these items, and they were considered [*20] a weapon at Mid-Orange, Plaintiff was found guilty of possession of a weapon. Plaintiff received a penalty of sixty days in keeplock, and sixty days' loss of recreation, packages, commissary, and telephone access. (See Defs.' 56.1 ¶ 61 & Ex. F; PL.'s 56.1 ¶ 61.)

Later on October 16, 2007, Correction Officer Korines, a non-party, issued Plaintiff another misbehavior report after recovering from Plaintiff's cell a white sock with a rock inside, approximately four inches long and weighing 1.6 pounds, as well as an orange shirt and a hot pot. (See Faliski Decl. Ex. E.) These items were found when packing up Plaintiff's belongings prior to moving him to keeplock as a result of the October 5 charge. The charges in the October 16 report were identical to the previous report. Defendant [*21] Faliski also reviewed this report, and again classified it as a Tier III offense for the same reasons as the October 5 report. At a disciplinary hearing held on October 22 (not conducted by Defendant Faliski), Plaintiff pled not guilty to all charges, claiming again that the rock was needed for physical therapy. [6] Because Plaintiff admitted to possessing each of the items in question, he was found guilty of the charges. A penalty of sixty days in keeplock and sixty days' loss of privileges was again imposed. (See Faliski Decl. Ex. G.) Because Plaintiff was already

---

[5] Plaintiff now appears to argue that the rocks were planted by Officer Fox. (See PL.'s 56.1 ¶ 56.) This statement is undermined by Plaintiff's own deposition testimony that on October 5, "I was in the gym and I had two small rocks that I use on my leg because I had knee replacement surgery." (See Plaintiff's Deposition Transcript, dated July 17, 2009 ("PL's Depo."), at 64, attached as Exhibit N-5 to Davis Aff.)

[6] With respect to the rock found in the sock, Plaintiff also argues that this was planted. (See Davis Aff. ¶ 70.) At the hearing, however, Plaintiff testified as follows: "I admit to having those locks in my thing." (See Transcript of October 22, 2007 Disciplinary Hearing ("Oct. Tr."), at 5, attached as Exhibit N-3 to Davis Aff.) Because the transcript is made from an audio tape, there are several errors in the transcription. The Court presumes "locks" is meant to read "rocks."

serving time in keeplock for the October 5 misbehavior report, his sentence was suspended and deferred pending good behavior. (See Davis Aff. Ex. N-3.)

On [*22] December 27, 2007, the Central Office Review Committee ("CORC") issued a decision on Plaintiff's appeal of the October 16 hearing. The CORC dismissed the charge of possession of a weapon, stemming from the October 5 incident. No reason was given for the decision. (See Davis Aff. Ex. S.) Plaintiff contends that without the weapons charge, which he alleges Defendant Faliski unilaterally added to the misbehavior report in retaliation for this action, he never would have been put in keeplock for 60 days. (See id. ¶ 67.) However, the CORC upheld the penalty imposed, even after dismissing the weapons charge.

## IV. The Motion to Dismiss and Plaintiff's Remaining Claims

Defendants previously moved to dismiss the Amended Complaint on several grounds, but because both parties submitted documents outside the pleadings, the motion to dismiss was converted to a motion for summary judgment. The District Court (Hon. John G. Koeltl) granted Defendants' motion in part. See *Davis v. Rhoomes, No. 07 Civ. 6592 (JGK), 2009 U.S. Dist. LEXIS 12891, 2009 WL 415628, at *11 (S.D.N.Y. Feb. 19, 2009)*. The District Court dismissed, and this Court will therefore not consider, Plaintiff's conspiracy claims against all Defendants, his *Eighth Amendment* [*23] harassment claims based on Rhoomes's conduct in the library and Faliski's alleged verbal threats following the April disciplinary hearing, his *First Amendment* denial of access to the courts claim based on Rhoomes's alleged loss of some of Plaintiff's legal papers, and his *Fourteenth Amendment* due process claim relating to the April disciplinary hearing. See *2009 U.S. Dist. LEXIS 12891, [WL] at *7-9*. The following claims remain in the case: (1) Defendant Rhoomes retaliated against Plaintiff for filing grievances against her by harassing him, losing or destroying some of his legal papers, and falsely writing him up for misbehavior on March 3 0; (2) Defendant Andino retaliated against Plaintiff for filing grievances against Defendant Rhoomes by endorsing the false misbehavior report; (3) Defendant Faliski retaliated against Plaintiff for filing grievances against Defendant Rhoomes by (a) finding Plaintiff guilty of the charges against him, despite the fact that he knew the March 30 misbehavior report contained fabricated charges, and (b) threatening Plaintiff to dissuade him from appealing the decision; (4)



2010 U.S. Dist. LEXIS 103562, *23

Defendant Faliski added false weapons charges to Plaintiff's October 5 and 16 misbehavior reports, resulting [*24] in a Tier III classification and time in keeplock, in retaliation for filing this lawsuit; (5) Defendant Van Buren was grossly negligent in managing, training, and supervising Defendants Rhoomes and Andino, resulting in their retaliatory acts against Plaintiff; and (6) Defendant Jones negligently supervised Defendant Rhoomes, because after informally resolving the March 26 grievance and assuring Plaintiff that Defendant Rhoomes would not retaliate against him, Rhoomes continued to harass him, lost some of his legal papers, and filed the false misbehavior report against him. See id.

## DISCUSSION

### I. Legal Standard for Summary Judgment

Under *Rule 56(c) of the Federal Rules of Civil Procedure*, a motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; see also *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986)*; *Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 98 (2d Cir. 2003)*. The burden of demonstrating [*25] the absence of any genuine dispute as to material facts rests upon the party seeking summary judgment. See *Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970)*; *Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)*. Once a properly supported motion for summary judgment has been submitted, the burden shifts to the nonmoving party to make a sufficient showing to establish the essential elements of the claims on which it bears the burden of proof at trial. See *Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d Cir. 2003)*; *Peck v. Pub. Serv. Mut. Ins. Co., 326 F.3d 330, 337 (2d Cir. 2003)* (citing *Celotex, 477 U.S. at 323, 106 S. Ct. at 2553*).

In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, courts are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986)*; *McClellan v.*

*Smith, 439 F.3d 137, 144 (2d Cir. 2006)*. However, the non-moving party must put forth "specific facts showing a genuine issue for trial." *Fed. R. Civ. P. 56(e)(2)*. [*26] A summary judgment "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)*. The non-moving party may not rely on its pleadings, mere allegations, simple denials, conclusory statements, or conjecture to create a genuine issue for trial. See *Anderson, 477 U.S. at 256-57, 106 S. Ct. at 2514*; *Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)*.

### II. Plaintiff's Motion for Preclusion

Before turning to the merits of Defendants' Motion for Summary Judgment, the Court must briefly address Plaintiff's motion for preclusion, as Defendants rely on many of the documents Plaintiff seeks to preclude in connection with their motion. Plaintiff's motion is premised on his claim that certain documents have been altered or fabricated. Although framed as a separate motion for preclusion, Plaintiff's submission is more akin to additional arguments in opposition to Defendants' Motion for Summary Judgment. As Plaintiff's claims of document tampering are simply speculative and conclusory, they should be flatly rejected. See *Rikhy v. AMC Computer Corp., No. 01 Civ. 7007 (WHP), 2003 U.S. Dist. LEXIS 4804, 2003 WL 1618529, at *4 (S.D.N.Y. Mar. 28, 2003)* [*27] (declining to credit plaintiff's "conclusory statements, innuendo, accusations and claims that defendants' documents are fabricated" in opposition to a motion for summary judgment); *Abdul-Matiyn v. Coughlin, No. 94 Civ. 5649 (SAS) (SEG), 1996 U.S. Dist. LEXIS 22331, 1996 WL 1089984, at *17 (S.D.N.Y. Nov. 8, 1996)* ("[W]holly unsupported allegations of a vast array of fabricated documents can hardly be credited, and, in any event, on this motion for summary judgment, conclusory unsupported allegations like these cannot serve to rebut the defendants' evidence."), Report and Recommendation adopted at *1997 U.S. Dist. LEXIS 923, 1997 WL 40939 (S.D.N.Y. Jan. 31, 1997)*; *Timmons v. Div. of Military and Naval Affairs, No. 92 Civ. 0237 (MBM), 1994 U.S. Dist. LEXIS 1207, 1994 WL 38861, at *4 (S.D.N.Y. Feb. 8, 1994)* (granting summary judgment to defendants where pro se plaintiff offered only "unsupported claims that [defendant's] documentation was fabricated or backdated").

For example, Plaintiff conclusively asserts that some of



the documents submitted by Defendants have been "altered, dates change [d] . . . do[] not reflect [] or represent[;] a true and accurate copy thereof." (See Affidavit of Samuel Davis in Support of Motion for Preclusion, dated Dec. 30, 2009 ("Davis [*28] Aff. II") ¶ 2.) Plaintiff further contends that Defendants and their attorneys are "conspiring to deprive[] the plaintiff[] of documents and information to support his claims." (Id. ¶ 20.) As support, Plaintiff points to Defendants' responses to certain of his discovery requests that he claims are incomplete or contain inappropriate redactions.

Defendants respond that they "have answered all of plaintiff's document requests and either produced the documents, set forth their objections to certain requests or repeatedly explained that there were no documents responsive to certain requests." (See Letter to the Court from Defendants, dated Jan. 21, 2010.) Defendants also note that the names of other inmates are routinely redacted due to security concerns within the correctional facility. (See id.) The Court has reviewed the parties' submissions and accompanying exhibits, and agrees with Defendants. Plaintiff, it seems, simply seeks exclusion of documents that are unsupportive or damaging to his case. Accordingly, Plaintiff's motion for preclusion should be denied.

## III. *First Amendment* Retaliation Claims

### A. Legal Standard

To support a retaliation claim under the *First Amendment*, a plaintiff [*29] must show that (1) he engaged in speech or conduct that was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the plaintiff's speech and the adverse action. See *Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004)*; accord *Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009)*. Courts must "examine prisoners' claims of retaliation with skepticism and particular care," because of "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated." *Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995)* (citing *Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983))*. Therefore, a prisoner's claim for retaliation must be "'supported by specific and detailed factual allegations,' not stated in wholly conclusory terms.'" *Thomas v. Goord, 215 F. App'x 51, 53 (2d Cir. 2007)* (quoting *Friedl v. City of New York, 210 F.3d 79, 85-86*

*(2d Cir. 2000))*.

Filing a prison grievance is considered a protected activity. See *Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001)*, overruled on other grounds, *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)*; [*30] see also *Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002)* (filing a grievance is "the exercise of a constitutionally protected right"); *Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996)* ("[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the *First* and *Fourteenth Amendments* and is actionable under § 1983.") (citing *Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988))*.

To satisfy the second prong of a retaliation claim in the prison context, "[o]nly retaliatory conduct that would deter similarly situated individuals of ordinary firmness from exercising . . . constitutional rights constitutes an adverse action . . . ." *Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003)*. Specifically, the Court of Appeals has found that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens before a [retaliatory] action taken against them is considered adverse." *Dawes, 239 F.3d at 493* (quoting *Thaddeus-X v. Blatter, 175 F.3d 378, 398 (6th Cir. 1999))*.

The third prong of a retaliation claim requires a causal connection between the protected speech [*31] and the adverse action. In order to show causation, the protected conduct must be "a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003)*; see also *Dillon v. Morano, 497 F.3d 247, 251 (2d Cir. 2007)*. Facts suggesting causation may be circumstantial and can include "(1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the plaintiff's prior good disciplinary record; (3) the plaintiff's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline." *Garcia v. Watts, No. 08 Civ. 7778 (JSR), 2009 U.S. Dist. LEXIS 84692, 2009 WL 2777085, at *11 (S.D.N.Y. Sept. 1, 2009)* (citing *Colon, 58 F.3d at 872-73*); accord *Espinal, 558 F.3d at 129-30*; see also *Bennett, 343 F.3d at 139* ("where . . . circumstantial evidence of a retaliatory motive is sufficiently compelling, direct evidence is not invariably required").

If a plaintiff succeeds in establishing each of the three prongs of a retaliation claim, a defendant may still meet



2010 U.S. Dist. LEXIS 103562, *31

its burden on summary judgment if she can demonstrate that she would have taken the same action against the plaintiff absent **[*32]** any retaliatory animus. See _Gayle, 313 F.3d at 682._ "A finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority." _Graham, 89 F.3d at 79_ (internal quotation marks and citation omitted). Nevertheless, a defendant must set forth "_undisputed facts_ demonstrat[ing] that the challenged action clearly would have been taken on a valid basis alone." _Davidson v. Chestnut, 193 F.3d 144, 149 (2d Cir. 1999)_ (per curiam) (emphasis added).

B. Application

1. Defendant Rhoomes

Plaintiff contends that Defendant Rhoomes retaliated against him after he filed the March 26 grievance. Plaintiff avers that Defendant Rhoomes harassed him, lost or destroyed some of his legal papers, and ultimately filed what Plaintiff alleges was a false misbehavior report on March 30. [7]

Defendants do not dispute that the filing of a grievance constitutes a protected activity. See, e.g., _Gayle, 313 F.3d at 682_; _Dawes, 239 F.3d at 492._ Defendants contend, however, that Defendant Rhoomes did not take any retaliatory adverse actions against Plaintiff, any causal connection alleged by Plaintiff is conclusory, and Defendant Rhoomes had a legitimate basis on which to issue the misbehavior report.

As to Plaintiff's claim that Defendant Rhoomes lost or destroyed some of his legal papers, this is insufficient, standing alone, to constitute an adverse action. See _Davis, 320 F.3d at 353_ ("[o]nly retaliatory conduct that would deter similarly situated individuals of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation"); _Dawes, 239 F.3d at 493_ ("[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens before a [retaliatory] action taken against them is considered

adverse"). Plaintiff's conclusory allegations that Defendant Rhoomes **[*34]** intentionally "destroyed" these pages cannot overcome this deficiency in his case. See _McClenton v. Menifee, No. 05 Civ. 2844 (JGK), 2009 U.S. Dist. LEXIS 8615, 2009 WL 195764, at *6 (S.D.N.Y. Jan. 12, 2009)_ (holding that plaintiff did not endure an adverse action when a prison official withheld his mail in retaliation for filing a grievance). At best, Plaintiff has shown that three of the 71 pages he gave to Defendant Rhoomes for copying were not returned to him, although Defendant Rhoomes contests this allegation and contends that any loss of Plaintiff's papers was inadvertent. Plaintiff has not identified the contents of the missing pages other than "legal papers," nor has he alleged that he suffered any prejudice as a result of their alleged disappearance. See _Islam v. Goord, No. 05 Civ. 7502 (RJH), 2006 U.S. Dist. LEXIS 71853, 2006 WL 2819651, at *6-7 (S.D.N.Y. Sept. 29, 2006)_ (threats, inadequate investigations, and isolated instances of mail tampering without any injury were insufficient to constitute adverse actions). Therefore, no reasonable juror could conclude that the alleged loss of these three pages constitutes an adverse action. Cf. _Smith v. City of New York, No. 03 Civ. 7576 (NRB), 2005 U.S. Dist. LEXIS 7903, 2005 WL 1026551, at *3 (S.D.N.Y. May 3, 2005)_ **[*35]** (summary judgment on retaliation claim denied where officers were shown to have entered plaintiff's cell and removed and destroyed copies of numerous motions, grand jury minutes, copies of civil complaints, a pro se book, and a jailhouse lawyer's manual, along with $900 of plaintiff's personal property).

Plaintiff's claim that Defendant Rhoomes filed a false misbehavior report in retaliation for the filing of grievances against her presents a closer question. It is well-settled in this Circuit that the filing of a false misbehavior report does not constitute "a per se constitutional violation actionable under § 1983." _Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986)_ ("prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest"). "[T]o maintain an actionable claim against correction officers for filing a false misbehavior report, a plaintiff must be able to show either: (1) that he was disciplined without adequate due process, as a result of the report; or (2) that the report [which resulted in disciplinary action against a plaintiff] was issued in retaliation for exercising **[*36]** a constitutionally protected right." _Parker v. City of New York, No. 05 Civ. 1803 (PKC) (GWG), 2008 U.S. Dist. LEXIS 791, 2008 WL 110904, at *10 (S.D.N.Y. Jan. 7,_

---

[7] Plaintiff has set forth no facts independent of the loss of some of his legal papers and the filing of the misbehavior report that could be construed as harassment. Therefore, the Court will address the question of whether Defendant Rhoomes retaliated against Plaintiff **[*33]** only with respect to Plaintiff's specific allegations of the lost legal papers and the false misbehavior report.



*2008)* (citations omitted).

In the procedural due process context, the relevant question is whether the prisoner is granted a hearing and an opportunity to rebut the charges. See *Freeman, 808 F.2d at 951*; see also *Jones v. Coughlin, 45 F.3d 677, 679 (2d Cir. 1994)* (reversing district court's grant of summary judgment to defendants when plaintiff alleged that he was "unfairly denied the right to call key witnesses in defense of the charges against him"). In the retaliation context, the Second Circuit has held that although "prison officials [have] wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights" such as the prisoner's *First Amendment* right to petition for redress of grievances. See *Franco, 854 F.2d at 590* (citations omitted). Indeed, the Circuit has not "eliminate[d] all liability in any case in which prison officials . . . intentionally filed false and unfounded charges." *Id. at 586*.

Here, Plaintiff [*37] does not maintain that he was denied the right to call witnesses and present evidence at his disciplinary hearing. [8] Rather, Plaintiff contends that the disciplinary charges filed against him by Defendant Rhoomes were false and retaliatory. The filing of a false misbehavior report that results in an unfavorable ruling at a disciplinary hearing can constitute an adverse action. See, e.g. , *Gill, 389 F.3d at 383-84*; see also *Brown v. Brown, No. 08 Civ. 0209 (DNH/GHL), 2010 U.S. Dist. LEXIS 28780, 2010 WL 1186569, at *6 (N.D.N.Y. Jan. 19, 2010)* (Report and Recommendation) (recommending dismissal of retaliation claim on exhaustion grounds, but finding that plaintiff had otherwise sufficiently stated a claim against a correction officer based on the filing of a false misbehavior report). Thus, the Court must determine whether (1) there is a genuine dispute as to the report's veracity, (2) there is a causal connection between the report and Plaintiff's filing a grievance, or (3) whether Defendant Rhoomes would have taken the same action against Plaintiff absent any retaliatory animus. See *Gayle, 313 F.3d at 682*.

In support of his allegation that the report was false,

Plaintiff has submitted evidence that certain of Defendant Rhoomes's statements in the report could not be true, specifically that the incident began as she was making photocopies on a machine that Plaintiff contends was inoperable. (See Davis Aff. ¶¶ 41-42 & Ex. I.) In Plaintiff's view, the fact that Defendant Rhoomes may have fabricated one portion of the report calls into question the credibility of the entire report. Plaintiff also submits his own sworn statement attesting to the events of March 30, in which he denies that he was disruptive or raised his voice in the library. (See Pl.'s 56.1 ¶¶ 15-17.) Plaintiff's alleged conduct in the library that day was certainly out of character in comparison to his relatively clean disciplinary record (see Davis Aff. Ex. M), and several inmate witnesses and even Defendant Andino confirmed this fact. (See Apr. Tr. at 63 ("I've never seen that ever. I've spoken to Inmate Davis a few times (inaudible) prior to the incident and he's always been (inaudible) inmate.").) In addition, Plaintiff maintains that Defendant Rhoomes never gave, and thus, Plaintiff [*39] never violated, a direct order.

To establish a causal connection between the protected activity and the adverse action, Plaintiff has set forth the following facts: (1) Defendant Rhoomes issued the false misbehavior report four days after Plaintiff filed a grievance against her (see Davis Aff. Exs. D & H); (2) Plaintiff had not been disciplined by any DOCS facility in the nearly seven years preceding the date in question (see id. Ex. M); and (3) Plaintiff was partially vindicated at the disciplinary hearing, when he was found not guilty of creating a disturbance (see Apr. Tr. at 70-71). [9] Further, the loss of some of Plaintiff's legal papers, while insufficient to constitute an adverse action standing alone, lends further support to the inference that Defendant Rhoomes exhibited a pattern of retaliatory behavior following Plaintiff's grievance, ultimately leading to the filing of the misbehavior report.

Taking all of these facts in the light most favorable to Plaintiff, a reasonable juror could conclude [*40] that Defendant Rhoomes took an adverse action against Plaintiff by filing a false misbehavior report, and a causal connection exists between the false report and Plaintiff's grievance. See *Brown, 2010 U.S. Dist. LEXIS 28780, 2010 WL 1186559, at *6-8* (finding plaintiff established causal connection when defendant's false misbehavior report closely followed plaintiff's grievance and plaintiff was partially vindicated at his disciplinary hearing); see

---

[8] Insofar as Plaintiff purports to state a due process claim, that claim was previously dismissed by the District [*38] Court. See *Davis, 2009 U.S. Dist. LEXIS 12891, 2009 WL 415628, at *8*.

[9] Defendant Faliski's conclusion that Plaintiff did not create a disturbance appears to be inconsistent with his finding that Plaintiff violated a direct order to stop yelling in the library.



2010 U.S. Dist. LEXIS 103562, *40

also *Espinal, 558 F.3d at 129* ("[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action").

Defendant Rhoomes, however, has set forth substantial evidence tending to show that she had a legitimate basis for filing the misbehavior report, and Plaintiff was ultimately found guilty of two of the charges against him at the disciplinary hearing. Specifically, Defendant Rhoomes submits the "Mid-Orange Law Library Warnings/Ticket Log," showing that Plaintiff received two verbal warnings for his behavior in the days preceding the misbehavior report. (See Rhoomes Decl. Ex. A.) In fact, one of those warnings preceded Plaintiff's grievance, thus undermining, if not eliminating, any inference [*41] of retaliatory animus by Defendant Rhoomes on that date. Defendant Rhoomes has also provided an internal memorandum from Correction Counselor Little, confirming that Plaintiff was disruptive in the law library on March 29. (See id. Ex. B.) Defendant Rhoomes states that she issued the misbehavior report on March 30 solely on account of Plaintiff's behavior, and for no other reason. (See id. ¶¶ 16-19.) In addition, Defendant Andino, who was also in the library on that date, confirms Defendant Rhoomes's version of events. (See Andino Decl. ¶¶ 6-7.)

Although "[a] finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration," see *Graham, 89 F.3d at 79*, the parties have presented sharply contrasting accounts of the events of March 30, either of which could be accepted as true by reasonable jurors. This is not a case where the events underlying the disciplinary charges are undisputed, but the parties disagree on the propriety of the disciplinary action taken. See, e.g., *Lowrance v. Achtyl, 20 F.3d 529, 534-35 (2d Cir. 1994)* (affirming dismissal of retaliation claim on summary judgment when plaintiff "had admitted to engaging in [*42] the conduct that formed the basis of the misbehavior report"). Plaintiff denies committing any of the prohibited conduct, while Defendant Rhoomes contends that Plaintiff's misbehavior justified the issuance of the report. Should a reasonable juror accept Plaintiff's account, then Defendant Rhoomes no longer has any valid justification for the issuance of the misbehavior report. In other words, the question of whether Defendant Rhoomes's acts were retaliatory or justified "runs to matters of credibility and weight of the evidence, which are matters for the jury." *Graham, 89 F.3d at 81*. Indeed, the Court need not reconcile the parties' incompatible stories at the summary judgment

stage. See *Gayle, 313 F.3d at 684* (reversing summary judgment granted to defendants when " [i] t is . . . disputed whether [plaintiff] committed all of the prohibited conduct"); *Colon, 58 F.3d at 873* (holding that disparity between the affidavits of a prisoner and correction officer "itself creates a credibility issue that is not readily amenable to resolution on summary judgment"); *Jones. 45 F.3d at 680* (noting that "determinations as to whether to credit such testimony and as to what inference to draw from [*43] the sequence of events is within the province of the factfinder at trial on the retaliation claims, not of the court on a motion for summary judgment").

This Court therefore recommends that Defendants' motion for summary judgment on Plaintiff's retaliation claim against Defendant Rhoomes, based on the filing of a false misbehavior report, be denied.

### 2. Defendant Andino

Plaintiff also contends that Defendant Andino retaliated against him for the grievances he filed against Defendant Rhoomes. Specifically, Plaintiff claims that Defendant Andino signed and endorsed the misbehavior report authored by Defendant Rhoomes, despite the fact that it allegedly contained false charges. Defendant Andino acknowledges signing the report, but argues that as a witness, she had to sign the report, and based on her observations, the contents of the report accurately reflected the events that transpired in the law library on March 30. She denies any retaliatory animus.

While it is questionable that the simple endorsement of another officer's report constitutes an adverse action, Plaintiff has also failed to show that a causal connection exists between his grievances against Defendant Rhoomes and the later [*44] actions of Defendant Andino. Defendant Andino is not alleged to have been present in the library on March 25 or March 29, the dates pertaining to Plaintiff's grievances. Nor is Defendant Andino alleged to have any involvement in Plaintiff's dispute over access to the judicial statutory law book or the loss of some of his legal papers, the subject of both grievances. In fact, Plaintiff's March 30 grievance, the only date on which Defendant Andino was present in the library, makes no mention of any retaliatory acts by Defendant Andino. (See Davis Aff. Ex. F.) Plaintiff bases his entire claim against her on the presence of her signature on the misbehavior report.

In the Court's view, no reasonable juror could conclude that a causal connection exists between Plaintiff's grievances against Defendant Rhoomes, pertaining to



dates and events in which Defendant Andino had no involvement, and the actions of Defendant Andino in an unrelated incident. Plaintiff's conclusory claim that Defendant Andino endorsed the misbehavior report in retaliation for his grievances against Defendant Rhoomes is simply insufficient. See Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) (affirming dismissal of retaliation [*45] claim, because "no rational juror could conclude that if [defendant] assaulted [plaintiff], it was in retaliation for [plaintiff's] having written . . . a letter that did not name [defendant] . . . and complained of an incident in which [defendant] was not a participant"); White v. Bergenstock, No. 9.-08-CV-717 (FJS) (DRH), 2009 U.S. Dist. LEXIS 110004, 2009 WL 4544390, at *7 (N.D.N. Y. Nov. 25, 2009) (where inmate alleged that a correctional official issued a misbehavior report in retaliation for grievance filed against another correctional official, court found plaintiff's allegation "wholly conclusory with no plausible nexus between the grievance and the misbehavior report other than [plaintiff's] suggested conclusion"); Bouknight v. Shaw, No. 08 Civ. 5187 (PKC), 2009 U.S. Dist. LEXIS 35402, 2009 WL 969932, at *6 (S.D.N.Y. Apr. 6, 2009) (plaintiff's assertion that he was written up for an infraction because he filed a grievance and, for revenge, found to be conclusory - "Plaintiff has not alleged any facts that would establish that [defendant] was motivated by plaintiff's filing of a grievance against her. Plaintiff's mere speculation is insufficient."). [10] Accordingly, Defendant Andino is entitled to summary judgment.

## 3. Defendant Faliski

Plaintiff's claims against Defendant Faliski are two-fold: first, Plaintiff alleges that Defendant Faliski retaliated against him in April 2007 when he found Plaintiff guilty of two of the three charges in the misbehavior report, despite knowing Defendant Rhoomes fabricated the report, and thereafter threatened Plaintiff with further charges if he filed an appeal; and second, Plaintiff contends that Defendant Faliski added charges to the

October 5 misbehavior report resulting in its Tier III classification, and similarly, classified the October 16 misbehavior report as Tier III, both in retaliation for Plaintiff [*47] filing this lawsuit.

Defendant Faliski responds that he conducted the disciplinary hearing in accordance with DOCS policies and procedures, found Plaintiff guilty of two of three charges based on the evidence presented at the hearing, and denies threatening Plaintiff if he appealed the decision. Defendant Faliski further argues that the classification of the infractions in the October misbehavior reports was based on the charges contained therein, namely Plaintiff's possession of an item that is considered a weapon at Mid-Orange.

### a. The April Disciplinary Hearing[11]

With respect to the April disciplinary hearing, Plaintiff's claim against Defendant Faliski [*48] suffers from the same defect as his claim against Defendant Andino - the lack of a causal connection. Specifically, Plaintiff has not shown that Defendant Faliski's conduct at the hearing was in any way motivated by the grievances Plaintiff filed against Defendant Rhoomes. See Wright, 554 F.3d at 274; White, 2009 U.S. Dist. LEXIS 110004, 2009 WL 4544390, at *7; Bouknight, 2009 U.S. Dist. LEXIS 35402, 2009 WL 969932, at *6. Indeed, Defendant Faliski had no involvement in the events at the law library on March 25, 29 or 30, the subject of the grievances. Absent a conspiracy between Defendants - a claim that the District Court has already dismissed - Plaintiff cannot credibly maintain that Defendant Faliski's decision at the hearing was retaliatory. Because there is no evidence of a causal connection to Plaintiff's protected activity, Plaintiff's claim relating to the April disciplinary hearing should be dismissed.

In any event, even if Plaintiff could establish the elements of a retaliation claim against Defendant Faliski, summary judgment would still be appropriate if Defendant Faliski can demonstrate that he would have taken the same action against Plaintiff absent any

---

[10] Although Defendant [*46] Andino contends that she was unaware of Plaintiff's grievance against Defendant Rhoomes when she endorsed the misbehavior report (see Andino Decl. ¶ 8), her testimony at the disciplinary hearing suggests otherwise. (See Apr. Tr. at 63 ["But once we were outside, it was apparent [Plaintiff] was (inaudible) retaliation by [Defendant Rhoomes]."); see also id. at 64-65 ("I was just trying to, you know, reiterate to [Plaintiff] that, you know, no matter what happened, grievances in the past or whatever, you just keep the civility within the Law Library . . . .").)

[11] Defendants suggest that, at his deposition, Plaintiff withdrew his retaliation claim against Defendant Faliski based on the April disciplinary hearing. (See Defs.' Mem. at 11.) The Court disagrees. While Plaintiff had some difficulty articulating this claim, he testified as follows: "I'm saying that by [Defendant Faliski] coaching Andino in what to say and how to give answers [at the hearing], they were retaliatory." (PL's Depo. at 65.) Plaintiff further testified that "he threatened me not to complain, not to appeal the ticket." (Id.)

retaliatory [*49] animus. See *Gayle, 313 F.3d at 682*. This Court has reviewed the transcript of the April disciplinary hearing - which was provided to the Court in full - and has found nothing to suggest that the hearing was conducted improperly, or that Defendant Faliski deprived Plaintiff of his due process rights. Plaintiff was made aware of the charges against him, was given an opportunity to rebut the charges, and to present witnesses in his defense. See *Wolff v. McDonnell, 418 U.S. 539, 566, 94 S. Ct. 2963, 2979, 41 L. Ed. 2d 935 (1974)* (noting that "the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense"); accord *Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004)*.

Defendant Faliski heard several witnesses, including two inmates who Plaintiff himself called to testify, and his findings were reasonable based on the evidence presented to him. He relied on the testimony of Defendant Andino, written reports, and the testimony of one of Plaintiff's inmate witnesses. In fact, in dismissing the charge of creating a disturbance, Defendant Faliski concluded that "the general atmosphere of the Law Library was not disturbed that particular evening" (see Apr. [*50] Tr. at 70-71), which is at least partially supportive of Plaintiff's view of the case.

In addition, any allegation that Defendant Faliski "knew or should have known" (see Second Am. Compl. ¶¶ 123-27) that the disciplinary report was false is wholly conclusory and not supported by the evidence. Plaintiff's allegations regarding the functionality of the photocopier and the inmate capacity of the library, while they may affect the credibility of Defendants Rhoomes and Andino, were not presented to Defendant Faliski at the time of the hearing. Thus, Plaintiff cannot now argue that Defendant Faliski issued his decision knowing the misbehavior report to be false based on these facts. [12]

In sum, there is no basis for reasonable jurors to conclude that Defendant Faliski did not have a legitimate basis for finding Plaintiff guilty of two of the three charges at the disciplinary hearing. That Plaintiff disagrees with the outcome of the proceeding does not render Defendant Faliski's decision retaliatory. To allow an inmate to proceed on a retaliation claim against a hearing officer simply because the officer ruled against him at a disciplinary proceeding, would clearly run afoul of the Second Circuit's admonition that courts must "examine prisoners' claims of retaliation with skepticism and particular care," because of "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated." *Colon, 58 F.3d at 872* (citing *Flaherty, 713 F.2d at 13*).

Plaintiff also contends that Defendant Faliski verbally threatened him not to appeal his decision, [*52] or he would file further charges against Plaintiff, and that Defendant Faliski further advised officers in Plaintiff's housing unit to do the same. [13] The latter allegation is wholly speculative and insufficient to defeat a motion for summary judgment. In any event, these general threats alone, even if proven at trial, do not constitute adverse actions. See *Islam, 2006 U.S. Dist. LEXIS 71853, 2006 WL 2819651, at *5* ("The threat to place plaintiff in protective custody is de minimis and does not constitute an adverse action."); *Bartley v. Collins, No. 95 Civ. 10161 (RJH), 2006 U.S. Dist. LEXIS 28285, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006)* (threats such as "we [are] going to get you, you better drop the suit," do not rise to the level of an adverse action"); *Pledger, 2005 U.S. Dist. LEXIS 5232, 2005 WL 736228, at *5* (allegations regarding threats of misbehavior reports and SHU confinement did not meet the adverse action standard). Accordingly, Defendant Faliski is entitled to summary judgment on Plaintiff's retaliation claim arising from the events of April 2007.

b. The October Misbehavior Reports

As to Plaintiff's claims arising out of the October 5 and 16 misbehavior reports, the filing of this lawsuit

---

[12] Although Plaintiff avers that Defendant Faliski coached Defendant Andino into testifying falsely, he has injected this fact into the record for the first time in opposition to Defendants' motion for summary judgment. Thus, the Court will not consider it. See, e.g., *Brutus v. Silverseal Corp., No. 06 Civ. 15298 (LAP), 2009 U.S. Dist. LEXIS 112654, 2009 WL 4277077, at *1 n.2 (S.D.N.Y. Nov. 24, 2009)* (stating that "[p]laintiff may not properly raise new allegations in his opposition to Defendants' motion for summary judgment"). In any event, [*51] Defendant Andino submitted a memo to Defendant Jones prior to the hearing, that was consistent with her testimony at the hearing, in which she detailed her observations from March 30. (Compare Apr. Tr. at 55-66, with Davis Aff. Ex. Z-1.)

---

[13] Defendant Faliski incorrectly suggests that the District Court previously disposed of this claim. (See Defs.' Mem. at 3.) The District Court dismissed Plaintiff's claim based on these facts only insofar [*53] as they purported to state an **Eighth Amendment** harassment claim. See *Davis, 2009 U.S. Dist. LEXIS 12891, 2009 WL 415628, at *7*. The Court permitted Plaintiff to pursue his retaliation claim against Defendant Faliski.



constitutes a protected activity. See *Graham, 89 F.3d at 80* ("[t]he right to petition government for redress . . . is among the most precious of the liberties safeguarded by the *Bill of Rights*"). For purposes of the instant motion, the Court will assume that Defendant Faliski's classification of Plaintiff's infractions as Tier III violations, leading to Plaintiff's confinement in keeplock, could be construed as an adverse action, even though Faliski was not the person who accused Plaintiff of misbehavior. See *Shire v. Greiner, No. 02 Civ. 6061 (GBD)(FM), 2007 U.S. Dist. LEXIS 18682, 2007 WL 840472, at *3 (S.D.N.Y. Mar. 15, 2007)* ("disciplinary actions such as keeplock are considered adverse actions") (citing *Gill, 389 F.3d at 379*). Finally, the fact that Plaintiff served Defendant Faliski with the Complaint in this action just days prior to the issuance and subsequent classification of [*54] these infractions might lead a reasonable juror to conclude that there is a causal connection between the protected activity and the allegedly retaliatory acts. Nevertheless, the inquiry does not end here.

Defendant Faliski did not issue the misbehavior reports against Plaintiff. He merely reviewed them and concluded that the alleged misconduct should be classified as a Tier III violation. Defendant Faliski argues that he had a legitimate basis on which to do so. Pursuant to DOCS policies and procedures, possession of a weapon is indeed a Tier III offense, and a rock wrapped inside of a sock or towel is considered a weapon at Mid-Orange. (*See* Faliski Decl. ¶ 20.) Although Plaintiff now contends that the recovered items were planted, he previously admitted to possessing them, seeking to justify his actions by claiming the rocks were needed to rehabilitate his injured knee. (*See* Second Am. Compl. ¶ 171; Oct. Tr. at 5.) Further, Plaintiff's purported justification is indicated nowhere in the October reports, and Defendant Faliski had no basis on which to classify these infractions as anything other than Tier III. Since it is undisputed that Plaintiff possessed these items, and within Mid-Orange [*55] they are considered "weapons" regardless of their intended use, it is therefore undisputed that Defendant Faliski had a legitimate basis for classifying the infractions as Tier III. Accordingly, even if Plaintiff could show that Defendant Faliski altered the reports, and was also motivated at least in part by retaliatory animus, Plaintiff's retaliation claim cannot survive summary judgment. See *Scott v. Coughlin, 344 F.3d 282, 287-88 (2d Cir. 2003)* ("a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.*, that even without the improper motivation the alleged retaliatory action would have occurred"); accord *Lowrance, 20 F.3d*

at 535 (dismissing retaliation claim when "misbehavior report had been motivated by both proper and improper reasons"); *Sher v. Coughlin, 739 F.2d 77, 82 (2d Cir. 1984)* ("state action taken on the basis of both valid and invalid motivations is not constitutionally tainted by the invalid motive if the action would in any event have been taken on the constitutionally valid basis"). [14]

## IV. Supervisory Liability

### A. Legal Standard

A supervisory official cannot be held liable in a *Section 1983* action based on respondeat superior; rather, the superior must be shown to have been directly involved in the constitutional violation. *Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003)*. Until recently, supervisory liability could be established by showing:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information that unconstitutional acts [*57] were occurring.

*Colon, 58 F.3d at 873; see also Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003)*. But even under this standard, a supervisor's mere denial of a grievance, or failure to investigate, was not sufficient to establish personal involvement. See, e.g., *Collins v. Goord, 438 F. Supp. 2d 399, 420 (S.D.N.Y. 2006); see also Hernandez v. Goord, 312 F. Supp. 2d 537, 547 n.6 (S.D.N.Y. 2004)* (noting that receipt of letters or grievances is insufficient to establish personal involvement, and conclusory allegations that a supervisor was told of an incident does not establish

---

[14] While the weapons charge against Plaintiff in one of the two October misbehavior reports was dismissed on appeal, no reason for this decision was given, [*56] and the sentence was upheld on appeal. Thus, if the harm that resulted from Defendant Faliski's allegedly retaliatory conduct was Plaintiff's placement in keeplock, the disposition of Plaintiff's appeal does nothing to revive his claim of retaliation.



2010 U.S. Dist. LEXIS 103562, *56

personal involvement); _Woods v. Goord, No. 01 Civ. 3255 (SAS), 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at *7 (S.D.N.Y. Apr. 23, 2002)_ (same).

The Supreme Court's recent <u>Iqbal</u> decision substantially limited the means by which supervisory liability could be established. There, the Court held that

> Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of <u>respondeat superior</u>. . . . In a § 1983 suit . . . masters do not answer for the torts of their servants - the term "supervisory liability" is a misnomer. . . . [E]ach Government official . . . is only liable for his . . . own misconduct.

_Ashcroft v. Iqbal. 556 U.S. 662 , 129 S. Ct. 1937, 1948-49, 173 L. Ed. 2d 868 (2009)_; **[*58]** see also _5 Borough Pawn, LLC v. City of New York, 640 F. Supp. 2d 268, 2009 WL 1834584, at *21 (S.D.N.Y. 2009)_. Thus, it appears that <u>Iqbal</u> substantially contracts the preexisting law on supervisory liability. See <u>Iqbal, 129 S. Ct. at 1957</u> ("Lest there be any mistake, in these words the majority is not narrowing the scope of supervisory liability; it is eliminating <u>Bivens</u> supervisory liability entirely. The nature of a supervisory liability theory is that the supervisor may be liable, under certain conditions, for the wrongdoing of his subordinates, and it is this very principle that the majority rejects.") (Souter, J., dissenting); see also _Newton v. City of New York, 640 F. Supp. 2d 426, 2009 WL 2365412, at *12 (S.D.N.Y. 2009)_ ("Moreover, there is no evidence that Lieutenant Sheehan - the head of the Bronx Sex Crimes Squad - took direct action concerning Newton, and passive failure to train claims pursuant to _section 1983_ have not survived the Supreme Court's recent decision in <u>Ashcroft v. Iqbal</u>.").

The Second Circuit has yet to address the effect of <u>Iqbal</u> on the five <u>Colon</u> factors. At least one District Judge in the Southern District of New York has concluded **[*59]** that "only the first and third <u>Colon</u> factors have survived the Supreme Court's decision in <u>Iqbal</u>." _Spear v. Hugles, No. 08 Civ. 4026 (SAS), 2009 U.S. Dist. LEXIS 62055, 2009 WL 2176725, at *2 (S.D.N.Y. July 20, 2009)_; accord _Bellamy v. Mount Vernon Hosp., No. 07 Civ. 1801 (SAS), 2009 U.S. Dist. LEXIS 54141, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009)_ ("[A] supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred."); see _also Joseph v. Fischer, No. 08 Civ. 2824 (PKC) (AJP), 2009_ _U.S. Dist. LEXIS 96952, 2009 WL 3321011, at *14 (S.D.N.Y. Oct. 8, 2009)_ ("[A] defendant can be liable under _section 1983_ only if that defendant took an action that deprived the plaintiff of his or her constitutional rights. A defendant is not liable under _section 1983_ if the defendant's failure to act deprived the plaintiff of his or her constitutional right."). Yet, another judge has concluded that <u>Iqbal</u> only applies to intent-based constitutional claims, and the five <u>Colon</u> factors may still apply in cases involving allegations of unreasonable conduct. See, e.g., _Sash v. United States, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009)_. Regardless, **[*60]** even under the more forgiving pre-<u>Iqbal</u> rule, a plaintiff must still prove "that the supervisors' conduct proximately caused the violation of rights." _Rahman v. Fischer, No. 08 Civ. 4368 (DLC), 2010 U.S. Dist. LEXIS 27155, 2010 WL 1063835, at *5 (S.D.N.Y. Mar. 22, 2010)_.

B. Application

1. Defendant Jones

Plaintiff alleges that Defendant Jones negligently supervised Defendant Rhoomes. Specifically, Plaintiff contends that after Defendant Jones resolved Plaintiff's first grievance against Defendant Rhoomes, Defendant Jones assured him that Defendant Rhoomes would not retaliate for the grievance. Yet, despite this assurance, Plaintiff avers that Defendant Rhoomes retaliated against him by harassing him, losing some of his legal papers, and filing a false misbehavior report against him. Plaintiff further alleges that he showed Defendant Jones proof that Defendant Rhoomes had lost some of his legal papers, but Defendant Jones's subsequent investigation of Plaintiff's additional grievances was inadequate.

Plaintiff's claim against Defendant Jones must fail because Defendant Jones did not take any actions that deprived Plaintiff of his constitutional rights. Indeed, any alleged constitutional violations by Defendant Rhoomes **[*61]** - which form the basis of Plaintiff's supervisory liability claim against Defendant Jones - arose out of a dispute over missing legal papers and Defendant Rhoomes's perception of Plaintiff's conduct in the library, and not any act by Defendant Jones. See _Joseph, 2009 U.S. Dist. LEXIS 96952, 2009 WL 3321011, at *14_; see also _Bellamy, 2009 U.S. Dist. LEXIS 54141, 2009 WL 1835939, at *6_. Assuming Defendant Jones assured Plaintiff, in investigating the grievance about the missing book, that Defendant Rhoomes would not retaliate against Plaintiff, that does not make Defendant Jones responsible for Rhoomes's subsequent conduct. There is no evidence that



2010 U.S. Dist. LEXIS 103562, *61

Defendant Jones had knowledge, at the time of the first grievance, that Rhoomes would retaliate against Plaintiff, and Jones failed to stop it.

Plaintiff's claim, at best, amounts to an allegation of an inadequate investigation, which does not warrant the imposition of supervisory liability. See Collins, 438 F. Supp. 2d at 420; Hernandez, 312 F. Supp. 2d at 547 n.6; Woods, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at *7. In any event, Defendant Jones adequately investigated each of Plaintiff's grievances. Defendant Jones informally resolved the first grievance regarding the missing book by both reiterating the library's check-out [*62] policy to Defendant Rhoomes, and ensuring that Plaintiff would receive the book upon his next visit to the library. Plaintiff admits that after Defendant Jones investigated his first grievance, he received the book from Defendant Rhoomes on March 29. (See PL.'s 56.1 ¶ 32.)

Defendant Jones investigated Plaintiff's second and third grievances alleging retaliation, on April 5, and Plaintiff does not allege any further constitutional violations by Defendant Rhoomes after that date. In fact, Defendant Jones noted in his April investigation that Defendant Rhoomes no longer worked in the law library. (See Jones Decl. Exs. C & E.) No reasonable juror could conclude that Defendant Jones's conduct in investigating Plaintiff's second and third grievances in April, led to any constitutional violations by Defendant Rhoomes - all of which are alleged to have occurred in March.

Under either pre- or post-Iqbal law, Plaintiff cannot sustain his supervisory liability claim against Defendant Jones. There are no allegations, much less evidence, that Defendant Jones directly participated in any constitutional violations, that he failed to remedy a constitutional wrong that he was aware of, or that he created [*63] a policy or custom under which unconstitutional practices occurred. Accordingly, Defendants' motion for summary judgment on Plaintiff's supervisory liability claim against Defendant Jones should be granted.

### 2. Defendant Van Buren

Plaintiff claims Defendant Van Buren was "grossly negligent" in managing, training and supervising Defendants Rhoomes and Andino. Because Plaintiff's retaliation claim against Defendant Andino has no merit, he cannot maintain a supervisory liability claim against Defendant Van Buren for her management or supervision of that officer. Further, Plaintiff has not set

forth any facts that would lead a reasonable juror to conclude that Defendant Van Buren had any personal involvement in the alleged constitutional violations by Defendant Rhoomes. See Iqbal, 129 S. Ct. at 1948-49 ("In a § 1983 suit . . . masters do not answer for the torts of their servants . . . . [E]ach Government official . . . is only liable for his own misconduct."); Newton, 640 F. Supp. 2d 426, 2009 WL 2365412, at *12 (noting that "passive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in Ashcroft v. Iqbal"); see also Bridgewater v. Taylor, No. 08 Civ. 3593 (VM), 698 F. Supp. 2d 351, 2010 WL 996154, at *5 (S.D.N.Y. Mar. 8, 2010) [*64] (dismissing a failure to train claim, because allegations that a defendant received an incident report regarding a use of force, drafted a report on the matter, and was involved in the resolution of plaintiff's grievance proceeding, occurred after the alleged constitutional violation). Plaintiff concedes that his only-communications with Van Buren were his grievances. (See PL's Depo. at 91.) At most, Defendant Van Buren denied Plaintiff's grievances, although she denies as much. (See Van Buren Decl. ¶¶ 12-13.) In any event, the denial of a grievance does not support a claim for supervisory liability. See Collins, 438 F. Supp. 2d at 420; Hernandez, 312 F. Supp. 2d at 547 n.6; Woods, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at *7. Accordingly, Defendants' motion for summary judgment on Plaintiff's supervisory liability claim against Defendant Van Buren should be granted.

### V. Qualified Immunity

In light of the foregoing, Defendant Rhoomes would be the only remaining Defendant in the case. Defendant Rhoomes contends that she is shielded from liability for damages under the doctrine of qualified immunity.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does [*65] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223 , 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). To determine whether a particular right was clearly established, the following factors are considered:

(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit

2010 U.S. Dist. LEXIS 103562, *65

court support the existence of the right in question; and (3) whether under prexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith, 945 F.2d 547, 550 (2d Cir. 1991)* (citations omitted); see also *Pena v. DePrisco, 432 F.3d 98, 115 (2d Cir. 2005)*; *Clue v. Johnson, 179 F.3d 57, 61 (2d Cir. 1999)*. "As **[*66]** the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton, 505 F.3d 161, 169-70 (2d Cir. 2007)* (citations omitted). "Objective reasonableness" is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986)*. Yet, when "there are facts in dispute that are material to a determination of reasonableness," summary judgment on the basis of a qualified immunity defense is unwarranted. *Thomas v. Roach, 165 F.3d 137, 143 (2d Cir. 1999)*; see also *Ali v. Szabo, 81 F. Supp. 2d 447, 461 (S.D.N.Y. 2000)* ("The Court cannot conclude as a matter of law that [the officers'] conduct was objectively reasonable since there are material issues of fact as to whether [plaintiff] was obeying the officers' order and who started the physical confrontation.").

A prisoner's *First Amendment* right not to be retaliated against for **[*67]** filing grievances is clearly established. See *Rivera v. Senkowski, 62 F.3d 80, 85 (2d Cir. 1995)* (citing *Franco, 854 F.2d at 589-90*); see also *Burton v. Lynch, 664 F. Supp. 2d 349, 368-69 (S.D.N.Y. 2009)* ("[A] claim of government retaliation for the exercise of *First Amendment* rights . . . alleges the violation of a clearly established right."). Here, there are genuine issues of material fact regarding Plaintiff's retaliation claim against Defendant Rhoomes. As noted, Plaintiff contends that he was never disruptive in the law library on March 30, and Defendant Rhoomes never gave him a direct order. Thus, he maintains that the misbehavior report was patently false. Taking the facts in the light most favorable to Plaintiff, and assuming these facts to be true, it cannot be said that Defendant Rhoomes could reasonably believe that it was lawful to issue the misbehavior report as retaliation for Plaintiff's grievance against her. Accordingly, the Court recommends that Defendant Rhoomes's motion for summary judgment pursuant to the doctrine of qualified immunity be denied.

## CONCLUSION

For the above reasons, I respectfully recommend that Defendants' motion for summary judgment be granted in **[*68]** part and denied in part, and Plaintiff's motion to preclude Defendants from relying on certain documents be denied.

Pursuant to *28 U.S.C. § 636(b)(1)(C)* and *Rule 72 of the Federal Rules of Civil Procedure*, the parties shall have fourteen (14) days from service of this report to file written objections. See also *Fed. R. Civ. P. 6(a)*. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable John G. Koeltl, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Koeltl. Failure to file objections will result in a waiver of those objections for purposes of appeal. See *Thomas v. Arn, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985)*; *IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993)*; *Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992)*; *Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)*.

Respectfully Submitted,

/s/ Theodore H. Katz

THEODORE H. KATZ

UNITED STATES MAGISTRATE JUDGE

Dated: July 8, 2010

New York, New York

---

End of Document





Positive
As of: June 21, 2019 4:39 PM Z

## *Fox v. Lee*

United States District Court for the Northern District of New York

December 18, 2018, Decided; December 18, 2018, Filed

No. 9:15-CV-0390 (TJM/CFH)

**Reporter**
2018 U.S. Dist. LEXIS 213705 *

JAVELL FOX, Plaintiff, v. SUPERINTENDENT LEE, et al., Defendants.

**Subsequent History:** Adopted by, Summary judgment granted by, in part, Summary judgment denied by, in part *Fox v. Lee, 2019 U.S. Dist. LEXIS 48967 (N.D.N.Y., Mar. 25, 2019)*

**Prior History:** *Fox v. Lee, 2016 U.S. Dist. LEXIS 103098 (N.D.N.Y., Aug. 5, 2016)*

## Core Terms

grievance, exhaust, inmate, administrative remedy, undersigned, failure to exhaust, defendants', issues, staff, summary judgment motion, material fact, informal, recommended, required to exhaust, sexual harassment, unavailable, deadline, days, disciplinary hearing, grievance process, excessive force, sexual abuse, allegations, non-moving, prison, hearing officer, retaliated, grievable, cell, mail

**Counsel:** [*1] Javell Fox, Plaintiff, Pro se, Auburn, New York.

For Defendants: LYNN M. KNAPP BLAKE, ESQ., Assistant Attorneys General, OF COUNSEL, Attorney General for the State of New York, Albany, New York.

**Judges:** Christian F. Hummel, United States Magistrate Judge.

**Opinion by:** Christian F. Hummel

## Opinion

## REPORT-RECOMMENDATION AND ORDER[1]

---

[1] This matter was referred to the undersigned for Report-

Plaintiff <u>pro se</u> Javell Fox ("plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to *42 U.S.C. § 1983*, alleging that defendants Superintendent ("Supt.") Lee, DOCCS Commissioner ("Comm.") Anthony Annucci, Correction Deputy Superintendent of Administration ("Deputy Superintendent") Wendland, Correction Deputy Superintendent Security ("DSS") Russo, Deputy Calao, Captain ("Capt.") Webbe, Lieutenant ("Lt.") Madison, Lt. Simmons, Lt. Sullivan, Sergeant ("Sgt.") Bey, Sgt. Connor, Sgt. Vanacore, Sgt. Barg, Corrections Officer ("C.O.") Kozak, C.O. Waugh, C.O. Miller, C.O. Henry, C.O. Williamson, C.O. S. Cruz, Corrections Steward C. Jennings, and Corrections Steward Diane Labatte - who at all relevant times, were employed at Eastern Correctional Facility ("Eastern") - violated his constitutional [*2] rights under the *First*, *Fourth*, *Eighth*, and *Fourteenth Amendments*. Dkt. No. 76 ("Am. Compl."). Presently pending before the Court is defendants' Motion for Summary Judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure* ("Fed. R. Civ. P.") seeking dismissal of this action on the grounds that plaintiff has failed to exhaust his administrative remedies. Dkt. No. 174.[2] Plaintiff opposed defendants' motion, and defendants filed a reply. Dkt. Nos. 184, 189. For the following reasons, it is recommended that defendants' motion be granted in part and denied in part.

### I. Background

---

Recommendation and Order pursuant to *28 U.S.C. § 636(b)* and *N.D.N.Y.L.R. 72.3(c)*.

[2] Plaintiff's Motion for Contempt, Dkt. No. 200, will be addressed in a subsequent decision.



2018 U.S. Dist. LEXIS 213705, *2

## A. Factual Background

In support of this Motion for Summary Judgment, defendants filed a Statement of Material Facts.[3] Plaintiff was housed at Eastern from September 2014 until October 2015. Dkt. No. 174-2 ¶ 3. While incarcerated at Eastern, plaintiff filed five grievances with the Eastern Inmate Grievance Program ("IGP"). Id. ¶ 5. On December 10, 2014, plaintiff filed grievance ECF-26147-14, alleging that Eastern staff had harassed and retaliated against him because of his religious hairstyle. Id. ¶¶ 6, 7. Grievance ECF-26147-14 "does not address many of the issues raised in this litigation." Id. ¶ 8. Grievance ECF-26147-14 was forwarded to the Superintendent for review; on December 24, 2014, [*3] the Superintendent denied plaintiff's grievance. Id. ¶ 9. On December 29, 2014, plaintiff appealed the Superintendent's determination to the Central Office Review Committee ("CORC"). Id. ¶ 10. Plaintiff did not contact Eastern's IGP in writing pursuant to 7 N.Y.C.R.R. § 701.5(d)(3)(i) to determine whether his appeal had been filed and transmitted to CORC. Id. ¶ 11. On April 29, 2015, CORC denied plaintiff's appeal. Id. ¶ 12. In his appeal packet to CORC concerning grievance ECF-26147-14, plaintiff raised issues that he

---

[3] Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no [*4] genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

---

did not raise in his original grievance filed with the Inmate Grievance Review Committee ("IGRC"). Id. ¶ 13. In Fox v. Labatte - a prior case filed by plaintiff addressing many of the same issues - this Court found that "[p]laintiff cannot circumvent the procedures set forth by the facility by submitting a backdoor appeal to CORC by raising the issue for the first time, as he did with grievance number ECF-26147-14." Id. ¶ 14 (citing Dkt. No. 174-5 at 8).

On February 23, 2015, plaintiff filed grievance ECF-26217-15, dated February 12, 2015, alleging that Eastern staff had retaliated against him and harassed him for writing grievances; that he had been sexually touched during frisks; and that an officer had read his legal mail. Dkt. No. 174-2 ¶¶ 16, 17. On April 21, 2015, the Superintendent [*5] denied plaintiff's grievance. Id. ¶ 18. On April 24, 2015, plaintiff appealed the Superintendent's determination to CORC; on July 8, 2015, CORC rendered a decision. Id. ¶¶ 19, 20. Of the five grievances plaintiff filed while incarcerated at Eastern, he appealed only grievances ECF-26147-14 and ECF-26217-15 to CORC. Id. ¶ 22. At his deposition, plaintiff testified that some of his grievances had been handled at the facility level, and "if you get your remedy at the facility level it's no need to appeal it and it's no need to go any further." Id. ¶ 23 (quoting Dkt. No. 174-4 [Pl. Dep.] at 30). Plaintiff filed the original complaint in this action on April 2, 2015. Id. ¶ 15 (citing Dkt. No. 1).

## 2. Procedural History

Plaintiff commenced this action on April 2, 2015. Dkt. No. 1. On December 19, 2016, plaintiff filed an amended complaint, which became the operative pleading. Dkt. Nos. 75, 76 ("Am. Compl."). Defendants filed an answer, and raised failure to exhaust administrative remedies as an affirmative defense. Dkt. Nos. 32, 82, 83. On July 17, 2017, plaintiff filed a motion for summary judgment. Dkt. No. 111. On August 18, 2017, defendants cross-moved to dismiss pursuant to Fed. R. Civ. P. 12(c). Dkt. No. [*6] 118. On February 2, 2018, the undersigned recommended that plaintiff's motion be denied. Dkt. No. 144. The undersigned further recommended that defendants' cross-motion be denied without prejudice, and with opportunity to renew by way of a motion for summary judgment limited to the issue of exhaustion. See id. On March 6, 2018, Senior District Court Judge Thomas J. McAvoy adopted the undersigned's Report-Recommendation and Order. Dkt. No. 157. In accordance with the Court's ruling, defendants now move for summary judgment on the



2018 U.S. Dist. LEXIS 213705, *6

grounds that he has failed to exhaust his administrative remedies.

## II. Discussion[4]

### A. Legal Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. *Fed. R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury [\*7] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." *Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997)*.

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Carey v. Crescenzi, 923 F. 2d 18, 19 (2d Cir. 1991)* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986))* (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. *See id.* "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. Pshp., 22 F.3d 1219, 1224 (2d Cir. 1994)*.

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special

solicitude. *See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006)*. As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally," . . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . . At the same time, our cases [\*8] have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008)*.

### B. Procedural Issues

As a threshold matter, the undersigned will address plaintiff's argument that defendants' Motion for Summary Judgment must be denied, as the November 2017 motion deadline has expired. Dkt. No. 184-1 ("Pl. Opp.") at 4-5. On June 19, 2017, the Court issued a text order resetting the case deadlines in the underlying action pursuant to plaintiff's request to file a motion to amend his amended complaint. *See* Dkt. No. 106; Text Min. Entry dated June 16, 2017. The dispositive motions deadline was set for November 14, 2017. Dkt. No. 106. On June 29, 2017, plaintiff advised the Court that he would not be submitting a motion to amend his amended complaint. Dkt. No. 109. Instead, on July 17, 2017, plaintiff filed [\*9] a motion for summary judgment. Dkt. No. 111. Defendants opposed plaintiff's motion, and cross-moved to dismiss pursuant to *Fed. R. Civ. P. 12(c)*. Dkt. No. 118.

On February 5, 2018, the undersigned recommended that plaintiff's motion be denied, and defendants' cross-motion be denied without prejudice and with opportunity to renew by way of a combined motion to dismiss and motion for summary judgment limited to the issue of exhaustion. Dkt. No. 144. On March 6, 2017, Judge McAvoy accepted the undersigned's recommendations and remanded the case to set deadlines. Dkt. No. 157.

---

[4] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.



2018 U.S. Dist. LEXIS 213705, *9

On March 21, 2018, the undersigned established the new motion deadline. Dkt. No. 161. That same day, defendants requested an extension of the motion deadline, and, on March 23, 2018, the undersigned granted defendants' request and ordered that "defendants file their motion no later than May 21, 2018." Dkt. Nos. 162, 163.

On May 21, 2018, defendants filed a motion for summary judgment based on plaintiff's failure to exhaust his administrative remedies. Dkt. No. 174. Thus, the undersigned concludes that defendants' motion is timely and was filed prior to the applicable motion deadline.

## C. Exhaustion

Defendants argue that the underlying action [*10] must be dismissed as a matter of law because plaintiff failed to exhaust his administrative remedies. Dkt. No. 174-16 ("Def. Mem. of Law") at 4-7. Plaintiff contends that he exhausted his administrative remedies, and that "DOCCS grievance employees contradict[ed] [ ] grievance policies by intentionally failing to file and forward plaintiff's grievances in an attempt to prevent plaintiff from filing a success [sic] suit and cause the mishaps that[ ] [are] occuring now in reference to whether plaintiff exhausted his administrative remedies[.]" Pl. Opp. at 5-6.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See _Porter v. Nussle, 534 U.S. 516, 524, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002)_; see also _Woodford v. Ngo, 548 U.S. 81, 82, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006)_. The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." _Porter, 534 U.S. at 532_. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. _Id. at 524_. To exhaust administrative remedies, the inmate [*11] must complete all administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See _Jones v. Bock, 549 U.S. 199, 218, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007)_ (internal citation omitted). Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." _Ruggiero v._

_Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006)_ (citation omitted). The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." _Ross v. Blake, ___ U.S. ___, 136 S. Ct. 1850, 1862, 195 L. Ed. 2d 117 (2016)_. Thus, the "special circumstances" exception in _Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004)_ is no longer consistent with the statutory requirements of the PLRA. _Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016)_.[5]

Although _Ross_ eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." _Ross, 136 S. Ct. at 1858_. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. _Id._ The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or [*12] consistently unwilling to provide any relief to aggrieved inmates." _Id. at 1859_ (citing _Booth v. Churner, 532 U.S. 731, 736, 738, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001))_. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." _Id._ Lastly, administrative remedies are unavailable when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." _Id. at 1860_.

## 1. Did Plaintiff Exhaust his Administrative Remedies?[6]

---

[5] In _Williams v. Priatno_, the Second Circuit debated _Ross_'s effect on _Hemphill_'s estoppel exception. See _Williams, 829 F.3d at 123_. The _Williams_ Court stated that "_Ross_ largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." _Id._ (citing _Ross, 136 S. Ct. at 1858-59_).

[6] First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. _N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(a)(1)_. An IGP representative has sixteen calendar days to informally resolve the issue. _Id. § 701.5(b)(1)_. If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the

Defendants do not dispute that plaintiff filed five grievances while housed at Eastern. Dkt. No. 174-2 ¶ 5; Dkt. No. 174-13 ("Black Decl.") ¶ 6. However, defendants argue that plaintiff failed to exhaust his administrative remedies prior to commencing this action. See Def. Mem. of Law at 4-7. Defendants proffer the declarations of Assistant Director of the DOCCS IGP Rachael Seguin and current Eastern IGP Supervisor Anthony Black, along with copies of plaintiff's grievances, in support of their argument that plaintiff failed to exhaust his administrative remedies prior to commencing this action. See Black Decl.; Dkt. No. 174-9 ("Seguin Decl."); Dkt. No. 174-14. Mr. Black declared that a review of the inmate grievance records at Eastern [*13] demonstrated that plaintiff filed five grievances while housed at Eastern between December 2014 and February 2015. Black Decl. ¶ 6. On December 10, 2014, plaintiff filed grievance ECF-26147-14, alleging that he had received misbehavior reports, was keeplocked, and harassed and retaliated against by staff because of his religious hairstyle. Id. ¶ 7; see Dkt. No. 174-14 at 31-34. Plaintiff submitted additional letters of complaint dated December 14, 2014, December 18, 2014, and December 20, 2014 alleging similar types of issues to the original grievance. Id. ¶ 8; see Dkt. No. 174-14 at 35-44. Eastern IGP consolidated these letters with grievance ECF-26147-14. See id. The Superintendent denied plaintiff's grievance on December 24, 2014, and plaintiff submitted an Appeal Statement and supporting exhibits to CORC. Id. ¶¶ 9, 10; see Dkt. No. 174-14 at 45-48, 50-51, 52-103. Within the attached exhibits submitted to CORC, plaintiff included a letter dated December 25, 2014 stating new allegations against defendant Labatte regarding her failure to send plaintiff's legal mail. Id. ¶ 11; see Dkt. No. 174-14 at 74-75. Plaintiff's allegations against defendant Labatte were not addressed during [*14] the facility-level investigation or considered by the Superintendent.

Id. CORC decided plaintiff's appeal on April 29, 2015. Seguin Decl. ¶ 16; see Dkt. No. 174-11 at 1.

In correspondence dated December 25, 2014 and January 18, 2015, plaintiff alleged that he had been denied copies of legal documents and/or interference with mail, and that the IGP was not properly processing his grievances. Black Decl. ¶ 12; see Dkt. No. 174-14 at 8-9. Plaintiff further submitted letters dated January 23, 2015 and February 24, 2015 alleging that defendant Labatte had falsified documents in connection with the disbursement of plaintiff's funds for legal copies, which resulted in missing court deadlines. Id. ¶ 13; see Dkt. No. 174-14 at 14-15, 21-23. These letters were consolidated into grievance ECF-26198-15. See id. ¶ 12; see Dkt. No. 174-14 at 8-9. On February 4, 2015, the Eastern Inmate Grievance Review Committee ("IGRC") denied plaintiff's grievance, and the next day, plaintiff appealed the IGRC's decision to the Superintendent. Id. ¶¶ 14, 15; see Dkt. No. 174-14 at 17-18. On April 9, 2015, the Superintendent denied plaintiff's grievance. Id. ¶ 16; see Dkt. No. 174-14 at 1. Plaintiff did not file [*15] an appeal with CORC. See Dkt. No. 174-15 at 3.

On January 15, 2016, plaintiff filed grievance ECF-26187-15 alleging that he had been frisked and threatened with a disciplinary ticket if he did not cut his hair; denied food; housed in a cell with no "feed-up slot"; injured himself attempting to retrieve his food tray; intolerable cell conditions. Black Decl. ¶ 18; see Dkt. No. 174-14 at 130-135. He also alleged due process violations. Id. On February 4, 2015, the Eastern IGRC denied plaintiff's grievance, and plaintiff appealed to the Superintendent. Id. ¶ 19; see Dkt. No. 174-14 at 112. On March 19, 2015, the Superintendent denied plaintiff's grievance. Id. ¶ 20; see Dkt. No. 174-14 at 111. Plaintiff did not file an appeal with CORC. See Dkt. No. 174-15 at 3.

On January 26, 2015, plaintiff filed grievance ECF-26197-15 dated January 18, 2015, alleging that he had been issued a misbehavior report because of his hairstyle; staff made false statements against him in a disciplinary hearing; staff subjected him to harassment, threats, and retaliation; and his hearing officer was biased and racist. Black Decl. ¶ 22; see Dkt. No. 174-14 at 144-48. Plaintiff submitted a letter dated January 23, [*16] 2015 alleging complaints similar to those set forth in the January 18, 2015 grievance, and that letter was consolidated with grievance ECF-26197-15. Id. ¶ 23; see Dkt. No. 174-14 at 149-50. On February 2, 2015, the Eastern IGRC "determined that the issues

---

hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii). Parties do not dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5.



raised in [the grievance] were outside the purview of the IGRC." Id. ¶ 24; see Dkt. No. 174-14 at 141. That same day, plaintiff appealed the IGRC's decision to the Superintendent. See id. On March 19, 2015, the Superintendent denied plaintiff's grievance. Id. ¶ 25; see Dkt. No. 174-14 at 138. Plaintiff did not file an appeal with CORC. See Dkt. No. 174-15 at 3.

On February 23, 2015, plaintiff filed grievance ECF-26217-15, dated February 12, 2015, alleging that non-party C.O. Kozak retaliated against him for using the grievance process by filing a misbehavior report; staff moved his cell, harassed him, and sexually harassed him in retaliation for writing grievances; staff sexually touched him during frisks; an officer read his legal mail; his claims were not being investigated. Black Decl. ¶ 27; see Dkt. No. 174-14 at 171-76. Plaintiff submitted a letter dated February 24, 2015 that was consolidated with grievance ECF-26217-15 alleging [*17] that plaintiff's letter of complaint to the Superintendent regarding sexual abuse was ignored. Id. ¶ 28; see Dkt. No. 174-14 at 177-78. On April 21, 2015, the Superintendent denied plaintiff's grievance. Id. ¶ 29; see Dkt. No. 174-14 at 170. Plaintiff appealed that determination to CORC on April 24, 2015. Id. ¶ 30; see Dkt. No. 174-14 at 170. CORC issued a decision on plaintiff's grievance on July 8, 2015. Seguin Decl. ¶ 26; see Dkt. No. 174-12 at 41. Plaintiff commenced this action on April 2, 2015. Dkt. No. 1.

It is well-settled that "the PLRA requires that an inmate plaintiff must exhaust his available administrative remedies before commencing a lawsuit in federal court with respect to prison conditions." *Peoples v. Beldock, 212 F. Supp. 2d 141, 142 (W.D.N.Y. 2002);* see *McMillian v. Walters, No. 9:16-CV-0277 (MAD/DJS), 2017 U.S. Dist. LEXIS 208444, 2017 WL 8894737, at *2 (N.D.N.Y. Dec. 18, 2017)* ("The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action.") (citation omitted); *White v. Drake, No. 10-CV-1034 (GTS/DRH), 2011 U.S. Dist. LEXIS 115632, 2011 WL 4478988, at *3 (N.D.N.Y. Aug. 11, 2011)* ("Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit.") (citation omitted).

As to the grievances ECF-26147-14 and ECF-26217-15, [*18] the record is clear that plaintiff filed this action on April 5, 2015, and, at that time, CORC had yet to issue a decision on plaintiff's CORC appeals. See Dkt. No. 1; Seguin Decl. ¶¶ 16, 26; Dkt. No. 174-12 at 41;

Dkt. No. 174-11 at 1. Despite plaintiff's assertions to the contrary, plaintiff did not fully exhaust his administrative remedies prior to filing this lawsuit because the CORC decisions were outstanding. Moreover, that plaintiff ultimately received CORC decisions on grievances ECF-26147-14 and ECF-26217-15 on April 29, 2015 and July 8, 2015 respectively, does not cure plaintiff's failure to exhaust. See *Lopez v. Cipolini, 136 F. Supp. 3d 570, 582 (S.D.N.Y. 2015)* (internal citation and quotation marks omitted) ("A plaintiff must exhaust his administrative remedies before filing his initial complaint in federal court . . . . [S]ubsequent exhaustion after suit is filed . . . is insufficient."). Accordingly, plaintiff did not fully exhaust his administrative remedies as to grievances ECF-26147-14 and ECF-26217-15 prior to filing this lawsuit. See *Peoples, 212 F. Supp. 2d at 142; McMillian, 2017 U.S. Dist. LEXIS 208444, 2017 WL 8894737, at *2; White, 2011 U.S. Dist. LEXIS 115632, 2011 WL 4478988, at * 3.* Further, the undersigned notes that insofar as plaintiff attempted to raise new issues for CORC's consideration in the appeal statements for grievances ECF-26147-14 and ECF-26217-15, [*19] this is improper and does not constitute exhaustion. See *Fox v. Labatte, No. 9:15-CV-144 (LEK/DJS), 2016 U.S. Dist. LEXIS 32529, 2016 WL 8716662, at *4 (N.D.N.Y. Mar. 11, 2016)* ("Furthermore, [p]laintiff cannot circumvent the procedures set forth by the facility by submitting a backdoor appeal to CORC by raising the issue for the first time, as he did with grievance number ECF 26147-14."); *Robinson v. Rome, No. 9:10-CV-0993 (LEK/CFH), 2013 U.S. Dist. LEXIS 92970, 2013 WL 3328222, at 8 (N.D.N.Y. July 2, 2013)* ("One appeal raised assault allegations for the first time that were not in the originating grievance. Thus, CORC declined to consider those allegations and advised Robinson to file a separate grievance raising those issues.").

As to plaintiff's remaining grievances, the record confirms Ms. Seguin and Mr. Black's statements that plaintiff never appealed grievances ECF-26198-15, ECF-26217-15, and ECF-26197-15 to CORC. See Dkt. No. 174-15 at 3; Black Decl. ¶¶ 17, 21, 26; Seguin Decl. ¶ 13; Dkt. No. 174-10 at 2. Therefore, defendants have met their burden of showing that plaintiff has failed to exhaust his administrative remedies.

**2. Availability of Administrative Remedies**

Plaintiff proffers a series of arguments suggesting that administrative remedies were unavailable to him. See generally Pl. Opp.



2018 U.S. Dist. LEXIS 213705, *19

#### a. CORC Delay

Plaintiff argues that CORC's delay in rendering [*20] a decision on his grievances rendered the process unavailable. See id. at 6-7. Courts within this Circuit are split as to whether a delay by CORC constitutes unavailability that would excuse a plaintiff's failure to exhaust his administrative remedies. Compare Casey v. Brockley, No. 9:13-CV-01271 (DNH/TWD), 2015 U.S. Dist. LEXIS 152397, 2015 WL 8008728, at *6 (N.D.N.Y. Nov. 9, 2015), report-recommendation and order adopted by 2015 U.S. Dist. LEXIS 161968, 2015 WL 7864161 (N.D.N.Y., Dec. 03, 2015) ("CORC's failure to act within the time frame set out in the regulations does not constitute a special circumstance justifying the failure to exhaust.") and Ford v. Smith, No. 9:12-CV-1109 (TJM/TWD), 2014 U.S. Dist. LEXIS 20581, 2014 WL 652933, at *3 (N.D.N.Y. Feb. 19, 2014) (concluding that CORC's six month delay in responding to his appeal did not render the grievance process unavailable) with Rossi v. Fischer, No. 13-CV-3167 (PKC)(DF), 2015 U.S. Dist. LEXIS 22348, 2015 WL 769551, at *6 (S.D.N.Y. Feb. 24, 2015) ("Because prison officials failed to respond to plaintiff's grievance within the 30 day time limit set by regulation, administrative remedies were not available to the plaintiff and dismissal for failure to exhaust is not appropriate.") and Peoples v. Fischer, No. 11 Civ. 2694(SAS), 2012 U.S. Dist. LEXIS 62428, 2012 WL 1575302, *6 (S.D.N.Y. 2012) on reconsideration in part, 898 F. Supp. 2d 618 (S.D.N.Y. 2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has neglected [*21] to issue a final administrative determination").

The record indicates that approximately four months elapsed between plaintiff's appeal of grievance ECF-26147-14 in December 2014 and when CORC ultimately rendered their decision in April 2015. Black Decl. ¶¶ 9, 10; Dkt. No. 174-14 at 45-48, 50-51; Seguin Decl. ¶ 16; Dkt. No. 174-11 at 1. The record further demonstrates that approximately three months elapsed between plaintiff's appeal of grievance ECF-26217-15 in April 2015 and when CORC rendered their decision in July 2015. Black Decl. ¶ 30; Dkt. No. 174-14 at 170; Seguin Decl. ¶ 26; Dkt. No. 174-12 at 41. Plaintiff does not proffer evidence that he wrote to the Eastern IGRC or CORC inquiring as to the status of his appeals for grievances ECF-26147-14 and ECF-26217-15; in fact,

plaintiff argues that "there is no policy that states that" he is required to "write anyone to see if his grievances were forward." Pl. Opp. at 9. However, pursuant to N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(d)(3)(i), "[i]f a grievant does not receive a copy of the written notice of receipt within 45 days of filing an appeal [to CORC], the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC." N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(d)(3)(i) [*22]. The same language regarding plaintiff's ability to contact the IGP supervisor regarding his appeal status appears in DOCCS Directive 4040, a copy of which plaintiff has provided to the Court. Further, Mr. Black declared that based on his review of Eastern's records, plaintiff "never contacted Eastern's [IGP supervisor] in writing . . . to confirm that any of his appeals were filed and transmitted to CORC." Black Decl. ¶ 34. Thus, the undersigned concludes that CORC's approximately four-month delay in ECF-26147-14 and three-month delay in ECF-26217-15 does not excuse plaintiff from the exhaustion requirement. Cf. Henderson v. Annucci, No. 14-CV-445A, 2016 U.S. Dist. LEXIS 33470, 2016 WL 3039687, at *10 (W.D.N.Y. Mar. 14, 2016) ("Since plaintiff has been awaiting a decision from CORC for more than two years with respect to his grievance relating to the October 22, 2013 incident, such an administrative remedy is no longer available to him for purposes of exhaustion under the PLRA.").

#### b. Non-Grievable Issue

Plaintiff contends that an unspecified person told him that "his claims pertaining to the hearing officers were non-grievable pursuant to Directive 4040 701.3(e)(1)[7]

---

[7] A list of "non grievable" issues is set forth in Section 701.3(e) and DOCCS' Directive # 4040:

e) Non-grievable issues.

(1) An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered non-grievable.

(2) An individual decision or disposition of the temporary release committee, time allowance committee, family reunion program or media review committee is not grievable. Likewise, an individual decision or disposition resulting from a disciplinary proceeding, inmate property claim (of [*25] any amount), central monitoring case review or records review (freedom of information request, expunction) is not grievable. In addition, an individual



as [he] had an appeal mechanism." Pl. Opp. at 8. Thus, based on plaintiff's interpretation of DOCCS' regulations and procedures, inmates [*23] are required to raise claims concerning hearing officer biases, related to disciplinary hearings, during the disciplinary process. See id. Plaintiff's argument is misplaced. Courts in this District have held that "[t]hough a disciplinary appeal is sufficient to exhaust a claim that Plaintiff was deprived of due process at a disciplinary hearing, 'allegations of staff misconduct related to the incidents giving rise to the discipline must be grieved.'" Barker v. Smith, No. 16-CV-76, 2017 U.S. Dist. LEXIS 137065, 2017 WL 3701495, at *3 (S.D.N.Y. Aug. 25, 2017) (quoting Scott v. Gardner, 287 F. Supp. 2d 477, 489 (S.D.N.Y. 2003), on reconsideration in part, 344 F. Supp. 2d 421 (S.D.N.Y. 2004), and on reconsideration in part, 2005 U.S. Dist. LEXIS 7372, 2005 WL 984117 (S.D.N.Y. Apr. 28, 2005) ); see also Labounty v. Johnson, 253 F. Supp. 2d 496, 501 (W.D.N.Y. 2003) ("An appeal from a disciplinary hearing does not satisfy the grievance exhaustion requirement for a [constitutional] claim, even if the hearing is based on the same set of facts underlying the grievance."). However, "[w]here an inmate claims both that there was official misconduct in the events leading to the disciplinary hearing and that the hearing itself was constitutionally flawed, he must follow both DOCCS procedures." Kimbrough v. Fischer, No. 9:13-CV-0100 (FJS/TWD), 2014 U.S. Dist. LEXIS 185284, 2014 WL 12684106, at *6 (N.D.N.Y. Sept. 29, 2014) (citing Rosales v. Bennett, 297 F. Supp. 2d 637, 639 (W.D.N.Y. 2004)). An inmate

cannot satisfy the PLRA's exhaustion requirement as to grievable matters that do not directly relate to the conduct of a hearing simply by alluding to them in his administrative [*24] appeal of the hearing decision. For example, if at the hearing the inmate asserts, or attempts to assert, allegations of misconduct by the correction officers involved in the underlying events, the inmate cannot adequately exhaust his remedies for PLRA purposes through

decision or disposition of the Commissioner, or his designee, on a foreign national prisoner application for international transfer is not grievable.

(3) The policies, rules, and procedures of any program or procedure, including those above, are grievable. Note: If an inmate is unsure whether an issue is grievable, he/she should file a grievance and the question will be decided through the grievance process in accordance with section 701.5 of this Part.

N.Y. Comp. Codes R. & Regs. tit. 7, § 701.3.

his administrative appeal of the hearing decision; he must separately grieve the alleged misconduct of the officers.

Kimbrough, 2014 U.S. Dist. LEXIS 185284, 2014 WL 12684106, at *6 (quoting Rosales, 297 F. Supp. 2d at 639). Thus, plaintiff's argument that his claims regarding hearing officer bias during his disciplinary hearings constituted non-grievable issues is contrary to well-settled law; plaintiff was required to grieve his claims against the individual hearing officers using the grievance procedure.

Even if the undersigned were to interpret plaintiff's argument as stating that DOCCS' regulations regarding the proper grievance procedures for his claims against the hearing officers were confusing and irreconcilable, plaintiff's excuse would still lack merit. The record demonstrates that plaintiff filed a series of letters that the Eastern IGP consolidated into grievance ECF-26197-15, wherein he suggests that his disciplinary hearing officers were biased against him, and thus, not fair and impartial hearing officers. See Dkt. No. 174014 at 144-48. That plaintiff filed at least one grievance alleging [*26] bias on behalf of the hearing officers at his disciplinary hearings casts doubt as to whether plaintiff could attempt to allege that the process was confusing.

As such, plaintiff's argument regarding non-grievable issues lacks merit.

### c. Other Arguments

Plaintiff offers a series of other arguments in an attempt to establish that the grievance procedure was unavailable. First, plaintiff states that "[a]ll confinement issues were handled at the facility level pursuant to Directive 4040 701.5(b)(1)." Pl. Opp. at 8. Directive 701.5(b)(1) concerns the informal resolution of a grievance prior to the commencement of a grievance hearing. See N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(b)(1).[8] Thus, plaintiff seems to suggest that the informal resolution of his conditions of confinement

[8] Section 701.5(b)(1) and DOCCS Directive 4040 states: "Informal resolution. The representatives of the IGRC shall have up to 16 calendar days after a grievance is filed to resolve it informally. If the matter is resolved to the satisfaction of the grievant, the resolution and the grievant's consent must be entered on the inmate grievance complaint form." N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(b)(1).

claims at the facility level constituted proper exhausted under PLRA. See Pl. Opp. at 8. Plaintiff specifies that (1) after complaining that he had to climb-up bars to receive his food in his cell, he was transferred to a cell with a "feed-up slot"; (2) when he complained that holes in his cell window caused him to be "very cold," he was moved to a housing unit with heat; and (3) when he complained he did not have clean clothes and only one set of pants, staff [*27] gave him the appropriate amount of clothing and his dirty clothes were washed. See Dkt. No. 18-2 at 3. However, plaintiff filed grievance ECF-26187-15 alleging these claims; grievance ECF-26187-15 was denied at both the IGRC level an the Superintendent's level. See Black Decl. ¶¶ 18, 19; Dkt. No. 174-14 at 112, 130-135. Plaintiff never appealed that grievance to CORC. See Dkt. No. 174-15 at 3.

Section 701.5(b)(1) refers to an informal resolution that occurs after plaintiff files his grievance, but before the full committee conducts a hearing to either answer the grievance or make a recommendation. See N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(b)(1). Thus, plaintiff's argument that his conditions of confinement claims were handled at the facility-level pursuant to section 701.5(b)(1) is misplaced as it is clear that plaintiff filed a grievance regarding these claims, and appealed the initial denial of that grievance to the Superintendent. See Black Decl. ¶¶ 18, 19; Dkt. No. 174-14 at 112, 130-135. There is no indication that the Eastern IGRC administratively closed plaintiff's grievance if he, in fact, received his requested relief. As section 701.5(b)(1) provides for informal resolution to occur up to sixteen calendar days after a grievance is filed, and because plaintiff's grievances [*28] were not informally resolved during that time, but, at the earliest, after the Superintendent's decision on grievance ECF-26187-15, it cannot be said that plaintiff's grievances were "handled at the facility level pursuant to Directive 4040 701.5(b)(1)." Pl. Opp. at 8; cf. Pellis v. Hobbs, No. 16 CV 4023 (VB), 2018 U.S. Dist. LEXIS 109326, 2018 WL 3212463, at *5 (S.D.N.Y. June 29, 2018) (denying the defendants' motion for summary judgment where the plaintiff's grievance was informally resolved during the sixteen-day time frame set forth in section 701.5(b)(1)).

The undersigned reaches a similar result as to plaintiff's excessive force claims against C.O. Cruz. Plaintiff claims that Lt. Simmons told him not to file a grievance against C.O. Cruz because plaintiff would "only make things worse on [him]self"; instead, Lt. Simmons transferred plaintiff to a different housing unit away from C.O. Cruz. Pl. Opp. at 8-9. Although these facts, on their face, would suggest that the grievance was informally

resolved pursuant to section 701.5(b)(1), plaintiff has failed to provide enough information to defeat defendants' motion. At first read, it seems as though plaintiff's excessive force claim against C.O. Cruz encompasses the same conduct as his sexual harassment claim,[9] see Dkt. No. 144 at 55-61, and, therefore, was grieved pursuant to grievance [*29] ECF-26217-15. Black Decl. ¶ 27; see Dkt. No. 174-14 at 171-76. However, plaintiff states that he did not file a grievance against C.O. Cruz for this conduct, see Pl. Opp. at 8-9; thus the undersigned is unsure as to whether the pat frisk that forms plaintiff's excessive force claim is the same incident as his sexual harassment claim. Even if plaintiff's excessive force claim was grieved in grievance ECF-26217-15, the undersigned is unable to determine if this informal resolution occurred within the sixteen-day time frame set forth in section 701.5(b)(1) as plaintiff does not provide dates as to when the conversation with Lt. Simmons occurred. Thus, plaintiff has failed to demonstrate that his excessive force claim against C.O. Cruz should be excused from the exhaustion requirement.

Second, plaintiff argues that his "sexual harassment issues were handled pursuant to 701.3(i)(1)," and that he "does not have to exhaust any remedies pertaining to sexual harassment claims [because] all [he] had to do was file a complaint pursuant to the PREA Act." Pl. Opp. at 8. Plaintiff is correct that "an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or [*30] sexual harassment to satisfy [PLRA] exhaustion requirement . . . before bringing a lawsuit regarding an allegation of sexual abuse as long as the matter was reported." N.Y. Comp. Codes R. & Regs. tit. 7, § 701.3(i)(1).

For purposes of the Prison Rape Elimination Act (PREA) Standards (28 C.F.R. § 115.52) and the exhaustion requirement, any allegation concerning an incident of sexual abuse or sexual harassment .

---

[9] Because excessive force is a separate cause of action, plaintiff's claim is not deemed exhausted through the filing of his PREA complaint. See Allen v. Graham, No. 9:16-CV-47 (GTS/ATB), 2017 U.S. Dist. LEXIS 159177, 2017 WL 9511168, at *7 (N.D.N.Y. Sept. 26, 2017) ("Because DOCCS created this exception solely for sexual abuse and sexual harassment claims, plaintiff's complaint to mental health staff would not exhaust other claims arising from the July 30, 2014 incident, such as an Eighth Amendment excessive force claim."); see also supra, 2017 U.S. Dist. LEXIS 159177 at *19.

. . shall be deemed exhausted if official documentation confirms that:

> (1) an inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident to facility staff; in writing to Central Office Staff; to any outside agency that the Department has identified as having agreed to receive and immediately forward inmate reports of sexual abuse and sexual harassment to agency officials under the PREA Standards (_28 C.F.R. § 115.51(b)_); or to the Department's Office of the Inspector General;

or

> (2) a third party reported that an inmate is the victim of sexual abuse and the alleged victim confirmed the allegation upon investigation.

_Id._ The record indicates that plaintiff filed grievance ECF-26217-15 alleging that C.O. Cruz sexually harassed him during a pat frisk. _See_ Dkt. No. 174-14 at 173-74. The undersigned finds that by virtue of plaintiff filing [*31] a grievance concerning the alleged sexual harassment, he has "report[ed] the incident to facility staff" pursuant to _section 701.3(i)(1)_. _N.Y. Comp. Codes R. & Regs. tit. 7, § 701.3(i)(1)_. Further, defendants have proffered an email from former Eastern IGP Supervisor Thomas Mauro to defendant Russo that, in discussing plaintiff's grievance ECF-26217-15, states, "[t]his complaint was also forwarded to you to be logged in PREA book." Dkt. No. 174-14 at 159. Defendants also proffer a memorandum from the director of the IGP to the Office of Special Investigations ("OSI") stating that plaintiff's grievance alleging sexual harassment was being investigated by OSI. _See_ Dkt. No. 174-12 at 50. Thus, because official documentation exists that plaintiff reported his claims of sexual harassment to Eastern facility staff, the undersigned finds that plaintiff has exhausted his sexual harassment claim against C.O. Cruz.

Next, plaintiff seems to suggest that he was prevented from filing grievances because "DOCCS grievance employees contradict [the] grievance policies by intentionally failing to file and forward plaintiff's grievances in an attempt to prevent plaintiff from filing a success[ful] suit and cause the mishaps that[ are] occur[r]ing now." Pl. Opp. at 5. [*32] "Administrative remedies are not available if prison officials 'interfere[ ] with an inmate's pursuit of relief' by, for example, misinforming an inmate as to the applicability of the grievance process to the inmate's claims." _Kendall v. Cuomo, No.1:12-CV-3438 (ALC)(RLE), 2017 U.S. Dist._ _LEXIS 152227, 2017 WL 4162338, at *3 (S.D.N.Y. Sept. 19, 2017)_ (citing _Ross, 136 S.Ct. at 1860_); _see also_ _Veloz v. New York, 339 F. Supp. 2d 505, 515-16 (S.D.N.Y. 2004)_ (noting that "[w]hen an inmate's reasonable attempts to exhaust administrative remedies are impeded by a correctional officer" the remedy is unavailable). The undersigned concludes that there is no evidence in the record that any of the defendants interfered with plaintiff's pursuit of the grievance procedure. In fact, the record clearly establishes that plaintiff was able to access the grievance process as he filed five grievances while housed at Eastern. _See_ Black Decl. ¶ 6. Moreover, plaintiff does not allege what claims defendants allegedly prevented him from filing. Thus, plaintiff's bare assertions that defendants thwarted his attempts to file grievances are insufficient to render the grievance process unavailable.

Finally, plaintiff argues the filing of his amended complaint cured the exhaustion issue as his claims were exhausted at the time his amended complaint was filed. Pl. Opp. at 9-10. Plaintiff's [*33] argument lacks merit. It is well-settled that "a post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced." _Guillory v. Haywood, No. 9:13-CV-1564, 2015 U.S. Dist. LEXIS 6385, 2015 WL 268933, *11 (N.D.N.Y. Jan. 21, 2015)_ (citing _Kasiem v. Switz, 756 F. Supp. 2d 570, 575 (S.D.N.Y. 2010)_; _see Shepherd v. Lempke, No. 9:10-CV-1524, 2017 U.S. Dist. LEXIS 48054, 2017 WL 1187859, at *3 (N.D.N.Y. Mar. 30, 2017)_ (citing cases). Thus, plaintiff's filing of an amended complaint does not cure his exhaustion defect.

Accordingly, it is recommended that defendants' motion be denied as to plaintiff's sexual assault claim against C.O. Cruz as plaintiff has demonstrated that he exhausted his administrative remedies with respect to that claim. It is further recommended that defendants' motion as to all other claims be granted for failure to exhaust.[10]

---

[10] To the extent that the undersigned recommends dismissal of plaintiff's claims, those claims should be dismissed with prejudice as he would be barred by the three-year statute of limitations from reinstating this suit, and "[b]ecause this and any subsequently amended or reinstituted complaint is subject to dismissal for failure to exhaust administrative remedies, it would be futile to grant plaintiff leave to amend or allow him to reinstitute the suit." _Baez v. Kahanowicz, 469 F. Supp. 2d 171, 180 (S.D.N.Y. 2007)_; _see Bridgeforth v. Bartlett, 686 F. Supp. 2d 238, 240 (W.D.N.Y. 2010)_ ("Since the time limits for plaintiff to file an administrative appeal have long since passed,

2018 U.S. Dist. LEXIS 213705, *33

## IV. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 174) be **GRANTED IN PART**:

(1) Insofar as it seeks dismissal of plaintiff's *First Amendment* freedom of expression and free exercise claims against defendants Lee, Russo, Madison, Simmons, Sullivan, Wendland, Webbe, Bey, Vanacore, Waugh, Miller, Williamson, and Cruz for failure to exhaust

(2) Insofar as it seeks dismissal of plaintiff's *First Amendment* retaliation claims against defendants Simmons, Madison, Cruz, [*34] Williamson, Bey, Wendland, Kozak, Waugh, Webbe, Russo, Lee, Miller, Vanacore, Sullivan, Connor, and Barg for failure to exhaust,

(3) Insofar as it seeks dismissal of plaintiff's *First Amendment* interference with mail claims against defendants Calao, Jennings, and Labatte for failure to exhaust,

(4) Insofar as it seeks dismissal of plaintiff's claim that defendants Webbe, Simmons, and Lee denied him access to magazines for failure to exhaust,

(5) Insofar as it seeks dismissal of plaintiff's *Fourth Amendment* claims pursuant to a search/strip search and cell search against defendants Connor, Williamson, and Cruz for failure to exhaust,

(6) Insofar as it seeks dismissal of plaintiff's *Eighth Amendment* conditions of confinement claims against defendants Lee, Webbe, Simmons, Sullivan, and Henry for failure to exhaust,

(7) Insofar as it seeks dismissal of plaintiff's *Fourteenth Amendment* due process claims against defendants Lee, Webbe, Russo, Simmons, Wendland, and Sullivan for failure to exhaust,

(8) Insofar as it seeks dismissal of plaintiff's supervisory liability claims against defendants Lee and Annucci for failure to exhaust,

the motion be **GRANTED**, and plaintiff's claims be **DISMISSED** with prejudice; and it is further

**RECOMMENDED**, that defendants' Motion for [*35] Summary Judgment (Dkt. No. 174) be **DENIED IN PART**:

(1) Insofar as it seeks dismissal of plaintiff's *Eighth Amendment* sexual harassment claims against

administrative remedies are no longer available to him[.]").

C.O. Cruz,

the motion be **DENIED**; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Pursuant to *28 U.S.C. § 636(b)(1)* and *Local Rule 72.1(c)*, the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14)** *DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993)* (citing *Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 6(a), 6(e), 72*.[11]

Dated: December 18, 2018

Albany, New York

/s/ Christian F. Hummel

Christian F. Hummel

United States Magistrate Judge

---

End of Document

---

[11] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. *Fed. R. Civ. P. 6(d)*. If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. *§ 6(a)(1)(C)*.